**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| JOHN K. GOODROW, *individually and on behalf of all others similarly situated*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:11cv020 |
| FRIEDMAN & MACFADYEN, P.A. JOHNIE R. MUNCY, and F&M SERVICES, L.C. | ) ) ) ) | |
| Defendants. | ) ) | |

**(PROPOSED) SECOND AMENDED CLASS COMPLAINT**

COMES NOW the Plaintiff, John K. Goodrow, individually and on behalf of all others similarly situated, by counsel, and as for his Second Amended Class Complaint against the Defendants, he alleges as follows:

**INTRODUCTION**

1.     Defendants – a now defunct foreclosure mill – engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring the mill had the lowest cost structure that they could construct.  To accomplish these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a neutral trustee, lied to Commissioners of Accounts, consumer victims, and others regarding the custody and ownership of mortgage notes and compliance with Virginia's foreclosure requirements, and largely ignored federal law enacted to protect debtors against overly aggressive debt collectors. Accordingly, Plaintiff brings this class action for actual, statutory, treble, and punitive damages, declaratory and injunctive relief, costs, and attorneys' fees

pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"), the Fair Debt Collections Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA"), and for the Defendants' breach of fiduciary duty, civil conspiracy, and fraud.

## JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1367, and 15 U.S.C. § 1692k(d).

## PARTIES

3.      Plaintiff John K. Goodrow (hereafter "Goodrow" or "Plaintiff") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

4.      Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman") is a now defunct law firm with offices in Maryland, Virginia, and Washington D.C., the principal purpose of whose business was the collection of debts, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

5.      Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

6.      Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

7.      Defendants regularly collect or attempt to collect debts owed or due or asserted to be owed or due another, and each is a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(6).  Defendants moreover use one or more instrumentalities of

interstate commerce or the mails in a business the principal purpose of which is the enforcement of security interests.

## STATEMENT OF FACTS

8.      Defendants operate as a debt collecting and foreclosure conducting enterprise. Friedman is not simply a parent holding company of F&M.  Instead, all Defendants operate as parts of a single business operation.  Friedman provides management and decision-making and operates as the front for contact with the targeted debtor-consumers and the loan servicers, while F&M exists as an employee-less paper entity that acts as the "substitute trustee" under the target deeds of trust. Muncy also acts as a "substitute trustee" under the target deeds of trust, and is often the "substitute trustee" whose name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers.

9.      F&M does not operate independent of Friedman.  It does not have a separate office, separate management or separate business and income.   Instead, they are interrelated and inseparably operate as a single business operation.

10.      For example, the majority of "officers" of F&M are also employees of Friedman.

11.      F&M has little or no income that is not directly derived from Friedman.

12.      F&M does not have any employees.  Instead, it is a shell entity used by Friedman whose sole purpose is to act as the "substitute trustee" for the mortgage loans that are referred to Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which F&M purports to be a substitute trustee.

13.      F&M does not act as "substitute trustee" under any deeds of trust that have not been referred to Friedman for debt collection and/or foreclosure proceedings.

3

14.     Similarly, Muncy does not operate independent of Friedman, but acts as "substitute trustee" only for those deeds of trust that have been referred to Friedman for collection and/or foreclosure proceedings.

15.     Additionally, Muncy is also an attorney who was employed by Friedman at the time he was named as "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

16.     Friedman, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors. Friedman directs the actions of the personnel who interact with the debtors and with the loan servicers whose mortgage loans are referred to Friedman for debt collection or foreclosure proceedings.

**Defendants Are Debt Collectors**

17.     Defendant Friedman is a law firm whose practice is focused on the collection of debts.

18.     Defendants advertise that they provide loss mitigation, bankruptcy, and foreclosure services to creditors[1].

19.     Defendants regularly collect home loan debts, bringing Defendants' collection activities within the purview of the FDCPA. 15 U.S.C. § 1692a(5).

20.     Defendants regularly demand payment from consumers of claimed arrearages and provide to consumers reinstatement quotes and itemizations of amounts they are attempting to collect

21.     Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt and any information obtained will be used for that purpose" and/or that the

---

[1] *See* http://www.fmlaw.com/fmlaw.html (last visited July 23, 2011).

4

communication is from a debt collector, the disclosures that the FDCPA, at 15 U.S.C. § 1692e(11), requires that debt collectors provide in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure").

22.     Defendants regularly attempt to provide the verification of debts required by the FDCPA, at 15 U.S.C. § 1692g(b), upon written request from consumers.

### Defendants' Foreclosure Operation

23.     Defendants accomplish their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that have been referred to them by various loan servicers.

24.     The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Friedman.  For example, Friedman employees mail out the correspondence regarding the alleged foreclosure sale to consumers, purchase newspaper space for advertisements of the foreclosure sales, and interact with the loan servicers and consumers.

25.     In fact, all letters mailed to consumers are printed on Defendant Friedman's letterhead, regardless of which Defendant signed the letter, and the documents submitted to the various Circuit Courts purportedly by the "substitute trustee" are prepared by and often have a return address for Defendant Friedman.

26.     When the mortgage loans are referred to the Defendants, including the Plaintiff's mortgage loan in this case, they do not actually receive the original note prior to instituting foreclosure proceedings.

27.     In fact, rather than locating the entity that is the actual noteholder or requesting the original note from the servicer, Defendants use a false "lost note affidavit". Defendants' motive is to streamline the foreclosure process.

28.     Once the mortgage loans are referred to Defendant Friedman, Defendants create a "Substitution of Trustee" document, which they claim gives them the authority to conduct a foreclosure sale under the subject deeds of trust.

29.     The Substitution of Trustee document is false and improper in several respects.

30.     The document identifies the loan servicers as the "Noteholders". These statements are false.

31.     Defendants do this as an alternative to locating and identifying the actual noteholders in an effort to save time and costs with which they are able to conduct foreclosures.

32.     Defendants send this document to various third-party entities purporting to be the "noteholders" or loan servicers, via electronic wires or through the mail, at which time they are allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document is also allegedly notarized.

33.     Upon information and belief, the individuals who sign these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, do not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

34.     Other times, these substitute trustee documents are created and signed by Defendant Friedman and/or its employees as "attorney in fact" for the "noteholder". Therefore, Defendants essentially attempt to appoint themselves as substitute trustees.

35.     Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

36.     In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by the Defendants, presumably so the dates on the first and second pages match.

37.     In fact, in two hearings that took place in Baltimore, Maryland, the Defendants' employees, Kenneth MacFadyen and Daniel Menchel, admitted to the Defendants practice of having employees sign documents for other attorneys in the law firm.

38.     Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1     Q      It is your signature?
2     A      Yes.
3     Q      Okay, and is it notarized?
4     A      Yes.
5     Q      On what date is it notarized?
6     A      June 30th.
7     Q      By whom?
8     A      Joann Sottile.
9     Q      Did you appear in front of Ms. Sottile on
10    that date?
11    A      I did not appear in front of her. I gave her
12    stacks of files to notarize after I'd signed them.
13    Q      I'm going to show you what's again in the
14    same group, same group of exhibits, adjustable rate
15    note. And I'm going to show you -- point to a
16    signature at the top.
```

17     Can you tell me whose signature that is?
18     A     That's my signature for Kenneth MacFadyen. I
19     signed that after I stamped the note, after I review
20     it.
21     Q     Okay.
22     A     And signed Kenneth MacFadyen's name.
23     Q     And would there have been a reason why you
24     wouldn't have used your own name?
25     A     No. I think we had a stamp that had Kenneth
1     MacFadyen's name on it. And we used that particular
2     stamp on that particular file.

39.     Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No.

24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21     Q     Let me -- let me show you the order to
22     docket, suit, and affidavit pursuant to Maryland Rule
23     14-207(b). Your name is at the bottom. Do you know
24     who signed your name?
25     A     No, not to this one. It would have been
1     either Daniel Menchel or Jeffrey Huston.
2     Q     But you don't know?
3     A     I don't know which one signed that one.
4     Q     Okay, let me show you, in this case, a deed
5     of removal and appointment of successor trustees
6     which is liber 11916, page 250, second page -- and ask
7     you who signed that one.
8     A     That would be Daniel Menchel. That's not
9     under oath. I believe he had every right to do that.
10     Q     Okay, but that would be Daniel Menchel's
11     signature?
12     A     That's a Daniel Menchel signature.
13     Q     Okay, let me show you an Atlantic bond, and
14     it's bond number 108147, and ask who signed that.
15     A     That looks to me like a Jeffrey Huston
16     version of Kenneth MacFadyen.

40.     These documents are a legal nullity and do not actually authorize Defendants

F&M or Muncy to act as substitute trustees.

8

41.     After preparing the substitution of trustee documents, Defendants then begin the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

42.     Upon information and belief, these letters were form letters that the Defendants sent to every consumer from whom they attempted to collect a debt and for whom they attempted to conduct a foreclosure sale of their home.

43.     These letters all contain similar misrepresentations, including but not limited to, an incorrectly identified Noteholder of the loan.

44.     Consumers rely on these false documents when they subsequently contact or pay money to Defendants in attempt to save their homes or relocate their families, with the mistaken belief that Defendants were validly appointed substitute trustees and have the authority to sell their homes.

45.     Defendants then advertise the foreclosure sales in local newspapers throughout Maryland and Virginia, listing Defendant Friedman as the contact for information about the property and the foreclosure sale.

46.     These foreclosure sale notices are mailed to consumers throughout Virginia and Maryland using the United States post office.

47.     Once an alleged foreclosure sale occurs, Defendants create a "Trustees Deed" in which the alleged substitute trustees convey the subject property to a grantee. This grantee is often not the last and highest bidder at the foreclosure sale, but is instead a third party or subsequent purchaser.

48.     Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which are subsequently mailed to consumers or to the Circuit Courts across the

Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

**Defendants' Specific Conduct Regarding John K. Goodrow**

49.     Plaintiff borrowed $290,000 in order to refinance his mortgage, as evidenced by a promissory note dated October 26, 2005 ("the Note"). The Note was payable to First Horizon Home Loan Corporation (hereafter "First Horizon").

50.     The Note was secured by a Deed of Trust dated October 26, 2005 ("the Deed of Trust") and recorded in the Clerk's office of Fairfax County Circuit Court.

51.     Plaintiff's Note and Deed of Trust obligated him to repay First Horizon.

52.     Federal National Mortgage Association ("Fannie Mae") purchased Plaintiff's loan subsequent to its origination. As provided by the Deed of Trust, Fannie Mae provided no documentation of the sale to Plaintiff.

53.     After the sale of Plaintiff's loan to Fannie Mae, Met Life Home Loans (hereafter "Met Life") was given the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Fannie Mae. Among its responsibilities as the servicer, Met Life was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing responsibilities were governed by Fannie Mae's Single Family Servicing Guide (the "Guide").

54.      The contract obligated Met Life to follow Fannie Mae's instructions for servicing the loan, particularly the instructions detailed in the Guide. This contract, and the direction it

imposed on Met Life, had the effect of making Met Life an agent of Fannie Mae to perform servicing functions.

55.     The Guide gave Met Life, on behalf of Fannie Mae, the authority to commence foreclosure on Plaintiff's home in case of his default on his obligations under the Note and Deed of Trust.

56.     The Guide and other instructions from Fannie Mae detailed when Met Life was to commence proceedings and how they were to supervise foreclosure counsel. The Guide further provided instructions to Defendants on its requirements prior to commencing a foreclosure sale.

57.     Plaintiff regularly made his payments to Met Life until he began to experience financial difficulties.

58.     In the Summer of 2008, Plaintiff was no longer able to work due to a disability.

59.     In the Fall of 2008, Plaintiff contacted his mortgage servicer, Met Life, in an effort to pursue loss mitigation options while he awaited his Social Security disability payments.

**Defendants Are "Appointed" to Collect a Debt**

60.     In approximately 2008, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale.

61.     Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer from whom they attempted to collect a debt and conduct a foreclosure sale. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

62.     Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiff and the putative class members in their records.

63.    The subject line of the letters to Plaintiff and the putative classes was styled as if a lawsuit was pending or was to be filed.  However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff or the putative class members.

64.    In a letter sent to the Plaintiff dated October 9, 2008, Defendants stated that "MetLife Home Loans, a division of MetLife Bank NA" retained them to foreclose on Plaintiff's home due to his alleged failure to make mortgage payments.

65.    The letter stated that "MetLife Home Loans, a division of MetLife Bank NA" was the "current noteholder and/or servicer" of Plaintiff's loan.

66.    The subject line of letter -  "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow" - was styled as if a lawsuit was to be or had already been filed. However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff.

67.    The letter further stated that the Defendants did not have the original Note in their possession, but that they had evidence of the indebtedness.

68.    Defendants falsely claim that they have satisfied the requirements of Va Code 55-59.1 which provides in pertinent part the following:

§ 55-59.1. Notices required before sale by trustee to owners, lienors, etc.; if note lost.
                        …
B. If a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced and the beneficiary submits to the trustee an affidavit to that effect, the trustee may nonetheless proceed to sale, provided the beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon expiration of 14 days from the date of mailing of the notice. The notice shall be sent by certified mail, return receipt requested, to the last known address of the person required to pay the instrument as reflected in the records of the beneficiary and shall include the name and mailing address of the trustee.

69.     Upon information and belief, the beneficiary of the note had not submitted to the trustee an affidavit to the effect that the note or other evidence of indebtedness secured by the subject deed of trust is lost or for any reason could not have been produced.

70.     Defendants' letter also stated that Defendants "have been informed by the Lender that they will forward the original note to us." Upon information and belief, this statement was false.

71.     Defendants sent Plaintiff a letter dated November 24, 2008.

72.     This letter provided a payoff statement to Plaintiff. It stated that the amount owed on Plaintiff's account was $293,965.23, through December 9, 2008.

73.     Of the total amount allegedly due, Defendants claimed that Plaintiff owed $2,001.00 for "Current Foreclosure Attorney/Trustee Fees and Costs". The statement included various other amounts for fees and costs allegedly related to Plaintiff's account, including, among others, interest in the amount of $8,507.96, property inspection cost of $15.00, an appraisal fee of $95.00, and corporate advance balance of $0.00.

74.     Defendants sent a second letter to Plaintiff dated November 24, 2008 in which they provided a reinstatement quote necessary to avoid foreclosure, through December 9, 2008.

75.     Defendants second November 24, 2008 letter stated that Plaintiff must pay $14,441.27 in order to reinstate his loan and avoid foreclosure. Of the total amount allegedly due, Defendants claimed that Plaintiff owed $2,001.00 for "Current Foreclosure Attorney/Trustee Fees and Costs".

76.     However, this second November 24, 2008 correspondence included various fees and costs allegedly due that conflicted with Defendants first payoff statement. For example, this

statement included an inspection fee of $60.00, appraisal fee of $0.00, corporate advance balance of $15.00, and did not include any interest as being due.

77.     Defendants send similar conflicting accounting statements to consumers, and upon information and belief sent them to the putative class members. This is evidence of not only the Defendants' intentional misrepresentations to consumers, but also of their business model in which they simply conduct foreclosures with the fastest speed and lowest cost possible.

78.     This letter also stated that upon receipt of the necessary funds Friedman & MacFadyen "will take appropriate action to obtain a dismissal of the action" implying that there was a lawsuit filed against the Plaintiff.  Virginia does not have judicial foreclosures, and there is no "action" against the consumers.

79.     Defendants sent Plaintiff a letter dated January 11, 2010.

80.     The subject line of letter -  "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow" - was styled as if a lawsuit was to be or had already been filed. However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff.

81.     All of Defendants' letters to the Plaintiff also included one or both of the following notices:

> THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

> THIS IS A COMMUNICATION FROM A DEBT COLLECTOR THIS FIRM IS A DEBT COLLECTOR.

82.     None of Defendants' letters to the Plaintiff ever identified Fannie Mae as the creditor, the actual owner, beneficiary and/or holder of his mortgage loan.

14

83.     Defendants also systematically misrepresent the amount of fees and costs they are entitled to pursuant to their contract with Fannie Mae and under the Guide.

84.     In fact, Defendants routinely document substantially smaller fee and cost requests in their submissions to the Commissioner of Accounts for confirmation of foreclosure sales.

85.     Additionally, at times, Defendant Friedman signed the letters to the Plaintiff and putative class as Substitute Trustee. The substitute trustee document for the Plaintiff and the putative class never purported to appoint Defendant Friedman as substitute trustee.

86.     The various letters to the Plaintiff and putative class included an alleged Substitution of Trustee document.

87.     The Substitution of Trustee document that Defendants sent to the Plaintiff was dated October 8, 2008 and was subsequently filed in the Fairfax County Circuit Court on November 10, 2008.

88.     This document stated that "First Horizon Home Loans, a division of First Tennessee National Association" (hereafter "First Horizon") was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared.  Upon information and belief, this statement was false.

89.     The Substitution of Trustee document stated that the First Horizon had appointed Defendants F&M and Muncy as substitute trustees.

90.     Defendants' statement that First Horizon appointed them as substitute trustees is in direct contradiction to their October 9, 2008 letter that states they were appointed by MetLife as substitute trustees. One or both, of these statements is false.

91.     Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

92.     Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

93.     Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

94.     In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

95.     Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

96.     Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon.

97.     However, upon information and belief, Fannie Mae was the Noteholder at the time the Substitution of Trustee document was created. Therefore, First Horizon no longer possessed the authority to appoint a substitute trustee.

98.     The Substitution of Trustee document was purportedly signed by an "Assistant Vice President" of First Horizon, the claimed noteholder, and was thereafter allegedly notarized.

Even after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match.

99.     Although the Substitution of Trustees Deed is dated October 8, 2008, the date on the notary block is October 21, 2008.

100.     Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

101.     Fannie Mae is the actual noteholder of Plaintiff's loan.

102.     The Defendants failed to disclose that Fannie Mae was the creditor to whom the debt was owed and the noteholder of his loan in their correspondences to Plaintiff, and further falsely represented in the substitution of trustee document that "First Horizon Home Loans, a division of First Tennessee National Association" was the current noteholder of his loan.

**Defendants Were Fiduciaries Under the Deed of Trust**

103.     At all times relevant hereto, Defendants were "designated counsel" for loans owned by Fannie Mae.

104.     As designated counsel, Defendants had knowledge of Fannie Mae's foreclosure policies and procedures as outlined in the Guide and subsequent directives and agreed to abide by such policies and procedures.

105.     Plaintiff's Deed of Trust is in the nature of a contract and is to be construed according to its terms to the extent the terms are not in conflict with the requirements of law.

106.    Because Plaintiff had a Fannie Mae loan, certain requirements and procedures must be met prior to a foreclosure sale being authorized. These requirements were incorporated into Plaintiff's Deed of Trust.

107.    The Deed of Trust must be construed in conjunction with Fannie Mae's guidelines, which have the effect of applicable law.

108.    On April 28, 2010, Fannie Mae amended its Servicing Guide to address procedural requirements for foreclosures for loans owed by Fannie Mae. The Guide stated that the new requirements were "particularly important and material to Fannie Mae's ongoing effort to keep borrowers in their homes and to reduce credit losses."

109.    The Guide states "Fannie Mae requires the servicer and the foreclosure attorney (or trustee) to interact throughout the conduct of foreclosure proceedings." Some of this required interaction includes:

> The servicer must submit a complete referral package to the selected attorney (or trustee). The referral package must include mortgage loan status data (from *Exhibit 1: Mortgage Loan Status Data for Foreclosure Proceedings*) and the documentation the attorney (or trustee) needs to conduct foreclosure proceedings.
>       . . . .
>
> The attorney (or trustee) will acknowledge receipt of the referral package (and indicate whether or not it is complete) within two business days. The servicer must provide any required missing documentation to the attorney (or trustee) within five business days after it received the attorney's (or trustee's) request.

FANNIE MAE, FANNIE MAE 2010 SERVICING GUIDE UPDATE PART VII AND PART VIII 801-73–74 (April 2010).

110.    As detailed above, Defendant was required to acknowledge receipt of the referral package from Plaintiff's servicer within two business days. In this acknowledgment, Defendants were required to indicate any documents they needed to conduct the foreclosure, which would

have included either the original note or the lost note affidavit pursuant to Virginia Code § 55-59.1(B).

111.    Specifically, Virginia Code § 55-59.1(B) provides that the trustee must either possess the original note or a lost note affidavit from the beneficiary must be provided to the homeowner.

112.    Upon information and belief, Defendants were aware of this requirement for loans owed by Fannie Mae, but insisted on instituting foreclosure proceedings against homeowners without obtaining the documents needed to conduct the foreclosure proceedings.

113.    These practices and procedures were adopted by Defendants to blatantly ignore its duties under the Plaintiff's Deed of Trust, the Fannie Mae Servicing Guidelines incorporated into the Deed of Trust, and Virginia law.

114.    Defendants claimed that they were appointed substitute trustees under Plaintiff's Deed of Trust.

115.    However, at no time did the alleged Substitute Trustees, Defendants F & M Services and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

116.    Virginia law provides that a trustee under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them.

117.    Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Muncy was employed by Defendant Friedman, and thus none of these parties is an impartial or neutral "substitute trustee."

118.    In fact, Defendant Muncy has consistently maintained that he and the law firm that he works for each have an attorney-client relationship with every possible entity involved – the supposed investors, noteholders and servicers – on the loans that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his interactions with those entities at a deposition, citing the attorney-client privilege as the basis for not disclosing such information:

> 9      Q    Okay.  At the time you sent this letter,
> 10   what evidence of the indebtedness did you have?
> 11      A    We had the information contained in the
> 12   referral, not limited to this header document that you
> 13   have gone through, Exhibit 3.
> 14      Q    What other information did you have in the
> 15   referral?
> 16          MR. BIONDI:  I'm going to object to
> 17   attorney/client privilege.  The referral would include
> 18   instructions and requests for advice from a client to
> 19   Mr. Muncy or lawyers in his firm.
> 20          **MS. KELLY:  So you're instructing him not**
> 21   **to answer obviously?**
> 22          **MR. BIONDI:  Yes.**
> 23          MS. KELLY:  Just to clarify, are you
> 24   instructing Mr. Muncy not to answer regarding anything
> 25   else that may be in the referral documents?
>
> 1          MR. BIONDI:  You had asked what other
> 2   information was communicated to Mr. Muncy, who's the
> 3   attorney at Friedman & MacFadyen, by the clients,
> 4   which is Met Life Home Loans.
> 5          MS. KELLY:  In the referral.
> 6          MR. BIONDI:  In the referral, which I
> 7   don't know what could be in there, whether there's
> 8   going to be advice, request for advice, instructions.
> 9   Those matters are reasonably to be anticipation of
> 10   litigation at this point.  I'm sorry.  Take that back.
> 11   Not litigation.  But it's definitely part of the
> 12   attorney/client relationship and the purpose of the
> 13   representation conducting the foreclosure.

---

> 16      Q    What instructions did you receive from

17   First Horizon regarding Mr. Goodrow's mortgage loan?
18          **MR. BIONDI:  Don't answer that question.**
19   **Attorney/client privilege.**
21      Q    Did you communicate with First Horizon to
22   verify that they were the noteholder of Mr. Goodrow's
23   mortgage loan?
24          MR. BIONDI:  Wait a minute.  Same
25   objection.
1   BY MS. KELLY:
2      Q    Did you communicate with Met Life at all
3   to verify who the noteholder was regarding
4   Mr. Goodrow's mortgage loan?
5          MR. BIONDI:  I think I have the same
6   objection.  You're trying to avoid the substance, but
7   you're trying to substitute the substance into the
8   question and then asking the question.
10      Q    Did you communicate with Fannie Mae
11   regarding their investment in Mr. Goodrow's mortgage
12   loan?
13          MR. BIONDI:  I object.  Attorney/client
14   privilege.
16      Q    Did you communicate with Fannie Mae at all
17   regarding their ownership interest in Mr. Goodrow's
18   mortgage loan?
19          MR. BIONDI:  Same objection.

119.   The Defendants therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust. Upon information and belief, Defendants also breached this fiduciary duty that they owed to the putative class members

120.   Further, upon information and belief, Defendants have a copy of Plaintiff's Deed of Trust and were aware that Fannie Mae owned Plaintiff's loan and that they and the servicer were required to comply with the Fannie Mae Servicing Guidelines, which were incorporated into Plaintiff's Deed of Trust.

121.   Because of this, Defendants, as fiduciaries, had a duty to ensure that these requirements were followed prior to the acceleration of the mortgage loan that was subject to the Deed of Trust.

122.    Despite this express mandate in the Deed of Trust, prior to conducting the foreclosure sale, aside from a one-page referral form, Defendants did not require *any* documents from the lender, servicer or noteholder confirming that the Fannie Mae Servicing Guidelines or the relevant regulations have been followed.

123.    As alleged substitute trustees, Defendants had a fiduciary duty under the Deed of Trust to ensure that the prerequisites to acceleration and foreclosure were followed prior to initiating foreclosure.

124.    Defendants breached this duty to Plaintiff and the putative class members.

### Mr. Goodrow Retains an Attorney

125.    Plaintiff retained the services of Legal Services of Northern Virginia, to represent him with respect to Defendants' collection efforts.

126.    Defendants knew that Plaintiff had retained the services of an attorney to represent him.

127.    Plaintiff's attorney communicated in writing with Defendants on behalf of Plaintiff regarding the alleged debt that Defendants were attempting to collect from him.

128.    By way of example, Plaintiff's attorney sent a letter dated December 18, 2008 letter to Defendants advising of counsel's representation of Plaintiff in connection with Defendants' attempts to collect the subject debt.

129.    Defendants received this letter.

130.    For a time after receiving this letter, Defendants communicated orally and in writing with Plaintiff's attorney with respect to the subject debt.

131.    By way of example, Defendants sent a letter dated December 23, 2008 to Plaintiff's attorney in connection with Defendants' attempts to collect the subject debt.

132.    Although the Defendants knew that Mr. Goodrow was represented by an attorney with regard to his unpaid mortgage and knew the attorney's name and address, they nevertheless subsequently communicated directly with him with respect to the subject debt.

133.    By way of example, Defendants sent a letter dated January 11, 2010 letter directly to Plaintiff in connection with Defendants' attempts to collect the subject debt.

134.    The January 11, 2010 correspondence included a copy of the Substitution of Trustees Deed, with the same misrepresentations as discussed above.

135.    The subject line of the January 11, 2010 letter that Defendants sent directly to Plaintiff is:  "MetLife Home Loans a division of MetLife Bank NA v. John K. Goodrow"

136.    The January 11, 2010 letter states that Plaintiff's home will be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advises Plaintiff to "contact the undersigned immediately" should he "desire to avoid the necessity of a foreclosure sale and satisfy (his) obligation.

137.    The January 11, 2010 correspondence also states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**Defendants Foreclose on Plaintiff's Home**

138.    Defendants' correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

23

139.    The foreclosure sale allegedly took place on February 3, 2010 and a trustee's deed dated February 3, 2010 (hereafter "the Trustee's Deed"), which purported to convey the property to a Grantee, was subsequently filed in the Fairfax County Circuit Court on February 16, 2010.

140.    The Trustee's Deed stated that "First Horizon Home Loan, A Division of First Tennessee Bank National Association" was the current Noteholder and Defendants Muncy and F&M were the current Substitute Trustees. These statements were false.

141.    Upon information and belief, the individuals who signed the sworn statements on the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

142.    Furthermore, according to Plaintiff's Deed of Trust, in the event of a foreclosure sale, the Trustee is required to deliver title to the highest bidder at the sale.

143.    Trustees failed to deliver the Trustee's Deed conveying property to the highest bidder, and instead conveyed the property to a third party who was not the highest bidder at the auction.

144.    Furthermore, in the Trustee's Deed, the Defendants represent that Fannie Mae is an affiliate of First Horizon Home Loans, a Division of First Tennessee Bank National Association". This statement was false.

145.    Fannie Mae is not an affiliate of First Horizon Home Loans.

146.    Upon information and belief, the Defendants thereafter filed a foreclosure accounting statement with the Commissioner of Accounts for Fairfax County.

147.    Upon information and belief, the Defendants made certain misrepresentations about the accounting of the proceeds obtained from the foreclosure sale.

148.    Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents, which the Commissioner relied on when it thereafter approved the accounting of the foreclosure sale.

**Count I:  Trustees' Breach of Fiduciary Duties (Fannie Mae Loans)**
**CLASS CLAIM**

149.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

150.    This matter is also brought as a class action for a "Fannie Mae" class, initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan owned by Fannie Mae for whom Defendants claimed they were appointed substitute trustees and attempted to conduct a foreclosure sale of the real property within the four years prior to the filing of the Complaint, and for whom 1) the records of the noteholder or servicer did not contain any record of receipt and acknowledgement of receipt of a referral package from the servicer to Defendants, and/or 2) the Defendants failed to obtain the original note or a lost note affidavit prior to the date of such foreclosure.  Excluded from the class are employees of the Defendants.

151.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

152.    Plaintiff's proposed class counsel has a substantial number of correspondences and Deed of Appointment of Substitute Trustee mailed to consumers by the Defendants. Plaintiff's proposed class counsel also has a substantial number of Trustees Deeds and Reports filed with the Commissioner Accounts by the Defendant.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

153.    Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished well more than 50 foreclosures as designated Fannie Mae counsel during the last 4 years.

154.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants' foreclosure upon a Deed of Trust is lawful where the Defendants and/or servicer have not otherwise complied with Fannie Mae regulations and governing law; (b.) whether Fannie Mae guidelines and governing law are incorporated within the Defendants' Deed of Trust duties; (c.) what remedies are available for such a breach of fiduciary duty.

155.    The claims of Plaintiff are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

156.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

157.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper. Prosecuting separate actions by or against individual class members would

create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

158.   Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

159.   Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.   As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be

resolved at one time.  One win for one consumer would set the law as for every similarly situated consumer.

160.     Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

161.     Defendants breached their fiduciary duties by undertaking the foreclosure sale and the transfer of the real property of the Plaintiff and the putative class without compliance with the Deed of Trust. Specifically, Defendants foreclosed upon the real property when the necessary prerequisite of compliance with Fannie Mae's guidelines and law had not been met.

162.     Under the Deed of Trust, Defendants' obligations are subject to and governed by "Applicable Law," including the Fannie Mae Servicing Guidelines.

163.     Defendants repeatedly breached their fiduciary duty to Plaintiff and the putative class including, but not limited to, the following conduct:

a.      By failing to ensure they received the appropriate foreclosure data from Plaintiff's and the putative class's servicer and the necessary documents to conduct the foreclosure;

b.      By consistently failing to acknowledge receipt of the referral package and failing to request the necessary foreclosure documents in order to expedite the foreclosure process on Plaintiff and the putative class;

c.      By failing to obtain a complete referral package, including the documents required to conduct a foreclosure under Virginia law prior to conducting the foreclosure; and

      d.    By conducting the foreclosure even though the preconditions to foreclosure had not been satisfied under the terms of the Notes and Deeds of Trust.

164.    As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

### Count II:  Fraud
### INDIVIDUAL CLAIM

165.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

166.    Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

167.    Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Fairfax County Circuit Court, including but not limited to, that First Horizon was the current Noteholder of Plaintiff's mortgage.

168.    Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of First Horizon purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

169.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of

the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or legal standing.

170.     Defendants made a material false representation in Plaintiff's Trustee's Deed filed in the Fairfax County Circuit Court, including but not limited to, that First Horizon was the current Noteholder of Plaintiff's mortgage.

171.     Upon information and belief, Defendants further misrepresented that the individual who signed the Trustee's Deed on behalf of Defendant Muncy as Substitute Trustee purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

172.     Upon information and belief, Defendants also misrepresented that the individual who notarized the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

173.     In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee and that the actual Note was lost or unavailable such as to permit Defendants' use of Va. Code § 55-59.1.

174.     In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Met Life was the current Noteholder of Plaintiff's mortgage.

175.     Defendants intentionally made these misrepresentations to Plaintiff with the intent to mislead him into believing these representations were true.

176.    Plaintiff relied on these misrepresentations to his detriment. He acceded to what he became convinced was a lawful appointment of trustee and then a lawful foreclosure. Eventually, he did not put up a legal fight to either the foreclosure or the loss of his home.

177.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

178.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

179.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

## Count III:  Civil Conspiracy
### INDIVIDUAL CLAIM

180.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

181.    Plaintiff alleges a cause of action against Defendants for civil conspiracy under the common law of the Commonwealth of Virginia.

182.    Defendants, separate entities and/or persons, along with Met Life, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted or actual collection of an alleged debt and/or the unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

183.    Furthermore, Defendants accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the use of falsified signatures and perjurous statements in their correspondence to Plaintiff and in court filings in violation of Virginia and Federal law.

184.    Defendants' unlawful purpose was to use such fraudulent signatures and sworn statements to make a false statement to the Circuit and Civil Courts – one that the parties knew was false when made and to proceed in the collection of a debt and foreclosure that Defendants knew was not in compliance with the law.

185.    Upon information and belief, the Defendants engaged in these actions with Met Life, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from Met Life for the speed with which they are able to conduct foreclosures.

186.    Defendants conducted themselves in this manner with the intent to defraud and with legal and actual malice as to the Plaintiff and to the Courts.  Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

187.    As a result of Defendants' conduct in furtherance of the conspiracy, Plaintiff suffered injury and is entitled to recover damages including, but not limited to, actual damages and costs against Defendants.

188.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

### Count IV: Violation of 18 U.S.C. § 1961
### Racketeer Influenced and Corrupt Organizations Act
### Class Claim

189.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

190.    This matter is brought as a class action on behalf a second class – the "RICO Class" - initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants attempted a foreclosure upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

191.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

192.    Plaintiff's proposed class counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiff's proposed class counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or filed with the Commissioners of Accounts.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

193.    Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished well more than 50 Fannie Mae foreclosures during the last four years.

194.    Plaintiff's counsel alleges that Defendants uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all foreclosure files.  His counsel assumes that this may not have always been the case – at some time in the past Defendants' attorneys may have actually signed documents, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee.  However, they are currently unable to determine when this lawful conduct ended.

195.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants constituted a RICO enterprise; (b.) whether Defendants'

falsification of foreclosure documents constituted mail or wire fraud; (c.) what remedies are available for such a RICO violation.

196.    The claims of Plaintiff are typical of those of the class members. All are based on the same facts and legal theories. The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

197.    The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

198.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

199.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

200.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil

Procedure is also appropriate in that:

a.      As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's. The issues at the core of this case are classwide and should be resolved one time. One win for one consumer would set the law as for every similarly situated consumer.

201.    The Defendants and the mortgage loan servicers (including, by example, Met Life) constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

202.    All of these servicers and each Defendant were engaged for a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

203.    Further, the loan servicers and the Defendants existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law. That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers'

homes.

204.    The loan servicers are separate entities and each operates in its own self-interest. They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for the profit of both the Defendants and the servicers.

205.    The racketeering proceeds obtained by Defendant F&M and/or Muncy as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

206.    The enterprise had an effect on interstate commerce. For example, the transmission of the fraudulent substitute trustee documents and lost note affidavits through the United States mail system and through the wires for ultimate transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Additionally, loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments.

207.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and lost note affidavits. It began sometime as early as 2009 and

continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

208.    The conduct and actions of the Defendants as alleged herein – creating fraudulent affidavits for use in collection lawsuits – violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  They involved an ongoing scheme to defraud consumers and courts, and they used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

209.    Defendants used this practice with respect to numerous documents that it caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants, and all of these contain the same fraudulent documents.

210.    Further, Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants regular way of conducting business.

211.    The Plaintiff, the Circuit Courts, and the Commissioners of Accounts relied on the fraudulent documents when they mistakenly believed that the Defendants were validly appointed substitute trustees who conducted a proper foreclosure sale.

212.    By means of example only, Plaintiff and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise. The Commissioners of Accounts approved the sales and the accounting of the sales based on the fraudulent documents that the Defendants submitted.

213.    Plaintiff and putative class members were injured as a result of the Defendants'

violations of 18 U.S.C. § 1962 and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

214.    Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

## Count V: Violations of the FDCPA, 15 U.S.C. § 1692 et seq.
## CLASS CLAIM

215.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

216.    Plaintiff pleads Defendants violations of the FDCPA pursuant to 15 U.S.C. §1692c, §1692e, §1692f, and §1692g:

a.     15 U.S.C. § 1692c prohibits a debt collector from communicating directly with a consumer if it is aware that the consumer is represented by an attorney.

b.     Generally, § 1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' §1692e also provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of §1692e prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

> **(2)** The false representation of--
> **(A)** the character, amount, or legal status of any debt; or
> **(B)** any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> **...**
> **(5)** The threat to take any action that cannot legally be taken or that is not intended to be taken.
> **...**

> **(10)** The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

> 15 U.S.C. § 1692e

c.        Section 1692f prohibits generally the use of "unfair or unconscionable means to collect or attempt to collect any debt", and specifically in relevant part:

> **(1)** The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by agreement creating the debt or permitted by law.
> **...**
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –
>> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

> 15 U.S.C. §1692f

d.        A debt collector must provide a consumer with the name of the creditor to whom the debt is owed pursuant to Section 1692g:

> a.  Notice of debt; contents.
> Within five days after the intial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the intial communication or the consumer has paid the debt, send the consumer a written notice containing –
> **...**
> **(2)** the name of the creditor to whom the debt is owed.

217.    For their class claim brought pursuant to the FDCPA, the Plaintiffs proposed a class initially defined as follows: [2]

---

[2] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert.denied*, 125 S.Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc.*, 236 F.R.D.

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

218.    Defendants violated §1692e and §1692f as to each class member by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters to the class members.

219.    Plaintiff alleges this class definition because all or substantially all of the class members would have received correspondence from the Defendants with a subject line that represented or implicitly threatened that a lawsuit was or would be filed.

220.    Plaintiff also alleges a "Lost Note" subclass initially defined as:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the mortgage note was lost or otherwise unavailable within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

221.    Defendants violated §1692e as to the Lost Note subclass because they forwarded correspondence to consumers that falsely represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1.

---

652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

222.  Plaintiff also alleges a "Servicer as Creditor" subclass of consumers initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

223.  Defendants violated §1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed.

224.  Plaintiffs also allege an "Inconsistent Demand for Payment" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as conflicting loan payoff and/or reinstatement calculation(s) within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

225.  Defendants violated §1692e and §1692f as to the Inconsistent Demand for Payment subclass because they made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers.

226.  Plaintiffs also allege an "False Affiliate" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured

payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as a letter that misrepresented they or the servicer was "affiliated" with another, separate entity within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

227.    Defendants violated §1692e as to the False Affiliate subclass because they made false statements that Defendants or servicers were affiliated with entities from which they were separate and distinct/

228.    Plaintiffs also allege an "Failure to Identify Creditor" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and to whom the Defendants failed to identify the creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

229.    Defendants violated §1692g as to the Failure to Identify Creditor subclass because in their initial correspondences to consumers, they failed to identify the creditor to whom the debt was owed.

230.    Plaintiffs allege an "False Statement About Fees" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan where Fannie Mae was the creditor, beneficiary, investor and/or noteholder and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and in that letter or another, demanded payment of fees in excess of $600.00 within the one year period preceding the filing date of the original Complaint in this matter.   Excluded from the subclass are employees of the Defendants.

42

231.    Defendants violated §1692e and §1692f as to the False Statement About Fees subclass because they made a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated their fees would be capped at $600.00.

232.    Plaintiffs also allege a "Communicating with Represented Party" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as a letter at a time when the Defendants knew the consumers were represented by an attorney within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

233.    Defendants violated §1692c as to the Communicating with a Represented Party subclass because they communicated directly with homeowners who they knew were represented by an attorney.

234.    Plaintiffs allege a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home that enclosed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

235.    Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer

rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustees (and/or where the signatures were forged altogether).

236.    Plaintiffs' counsel has reviewed a substantial number of correspondences and Deeds of Appointment of Substitute Trustee mailed to consumers by the Defendants. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

237.    Defendants use the same form correspondences that they send to consumers across Virginia. These form correspondences include the initial correspondences to consumers, lost note letters, substitution of trustees deeds, notices of sale, payoff statements and reinstatement quotes.

238.    Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

239.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants routinely misrepresented the identity of the creditor, amount, legal status, or character of the debts that they were attempting to collect from Plaintiffs and the putative class members (b.)  whether the Defendants falsely represented the compensation that they could lawfully receive as a result  of these attempted and/or actual foreclosures (c.)  whether the Defendants threatened to take or took action that could not legally be taken (d.)  whether the Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiffs and the putative class members (e) whether Defendants communicated directly with consumers who they knew were represented by an attorney and (f) whether

Defendants could lawfully foreclose upon Plaintiffs and the putative class members prior to meeting the requirements of the Deed of Trust and/or other regulations and governing law .

240.    The claims of Plaintiffs are typical of those of the class members.  All are based on the same facts, form documents and legal theories.  The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiffs' claims rise or fall.

241.    The Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative classes and have accepted such responsibilities.

242.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

243.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

244.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.   Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.   Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. The issues at the core of this case are class wide and should be resolved at one time.   One win for one consumer would set the law as for every similarly situated consumer.

245.    As a result, Plaintiffs and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the putative class members, respectfully moves for class certification and for actual and compensatory, statutory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to

RICO and the FDCPA; for his attorneys' fees and costs; and such other relief the Court deems

just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**JOHN K. GOODROW**

By_____/s/_____
Of Counsel

Matthew J. Erausquin, VSB#65434
Janelle E. Mason, VSB#82389
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd., Ste. 600
Alexandria, VA 22314
(703) 273-7770 - Telephone
(888) 892-3512 – Facsimile
matt@claleglal.com
janelle@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

J. Chapman Petersen, Esq., VSB # 37225
Kristi Cahoon Kelly, Esq., VSB #72791
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
(703) 277-9774
(703) 591-9285 Facsimile
jpetersen@smillaw.com
kkelly@siplfirm.com

Leonard A. Bennett, VSB #37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net
srotkis@clalegal.com

*Counsel for Plaintiff*

Richard John Rubin
1300 Canyon Road
Santa Fe, NM 87501
Telephone (505) 983-4418
Facsimile (505) 983-2050
*PRO HAC VICE*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Andrew Biondi
Cullen Dennis Seltzer
Sands Anderson, PC
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

Andrew Todd Rich
Friedman & MacFadyen, PC
1601 Rolling Hills Drive
Suite 125
Richmond VA  23229
trich@fmlaw.com

Douglas Pendleton Rucker, Jr.
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
drucker@sandsanderson.com

*Counsel for the Defendants*

_____/s/_____
Susan M. Rotkis, VSB #40693
*Attorney for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
srotkis@clalegal.com