## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ADAM MBUNDURE, *individually and on*
*behalf of all others similarly situated*,

                Plaintiff,

v.                                       Civil Action No. 3:11cv489

FRIEDMAN & MACFADYEN, P.A.,
F & M SERVICES, L.C.,
and
JOHNIE R. MUNCY,

                Defendants.

### (PROPOSED) FIRST AMENDED CLASS COMPLAINT

COMES NOW the Plaintiff, Adam Mbundure, individually and on behalf of all others similarly situated, by counsel, and as for his First Amended Class Complaint against the Defendants, he alleges as follows:

### INTRODUCTION

1.     Defendants – a now defunct foreclosure mill – engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring the mill had the lowest cost structure that they could construct.  To accomplish these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a neutral trustee, lied to Commissioners of Accounts, consumer victims, and others regarding the custody and ownership of mortgage notes and compliance with Virginia's foreclosure requirements, and largely ignored federal law enacted to protect debtors against overly aggressive debt collectors. Accordingly, Plaintiff brings this class action alleging claims for actual, statutory, treble, and punitive damages, declaratory and injunctive relief, costs, and

attorneys' fees brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §1961, *et seq.* ("RICO"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*

("FDCPA"), and for the Defendants' civil conspiracy, and fraud.

## JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1367, and 15 U.S.C. §

1692k(d).

## PARTIES

3.      Plaintiff Adam Mbundure (hereafter "Mbundure" or "Plaintiff") is a natural

person who resides in Virginia.  At all times relevant hereto, Plaintiff was a consumer within the

meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

4.      Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman and MacFadyen")

is a now defunct law firm with offices previously in Maryland, Virginia, and Washington D.C.,

the principal purpose of whose business was the collection of debts, and was located at 1601

Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

5.      Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company,

the principal purpose of whose business is the collection of debts and who purported to be a

Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive,

Surry Building, Suite 125, Richmond, Virginia 23229.

6.      Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by

Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of

Trust.

7.      Defendants regularly collect or attempt to collect debts owed or due or asserted to

be owed or due another, and each is a "debt collector" within the meaning of the FDCPA, as

2

defined at 15 U.S.C. § 1692a(6).  Defendants moreover use one or more instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the enforcement of security interests.

## STATEMENT OF FACTS

8.     Defendants operate as a debt collecting and foreclosure conducting enterprise. Friedman is not simply a parent holding company of F&M.  Instead, all Defendants operate as parts of a single business operation.  Friedman provides management and decision-making and operates as the front for contact with the targeted debtor-consumers and the loan servicers, while F&M exists as an employee-less paper entity that acts as the "substitute trustee" under the target deeds of trust. Muncy also acts as a "substitute trustee" under the target deeds of trust, and is often the "substitute trustee" whose name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers.

9.     F&M does not operate independent of Friedman.  It does not have a separate office, separate management or separate business and income.   Instead, they are interrelated and inseparably operate as a single business operation.

10.     For example, the majority of "officers" of F&M are also employees of Friedman.

11.     F&M has little or no income that is not directly derived from Friedman.

12.     F&M does not have any employees.  Instead, it is a shell entity used by Friedman whose sole purpose is to act as the "substitute trustee" for the mortgage loans that are referred to Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which F&M purports to be a substitute trustee.

13.     F&M does not act as "substitute trustee" under any deeds of trust that have not been referred to Friedman for debt collection and/or foreclosure proceedings.

3

14.     Similarly, Muncy does not operate independent of Friedman, but acts as "substitute trustee" only for those deeds of trust that have been referred to Friedman for collection and/or foreclosure proceedings.

15.     Additionally, Muncy is also an attorney who was employed by Friedman at the time he was named as "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

16.     Friedman, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors. Friedman directs the actions of the personnel who interact with the debtors and with the loan servicers whose mortgage loans are referred to Friedman for debt collection or foreclosure proceedings.

## Defendants are Debt Collectors

17.     Defendant Friedman is a law firm whose practice is focused on the collection of debts.

18.     Defendants advertise that they provide loss mitigation, bankruptcy, and foreclosure services to creditors[1].

19.     Defendants regularly collect home loan debts, bringing Defendants' collection activities within the purview of the FDCPA. 15 U.S.C. § 1692a(5).

20.     Defendants regularly demand payment from consumers of claimed arrearages and provide to consumers reinstatement quotes and itemizations of amounts they are attempting to collect.

21.     Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt and any information obtained will be used for that purpose" and/or that the

---

[1]  *See* http://www.fmlaw.com/fmlaw.html (last visited July 23, 2011).

communication is from a debt collector, the disclosures that the FDCPA, at 15 U.S.C. § 1692e(11), requires that debt collectors provide in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure").

22.     Defendants regularly attempt to provide the verification of debts required by the FDCPA, at 15 U.S.C. § 1692g(b), upon written request from consumers.

**Defendants' Foreclosure Operation**

23.     Defendants accomplish their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that have been referred to them by various loan servicers.

24.     The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Friedman.  For example, Friedman employees mail out the correspondence regarding the alleged foreclosure sale to consumers, purchase newspaper space for advertisements of the foreclosure sales, and interact with the loan servicers and consumers.

25.     In fact, all letters mailed to consumers are printed on Defendant Friedman's letterhead, regardless of which Defendant signed the letter, and the documents submitted to the various Circuit Courts purportedly by the "substitute trustee" are prepared by and often have a return address for Defendant Friedman.

26.     When the mortgage loans are referred to the Defendants, including the Plaintiff's mortgage loan in this case, they do not actually receive the original note prior to instituting foreclosure proceedings.

27.     In fact, rather than locating the entity that is the actual noteholder or requesting the original note from the servicer, Defendants use a false "lost note affidavit". Defendants' motive is streamline the foreclosure process.

28.     Once the mortgage loans are referred to Defendant Friedman, Defendants create a "Substitution of Trustee" document, which they claim gives them the authority to conduct a foreclosure sale under the subject deeds of trust.

29.     The Substitution of Trustee document is false and inproper in several respects.

30.     The document identifies the loan servicers as the "Noteholders". These statements are false.

31.     Defendants do this as an alternative to locating and identifying the actual noteholders in an effort to save time and costs with which they are able to conduct foreclosures.

32.     Defendants send this document to various third-party entities purporting to be the "noteholders" or loan servicers, via electronic wires or through the mail, at which time they are allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document is also allegedly notarized.

33.     Upon information and belief, the individuals who sign these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, do not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

34.     Other times, these substitute trustee documents are created and signed by Defendant Friedman and/or its employees as "attorney in fact" for the "noteholder". Therefore, Defendants essentially attempt to appoint themselves as substitute trustees.

35.     Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

36.     In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by the Defendants, presumably so the dates on the first and second pages match.

37.     In fact, in two hearings that took place in Baltimore, Maryland, the Defendants' employees, Kenneth MacFadyen and Daniel Menchel, admitted to the Defendants' practice of having employees sign documents for other attorneys in the law firm.

38.     Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
 1     Q      It is your signature?
 2     A      Yes.
 3     Q      Okay, and is it notarized?
 4     A      Yes.
 5     Q      On what date is it notarized?
 6     A      June 30th.
 7     Q      By whom?
 8     A      Joann Sottile.
 9     Q      Did you appear in front of Ms. Sottile on
10     that date?
11     A      I did not appear in front of her. I gave her
12     stacks of files to notarize after I'd signed them.
13     Q      I'm going to show you what's again in the
14     same group, same group of exhibits, adjustable rate
15     note. And I'm going to show you -- point to a
16     signature at the top.
```

7

17    Can you tell me whose signature that is?
18    A      That's my signature for Kenneth MacFadyen. I
19    signed that after I stamped the note, after I review
20    it.
21    Q      Okay.
22    A      And signed Kenneth MacFadyen's name.
23    Q      And would there have been a reason why you
24    wouldn't have used your own name?
25    A      No. I think we had a stamp that had Kenneth
1     MacFadyen's name on it. And we used that particular
2     stamp on that particular file.

39.    Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No.

24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21    Q      Let me -- let me show you the order to
22    docket, suit, and affidavit pursuant to Maryland Rule
23    14-207(b). Your name is at the bottom. Do you know
24    who signed your name?
25    A      No, not to this one. It would have been
1     either Daniel Menchel or Jeffrey Huston.
2     Q      But you don't know?
3     A      I don't know which one signed that one.
4     Q      Okay, let me show you, in this case, a deed
5     of removal and appointment of successor trustees
6     which is liber 11916, page 250, second page -- and ask
7     you who signed that one.
8     A      That would be Daniel Menchel. That's not
9     under oath. I believe he had every right to do that.
10    Q      Okay, but that would be Daniel Menchel's
11    signature?
12    A      That's a Daniel Menchel signature.
13    Q      Okay, let me show you an Atlantic bond, and
14    it's bond number 108147, and ask who signed that.
15    A      That looks to me like a Jeffrey Huston
16    version of Kenneth MacFadyen.

40.    These documents are a legal nullity and do not actually authorize Defendants

F&M or Muncy to act as substitute trustees.

41.     After preparing the substitution of trustee documents, Defendants then begin the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

42.     Upon information and belief, these letters were form letters that the Defendants sent to every consumer from whom they attempted to collect a debt and for whom they attempted to conduct a foreclosure sale of their home.

43.     These letters all contain similar misrepresentations, including but not limited to, an incorrectly identified Noteholder of the loan.

44.     Consumers rely on these false documents when they subsequently contact or pay money to Defendants in attempt to save their homes or relocate their families, with the mistaken belief that Defendants were validly appointed substitute trustees and have the authority to sell their homes.

45.     Defendants then advertise the foreclosure sales in local newspapers throughout Maryland and Virginia, listing Defendant Friedman as the contact for information about the property and the foreclosure sale.

46.     These foreclosure sale notices are mailed to consumers throughout Virginia and Maryland using the United States post office.

47.     Once an alleged foreclosure sale occurs, Defendants create a "Trustees Deed" in which the alleged substitute trustees convey the subject property to a grantee. This grantee is often not the last and highest bidder at the foreclosure sale, but is instead a third party or subsequent purchaser.

48.     Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which are subsequently mailed to consumers or to the Circuit Courts across the

9

Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

**Defendants' Specific Conduct Regarding Adam Mbundure**

49.     Mr. Mbundure borrowed $280,000.00 for his mortgage, as evidenced by a promissory note ("Note"), dated March 29, 2004. The Note was payable to Riggs Bank, N.A.

50.     The Note was secured by a Deed of Trust dated March 29, 2004 and recorded in the Clerk's office of Circuit Court of Fairfax County.

51.     Mr. Mbundure's Note and Deed of Trust obligated him to repay Riggs Bank, N.A.

52.     On October 10, 2005, the Deed of Trust was allegedly assigned from Riggs Bank, N.A. to Mortgage Electronic Registration System, Inc. ("MERS") as nominee for PNC Bank, N.A. ("PNC Bank").

53.     At this time, the Deed of Trust was assigned a Mortgage Identification Number ("MIN") so that the servicing rights and ownership rights of the mortgage loan can be tracked electronically on MERS.

54.     Upon information and belief, at some point PNC Bank acquired both the ownership and servicing rights of the loan.

55.     Plaintiff made his monthly mortgage payments to PNC Bank until he began to experience financial difficulty.

**Defendants Are "Appointed" to Collect a Debt**

56.     Around August 2010, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale.

57.     Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer from whom they attempted to collect a debt and conduct a foreclosure sale. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

58.     Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiff and the putative class members in their records.

59.     In correspondence to Mr. Mbundure dated August 2, 2010, Defendants stated that Dovenmuehle Mortgage appointed them to foreclose on Mr. Mbundure's home due to his alleged failure to make mortgage payments.

60.     The subject line of Defendants' correspondence to Plaintiff was styled as if a lawsuit was to be or had already been filed.  However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff. In fact, Virginia does not have judicial foreclosures, and there is no "action" against consumers.

61.     For example, the subject line of the August 2, 2010, correspondence is "Dovenmuehle Mortgage. v. Adam Mbundure and Regina Mbundure."

62.     The August 2, 2010, correspondence also stated that Dovenmuehle Mortgage is the "holder/servicer" of the note.

63.     Defendants August 2, 2010 correspondence further stated that the Defendants did not have the original Note in their possession, but that they have evidence of the indebtedness.

64.     Defendants falsely claim that they had satisfied the requirements of Va Code 55-59.1 which provides in pertinent part the following:

> § 55-59.1. Notices required before sale by trustee to owners, lienors, etc.;
> if note lost.
> …

11

B. If a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced and the beneficiary submits to the trustee an affidavit to that effect, the trustee may nonetheless proceed to sale, provided the beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon expiration of 14 days from the date of mailing of the notice. The notice shall be sent by certified mail, return receipt requested, to the last known address of the person required to pay the instrument as reflected in the records of the beneficiary and shall include the name and mailing address of the trustee.

65.     Upon information and belief, the beneficiary of the note had not submitted to the trustee an affidavit to the effect that the note or other evidence of indebtedness secured by the subject deed of trust is lost or for any reason could not have been produced.

66.     Instead, Defendants' August 2, 2010 letter stated that Defendants "have been informed by the Lender that they will forward the original note to us." Upon information and belief, this statement was false.

67.     Defendants' August 2, 2010, letter further included the following § 1692e(11) disclosure:

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

68.     This correspondence from Defendants also provided an alleged amount of indebtedness due from the date of default. Defendants claimed that Plaintiff owed a total amount of $254,761.85. The payoff statement included accrued late charges of $141.88 from April 1, 2010 through August 2, 2010, a "legal fee" of $600.00, foreclosure expenses of $150.00, and "total fees" of $74.00.

69.     Defendants mailed another correspondence to Mr. Mbundure dated August 18, 2010 in which they provided a reinstatement quote advising Plaintiff how much he had to pay them in order to bring his loan current.

70.     Defendants' August 18, 2010 letter was an attempt to collect a debt and begins with a boldface § 1692e(11) disclosure that they are a debt collector and this is an attempt to collect a debt.

71.     The August 18, 2010 letter does the following, among other things, in connection with Defendants' attempts to collect the subject debt:

A.     Sets out the amount necessary to reinstate the above-referenced loan and to resolve the pending action in amounts that "are good through September 12, 2010";

B.     Warns Mr. Mbundure that "if the effective date for the payment quotation stated in this letter continues past the scheduled foreclosure sale date, the foreclosure sale will nonetheless occur unless the loan is reinstated or paid off PRIOR TO the foreclosure sale";

C.     States that "(B)ecause of interest, late charges, trustee's and/or attorney's fees and costs (if applicable), and other charges that may vary from day to day or that may change after the date of this communication, the amount due on the day you pay may be greater. You may also owe the amount of any monthly or other payments and late charges that may fall due after the date of this communication. Therefore, if you pay the amount above, an adjustment may be necessary after we receive your payment. For further information or for an updated figure, write or call.";

D.     States that "(A)ll funds must be submitted in the form of Certified and/or Cashier's check(s) and/or Money Order(s) and must be made payable to Dovenmuehle Mortgage. Funds must be sent to the attorney/trustee office listed above.";

E.     Advises Mr. Mbundure that he should verify the amounts due and owing to insure that they are correct; and

F.     Provides an amount demanded for reinstatement of Mr. Mbundure's home mortgage loan.

72.     Defendants' letter to Plaintiff dated August 18, 2010 provides that a total amount of $12,755.84 is needed in order to reinstate his loan and avoid foreclosure. Of this total amount allegedly due, Defendants claimed that Plaintiff owed $2,006.00 for "Current Foreclosure Attorney/Trustee Fees and Costs", $283.76 in late charges, $27.00 for "Other Fees", and $70.94 for "Late Charge Forecasted".

13

73.     The various fees and costs included in Defendants' alleged reinstatement quote dated August 18, 2010 were drastically different from those included in the payoff statement dated August 2, 2010, just sixteen days prior. Upon information and belief, one or both of these accounting statements were false.

74.     Defendants systematically misrepresent the amount of fees and costs they are entitled to pursuant to their contracts with servicers, noteholders, and other entities or that are permitted under the Deed of Trust or by law.

75.     In fact, Defendants routinely document substantially smaller fee and cost requests in their submissions to the Commissioner of Accounts for confirmation of foreclosure sales.

76.     This is evidence of not only the Defendants' intentional misrepresentations to consumers, but also of their business model in which they simply conduct foreclosures with the fastest speed and lowest cost possible.

77.     Defendants' August 18, 2010 correspondence to Plaintiff stated that "the action will continue until the total reinstatement funds are received, in compliance with the terms in this letter. After reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a withdrawal of the action." Defendants therefore imply that there is a lawsuit pending against the Plaintiff.  However, Virginia does not have judicial foreclosures, and there is no "action" against the consumers.

78.     Defendants mailed another correspondence dated August 24, 2010 to Mr. Mbundure, which claimed that Defendant Friedman and Muncy had been appointed Substitute Trustee for the purpose of foreclosing on Plaintiff's home.

79.     Upon information and belief, this letter was a form correspondence that was also sent to the putative class members in which the Defendants claimed that Defendant Friedman

14

was an appointed substitute trustee. However, the substitute trustee documents for the Plaintiff and the putative class never purported to appoint Defendant Friedman as a substitute trustee.

80.     Defendants August 24, 2010 letter to Plaintiff also included a copy of an alleged Substitution of Trustees document. Upon information and belief, copies of substitute trustees documents were also included in the letters mailed to the putative class members.

81.     Defendants' August 24, 2010 letter to the Plaintiff stated that his home will be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advises Mr. Mbundure to "contact the undersigned immediately" should he "desire to avoid the necessity of a foreclosure sale and satisfy [his] obligation.

82.     Defendants' August 24, 2010 correspondence also included the following § 1692e(11) disclosure:

> THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

83.     The Substitution of Trustee document that Defendants sent to the Plaintiff was dated July 30, 2010 and was subsequently filed in the Circuit Court for Fairfax County.

84.     This document states that PNC Bank was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared. This statement was a contradiction to Defendants' earlier statement that Dovenmuehle Mortgage was the holder of Plaintiff's Note. One or both of the statements were false.

85.     The Substitution of Trustee document stated that PNC Bank had appointed Defendants F&M and Muncy as substitute trustees.

86.     Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

87.     Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note or partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

88.     Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

89.     In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

90.     Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

91.     The Substitution of Trustee document was purportedly signed by a "Vice President" of PNC Bank, the claimed noteholder, and was thereafter allegedly notarized. At some point after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match.

92.     Although the Substitution of Trustees Deed is dated July 30, 2010, it was not claimed to be notarized until August 5, 2010.

93.     Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.   Upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

94.     If PNC Bank is the actual noteholder, Defendants failed to disclose that PNC Bank was the creditor to whom the debt is owed in their correspondences to Mr. Mbundure.

95.     Defendants claimed that they were appointed substitute trustees under Plaintiff's Deed of Trust.

96.     However, at no time did the alleged Substitute Trustees, Defendants F&M and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

97.     As a result of the acts and omissions of the Defendants, Mr. Mbundure has suffered actual damages and injury, including but not limited to, emotional distress, mental anguish, and suffering.

### Count I:  Fraud
### INDIVIDUAL CLAIM

98.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

99.     Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

100.   In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Dovenmuehle Mortgage was the noteholder of Plaintiff's mortgage loan.

101.   In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that the accounting statements they provided for the balance that Plaintiff allegedly owed on the mortgage were a true and accurate accounting.

102.   In their correspondences to Plaintiff and in the advertisements of the alleged foreclosure sale of Plaintiff's home, Defendants made one or more material misrepresentations, including but not limited to, that Defendants were each a validly appointed substitute trustee.

103.   Upon information and belief, Defendants misrepresented that the individual who signed the Substitution of Trustee document on behalf of PNC Bank purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves or forwarded it to an entity purporting to be the noteholder where it was allegedly notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

104.   Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

105.    Defendants intentionally made these misrepresentations to Plaintiff with the intent to mislead him into believing these representations were true. Plaintiff relied on these misrepresentations to his detriment.

106.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

107.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

108.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

**Count II:  Civil Conspiracy**
**INDIVIDUAL CLAIM**

109.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

110.    Plaintiff alleges a cause of action against Defendants for civil conspiracy under the common law of the Commonwealth of Virginia.

111.    Defendants, separate entities and/or persons, along with PNC Bank, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted collection of an alleged debt and/or the attempted unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

112.    Furthermore, Defendants accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the use

19

of falsified signatures and perjurous statements in their correspondence to Plaintiff and in court filings in violation of Virginia and Federal law.

113.    Defendants' unlawful purpose was to use such fraudulent signatures and sworn statements to make a false statement to the Circuit and Civil Courts – one that the parties knew was false when made and to proceed in the collection of a debt and foreclosure that Defendants knew was not in compliance with the law.

114.    Upon information and belief, the Defendants engaged in these actions with PNC Bank, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from PNC Bank for the speed with which they are able to conduct foreclosures.

115.    Defendants conducted themselves in this manner with the intent to defraud and with legal and actual malice as to the Plaintiff and to the Courts.  Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

116.    As a result of Defendants' conduct in furtherance of the conspiracy, Plaintiff suffered injury and is entitled to recover damages including, but not limited to, actual damages and costs against Defendants.

117.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

### Count III: Violation of 18 U.S.C. § 1961
### Racketeer Influenced and Corrupt Organizations Act
### CLASS CLAIM

118.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

119.   This matter is brought as a class action on behalf a second class – the "RICO Class" - initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants attempted a foreclosure upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

120.   Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

121.   Plaintiff's proposed class counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiff's proposed class counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or filed with the Commissioners of Accounts.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

122.   Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

123.   Plaintiff's counsel alleges that Defendants uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all foreclosure files.  Their counsel assumes that this may not have always been the case – at some time in the past Defendants' attorneys may have actually signed documents, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee.  However, they are currently unable to determine when this lawful conduct ended.

124.   There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants constituted a RICO enterprise; (b.) whether Defendants'

falsification of foreclosure documents constituted mail or wire fraud; (c.) what remedies are available for such a RICO violation.

125.    The claims of Plaintiff are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

126.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff haas retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

127.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

128.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

129.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil

Procedure is also appropriate in that:

a.     As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved one time. One win for one consumer would set the law as for every similarly situated consumer.

130.   The Defendants and the mortgage loan servicers (including by example, PNC Bank) constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

131.   All of these servicers and each Defendant were engaged in a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

132.   Further, the loan servicers and the Defendants existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law.  That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers'

homes.

133.    The loan servicers are separate entities and each operates in its own self-interest. They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for the profit of both the Defendants and the servicers.

134.    The racketeering proceeds obtained by Defendant F&M and/or Muncy as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

135.    The enterprise had an effect on interstate commerce. For example, the transmission of the fraudulent substitute trustee documents and lost note affidavits through the United States mail system and through the wires for ultimate transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Additionally, loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments.

136.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and lost note affidavits. It began sometime as early as 2009 and

continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

137. The conduct and actions of the Defendants as alleged herein – i.e. creating fraudulent documents for use in foreclosures – violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. They involved an ongoing scheme to defraud consumers and courts, and they used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

138. Defendants used this practice with respect to numerous documents that it caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants, and all of these contain the same fraudulent documents.

139. Further, Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants regular way of conducting business.

140. The Plaintiff and the putative RICO Class members, the Circuit Courts, and the Commissioner of Accounts relied on the fraudulent documents when they mistakenly believed that the Defendants were validly appointed substitute trustees who conducted a proper foreclosure sale.

141. For example, many consumers lost their homes as a direct result of the Defendants' enterprise. The Commissioner of Accounts approved the sales and the accounting of the sales based on the fraudulent documents that the Defendants submit.

142. Plaintiff and the putative class members were injured as a result of the

Defendants' violations of 18 U.S.C. § 1962 and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

143.    Plaintiff and the putative class members also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein.

**Count IV: Violations of 15 U.S.C. § 1692 et seq.**
**Fair Debt Collections Practices Act**
**CLASS CLAIM**

144.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

145.    Plaintiff alleges that Defendants violated the FDCPA purusant to 15 U.S.C. §1692e, §1692f, and §1692g of the FDCPA, which provides as follows:

a.    Generally, §1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' Section §1692e also provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

> (2) The false representation of--
> (A) the character, amount, or legal status of any debt; or
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> …
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
> …

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692e

b.   Section 1692f prohibits generally the use of "unfair or unconscionable means to collect or attempt to collect any debt", and specifically in relevant part:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by agreement creating the debt or permitted by law.
    …
(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –
(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

15 U.S.C. § 1692f.

c.   A debt collector must provide a consumer with the name of the creditor to whom the debt is owed pursuant to § 1692g:

(a)   Notice of debt; contents.
Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing –
    …
(2) the name of the creditor to whom the debt is owed.

146.   For their class claim brought pursuant to the FDCPA, the Plaintiffs proposed a class initially defined as follows:[2]

---

[2] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert.denied*, 125 S.Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title*

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

147.   Defendants violated §1692e and §1692f as to each class member by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters to the class members.

148.   Plaintiff alleges this class definition because all or substantially all of the class members would have received correspondence from the Defendants with a subject line that represented or implicitly threatened that a lawsuit was or would be filed.

149.   Plaintiff also alleges a "Lost Note" subclass initially defined as:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the mortgage note was lost or otherwise unavailable within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

150.   Defendants violated §1692e as to the Lost Note subclass because they forwarded correspondence to consumers that falsely represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1.

151.   Plaintiff also alleges a "Servicer as Creditor" subclass of consumers initially defined as follows:

---

*Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

152. Defendants violated §1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed.

153. Plaintiff also alleges an "Inconsistent Demand for Payment" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as conflicting loan payoff and/or reinstatement calculation(s) within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

154. Defendants violated §1692e and §1692f as to the Inconsistent Demand for Payment subclass because they made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers.

155. Plaintiffs also allege an "Failure to Identify Creditor" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and to whom the Defendants failed to identify the creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

156.    Defendants violated §1692g as to the Failure to Identify Creditor subclass because in their initial correspondences to consumers, they failed to identify the creditor to whom the debt was owed.

157.    Plaintiff alleges a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home that enclosed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

158.    Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustees (and/or where the signatures were forged altogether).

159.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

160.    Plaintiff's proposed class counsel has reviewed a substantial number of correspondences and Appointment of Substitute Trustee documents mailed to consumers by the Defendants. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

161.    Defendants use the same form correspondences that they send to consumers

across Virginia. These form correspondences include the initial correspondences to consumers, lost note letters, substitution of trustees deeds, notices of sale, payoff statements and reinstatement quotes.

162.    Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

163.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants routinely misrepresented the identity of the creditor, amount, legal status, or character of the debts that they were attempting to collect from Plaintiff and the putative class members;  (b.)  whether the Defendants falsely represented the compensation that they could lawfully receive as a result of these attempted and/or actual foreclosures;  (c.)  whether the Defendants threatened to take or took action that could not legally be taken;  (d.)  whether the Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiffs and the putative class members;  and (e) whether Defendants could lawfully foreclose upon Plaintiffs and the putative class members prior to meeting the requirements of the Deed of Trust and/or other regulations and governing law.

164.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

165.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff

has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

166.  Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

167.  Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

168.  Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.  As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment

32

as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

169.    As a result, Plaintiff and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully moves for class certification and for actual and compensatory, statutory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO and the FDCPA; for his attorneys' fees and costs; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**ADAM MBUNDURE,** *on behalf of herself and all others similarly situated*

By_____/s/_____
         Of Counsel

Matthew J. Erausquin, VSB No. 65434
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.

1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com
janelle@clalegal.com

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:    (757) 930-3660
Fax:    (757) 930-3662
lenbennett@clalegal.com
srotkis@clalegal.com

Dale W. Pittman, VSB No. 15673
*Counsel for the Plaintiff*
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel:    (804) 861-6000
Fax:    (804) 861-3368
dale@pittmanlawoffice.com

Kristi Cahoon Kelly, VSB No. 72791
*Counsel for the Plaintiff*
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Tel:    (703) 277-9774
Fax:    (703) 591-9285
kkelly@siplfirm.com