**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| ALLEN CHATTER, *individually and on behalf of others similarly situated*, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 3:11cv613 |
| FRIEDMAN & MACFADYEN, P.A., ) F & M SERVICES, L.C., ) JOHNIE R. MUNCY, ) ) | |
| Defendants. ) | |

**FIRST AMENDED CLASS COMPLAINT**

COMES NOW the Plaintiff, Allen Chatter, individually and on behalf of others similarly situated, by counsel, and as for his First Amended Class Complaint against the Defendants, he alleges as follows:

**INTRODUCTION**

1.      Defendants – a now defunct foreclosure mill – engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring the mill had the lowest cost structure that they could construct.  To accomplish these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a neutral trustee, lied to Commissioners of Accounts, consumer victims, and others regarding the custody and ownership of mortgage notes and compliance with Virginia's foreclosure requirements, and largely ignored federal law enacted to protect debtors against overly aggressive debt collectors. Accordingly, Plaintiff brings this class action alleging claims for actual, treble, and punitive damages, declaratory and injunctive relief, costs, and attorneys' fees

brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO") and for the Defendants' breach of fiduciary duty, civil conspiracy, and fraud.

## JURISDICTION

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

## PARTIES

3.     Plaintiff Allen Chatter (hereafter "Chatter" or "Plaintiff") is a natural person and a resident of the Commonwealth of Virginia.

4.     Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman") is a now defunct law firm with offices previously in Maryland, Virginia, and Washington D.C., the principal purpose of whose business was the collection of debts, and was located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

5.     Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

6.     Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

## STATEMENT OF FACTS

7.     Defendants operate as a debt collecting and foreclosure conducting enterprise. Friedman is not simply a parent holding company of F&M.  Instead, all Defendants operate as parts of a single business operation.  Friedman provides management and decision-making and operates as the front for contact with the targeted debtor-consumers and the loan servicers, while

2

F&M exists as an employee-less paper entity that acts as the "substitute trustee" under the target deeds of trust. Muncy also acts as a "substitute trustee" under the target deeds of trust, and is often the "substitute trustee" whose name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers.

8.    F&M does not operate independent of Friedman.  It does not have a separate office, separate management or separate business and income.   Instead, they are interrelated and inseparably operate as a single business operation.

9.    For example, the majority of "officers" of F&M are also employees of Friedman.

10.   F&M has little or no income that is not directly derived from Friedman.

11.   F&M does not have any employees.  Instead, it is a shell entity used by Friedman whose sole purpose is to act as the "substitute trustee" for the mortgage loans that are referred to Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales for which F&M purports to be a substitute trustee.

12.   F&M does not act as "substitute trustee" under any deeds of trust that have not been referred to Friedman for debt collection and/or foreclosure proceedings.

13.   Similarly, Muncy does not operate independent of Friedman, but acts as "substitute trustee" only for those deeds of trust that have been referred to Friedman for collection and/or foreclosure proceedings.

14.   Additionally, Muncy is also an attorney who was employed by Friedman at the time he was named as "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

15.   Friedman, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors. Friedman directs the actions of the personnel who interact with

the debtors and with the loan servicers whose mortgage loans are referred to Friedman for debt collection or foreclosure proceedings.

## Defendants' Foreclosure Operation

16. Defendants accomplish their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that have been referred to them by various loan servicers.

17. The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Friedman. For example, Friedman employees mail out the correspondence regarding the alleged foreclosure sale to consumers, purchase newspaper space for advertisements of the foreclosure sales, and interact with the loan servicers and consumers.

18. In fact, all letters mailed to consumers are printed on Defendant Friedman's letterhead, regardless of which Defendant signed the letter, and the documents submitted to the various Circuit Courts purportedly by the "substitute trustee" are prepared by and often have a return address for Defendant Friedman.

19. When the mortgage loans are referred to the Defendants, including the Plaintiff's mortgage loan in this case, they do not actually receive the original note prior to instituting foreclosure proceedings.

20. In fact, rather than locating the entity that is the actual noteholder or requesting the original note from the servicer, Defendants use a false "lost note affidavit". Defendants' motive is to streamline the foreclosure process.

21.     Once the mortgage loans are referred to Defendant Friedman, Defendants create a "Substitution of Trustee" document, which they claim give them the authority to conduct a foreclosure sale under the subject deeds of trust.

22.     The Substitution of Trustee document is false and improper in several respects.

23.     The document identifies the loan servicers as the "Noteholders". These statements are false.

24.     Defendants do this as an alternative to locating and identifying the actual noteholders in an effort to save time and costs with which they are able to conduct foreclosures.

25.     Defendants send this document to various third-party entities purporting to be the "noteholders" or loan servicers, via electronic wires or through the mail, at which time they are allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document is also allegedly notarized.

26.     Upon information and belief, the individuals who sign these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, do not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

27.     Other times, these substitute trustee documents are created and signed by Defendant Friedman and/or its employees as "attorney in fact" for the "noteholder". Therefore, Defendants essentially attempt to appoint themselves as substitute trustees.

28.     Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

29.     In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by the Defendants, presumably so the dates on the first and second pages match.

30.     In fact, in two hearings that took place in Baltimore, Maryland, the Defendants' employees, Kenneth MacFadyen and Daniel Menchel, admitted to the Defendants practice of having employees sign documents for other attorneys in the law firm.

31.     Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1    Q    It is your signature?
2    A    Yes.
3    Q    Okay, and is it notarized?
4    A    Yes.
5    Q    On what date is it notarized?
6    A    June 30th.
7    Q    By whom?
8    A    Joann Sottile.
9    Q    Did you appear in front of Ms. Sottile on
10   that date?
11   A    I did not appear in front of her. I gave her
12   stacks of files to notarize after I'd signed them.
13   Q    I'm going to show you what's again in the
14   same group, same group of exhibits, adjustable rate
15   note. And I'm going to show you -- point to a
16   signature at the top.
17   Can you tell me whose signature that is?
18   A    That's my signature for Kenneth MacFadyen. I
19   signed that after I stamped the note, after I review
20   it.
21   Q    Okay.
22   A    And signed Kenneth MacFadyen's name.
```

23    Q      And would there have been a reason why you
24    wouldn't have used your own name?
25    A      No. I think we had a stamp that had Kenneth
1    MacFadyen's name on it. And we used that particular
2    stamp on that particular file.

32.    Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No. 24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21    Q      Let me -- let me show you the order to
22    docket, suit, and affidavit pursuant to Maryland Rule
23    14-207(b). Your name is at the bottom. Do you know
24    who signed your name?
25    A      No, not to this one. It would have been
1    either Daniel Menchel or Jeffrey Huston.
2    Q      But you don't know?
3    A      I don't know which one signed that one.
4    Q      Okay, let me show you, in this case, a deed
5    of removal and appointment of successor trustees
6    which is liber 11916, page 250, second page -- and ask
7    you who signed that one.
8    A      That would be Daniel Menchel. That's not
9    under oath. I believe he had every right to do that.
10    Q      Okay, but that would be Daniel Menchel's
11    signature?
12    A      That's a Daniel Menchel signature.
13    Q      Okay, let me show you an Atlantic bond, and
14    it's bond number 108147, and ask who signed that.
15    A      That looks to me like a Jeffrey Huston
16    version of Kenneth MacFadyen.

33.    These documents are a legal nullity and do not actually authorize Defendants F&M or Muncy to act as substitute trustees.

34.    After preparing the substitution of trustee documents, Defendants then begin the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

35. Upon information and belief, these letters were form letters that the Defendants sent to every consumer from whom they attempted to collect a debt and for whom they attempted to conduct a foreclosure sale of their home

36. These letters all contain similar misrepresentations, including but not limited to, an incorrectly identified Noteholder of the loan.

37. Consumers rely on these false documents when they subsequently contact or pay money to Defendants in attempt to save their homes or relocate their families, with the mistaken belief that Defendants were validly appointed substitute trustees and have the authority to sell their homes.

38. Defendants then advertise the foreclosure sales in local newspapers throughout Maryland and Virginia, listing the contact as Defendant Friedman for information about the property and the foreclosure sale.

39. These foreclosure sale notices are mailed to consumers throughout Virginia and Maryland using the United States post office.

40. Once an alleged foreclosure sale occurs, Defendants create a "Trustees Deed" in which the alleged substitute trustees convey the subject property to a grantee. This grantee is often not the last and highest bidder at the foreclosure sale, but is instead a third party or subsequent purchaser.

41. Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which are subsequently mailed to consumers or to the Commission of Accounts in the Circuit Courts across the Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

**Defendants' Specific Conduct Regarding Allen Chatter**

42.     Plaintiff borrowed $423,675.00 for his mortgage, as evidenced by a promissory note dated February 20, 2008 (hereafter "the Note"). The Note was payable to First Horizon Home Loans (hereafter "First Horizon").

43.     The Note was secured by a deed of trust dated February 20, 2008 (hereafter the "Deed of Trust") and recorded in the Clerk's office of the Fairfax County Circuit Court.

44.     Plaintiff's Note and Deed of Trust obligated him to repay First Horizon.

45.     At some point, Chase Home Finance, LLC (hereafter "Chase") became the servicer of Plaintiff's loan. As servicer, Chase acted on behalf of the owner of the loan to conduct certain customary servicing functions such as collecting and recording payments, communicating with the homeowner, and assessing late fees.

46.     Plaintiff's mortgage loan was a U.S. Department of Veterans Affairs (VA) guaranteed loan, and as such is insured against loss if the loan goes into default.

47.     Because of this low-risk status, the VA expressly incorporated certain provisions and guidelines into the Deed of Trust that requires note holders and servicers to abide by a defined set of regulations and procedures as codified under Title 38 of the United States Code and in regulations issued by the VA.

48.     These laws and regulations require that the loan servicing program be maintained in such a way as to assure prompt responses to inquiries from borrowers. 38 C.F.R. 36.4278(g)(iv) specifically provides that if the holder has not evaluated the financial circumstances of the borrower or obtained a repayment plan from the borrower, then a face-to-face interview or reasonable effort to arrange a meeting is required.

49.     The VA Servicer Guide further provides:

VA prefers that you first consider loss mitigation options that keep the veteran in their [sic] home. VA requires you to choose the best option for all parties and asks that you consider options as early in the delinquency as possible.

. . . .

*When alternatives to foreclosure are not possible*, the loan should be referred for foreclosure as quickly as possible. VA encourages you to continue to pursue loss mitigation options even after initiating the foreclosure process. If a loss mitigation option looks promising, *VA would expect you to postpone the foreclosure action*.

VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 72–73

(Version 1.2 July 2009).

50. Around 2009, Plaintiff began experiencing financial hardship and sought a loan modification in the attempt to make his loan payments more affordable and prevent foreclosure. In 2009, Plaintiff submitted a complete application for a loan modification to Chase.

51. After sending Chase the completed modification application, Plaintiff called Chase to verify its receipt. Chase verified that it had received the application.

52. Despite the explicit instructions from the VA, Plaintiff's request for assistance went ignored. Chase never evaluated his financial circumstances, established the reason for his default or obtained an agreement for a repayment plan. Instead, his loan was referred to foreclosure.

53. Chase never offered nor made any attempts to arrange a face-to-face interview with the Plaintiff.

54. In approximately 2010, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale. Upon information and belief, Defendants maintain copies of these letters in their records that can be more specifically identified once produced in discovery.

55.     Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer who they attempted to collect a debt and conduct a foreclosure sale on their home.

56.     The subject line of the letters to Plaintiff and the putative class was styled as if a lawsuit was pending or was to be filed.  However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff or the putative class members.

57.     For example, the letters sent to Plaintiff were styled "Chase Home Finance, LLC v. Allen Chatter."

58.     Additionally, at times, Defendant Friedman signed the letters to the Plaintiff and putative class as Substitute Trustee. The substitute trustee document never purported to appoint Defendant Friedman as substitute trustee.

59.     The various letters to the Plaintiff and putative class further included an alleged Substitution of Trustee document dated July 22, 2010, which was filed in the Fairfax County Circuit Court on August 20, 2010.

60.     This document stated that Chase Home Finance, LLC was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared.  Upon information and belief, this statement was false.

61.     The Substitution of Trustee document stated that Chase had appointed Defendants F&M and Muncy as substitute trustees.

62.     Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

63.     Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

64.     Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

65.     In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

66.     Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

67.     Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon Home Loans. Any authority Chase possesses to appoint a substitute trustee would have to come from First Horizon or a subsequent noteholder. No such authority appears to exist.

68.     The Substitution of Trustee document was purportedly signed by Mark H. Friedman, as "Attorney-in-Fact" for the purported Noteholder and was thereafter allegedly notarized. Even after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match. Therefore, Defendant Friedman essentially attempted to appoint itself, through its employees, as substitute trustee.

69.     Again, this Substitution of Trustee document was a form document used by the Defendants and it was Defendants policy and procedure to have Mark Friedman (or someone on

his behalf) sign these documents as "Attorney-in-Fact", have it notarized at a later time, and have the notary block filled in at an even different time.

70.     Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

**Defendants Were Fiduciaries Under the Deed of Trust**

71.     Defendants claimed that they were appointed substitute trustees under Plaintiffs' Deed of Trust.

72.     At no time did the alleged Substitute Trustees, Defendants F & M and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

73.     Virginia law provides that a trustee under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them.

74.     Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Muncy was employed by Defendant Friedman, and thus none of these parties is an impartial or neutral "substitute trustee."

75.     In fact, Defendant Muncy has consistently maintained in the related *Goodrow* matter that he and the law firm that he works for each have an attorney-client relationship with every possible entity involved – the supposed investors, noteholders and servicers – on the loans

that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his

interactions with those entities at a deposition, citing the attorney-client privilege as the basis for

not disclosing such information:

9    Q    Okay.  At the time you sent this letter,
10   what evidence of the indebtedness did you have?
11       A    We had the information contained in the
12   referral, not limited to this header document that you
13   have gone through, Exhibit 3.
14       Q    What other information did you have in the
15   referral?
16           MR. BIONDI:  I'm going to object to
17   attorney/client privilege.  The referral would include
18   instructions and requests for advice from a client to
19   Mr. Muncy or lawyers in his firm.
20           **MS. KELLY:  So you're instructing him not**
21   **to answer obviously?**
22           **MR. BIONDI:  Yes.**
23           MS. KELLY:  Just to clarify, are you
24   instructing Mr. Muncy not to answer regarding anything
25   else that may be in the referral documents?

1            MR. BIONDI:  You had asked what other
2    information was communicated to Mr. Muncy, who's the
3    attorney at Friedman & MacFadyen, by the clients,
4    which is Met Life Home Loans.
5            MS. KELLY:  In the referral.
6            MR. BIONDI:  In the referral, which I
7    don't know what could be in there, whether there's
8    going to be advice, request for advice, instructions.
9    Those matters are reasonably to be anticipation of
10   litigation at this point.  I'm sorry.  Take that back.
11   Not litigation.  But it's definitely part of the
12   attorney/client relationship and the purpose of the
13   representation conducting the foreclosure.

---

16       Q    What instructions did you receive from
17   First Horizon regarding Mr. Goodrow's mortgage loan?
18           **MR. BIONDI:  Don't answer that question.**
19   **Attorney/client privilege.**
21       Q    Did you communicate with First Horizon to
22   verify that they were the noteholder of Mr. Goodrow's
23   mortgage loan?

24          MR. BIONDI:  Wait a minute.  Same
25    objection.
      1  BY MS. KELLY:
  2      Q    Did you communicate with Met Life at all
  3    to verify who the noteholder was regarding
  4    Mr. Goodrow's mortgage loan?
  5          MR. BIONDI:  I think I have the same
  6    objection.  You're trying to avoid the substance, but
  7    you're trying to substitute the substance into the
  8    question and then asking the question.
 10      Q    Did you communicate with Fannie Mae
 11    regarding their investment in Mr. Goodrow's mortgage
 12    loan?
 13          MR. BIONDI:  I object.  Attorney/client
 14    privilege.
 16      Q    Did you communicate with Fannie Mae at all
 17    regarding their ownership interest in Mr. Goodrow's
 18    mortgage loan?
 19          MR. BIONDI:  Same objection.

76.    The Defendants therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust.

77.    Further, Defendants have a copy of the Deed of Trust and were aware that Mr. Chatter's loan was a VA loan and the noteholder was required to comply with Title 38 of the United States Code and Regulations implemented by the VA as they were expressly incorporated into Mr. Chatter's Deed of Trust.

78.    Because of this, Defendants, as fiduciary had a duty to ensure that these requirements were followed prior to the acceleration of the mortgage loan that was subject to the Deed of Trust.

79.    Specifically, the Deed of Trust states: "the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations."

80.     Despite this express mandate in the Deed of Trust, prior to conducting the foreclosure sale, aside from a one page referral form, Defendants did not require *any* documents from the lender, servicer or noteholder confirming that Title 38 or the relevant regulations have been followed.

81.     Because the Defendants are appointed substitute trustee, they have a fiduciary duty under the Deed of Trust to ensure that the prerequisites to acceleration and foreclosure are followed.

82.     Defendants breached this duty to Mr. Chatter and the putative class members.

**Defendants Foreclose on Plaintiff's Home**

83.     Defendants' correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

84.     The foreclosure sale allegedly took place on September 1, 2010 and a trustee's deed dated September 1, 2010 (hereafter "the Trustee's Deed"), which purported to convey the property to a Grantee, was subsequently filed in the Fairfax County Circuit Court on October 19, 2010.

85.     The Trustee's Deed stated that Chase Home Finance was the current Noteholder and Defendants Muncy and F&M were the current Substitute Trustees. These statements were false.

86.     Upon information and belief, the individuals who signed the sworn statements on the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal

knowledge or legal standing. Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

87. Furthermore, according to Plaintiff's Deed of Trust, in the event of a foreclosure sale, the Trustee is required to deliver title to the highest bidder at the sale.

88. Trustees failed to deliver the Trustee's Deed conveying property to the highest bidder, and instead conveyed the property to a third party who was not the highest bidder at the auction.

89. The Defendants thereafter filed a foreclosure accounting statement with the Commissioner of Accounts for Fairfax County on February 22, 2011 (hereafter "the Accounting Statement").

90. The Accounting Statement was subsequently recorded in the Fairfax County Circuit Court on October 27, 2011.

91. This statement accounts for a "Trustee's Commission" of $600.00 that the Defendants collected from the foreclosure proceeds.

92. Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents, which the Commissioner relied on when it thereafter approved the accounting of the foreclosure sale.

### Count I:  Trustees' Breach of Fiduciary Duties (VA Loans)
### CLASS CLAIM

93. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

94. This matter is also brought as a class action for a "VA Loans" class, initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan insured by the Department of Veterans Affairs and for which property Defendants drafted, executed and recorded a foreclosure Trustee's Deed upon such Deed of Trust within the four years prior to the filing of the Complaint, and for whom the records of the noteholder or servicer did not contain any record of an attempt to provide a face-to-face meeting with the class member prior to the date of such foreclosure. Excluded from the class are employees of the Defendants.

95.     Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

96.     Plaintiff's proposed class counsel has a substantial number of correspondences and Deed of Appointment of Substitute Trustee mailed to consumers by the Defendants. Plaintiffs' proposed class counsel also has a substantial number of Trustees Deeds and Reports filed with the Commissioner Accounts by the Defendant. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

97.     Defendant has conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished more than 50 VA foreclosures during the last 4 years.

98.     There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendants' foreclosure upon a VA Deed of Trust is lawful where the noteholder or servicer has not otherwise complied with VA regulations and governing law; (b.) whether VA regulations and governing law are incorporated within the Defendants' Deed of Trust duties; and (c.) what remedies are available for such a breach of fiduciary duty.

99.     Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories. The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The

violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

100.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

101.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

102.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

103.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

        a.      As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages

issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved at one time.  One win for one consumer would set the law as for every similarly situated consumer.

104.    Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the Noteholder, thus owing fiduciary duties to both parties.

105.    Defendants breached their fiduciary duties by undertaking the foreclosure sale and the transfer of the real property of the Plaintiff and the putative class without compliance with the Deed of Trust.  Specifically, Defendants foreclosed upon the real property when the necessary prerequisite of compliance with the VA regulations and law had not been met.

106.    As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

## Count II:  Fraud
## INDIVIDUAL CLAIM

107.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

108.    Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

109.    Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Fairfax County Circuit Court, including but not limited to, that Chase was the current Noteholder of Plaintiff's mortgage.

110.    Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of Chase purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

111.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or legal standing.

112.    Defendants made a material false representation in Plaintiff's Trustee's Deed filed in the Fairfax County Circuit Court, including but not limited to, that Chase Home Finance was the current Noteholder of Plaintiff's mortgage.

113. Upon information and belief, Defendants further misrepresented that the individual who signed the Trustee's Deed on behalf of Defendant Muncy as Substitute Trustee purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or legal standing.

114. Upon information and belief, Defendants also misrepresented that the individual who notarized the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

115. In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee and that the actual Note was lost or unavailable such as to permit Defendants' use of Va. Code § 55-59.1.

116. In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Chase Home Finance was the current Noteholder of Plaintiff's mortgage.

117. Defendants intentionally made these misrepresentations to Plaintiff with the intent to mislead him into believing these representations were true.

118. Plaintiff relied on these misrepresentations to his detriment. He acceded to what he became convinced was a lawful appointment of trustee and then a lawful foreclosure. Eventually, he did not put up a legal fight to either the foreclosure or the loss of his home.

119. As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

120.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

121.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

### Count III:  Civil Conspiracy
### INDIVIDUAL CLAIM

122.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

123.    Plaintiff alleges a cause of action against Defendants for civil conspiracy under the common law of the Commonwealth of Virginia.

124.    Defendants, separate entities and/or persons, along with Chase, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted or actual collection of an alleged debt and/or the unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

125.    Furthermore, Defendants accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the use of falsified signatures and perjurous statements in their correspondence to Plaintiff and in court filings in violation of Virginia and Federal law.

126.    Defendants' unlawful purpose was to use such fraudulent signatures and sworn statements to make a false statement to the Circuit and Civil Courts – one that the parties knew was false when made and to proceed in the collection of a debt and foreclosure that Defendants knew was not in compliance with the law.

127.     Upon information and belief, the Defendants engaged in these actions with Chase, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from Chase for the speed with which they are able to conduct foreclosures.

128.     Defendants conducted themselves in this manner with the intent to defraud and with legal and actual malice as to the Plaintiff and to the Courts.  Plaintiff is entitled to and each Defendant is obligated to pay punitive damages.

129.     As a result of Defendants' conduct in furtherance of the conspiracy, Plaintiff suffered injury and is entitled to recover damages including, but not limited to, actual damages and costs against Defendants.

130.     Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the subject debt.

**Count IV: Violation of 18 U.S.C. § 1961**
**Racketeer Influenced and Corrupt Organizations Act**
**CLASS CLAIM**

131.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

132.     This matter is brought as a class action on behalf a second class – the "RICO Class" - initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants drafted, executed and recorded a foreclosure Trustee's Deed upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

133.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

134.    Plaintiff's proposed class counsel have a substantial number of correspondences and Deed of Appointment of Substitute Trustee mailed to consumers by the Defendants. Putative class counsels also have a substantial number of Trustees Deeds and Reports filed with the Commissioner Accounts by the Defendant.   These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

135.    Defendant has conducted and attempted hundreds of foreclosures in Virginia.   A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished more than 50 VA foreclosures during the last 4 years.

136.    Plaintiff's counsel alleges that Defendants' use of the set of fraudulent processes and business actions demonstrated in this case were uniformly followed by defendants across all foreclosure files.   His counsel assumes that this may not have always been the case – at some time in the past Defendants' attorneys actually signed documents, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee.   However, they are currently unable to determine when this lawful conduct ended.

137.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.   For example, and without limitation:   (a.) whether Defendants constituted a RICO enterprise; (b.) whether Defendants' falsification of foreclosure documents constituted mail or wire fraud; and (c.) what remedies are available for such a RICO violation.

138.    Plaintiff's claims are typical of those of the class members.   All are based on the same facts and legal theories.   The letters, deed of appointment of substitute trustee, and trustees

deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

139. The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

140. Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

141. Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

142. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages

issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's. The issues at the core of this case are classwide and should be resolved one time. One win for one consumer would set the law as for every similarly situated consumer.

143. The Defendants and the mortgage loan servicers (including by example, Chase) constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

144. All of these servicers and each Defendant were engaged in a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

145. Further, the loan servicers and the Defendants existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law. That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers' homes.

146. The loan servicers are separate entities and each operates in its own self-interest. They are organizationally structured in a defined set of relationships and roles and are so

engaged for an ongoing continuous business relationship for the profit of both the Defendants and the servicers.

147.    The racketeering proceeds obtained by Defendant F&M and/or Muncy as a result of the activities of the enterprise ultimately flowed to Defendant Friedman. The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

148.    The enterprise had an effect on interstate commerce. For example, the transmission of the fraudulent substitute trustee documents and lost note affidavits through the United States mail system and through the wires for ultimate transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Additionally, loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments.

149.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and lost note affidavits. It began sometime as early as 2009 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

150.    The conduct and actions of the Defendants as alleged herein – creating fraudulent documents for use in foreclosures – violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  They involved an ongoing scheme to defraud consumers and courts, and they used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

151.    Defendants used this practice with respect to numerous documents that it caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants, and all of these contain the same fraudulent documents.

152.    Further, Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants regular way of conducting business.

153.    The Plaintiff, the Circuit Courts, and the Commissioner of Accounts relied on the fraudulent documents when they mistakenly believed that the Defendants were validly appointed substitute trustees who conducted a proper foreclosure sale.

154.    By means of example only, Plaintiffs and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise.  The Commissioner of Accounts approved the sale and the accounting of the sale based on the fraudulent documents that the Defendants submitted to him.

155.    Plaintiff and putative class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962 and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

156.     Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for compensatory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO; for his attorneys' fees and costs; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**ALLEN CHATTER**

By_____/s/_____
Of Counsel

Matthew J. Erausquin, VSB No. 65434
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com
janelle@clalegal.com

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:    (757) 930-3660

Fax:    (757) 930-3662
lenbennett@clalegal.com
srotkis@clalegal.com

Dale W. Pittman, VSB No. 15673
*Counsel for the Plaintiff*
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel:    (804) 861-6000
Fax:    (804) 861-3368
dale@pittmanlawoffice.com

Kristi Cahoon Kelly, VSB No. 72791
*Counsel for the Plaintiff*
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Tel:    (703) 277-9774
Fax:    (703) 591-9285
kkelly@siplfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2012, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Douglas P. Rucker, Jr.
Andrew Biondi
Cullen D. Seltzer
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, V A 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
drucker@sandsanderson.com
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

*Counsel for the Defendants*

$$\overline{\qquad\qquad \text{/s/} \qquad\qquad}$$
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:   (757) 930-3660
Fax:   (757) 930-3662
srotkis@clalegal.com