**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| JOHN K. GOODROW, )<br>LETONYA BANKS, ALLEN CHATTER, )<br>LAUREN BUEL, MARTIN BUEL, )<br>ADAM MBUNDURE, MICHELE )<br>McBETH )<br>*individually and on* )<br>*behalf of all others similarly situated*, )<br>  )<br>Plaintiffs, )<br>  )<br>v.  )<br>  )<br>FRIEDMAN & MACFADYEN, P.A. )<br>JOHNIE R. MUNCY, and )<br>F&M SERVICES, L.C. )<br>  )<br>Defendants. )<br>_____ ) | Civil Action No. 3:11cv020 |

## CONSOLIDATED CLASS COMPLAINT

COME NOW the Plaintiffs, John K. Goodrow, Letonya Banks, Allen Chatter, Lauren

Buel, Martin Buel, Adam Mbundure, and Michele McBeth, individually and on behalf of all

others similarly situated, ("Plaintiffs" or "Consolidated Plaintiffs") by counsel, and allege the

following facts that entitle them to relief, both as a class and individually:

## INTRODUCTION

1.      Defendants – a now defunct foreclosure mill – engaged in a systemic practice of

law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures

and ensuring that the mill had as low a cost structure as they could construct.  To accomplish

these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a

neutral trustee, lied to Circuit Courts through their Commissioners of Accounts, in addition to

consumer victims and others regarding the custody and ownership of mortgage notes and their

supposed compliance with Virginia's foreclosure requirements, and, in the process, largely ignored federal law enacted to protect consumers against overly aggressive debt collectors. Accordingly, Plaintiffs bring these claims for actual, statutory, treble, and punitive damages, declaratory and injunctive relief, costs, and attorneys' fees pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"), the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§1692 *et seq.*, and for the Defendants' civil conspiracy and fraud. These claims arise from the Defendants' unlawful attempts to collect delinquent home mortgage debts allegedly owed by Plaintiffs and the putative class members. Plaintiffs allege that, to the extent that any of the named Defendants were validly and properly appointed as Substitute Trustees, they breached their fiduciary duties as trustees under the Deeds of Trust by acting in conflict with the interests of the named individual Plaintiffs and the putative class members; by failing to undertake necessary actions regarding the prerequisites to instituting foreclosure sales and mailing notices of the alleged foreclosure sales as required under the Deeds of Trust and by law; and by exceeding the scope of their authority.

2.      Furthermore, Plaintiffs and the putative class members allege that Defendants acted fraudulently in that they knowingly made a series of false statements and representations in connection with the collection of the alleged debts and of the foreclosures in their efforts to rush through the foreclosure process as quickly as possible.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from the alleged mortgage servicers and others based in large part on the speed with which they are able to conduct foreclosures.  Another benefit obtained by the Defendants by sacrificing their grave responsibilities to ensure the fundamental integrity of the foreclosure process in exchange for speed is a competitive edge against other foreclosure mills.  Servicers will refer more cases to the

Defendants based on the speed in which they conduct foreclosure sales. Thus, not only do the Defendants lie to consumers and Circuit Courts, but they obtain an unfair advantage against entities that engage in a more thoughtful and deliberative process in an effort to comply with the law. Plaintiffs and the putative class allege that Defendants engaged in a civil conspiracy to violate Virginia and federal law. Plaintiffs and the putative class members also allege that Defendants violated the FDCPA by sending letters to consumers that failed to identify the creditors to whom the debts were owed, contained false statements and material misrepresentations regarding the collection of a debt by a debt collector, attempted to collect "attorneys fees" for themselves which were not due and owing, and initiated foreclosure activities when they had no present right to possession of the property. Finally, certain of the Plaintiffs allege that Defendants communicated directly with them when the Defendants knew that the Plaintiffs were represented by counsel.

## JURISDICTION

3.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

## PARTIES

4.      Plaintiff John K. Goodrow (hereafter "Goodrow") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

5.      Plaintiff Letonya Banks (hereafter "Banks") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

6.      Plaintiff Allen Chatter (hereafter "Chatter") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

7.     Plaintiff Adam Mbundure (hereafter "Mbundure") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

8.     Plaintiff Laurel Buel (hereafter "Mrs. Buel") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

9.     Plaintiff Martin Buel (hereafter "Mr. Buel") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

10.    Plaintiff Michele McBeth (hereafter "McBeth") is a natural person who resides in Virginia.  At all times relevant hereto, Ms. McBeth was a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

11.    Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman") is a law firm with offices in Maryland, Virginia, and Washington D.C., the principal purpose of whose business is the collection of debts, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

12.    Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

13.    Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

14.    Defendants regularly collect or attempt to collect debts owed or due or asserted to be owed or due another, and each is a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(6).

**STATEMENT OF FACTS**

15.     Defendants operate as a debt collecting and foreclosure conducting enterprise. Friedman is not, for example, simply a parent holding company of F&M.  Instead, all Defendants operate as parts of a single business operation.  Friedman provides management and decision-making and operates as the front for contact with the targeted debtor-consumers and the loan servicers, while F&M exists as an employee-less paper entity that purports to act as the "substitute trustee" under the various deeds of trust. Muncy also acts as a "substitute trustee" under the deeds of trust, and is often the named "substitute trustee" listed in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers.

16.     F&M does not operate independent of Friedman.  It does not have a separate office, separate management or separate business and income.   Instead, they are interrelated and inseparably operate as a single business operation.

17.     For example, the majority of the "officers" of F&M are also employees of Friedman.

18.     F&M has little or no income that is not directly derived from Friedman.

19.     F&M does not have any employees.  Instead, it is a shell entity used by Friedman whose sole purpose is to act as the "substitute trustee", and it is only used for that purpose with Defendant Muncy listed as the named "trustee" on many related documents.

20.     Additionally, Muncy is also an attorney who was employed by Friedman at the time he was named as "substitute trustee" for various deeds of trust, including the Plaintiffs' deeds of trust.

21.     Friedman, on the other hand, serves as the frontline company that deals directly with targeted consumer debtors. Friedman directs the actions of the personnel who interact with the debtors and with the loan servicers.

### The Defendants are Debt Collectors

22.     Defendant Friedman is a law firm whose practice is focused on the collection of debts.

23.     Defendants advertise that they provide loss mitigation, bankruptcy, and foreclosure services to creditors[1].

24.     Defendants regularly collect home loan debts, bringing Defendants' collection activities within the purview of the FDCPA. 15 U.S.C. § 1692a(5).

25.     Defendants regularly demand payment from consumers of claimed arrearages and provide reinstatement quotes to consumers and itemizations of amounts they are attempting to collect that often have no basis in reality.

26.     Defendants regularly tell consumers in correspondence that "this is an attempt to collect a debt and any information obtained will be used for that purpose" and/or that "the communication is from a debt collector".  These are disclosures that the FDCPA, at 15 U.S.C. § 1692e(11), requires that debt collectors provide in all written communications (other than a formal pleading) sent "in connection with the collection of any debt" ("the § 1692e(11) disclosure").

27.     Defendants regularly purport to provide verification of debts required by the FDCPA, at 15 U.S.C. § 1692g(b), upon written request from consumers in an effort to convince the consumer to pay the amount demanded.

---

[1] *See* http://www.fmlaw.com/fmlaw.html (last visited July 23, 2011).

## FACTS REGARDING THE NAMED PLAINTIFFS

### A.  Defendants' Specific Conduct Regarding John K. Goodrow

28.     Plaintiff borrowed $290,000 in order to refinance his mortgage, as evidenced by a promissory note dated October 26, 2005 ("the Note"). The Note was payable to First Horizon Home Loan Corporation (hereafter "First Horizon").

29.     The Note was secured by a Deed of Trust dated October 26, 2005 and recorded in the Clerk's office of the Circuit Court of Fairfax County.

30.     Plaintiff's Note and Deed of Trust obligated him to repay First Horizon.

31.     The Deed of Trust has a Mortgage Identification Number ("MIN") so that the servicing rights and ownership rights of the mortgage loan can be tracked electronically on the Mortgage Electronic Registration System ("MERS").

32.     Upon information and belief, at the time of origination of the loan, Federal National Mortgage Association ("Fannie Mae") had a contractual agreement to purchase loans originated by First Horizon.

33.     Upon information and belief, Fannie Mae purchased Plaintiff's loan subsequent to the origination through the above-described contractual agreement with First Horizon.

34.     In accordance with the Deed of Trust, Fannie Mae was under no obligation to provide and, in fact, provided no documentation of the sale to Plaintiff.

35.     Plaintiff's loan was thereafter serviced by Met Life Home Loans (hereafter "Met Life"). As a servicer, Met Life acted on behalf of the owner of the loan to conduct certain customary servicing functions, such as collecting and recording payments, communicating with the homeowner, and assessing various fees.

36.     Plaintiff regularly made his payments to Met Life until he began to experience financial difficulties.

37.     In the summer of 2008, Plaintiff was no longer able to work due to a disability.

38.     In the fall of 2008, Plaintiff contacted his mortgage servicer, Met Life, in an effort to pursue loss mitigation options while he awaited his Social Security disability payments.

39.     In approximately 2008, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct a foreclosure sale.

40.     Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer from whom they attempted to collect a debt and thereafter conduct a foreclosure sale on their home. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

41.     Upon information and belief, Defendants maintain copies of these letters in their records.

42.     The subject line of the letters to the Plaintiffs and the putative class was styled as if a lawsuit was pending or was to be filed in order to intimidate consumers into paying the amounts demanded, including as a component inflated "attorneys fees" which went directly into the Defendants' pockets.  However, none of the Defendants ever filed or intended to file a lawsuit against the Plaintiffs or the putative class members.

43.     For example, the subject line of an October 9, 2008 correspondence is: "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow."

44.     In the October 9, 2008, Defendants also stated that they purportedly were retained by "MetLife Home Loans, a division of MetLife Bank NA", to foreclose on Plaintiff's home due to his alleged failure to make mortgage payments.

45.     This October 9, 2008 correspondence made several misrepresentations to Plaintiff, including but not limited to: that Defendants had been appointed by MetLife Home Loans a division of MetLife Bank NA in order to foreclose on Mr. Goodrow's home and that MetLife Home Loans a division of MetLife Bank NA was the holder/servicer of the Note.

46.     Defendants sent this October 9, 2008 letter to Plaintiff in connection with the collection of a debt.

47.     Defendants sent correspondence to Plaintiff dated November 24, 2008 providing him with a reinstatement quote demanding money from the Plaintiff in order to purportedly bring his loan current.

48.     Defendants' November 24, 2008 letter was an attempt to collect a debt and contains a boldface § 1692e(11) disclosure.

49.     Defendants' November 24, 2008 letter to the Plaintiff attempting to collect a debt states the following, among other things:

    A.     The amount necessary to reinstate the above-referenced loan and to resolve the pending action in amounts that "are good through December 9, 2008,"

    B.     Warns Mr. Goodrow that "if the effective date for the payment quotation stated in this letter continues past the scheduled foreclosure sale date, the foreclosure sale will nonetheless occur unless the loan is reinstated or paid off PRIOR TO the foreclosure sale,"

    C.     That "(B)ecause of interest, late charges, trustee's and/or attorney's fees and costs (if applicable), and other charges that may vary from day to day or that may change after the date of this communication, the amount due on the day you pay may be greater. You may also owe the amount of any monthly or other payments and late charges that may fall due after the date of this communication. Therefore, if you pay the amount above, an adjustment may be necessary after we

receive your payment. For further information or for an updated figure, write or call."

D.      That "(A)ll funds must be submitted in the form of Certified and/or Cashier's check(s) and/or Money Order(s) and must be made payable to **MetLife Home Loans** Funds must be sent to the attorney/trustee office listed above."

E.      That "(U)pon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action to obtain **a dismissal of the action**." (emphasis added)

F.      Advises Mr. Goodrow that he should verify the amounts due and owing to ensure that they are correct.

G.      Provides an amount demanded for reinstatement of Mr. Goodrow's home mortgage loan.

50.     Defendants sent Plaintiff another letter bearing the date November 24, 2008 ("the second November 24, 2008 dunning letter").

51.     The second November 24, 2008 dunning letter also begins with the FDCPA's required disclosure of the § 1692e(11) notice and includes language pertinent to Defendants' attempts to collect the subject debt.

52.     Defendants also sent Plaintiff Goodrow correspondence dated November 26, 2008.

53.     The November 26, 2008 letter states that "Fannie Mae, the investor with respect to your loan, instructed us to temporarily halt the foreclosure sale…"

54.     The November 26, 2008 correspondence also presents "various options to avoid foreclosure," including a "**Repayment Plan:**   an agreement to pay the delinquency over a series of months," and it concludes with a recitation of the FDCPA's required § 1692e(11) notice.

55.     The November 26, 2008 correspondence states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT**

**PURPOSE. THIS IS A COMMUNICATION FROM A DEBT COLLECTOR. THIS FIRM IS A DEBT COLLECTOR**

56.     Additionally, at times, Defendant Friedman signed the letters to the Plaintiff and putative class as Substitute Trustee. However, the substitute trustee document for the Plaintiff and the putative class never purported to appoint Defendant Friedman as substitute trustee.

57.     The various letters to the Plaintiff and putative class further included an alleged Substitution of Trustee document.

58.     The Substitution of Trustee document that Defendants sent to the Plaintiff was dated October 8, 2008 and was subsequently filed in the Fairfax County Circuit Court on November 10, 2008.

59.     This document stated that "First Horizon Home Loans, a division of First Tennessee National Association" was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared.  Upon information and belief, this statement was false.

60.     This statement that the Defendants were appointed by First Horizon is in direct contradiction to their October 9, 2008 letter that states the Defendants were appointed by MetLife Home Loans, a division of MetLife Bank NA.  One, or both, of these statements is false, particularly given that Virginia Code §55-59(9) requires that only the party secured by the deed of trust or the holders of greater than 50% of the monetary obligations secured thereby have the right to appoint a substitute trustee.

61.     The Substitution of Trustee document stated that the identified entity had appointed Defendants F&M and Muncy as substitute trustees.

62.     Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

63.     Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

64.     Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

65.     In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

66.     Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

67.     Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon.

68.     However, upon information and belief, Fannie Mae was the Noteholder at the time the Substitution of Trustee document was created. Therefore, First Horizon no longer possessed the authority to appoint a substitute trustee.

69.     The Substitution of Trustee document was purportedly signed by an "Assistant Vice President" of First Horizon Home Loans, a division of First Tennessee National Association, the claimed noteholder, and was thereafter allegedly notarized. At some point after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match.

70.     Although the Substitution of Trustees Deed is dated October 8, 2008, it was not purportedly notarized until October 21, 2008.

71.     Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

72.     The Defendants failed to disclose that Fannie Mae was the creditor to whom the debt was owed and the noteholder of his loan in their correspondences to Plaintiff, and further the Defendants falsely represented in the substitution of trustee document that "First Horizon Home Loans, a division of First Tennessee National Association" was the current noteholder of Plaintiff Goodrow's loan.

73.     In short - at no time did the alleged Substitute Trustees, Defendants F & M and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

### *Mr. Goodrow Retains an Attorney*

74.     Plaintiff retained the services of Legal Services of Northern Virginia, to represent him with respect to Defendants' collection efforts.

75.     Defendants knew that Plaintiff had retained the services of an attorney to represent him.

76.     Plaintiff's attorney communicated in writing with Defendants on behalf of Plaintiff regarding the alleged debt that Defendants were attempting to collect from him.

13

77.     By way of example, Plaintiff's attorney sent a letter dated December 18, 2008 letter to Defendants advising of counsel's representation of Plaintiff in connection with Defendants' attempts to collect the subject debt.

78.     Defendants received this letter.

79.     For a time after receiving this letter, Defendants communicated orally and in writing with Plaintiff's attorney with respect to the subject debt.

80.     By way of example, Defendants sent a letter dated December 23, 2008 to Plaintiff's attorney in connection with Defendants' attempts to collect the subject debt.

81.     Although the Defendants knew that Mr. Goodrow was represented by an attorney with regard to his unpaid mortgage and knew the attorney's name and address, they nevertheless subsequently communicated directly with him with respect to the subject debt.

82.     By way of example, Defendants sent a letter dated January 11, 2010 letter directly to Plaintiff in connection with Defendants' attempts to collect the subject debt.

83.     The January 11, 2010 correspondence included a copy of the Substitution of Trustees Deed, with the same misrepresentations as discussed above.

84.     The subject line of the January 11, 2010 letter that Defendants sent directly to Plaintiff is:  "MetLife Home Loans a division of MetLife Bank NA v. John K. Goodrow"

85.     The January 11, 2010 letter states that Plaintiff's home will be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advises Plaintiff to "contact the undersigned immediately" should he "desire to avoid the necessity of a foreclosure sale and satisfy (his) obligation.

86.     The Defendants were aware at all times that Virginia Rule of Professional Conduct 4.2 prohibited them as attorneys from communicating directly with a represented party.

87.     The January 11, 2010 correspondence also states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

### *Defendants Foreclose on Mr. Goodrow's Home*

88.     Defendants' correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

89.     The foreclosure sale allegedly took place on February 3, 2010 and a trustee's deed dated February 3, 2010 (hereafter "the Trustee's Deed"), which purported to convey the property to a Grantee, was subsequently filed in the Fairfax County Circuit Court on February 16, 2010.

90.     The Trustee's Deed stated that "First Horizon Home Loan, A Division of First Tennessee Bank National Association" was the current Noteholder and Defendants Muncy and F&M were the current Substitute Trustees. These statements were false.

91.     Upon information and belief, the individuals who signed the sworn statements on the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

92.     Furthermore, according to Plaintiff's Deed of Trust, in the event of a foreclosure sale, the Trustee is required to deliver title to the highest bidder at the sale.

15

93.     Trustees failed to deliver the Trustee's Deed conveying property to the highest bidder, and instead conveyed the property to a third party who was not the highest bidder at the auction.

94.     Furthermore, in the Trustee's Deed, the Defendants represent that Fannie Mae is an affiliate of First Horizon Home Loans, a Division of First Tennessee Bank National Association". This statement was false.

95.     Fannie Mae is not an affiliate of First Horizon Home Loans.

96.     Upon information and belief, the Defendants thereafter filed a foreclosure accounting statement with the Fairfax County Circuit Court's Commissioner of Accounts.

97.     Upon information and belief, the Defendants made certain misrepresentations about the accounting of the proceeds obtained from the foreclosure sale.

98.     Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents, which the Commissioner relied on when it thereafter approved the accounting of the foreclosure sale.

99.     Defendants knew or should have known that this and each of the foregoing misrepresentations that they made were false.

100.    As a result of the acts and omissions of the Defendants, Plaintiff has suffered actual damages and injury, including but not limited to, emotional distress, mental anguish, and suffering.

### B. Defendants' Specific Conduct Regarding Allen Chatter

101.    Plaintiff borrowed $423,675.00 for his mortgage, as evidenced by a promissory note dated February 20, 2008 (hereafter "the Note"). The Note was payable to First Horizon Home Loans (hereafter "First Horizon").

102.    The Note was secured by a deed of trust dated February 20, 2008 (hereafter the "Deed of Trust") and recorded in the Clerk's office of the Fairfax County Circuit Court.

103.    Plaintiff's Note and Deed of Trust obligated him to repay First Horizon.

104.    At some point, Chase Home Finance, LLC (hereafter "Chase") became the servicer of Plaintiff's loan. As servicer, Chase acted on behalf of the owner of the loan to conduct certain customary servicing functions such as collecting and recording payments, communicating with the homeowner, and assessing late fees.

105.    Plaintiff's mortgage loan was a U.S. Department of Veterans Affairs (VA) guaranteed loan, and as such is insured against loss if the loan goes into default.

106.    Because of this low-risk status and the government's guarantee, the VA expressly incorporated certain provisions and guidelines into the Deed of Trust that requires note holders and servicers to abide by a defined set of regulations and procedures as codified under Title 38 of the United States Code and in regulations issued by the VA.

107.    These laws and regulations require that the loan servicing program be maintained in such a way as to assure prompt responses to inquiries from borrowers. 38 C.F.R. 36.4278(g)(iv) specifically provides that if the holder has not evaluated the financial circumstances of the borrower or obtained a repayment plan from the borrower, then a face-to face interview or reasonable effort to arrange a meeting is required.

108.    The VA Servicer Guide further provides:

VA prefers that you first consider loss mitigation options that keep the veteran in their [sic] home. VA requires you to choose the best option for all parties and asks that you consider options as early in the delinquency as possible.
        . . . .

*When alternatives to foreclosure are not possible*, the loan should be referred for foreclosure as quickly as possible. VA encourages you to continue to pursue loss mitigation options even after initiating the foreclosure process. If a loss mitigation

option looks promising, *VA would expect you to postpone the foreclosure action*.

VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 72–73

(Version 1.2 July 2009).

109.    Around 2009, Plaintiff began experiencing financial hardship and sought a loan modification in the attempt to make his loan payments more affordable and prevent foreclosure. In 2009, Plaintiff submitted a complete application for a loan modification to Chase.

110.    After sending Chase the completed modification application, Plaintiff called Chase to verify its receipt. Chase verified that it had received the application.

111.    Despite the explicit instructions from the VA, Plaintiff's request for assistance went ignored. Chase never evaluated his financial circumstances, established the reason for his default or obtained an agreement for a repayment plan. Instead, his loan was referred to foreclosure.

112.    Chase never offered nor made any attempts to arrange a face-to-face interview with the Plaintiff.

113.    In approximately 2010, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale. Upon information and belief, Defendants maintain copies of these letters in their records.

114.    Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer who they attempted to collect a debt and conduct a foreclosure sale on their home.

115.    The subject line of the letters to Plaintiff and the putative class was styled as if a lawsuit was pending or was to be filed.  However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff or the putative class members.

116.    For example, the letters sent to Plaintiff were styled "Chase Home Finance, LLC v. Allen Chatter."

117.    Additionally, at times, Defendant Friedman signed the letters to the Plaintiff and putative class as Substitute Trustee. The substitute trustee document never purported to appoint Defendant Friedman as substitute trustee.

118.    The various letters to the Plaintiff and putative class further included an alleged Substitution of Trustee document dated July 22, 2010, which was filed in the Fairfax County Circuit Court on August 20, 2010.

119.    This document stated that Chase Home Finance, LLC was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared.  Upon information and belief, this statement was false.

120.    The Substitution of Trustee document stated that Chase had appointed Defendants F&M and Muncy as substitute trustees.

121.    Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

122.    Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the

Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

123. Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

124. In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

125. Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

126. Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon Home Loans. Any authority Chase possesses to appoint a substitute trustee would have to come from First Horizon or a subsequent noteholder. No such authority appears to exist.

127. The Substitution of Trustee document was purportedly signed by Mark H. Friedman, as "Attorney-in-Fact" for the purported Noteholder and was thereafter allegedly notarized. Even after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match. Therefore, Defendant Friedman essentially attempted to appoint itself, through its employees, as substitute trustee.

128. At the time that he executed and acknowledged the document appointing his firm as the substitute trustee, Mark Friedman was not the party secured by the Deed of Trust.

129. At the time that he executed and acknowledged the document appointing his form as the substitute trustee, Mark Friedman was not the holder of greater than 50% of the monetary obligations secured by the Deed of Trust.

130. Again, this Substitution of Trustee document was a form document used by the Defendants and it was Defendants policy and procedure to have Mark Friedman (or some other

person forging his name) sign these documents as "Attorney-in-Fact", have it notarized at a later time, and have the notary block filled in at yet another time.

131.    Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

132.    In short - at no time did the alleged Substitute Trustees, Defendants F & M and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

133.    Further, Defendants had access to a copy of the Deed of Trust and knew or should have known that Mr. Chatter's loan was a VA loan and the noteholder was required to comply with Title 38 of the United States Code and Regulations implemented by the VA, in that they were expressly incorporated into Mr. Chatter's Deed of Trust.

134.    Because of this, Defendants, as fiduciary, had a duty to ensure that these requirements were followed prior to the acceleration of the mortgage loan that was subject to the Deed of Trust.

135.    Specifically, the Deed of Trust states: "the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations."

136.    Despite this express mandate in the Deed of Trust, prior to conducting the foreclosure sale, aside from a one page referral form, Defendants did not require *any* documents from the lender, servicer or noteholder confirming that Title 38 or the relevant regulations were followed.

137.    Because the Defendants were allegedly appointed substitute trustee, they had a fiduciary duty under the Deed of Trust to ensure that the prerequisites to acceleration and foreclosure were followed.

138.    Defendants breached this duty to Mr. Chatter and the putative class members.

### Defendants Foreclose on Mr. Chatter's Home

139.    Defendants' correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

140.    The foreclosure sale allegedly took place on September 1, 2010 and a trustee's deed dated September 1, 2010 (hereafter "the Trustee's Deed"), which purported to convey the property to a Grantee, was subsequently filed in the Fairfax County Circuit Court on October 19, 2010.

141.    The Trustee's Deed stated that Chase Home Finance was the current Noteholder and Defendants Muncy and F&M were the current Substitute Trustees. These statements were false.

142.    Upon information and belief, the individuals who signed the sworn statements on the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal

knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

143.    Furthermore, according to Plaintiff's Deed of Trust, in the event of a foreclosure sale, the Trustee is required to deliver title to the highest bidder at the sale.

144.    Trustees failed to deliver the Trustee's Deed conveying property to the highest bidder, and instead conveyed the property to a third party who was not the highest bidder at the auction.

145.    The Defendants thereafter filed a foreclosure accounting statement with the Circuit Court Commissioner of Accounts for Fairfax County on February 22, 2011 (hereafter "the Accounting Statement").

146.    The Accounting Statement was subsequently recorded in the Fairfax County Circuit Court on October 27, 2011.

147.    This statement accounts for a "Trustee's Commission" of $600.00 that the Defendants collected from the foreclosure proceeds.

148.    Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents, which the Commissioner relied on when it thereafter approved the accounting of the foreclosure sale.

### C.  Defendants' Specific Conduct Regarding Michele McBeth

149.    Ms. McBeth borrowed $168,000 for her mortgage, as evidenced by a promissory note dated July 29, 2003 ("the Note"). The Note was payable to Wachovia Mortgage Corporation (hereafter "Wachovia").

150.    The Note was secured by a Deed of Trust dated July 29, 2003 and recorded in the Clerk's office for the City of Norfolk.

151.   Ms. McBeth's Note and Deed of Trust obligated her to repay Wachovia.

152.   The Deed of Trust was assigned a Mortgage Identification Number ("MIN") so that the servicing rights and ownership rights of the mortgage loan can be tracked electronically with Mortgage Electronic Registration System, Inc. ("MERS").

153.   Upon information and belief, at some time after the assignment of the Deed of Trust, Federal National Mortgage Association ("Fannie Mae") had a contractual agreement to purchase loans originated by Wachovia.

154.   Upon information and belief, Fannie Mae purchased Ms. McBeth's loan subsequent to the origination through the above-described contractual agreement with Wachovia.

155.   Ms. McBeth's loan was serviced by EverHome Mortgage Company (hereafter "EverHome") through August 1, 2010. As servicer, EverHome acted on behalf of the owner of the loan to conduct certain customary servicing functions such as collecting and recording payments, communicating with the homeowner, and assessing late fees.

156.   Ms. McBeth regularly made her payments to EverHome until August 2009, when she called EverHome to make a payment over the phone and inquire about a modified payment plan. During that phone call, EverHome lowered Ms. McBeth's monthly payment and confirmed that she was qualified for the Making Home Affordable Home Affordable Modification Program (HAMP).

157.   Wells Fargo Home Mortgage (hereafter "Wells Fargo") forwarded correspondence to Ms. McBeth dated July 27, 2010 indicating that EverHome was transferring the servicing responsibilities of her loan to Wells Fargo effective August 1, 2010.

158.    In July 2010, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale.

159.    Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer who they attempted to collect a debt and conduct a foreclosure sale on their home. Therefore, upon information and belief these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

160.    Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiff and to the putative class members in their records.

161.    In correspondence to Ms. McBeth dated July 28, 2010, Defendants stated that EverHome purportedly retained them to foreclose on Ms. McBeth's home to her alleged failure to make mortgage payments.

162.    The July 28, 2010 correspondence stated that EverHome was the noteholder and/or servicer at the time the letter was prepared.

163.    The July 28, 2010 correspondence advised Ms. McBeth that Defendants had been appointed by EverHome to foreclose on Ms. McBeth's home.

164.    Defendants' July 28, 2010 letter further stated:

**THIS IS A COMMUNICATION FROM A DEBT COLLECTOR THIS FIRM IS A DEBT COLLECTOR.**

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

165.    Among other things, Defendants' July 28, 2010 letter attempting to collect the subject debt, stated the following:

a.  that the total indebtedness "due from the date of default is $158,561.98,"

b. that they had calculated a statement of Ms. McBeth's debt, as of the date of the letter, but to obtain the most current figures, it would be necessary for Ms. McBeth to contact the Defendants,

c. that "[s]hould you wish to reinstate or payoff your loan, or obtain a current statement of your debt for any reason, please contact our foreclosure department at the above telephone number…

166.     On July 28, 2010, Defendants forwarded another correspondence to Ms. McBeth claiming that they did not have possession of the original note, but had evidence of the indebtedness.

167.     The subject line of the letter to Ms. McBeth, and similarly the letters to the putative class members, was styled as if a lawsuit was pending or was to be filed.  However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff or the putative class members.

168.     For example, the subject line of the second July 28, 2010 correspondence is: "EverHome Mortgage Company v. Michele L. McBeth."

169.     Defendants' July 28, 2010 letter further advised Ms. McBeth that Defendants were attempting to collect a debt.

170.     On July 28, 2010, Defendants forwarded Ms. McBeth a third letter regarding alternatives to foreclosure. The subject line of the third July 28, 2010 correspondence is: "EverHome Mortgage Company v. Michele L. McBeth."

171.     In order to discuss alternatives to foreclosure, Ms. McBeth was advised to call Defendant Friedman & MacFadyen.

172.     Defendants sent correspondence to Ms. McBeth dated August 3, 2010 providing her with a reinstatement quote advising Ms. McBeth how much to pay them in order to bring her loan current.

173.    Defendants' August 3, 2010 letter was an attempt to collect a debt, and contains a boldface § 1692e(11) disclosure.

174.    The August 3, 2010 letter states the following, among other things, in connection with Defendants' attempts to collect the subject debt:

A.    States that the amount necessary to reinstate the above-referenced loan and to resolve the pending action in amounts that "are good through August 27, 2010"

B.    Warns Ms. McBeth that **"**if the effective date for the payment quotation stated in this letter continues past the scheduled foreclosure sale date, the foreclosure sale will nonetheless occur unless the loan is reinstated or paid off PRIOR TO the foreclosure sale,"

C.    States that "(B)ecause of interest, late charges, trustee's and/or attorney's fees and costs (if applicable), and other charges that may vary from day to day or that may change after the date of this communication, the amount due on the day you pay may be greater. You may also owe the amount of any monthly or other payments and late charges that may fall due after the date of this communication. Therefore, prior to making payment, it is necessary for you to verify the exact amount due."

D.    States that "(A)ll funds must be submitted in the form of Certified and/or Cashier's check(s) and/or Money Order(s) and must be made payable to **EverHome Mortgage** Funds must be sent to the attorney/trustee office listed above."

E.    States that "After reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a withdrawal of the action."

F.    Advises Ms. McBeth that she should verify the amounts due and owing to insure that they are correct.

G.    And provides an amount demanded for reinstatement of Ms. McBeth's home mortgage loan.

175.    At times, Defendant Friedman signed the letters to the Plaintiff and to the putative class members as "Substitute Trustee". The substitute trustee documents for the Plaintiff and the putative class never purported to appoint Defendant Friedman as substitute trustee.

27

176.    The various letters to the Plaintiff and the putative class further included an alleged Substitution of Trustee document.

177.    On August 10, 2010, Defendants forwarded Ms. McBeth a letter that contained a copy of the alleged Substitution of Trustees document.

178.    The August 10, 2010 letter states that Ms. McBeth's home will be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advises Ms. McBeth to "contact the undersigned immediately" should she "desire to avoid the necessity of a foreclosure sale and satisfy (her) obligation.

179.    The second August 10, 2010 correspondence also states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

180.    The Substitution of Trustee document sent to the Plaintiff was dated July 27, 2010 and was subsequently filed in the Circuit Court for the City of Norfolk.

181.    This document states that EverHome was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared. This statement was false.

182.    The Substitution of Trustee document stated that EverHome had appointed Defendants F&M and Muncy as substitute trustees.

183.    Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

184.    Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

The Note or partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

185.    Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

186.    In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

187.    Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

188.    Plaintiff's Deed of Trust identifies the Lender of her mortgage as Wachovia. Any authority EverHome possesses to appoint a substitute trustee would have to come from Wachovia or a subsequent noteholder. No such authority appears to exist.

189.    The Substitution of Trustee document was purportedly signed by an "Assistant Vice President" of EverHome, the claimed noteholder, and was thereafter allegedly notarized. At some point after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match.

190.    Although the Substitution of Trustees Deed is dated July 27, 2010, it was not purportedly notarized until August 5, 2010.

191.    Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement

or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

192.    Fannie Mae is/was the actual noteholder of Plaintiff's loan.

193.    The Defendants failed to disclose that Fannie Mae was the creditor to whom the debt was owed and the noteholder of her loan in their correspondences to Ms. McBeth, and further falsely represented in the substitution of trustee document that EverHome was the current noteholder of her loan.

**D.  Defendants' Specific Conduct Regarding Laurel and Milton Buel**

194.    Plaintiffs, as co-mortgagors, obtained a mortgage for their home, as evidenced by a promissory note dated December 3, 2002 (hereafter the "Note"). The Note was payable to Wachovia Mortgage Corporation (hereafter "Wachovia").

195.    The Note was secured by a deed of trust dated December 3, 2002 ("the Deed of Trust") and recorded in the Clerk's office of the Westmoreland County Circuit Court.

196.    Plaintiffs' Note and Deed of Trust obligated them to pay Wachovia.

197.    At some point, Chase Home Finance (hereafter "Chase") began servicing Plaintiffs' mortgage loan. As servicer, Chase acted on behalf of the owner of the loan to conduct certain customary servicing functions such as collecting and recording payments, communicating with the homeowner, and assessing late fees.

198.    Plaintiffs made their payments to Chase until they began to experience financial difficulty and inquired about a modification of their mortgage payments.

199.    Chase informed Plaintiffs that they must first be delinquent on their mortgage payments before they could obtain a loan modification.

200.    Plaintiffs followed Chase's instructions and subsequently submitted a complete loan modification application in June 2009.

201.    Plaintiffs spent the next roughly sixteen months resubmitting documents that Chase claimed were lost or never received or outdated, all the while being told repeatedly that their application was in underwriting.

202.    Around September 2010, the Defendants began sending various correspondences to the Plaintiffs in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale.

203.    Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer who they attempted to collect a debt and conduct a foreclosure sale on their home. Therefore, upon information and belief these form correspondences were sent not only to the Plaintiffs, but to the putative class members as well.

204.    Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiffs and to the putative class members in their records.

205.    In correspondence to each Plaintiff, both dated September 29, 2010, Defendants stated that "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp." purportedly retained them to foreclose on Plaintiffs' home for their alleged failure to make mortgage payments

206.    This correspondence stated that "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp." was the "servicer and/or noteholder" of Plaintiffs' loan.

207.    Defendants' September 29, 2010 correspondence to Plaintiffs also stated that "upon receipt of the necessary funds, Friedman and MacFadyen, P.A. will take appropriate action to obtain a dismissal of the action."

208.   Virginia is not a judicial foreclosure state, and there is no "action" against the consumers requiring "dismissal".

209.   The second September 29, 2010 correspondence to Plaintiffs further stated, "Chase acts as the mortgage loan servicer for the investor that owns your loan. The investor has authorized Chase to provide this information and to act on its behalf."

210.   Defendants sent Plaintiffs' a second correspondence dated September 29, 2010.

211.   The subject line of the second correspondence to Plaintiffs was styled as if a lawsuit was to be or had already been filed.  However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiffs.

212.   For example, the second letter dated September 29, 2010 that Defendants sent to Plaintiffs was styled "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp. v. Milton S. Buel and Laura [sic] B. Buel."

213.   This letter to the Plaintiffs stated that "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp." was the current "holder/servicer" of the Note. This statement was in direct conflict with their statement that Chase was the servicer on behalf of the owner of Plaintiffs' Note.

214.   Defendants' letter stated that "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp." had appointed the undersigned, Defendants Friedman and Muncy, as trustees for the purpose of foreclosing on the deed of trust. However, no alleged substitute trustee document was recorded in the Westmoreland County Circuit Court.

215.   The correspondence further stated that the Defendants did not have the original Note in their possession, but they have evidence of the indebtedness.

216.    Defendants' letter to Plaintiffs further stated that the Lender had informed them that the original Note would be forwarded to them.  Upon information and belief, this statement was false.

217.    Defendants' letters also included one or both of the following notices:

> THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

> THIS IS A COMMUNICATION FROM A DEBT COLLECTOR THIS FIRM IS A DEBT COLLECTOR.

218.    On September 29, 2010, Defendants forwarded Plaintiffs a third letter regarding alternatives to foreclosure. The subject line of the third September 29, 2010 correspondence is: "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp. v. Milton S. Buel and Laura [sic] B. Buel".

219.    In order to discuss alternatives to foreclosure, Plaintiffs were advised to call Defendant Friedman.

220.    The Defendants sent to Plaintiffs three letters within the span of one month providing an accounting of the current balance that Defendants claimed was due in order to prevent a foreclosure from taking place. However, these three accounting statements contained conflicting information related to certain costs, fees, and interest that were charged to the Plaintiffs.

221.    By means of example only and without limitation, on the first statement dated September 29, 2010, the interest purportedly began to accrue on February 1, 2009.  However, in the last two statements dated October 27, 2010 and October 29, 2010, the interest purportedly began to accrue on January 1, 2009.  One or both of these statements was false.

222.   Additionally, by means of example only and without limitation, in the two October 2010 statements provided by Defendants that were provided to Plaintiffs two days apart and for the same loan, one statement alleged that the "Current Foreclosure Attorney/Trustee Fees and Costs" was $2,881.59 while on the other statement (for the same loan), this amount was $875.59. Both of these amounts were inflated figures not owed by the Plaintiffs.

223.   At least one notice of the alleged foreclosure sale was advertised in a newspaper and stated that Defendants Muncy and F & M Services were the Substitute Trustees.

224.   At no time did the alleged Substitute Trustees, Defendants F & M Services and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

225.   Plaintiffs ultimately paid $111,800.30 to Defendants to prevent a foreclosure sale of their home.

E.   **Defendants' Specific Conduct Regarding Adam Mbundure**

226.   Mr. Mbundure borrowed $280,000 for his mortgage, as evidenced by a promissory note ("Note"), dated March 29, 2004. The Note was payable to Riggs Bank, N.A.

227.   The Note was secured by a Deed of Trust dated March 29, 2004 and recorded in the Clerk's office of Circuit Court of Fairfax County. Mr. Mbundure's Note and Deed of Trust obligated him to repay Riggs Bank, N.A.

228.   On October 10, 2005, the Deed of Trust was assigned from Riggs Bank, N.A. to Mortgage Electronic Registration System, Inc. ("MERS") as nominee for PNC Bank, N.A. ("PNC Bank").

229.    At this time, the Deed of Trust was assigned a Mortgage Identification Number ("MIN") so that the servicing rights and ownership rights of the mortgage loan can be tracked electronically on MERS.

230.    Upon information and belief, PNC Bank acquired both the ownership and servicing rights of the loan.

231.    In correspondence to Mr. Mbundure dated, August 2, 2010, the Defendants stated that they purportedly were appointed to foreclose on Mr. Mbundure's home by Dovenmuehle Mortgage due to Plaintiff's alleged failure to make mortgage payments.

232.    The subject line of the January 10, 2011, correspondence is: "Dovenmuehle Mortgage. v. Adam Mbundure and Regina Mbundure."

233.    The August 2, 2010, correspondence stated that Dovenmuehle Mortgage is the holder/servicer of the note.

234.    The August 2, 2010, correspondence advised Mr. Mbundure that Defendants had been appointed by Dovenmuehle Mortgage in order to foreclose on Mr. Mbundure's home.

235.    On August 2, 2010, Defendants forward correspondence to Mr. Mbundure indicating that they did not have possession of the original note, but do have evidence of the indebtedness.

236.    Defendants' August 2, 2010, letter further stated:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

*Defendants Attempt to Collect a Debt*

237.    The August 2, 2010, letter does the following, among other things, in connection with Defendants' attempts to collect the subject debt:

    a.   States that that the total indebtedness "of $254,761.85 as of the date of this letter,"

    b.   States that "[s]hould you wish to reinstate or payoff your loan, or obtain a current statement of your debt for any reason, please contact our foreclosure department at the above telephone number…

238.    Defendants sent correspondence to Mr. Mbundure dated August 18, 2010 providing them with a reinstatement quote advising Mr. Mbundure how much to pay them in order to bring his loan current.

239.    Defendants' August 18, 2010. letter was an attempt to collect a debt.

240.    Defendants' August 18, 2010. letter begins with a boldface § 1692e(11) disclosure.

241.    The August 18, 2010 letter does the following, among other things, in connection with Defendants' attempts to collect the subject debt:

    A.   Sets out the amount necessary to reinstate the above-referenced loan and to resolve the pending action in amounts that "are good through September 12, 2010"

    B.   Warns Mr. Mbundure that **"**if the effective date for the payment quotation stated in this letter continues past the scheduled foreclosure sale date, the foreclosure sale will nonetheless occur unless the loan is reinstated or paid off PRIOR TO the foreclosure sale,"

    C.   States that "(B)ecause of interest, late charges, trustee's and/or attorney's fees and costs (if applicable), and other charges that may vary from day to day or that may change after the date of this communication, the amount due on the day you pay may be greater. You may also owe the amount of any monthly or other payments and late charges that may fall due after the date of this communication. Therefore, if you pay the amount above, an adjustment may be necessary after we receive your payment. For further information or for an updated figure, write or call."

    D.   States that "(A)ll funds must be submitted in the form of Certified and/or Cashier's check(s) and/or Money Order(s) and must be made payable to **Dovenmuehle Mortgage** Funds must be sent to the attorney/trustee office listed above."

    E.   States that "After reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a withdrawal of the action."

      F.      Advises Mr. Mbundure that they should verify the amounts due and owing to insure that they are correct.

      G.      And provides an amount demanded for reinstatement of Mr. Mbundure's home mortgage loan.

242.     Defendants forwarded Mr. Mbundure correspondence dated August 24, 2010. Enclosed with that correspondence a Substitution of Trustees Deed.

243.     The second January 10, 2011, letter states that Mr. Mbundure's home will be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advises Mr. Mbundure to "contact the undersigned immediately" should he "desire to avoid the necessity of a foreclosure sale and satisfy (his) obligation.

244.     The second August 24, 2010 correspondence also states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

245.     The Substitution of Trustees Deed states that PNC Bank is the Noteholder.

246.     A Vice President of PNC Bank signed the Substitution of Trustees Deed.

247.     The Substitution of Trustees Deed is dated July 30, 2010, but is not notarized until August 5, 2010.

248.     Defendants claim that the Substitution of Trustees Deed gives them the authority to foreclose on Mr. Mbundure's home, by appointing them substitute trustee.

249.     If PNC Bank was the actual noteholder, Defendants failed to disclose that PNC Bank was the creditor to whom the debt is owed in their correspondences to Mr. Mbundure.

250.   As a result of the acts and omissions of the Defendants, Mr. Mbundure has suffered actual damages and injury, including but not limited to, emotional distress, mental anguish, and suffering.

**F.  Defendants' Specific Conduct Regarding Letonya Banks**

251.   Plaintiff borrowed $152,500.00 for her mortgage, as evidenced by a promissory note, dated October 31, 2007 (hereafter the "Note"). The Note was payable to SunTrust Mortgage, Inc. (hereafter "SunTrust").

252.   The Note was secured by a deed of trust dated October 31, 2007 (hereafter the "Deed of Trust") and recorded in the Clerk's office of Circuit Court for the City of Virginia Beach.

253.   Plaintiff's Note and Deed of Trust obligated her to repay SunTrust.

254.   Fannie Mae purchased Plaintiff's loan subsequent to its origination. As provided by the Deed of Trust, Fannie Mae provided no documentation of the sale to Plaintiff.

255.   After the sale of Plaintiff's loan to Fannie Mae, Litton Loan Servicing, LLP (hereafter "Litton") was given the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Fannie Mae. Among its responsibilities as the servicer, Litton was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing responsibilities were governed by Fannie Mae's Single Family Servicing Guide (the "Guide").

256.   The contract obligated Litton to follow Fannie Mae's instructions for servicing the loan, particularly the instructions detailed in the Guide. This contract, and the direction it

imposed on Litton, had the effect of making Litton an agent of Fannie Mae to perform servicing functions.

257.   The Guide gave Litton, on behalf of Fannie Mae, the authority to commence foreclosure on Plaintiff's home in case of their default on their obligations under the Note and Deed of Trust.

258.   The Guide and other instructions from Fannie Mae detailed when Litton was to commence proceedings and how they were to supervise foreclosure counsel. The Guide further provided instructions to Defendants on its requirements prior to commencing a foreclosure sale.

259.   Around 2009, Plaintiff began experiencing financial hardship and sought a loan modification in the attempt to make her loan payments more affordable and prevent foreclosure. In 2009, Plaintiff submitted a complete application for a loan modification to Litton.

260.   Litton approved Plaintiff's loan modification in 2009, but the proposed agreement would have increased, rather than decreased, Plaintiff's monthly payments.

261.   Despite resubmitting an application several times in an attempt to receive a more reasonable modification agreement, Plaintiff's loan was instead referred to foreclosure.

262.   In approximately 2010, the Defendants began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct a foreclosure sale.

263.   Upon information and belief, Defendants maintain copies of these letters in their records.

264.   Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer from whom they attempted to collect a debt and

conduct a foreclosure sale. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiffs, but to the putative class members as well.

265.    The subject line of the letters to Plaintiff was styled as if a lawsuit was pending or was to be filed. However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff.

266.    For example, a letter dated August 25, 2010 that the Defendants sent to Plaintiff was styled "Litton Loan Servicing, LLP v. Letonya L. Banks."

267.    Additionally, at times such as in its August 25, 2010 correspondence, Defendant Friedman signed the letters to the Plaintiff as Substitute Trustee. The substitute trustee document never purported to appoint Defendant Friedman as substitute trustee.

268.    The various letters to the Plaintiff further included an alleged Substitution of Trustee document dated August 11, 2010, which was filed in the Circuit Court for the City of Virginia Beach on September 3, 2010.

269.    The document stated that Litton Loan Servicing, LP was the Noteholder of Plaintiff's mortgage loans at the time that it was prepared. Upon information and belief, this statement was false.

270.    The Substitution of Trustee document stated that Litton had appointed Defendants F&M and Muncy as substitute trustees.

271.    Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

272.    Plaintiff's Deed of Trust contains specific provisions for the sale of her Note and the change of loan servicer. The provisions of section 20 state:

The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

273.   Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

274.   In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

275.   Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

276.   Plaintiff's Deed of Trust identifies the Lender of her mortgage as SunTrust. Any authority Litton possesses to appoint a substitute trustee would have to come from SunTrust or a subsequent noteholder. No such authority appears to exist.

277.   The Substitution of Trustee document was signed by a claimed representative on behalf of the purported Noteholder and was, on a later date, allegedly notarized.

278.   Again, this Substitution of Trustee document was a form document used by the Defendants and it was Defendants' policy and procedure to have Mark Friedman (or someone on his behalf) sign these documents as "Attorney-in-Fact", have it notarized at a later time, and have the notary block filled in at yet another time.

279.   Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee documents purporting to have personal knowledge of the facts contained in the sworn statement

or the legal standing to take the actions described therein, did not have such personal knowledge or legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

## FACTS COMMON TO ALL CONSUMERS

### Defendants owe a Fiduciary Duty to the Homeowner

280.    Virginia law provides that a trustee appointed under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them.

281.    Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Muncy was employed by Defendant Friedman, and thus none of these parties is an impartial or neutral "substitute trustee."

282.    In fact, Defendant Muncy has consistently maintained in this case that he and the law firm that he works for each have an attorney-client relationship with every possible entity involved – the supposed investors, noteholders and servicers – on the loans that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his interactions with those entities at a deposition, citing the attorney-client privilege as the basis for not disclosing such information:

```
 9      Q    Okay.  At the time you sent this letter,
10   what evidence of the indebtedness did you have?
11       A    We had the information contained in the
12   referral, not limited to this header document that you
13   have gone through, Exhibit 3.
14       Q    What other information did you have in the
15   referral?
16          MR. BIONDI:  I'm going to object to
17   attorney/client privilege.  The referral would include
18   instructions and requests for advice from a client to
19   Mr. Muncy or lawyers in his firm.
20          MS. KELLY:  So you're instructing him not
```

21  **to answer obviously?**
22          **MR. BIONDI:  Yes.**
23          MS. KELLY:  Just to clarify, are you
24  instructing Mr. Muncy not to answer regarding anything
25  else that may be in the referral documents?

1          MR. BIONDI:  You had asked what other
2   information was communicated to Mr. Muncy, who's the
3   attorney at Friedman & MacFadyen, by the clients,
4   which is Met Life Home Loans.
5          MS. KELLY:  In the referral.
6          MR. BIONDI:  In the referral, which I
7   don't know what could be in there, whether there's
8   going to be advice, request for advice, instructions.
9   Those matters are reasonably to be anticipation of
10  litigation at this point.  I'm sorry.  Take that back.
11  Not litigation.  But it's definitely part of the
12  attorney/client relationship and the purpose of the
13  representation conducting the foreclosure.

---

16      Q    What instructions did you receive from
17  First Horizon regarding Mr. Goodrow's mortgage loan?
18          **MR. BIONDI:  Don't answer that question.**
19  **Attorney/client privilege.**
21      Q    Did you communicate with First Horizon to
22  verify that they were the noteholder of Mr. Goodrow's
23  mortgage loan?
24          MR. BIONDI:  Wait a minute.  Same
25  objection.
1   BY MS. KELLY:
2       Q    Did you communicate with Met Life at all
3   to verify who the noteholder was regarding
4   Mr. Goodrow's mortgage loan?
5          MR. BIONDI:  I think I have the same
6   objection.  You're trying to avoid the substance, but
7   you're trying to substitute the substance into the
8   question and then asking the question.
10      Q    Did you communicate with Fannie Mae
11  regarding their investment in Mr. Goodrow's mortgage
12  loan?
13          MR. BIONDI:  I object.  Attorney/client
14  privilege.
16      Q    Did you communicate with Fannie Mae at all
17  regarding their ownership interest in Mr. Goodrow's
18  mortgage loan?

19          MR. BIONDI:  Same objection.

283.    The Defendants therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust. Upon information and belief, Defendants also breached the fiduciary duty that they owed to the putative class members.

## Loans Owned by Fannie Mae Impose Additional Duties

284.    Similarly, Defendants also breached their fiduciary duty of impartiality through its failure to follow Fannie Mae' Servicing Guidelines when conducting foreclosures.

285.    At all times relevant hereto, Defendant was "designated counsel" for loans owned by Fannie Mae.

286.    As designated counsel, Defendants had knowledge of Fannie Mae's foreclosure policies and procedures as outlined in the Guide and subsequent directives and agreed to abide by such policies and procedures.

287.    Plaintiffs' Deed of Trust is in the nature of a contract and is to be construed according to its terms to the extent the terms are not in conflict with the requirements of law.

288.    Because Plaintiffs had a Fannie Mae loan, certain requirements and procedures must be met prior to a foreclosure sale being authorized. These requirements were incorporated into Plaintiffs' Deed of Trust.

289.    The Deed of Trust must be construed in conjunction with Fannie Mae's guidelines, which have the effect of applicable law.

290.    On April 28, 2010, Fannie Mae amended its Servicing Guide to address procedural requirements for foreclosures for loans owed by Fannie Mae. The Guide stated that the new requirements were "particularly important and material to Fannie Mae's ongoing effort to keep borrowers in their homes and to reduce credit losses."

291.   The Guide states "Fannie Mae requires the servicer and the foreclosure attorney (or trustee) to interact throughout the conduct of foreclosure proceedings." Some of this required interaction includes:

> The servicer must submit a complete referral package to the selected attorney (or trustee). The referral package must include mortgage loan status data and the documentation the attorney (or trustee) needs to conduct foreclosure proceedings.
> . . . .
>
> The attorney (or trustee) will acknowledge receipt of the referral package (and indicate whether or not it is complete) within two business days. The servicer must provide any required missing documentation to the attorney (or trustee) within five business days after it received the attorney's (or trustee's) request.

FANNIE MAE, FANNIE MAE  2010 SERVICING GUIDE UPDATE PART VII AND PART VIII 801-73–74 (April 2010).

292.   As detailed above, Defendant was required to acknowledge receipt of the referral package from Plaintiffs' servicer within two business days. In this acknowledgment, Defendants were required to indicate any documents they needed to conduct the foreclosure, which would have included either the original note or the lost note affidavit pursuant to Virginia Code § 55-59.1(B).

293.   Specifically, Virginia Code § 55-59.1(B) provides that the trustee must either possess the original note or a lost note affidavit from the beneficiary must be provided to the homeowner.

294.   Upon information and belief, Defendant was aware of this requirement for loans owed by Fannie Mae, but insisted on instituting foreclosure proceedings against homeowners without obtaining the documents needed to conduct the foreclosure proceedings.

295.   These practices and procedures were adopted by Defendants to speed the foreclosure process through, while blatantly ignoring their duties under the Plaintiffs' Deeds of

Trust, the Fannie Mae Servicing Guidelines incorporated into the Deed of Trust, and Virginia law in the process.

296.    Defendants claimed that they were appointed substitute trustees under Plaintiffs' Deed of Trust.

297.    However, at no time did the alleged Substitute Trustees, Defendants F & M Services and/or Muncy, actually provide the requisite notice of the foreclosure sale in a manner that complied with Virginia law.

### Defendants' Foreclosure Operation

298.    Defendants accomplish their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that have been referred to them by various loan servicers.

299.    The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Friedman.  For example, Friedman employees mail out the correspondence regarding the alleged foreclosure sale to consumers, purchase newspaper space for advertisements of the foreclosure sales, and interact with the loan servicers and consumers.

300.    In fact, all letters mailed to consumers are printed on Defendant Friedman's letterhead, regardless of which Defendant signed the letter, and the documents submitted to the various Circuit Courts purportedly by the "substitute trustee" are prepared by and often have a return address for Defendant Friedman.

301.    When the mortgage loans are referred to the Defendants, including the Plaintiffs' mortgage loan in this case, they do not actually receive the original note prior to instituting foreclosure proceedings.

302.    In fact, rather than locating the entity that is the actual noteholder or requesting the original note from the servicer, Defendants use a false "lost note affidavit". Defendants' motive is to streamline the foreclosure process.

303.    Once the mortgage loans are referred to Defendant Friedman, Defendants create a "Substitution of Trustee" document, which they claim give them the authority to conduct a foreclosure sale under the subject deeds of trust.

304.    The Substitution of Trustee document is false and improper in several respects.

305.    The document identifies the loan servicers as the "Noteholders". These statements are false.

306.    Defendants do this as an alternative to locating and identifying the actual noteholders in an effort to save time and costs with which they are able to conduct foreclosures.

307.    Defendants send this document to various third-party entities purporting to be the "noteholders" or loan servicers, via electronic wires or through the mail, at which time they are allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document is also allegedly notarized.

308.    Upon information and belief, the individuals who sign these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, do not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

309.     Other times, these substitute trustee documents are created and signed by Defendant Friedman and/or its employees as "attorney in fact" for the "noteholder". Therefore, Defendants essentially attempt to appoint themselves as substitute trustees.

310.     Plaintiffs' counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

311.     In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by the Defendants, presumably so the dates on the first and second pages match.

312.     In fact, in two hearings that took place in Baltimore, Maryland, the Defendants' employees, Kenneth MacFadyen and Daniel Menchel, admitted to the Defendants' practice of having employees sign documents for other attorneys in the law firm.

313.     Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1    Q      It is your signature?
2    A      Yes.
3    Q      Okay, and is it notarized?
4    A      Yes.
5    Q      On what date is it notarized?
6    A      June 30th.
7    Q      By whom?
8    A      Joann Sottile.
9    Q      Did you appear in front of Ms. Sottile on
10   that date?
11   A      I did not appear in front of her. I gave her
12   stacks of files to notarize after I'd signed them.
13   Q      I'm going to show you what's again in the
14   same group, same group of exhibits, adjustable rate
```

15    note. And I'm going to show you -- point to a
16    signature at the top.
17    Can you tell me whose signature that is?
18    A    That's my signature for Kenneth MacFadyen. I
19    signed that after I stamped the note, after I review
20    it.
21    Q    Okay.
22    A    And signed Kenneth MacFadyen's name.
23    Q    And would there have been a reason why you
24    wouldn't have used your own name?
25    A    No. I think we had a stamp that had Kenneth
1    MacFadyen's name on it. And we used that particular
2    stamp on that particular file.

314.    Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No.

24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21    Q    Let me -- let me show you the order to
22    docket, suit, and affidavit pursuant to Maryland Rule
23    14-207(b). Your name is at the bottom. Do you know
24    who signed your name?
25    A    No, not to this one. It would have been
1    either Daniel Menchel or Jeffrey Huston.
2    Q    But you don't know?
3    A    I don't know which one signed that one.
4    Q    Okay, let me show you, in this case, a deed
5    of removal and appointment of successor trustees
6    which is liber 11916, page 250, second page -- and ask
7    you who signed that one.
8    A    That would be Daniel Menchel. That's not
9    under oath. I believe he had every right to do that.
10    Q    Okay, but that would be Daniel Menchel's
11    signature?
12    A    That's a Daniel Menchel signature.
13    Q    Okay, let me show you an Atlantic bond, and
14    it's bond number 108147, and ask who signed that.
15    A    That looks to me like a Jeffrey Huston
16    version of Kenneth MacFadyen.

315.    These documents are a legal nullity and do not actually authorize Defendants

F&M or Muncy to act as substitute trustees.

316.    After preparing the substitution of trustee documents, Defendants then begin the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

317.    Upon information and belief, these letters were form letters that the Defendants sent to every consumer from whom they attempted to collect a debt and for whom they attempted to conduct a foreclosure sale of their home

318.    These letters all contain similar misrepresentations, including but not limited to, an incorrectly identified Noteholder of the loan.

319.    Consumers rely on these false documents when they subsequently contact or pay money to Defendants in attempt to save their homes or relocate their families, with the mistaken belief that Defendants were validly appointed substitute trustees and have the authority to sell their homes.

320.    Defendants then advertise the foreclosure sales in local newspapers throughout Maryland and Virginia, listing the contact as Defendant Friedman for information about the property and the foreclosure sale.

321.    These foreclosure sale notices are mailed to consumers throughout Virginia and Maryland using the United States post office.

322.    Once an alleged foreclosure sale occurs, Defendants create a "Trustees Deed" in which the alleged substitute trustees convey the subject property to a grantee. This grantee is often not the last and highest bidder at the foreclosure sale, but is instead a third party or subsequent purchaser.

323.    Plaintiffs counsel has reviewed a considerable amount of documents created by Defendants, which are subsequently mailed to consumers or to the Commission of Accounts in

the Circuit Courts across the Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

**Count I:  Breach of Fiduciary Duties- Fannie Mae Loans**
**CLASS CLAIM**
**(Plaintiffs Goodrow, Banks, Buels and McBeth)**

324.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

325.    This matter is also brought as a class action for a "Fannie Mae" class, initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan owned by Fannie Mae for whom Defendants claimed they were appointed substitute trustees and attempted to conduct a foreclosure sale of the real property within the four years prior to the filing of the Complaint, and for whom 1) the records of the noteholder or servicer did not contain any record of receipt and acknowledgement of receipt of a referral package from the servicer to Defendants, and/or 2) the Defendants failed to obtain the original note or a lost note affidavit prior to the date of such foreclosure.  Excluded from the class are employees of the Defendants.

326.    Plaintiffs incorporate their prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

327.    Plaintiffs' counsel is in possession of a substantial number of correspondences and Deed of Appointment of Substitute Trustee mailed to consumers by the Defendants. Plaintiffs' counsel is also in possession of a substantial number of Trustees Deeds and Reports filed with the Commissioner Accounts by the Defendant.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

328.    Defendant has conducted and attempted hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

Defendant have accomplished well more than 50 foreclosures as designated Fannie Mae counsel during the last four years.

329.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants' foreclosure Deed of Trust owned by Fannie Mae is lawful where Defendants have not otherwise complied with Fannie Mae Servicing Guidelines and governing law; (b.) whether Fannie Mae Servicing Guidelines and governing law are incorporated within the Defendants' Deed of Trust duties; (c.) what remedies are available for such a breach of fiduciary duty.

330.    The claims of Plaintiffs are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiffs' claims rise or fall.

331.    The Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiffs nor their counsel has any interests that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative classes and have accepted such responsibilities.

332.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

333. Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

334. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. As well, individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

335.     Plaintiffs and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the putative class and the Noteholder, thus owing fiduciary duties to both parties.

336.     Plaintiff and the putative Fiduciary Duty class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust. To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiffs and the putative Fiduciary Duty class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

337.     Defendants breached their fiduciary duties by undertaking the foreclosure sale and the transfer of the real property of the Plaintiff and the putative class without compliance with the Deeds of Trust.   Specifically, Defendants foreclosed upon the real property when the necessary prerequisites of compliance with the Fannie Mae Servicing Guidelines and Virginia law had not been met.

338.     Under the Deeds of Trust, Defendants' obligations are subject to and governed by "Applicable Law," including the Fannie Mae Servicing Guidelines.

339.     Defendants repeatedly breached their fiduciary duty to Plaintiffs and the putative class including, but not limited to, the following conduct:

a.      By failing to ensure they received the appropriate foreclosure data from the servicers and the necessary documents to conduct the foreclosure;

b.      By consistently failing to acknowledge receipt of the referral package and failing to request the necessary foreclosure documents in order to expedite the foreclosure process on Plaintiff and the putative class;

c.      By failing to obtain a complete referral package, including the documents

required to conduct a foreclosure under Virginia law prior to conducting the foreclosure; and

d.      By conducting the foreclosure even though the preconditions to foreclosure had

not been satisfied under the terms of the Notes and Deeds of Trust.

340.    As a result, Plaintiff and the putative class suffered injury and are entitled to

recover actual damages and costs against Defendants.

**Count II:  Trustees' Breach of Fiduciary Duties -VA Loans**
**CLASS CLAIM**
**(Plaintiff Chatter)**

341.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth

at length herein.

342.    This matter is also brought as a class action for a "VA Loans" class, initially

defined as follows:

> All natural persons who were the record owners in fee simple of real property
> located in Virginia that by a recorded Deed of Trust secured payment of a loan
> insured by the Department of Veterans Affairs and for which property Defendants
> drafted, executed and recorded a foreclosure Trustee's Deed upon such Deed of
> Trust within the four years prior to the filing of the Complaint, and for whom the
> records of the noteholder or servicer did not contain any record of an attempt to
> provide a face-to-face meeting with the class member prior to the date of such
> foreclosure.  Excluded from the class are employees of the Defendants.

343.    Plaintiff incorporates his prior allegations and estimates that the class is so

numerous that joinder of all members is impractical.

344.    Plaintiff's proposed class counsel has a substantial number of correspondences

and Deed of Appointment of Substitute Trustee mailed to consumers by the Defendants.

Plaintiffs' proposed class counsel also has a substantial number of Trustees Deeds and Reports

filed with the Commissioner Accounts by the Defendant.   These documents have remained

consistent and uniform across time, Virginia jurisdictions and consumers.

345.     Defendant has conducted and attempted hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished more than 50 VA foreclosures during the last 4 years.

346.     There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants' foreclosure upon a VA Deed of Trust is lawful where the noteholder or servicer has not otherwise complied with VA regulations and governing law; (b.) whether VA regulations and governing law are incorporated within the Defendants' Deed of Trust duties; and (c.) what remedies are available for such a breach of fiduciary duty.

347.     Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

348.     The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

349.     Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

350.   Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

351.   Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.   As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved at one time.  One win for one consumer would set the law as for every similarly situated consumer.

352.     Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the Noteholder, thus owing fiduciary duties to both parties.

353.     Defendants breached their fiduciary duties by undertaking the foreclosure sale and the transfer of the real property of the Plaintiff and the putative class without compliance with the Deed of Trust.   Specifically, Defendants foreclosed upon the real property when the necessary prerequisite of compliance with the VA regulations and law had not been met.

354.     As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

### Count III:  Fraud
### INDIVIDUAL CLAIM
### (Plaintiff Goodrow)

355.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

356.     Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

357.     Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Fairfax County Circuit Court, including but not limited to, that First Horizon was the current Noteholder of Plaintiff's mortgage.

358.     Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of First Horizon purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal

standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

359.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

360.    Defendants made a material false representation in Plaintiff's Trustee's Deed filed in the Fairfax County Circuit Court, including but not limited to, that First Horizon was the current Noteholder of Plaintiff's mortgage.

361.    Upon information and belief, Defendants further misrepresented that the individual who signed the Trustee's Deed on behalf of Defendant Muncy as Substitute Trustee purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

362.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Trustee's Deed purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

363.    In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee.

364.    In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that First Horizon was the current Noteholder of Plaintiff's mortgage.

365.    Defendants intentionally made these misrepresentations to Plaintiff with intent to mislead him into believing these representations were true. Plaintiff relied on these misrepresentations to his detriment.

366.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

367.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the attempted foreclosure.

368.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

### Count IV:  Fraud
### INDIVIDUAL CLAIM
### (Plaintiff Chatter)

369.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

370.    Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

371.    Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Fairfax County Circuit Court, including but not limited to, that Chase was the current Noteholder of Plaintiff's mortgage.

372.   Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of Chase purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

373.   Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

374.   Defendants made a material false representation in Plaintiff's Trustee's Deed filed in the Fairfax County Circuit Court, including but not limited to, that Chase Home Finance was the current Noteholder of Plaintiff's mortgage.

375.   Upon information and belief, Defendants further misrepresented that the individual who signed the Trustee's Deed on behalf of Defendant Muncy as Substitute Trustee purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

376.   Upon information and belief, Defendants also misrepresented that the individual who notarized the Trustee's Deed purporting to have personal knowledge of the facts contained

in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

377.    In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee and that the actual Note was lost or unavailable such as to permit Defendants' use of Va. Code § 55-59.1.

378.    In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Chase Home Finance was the current Noteholder of Plaintiff's mortgage.

379.    Defendants intentionally made these misrepresentations to Plaintiff with intent to mislead him into believing these representations were true.

380.    Plaintiff relied on these misrepresentations to his detriment.  He acceded to what he became convinced was a lawful appointment of trustee and then a lawful foreclosure. Eventually, he did not put up a legal fight to either the foreclosure or the loss of his home.

381.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

382.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to his reputation, his time and his ongoing distress over the attempted foreclosure.

383.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

**Count V:  Fraud**
**Individual Claim**
**(Plaintiffs Buels)**

384.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

385.    Plaintiffs allege a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

386.    In their correspondences to Plaintiffs, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee.

387.    In their alleged advertisements of the foreclosure sale of Plaintiffs' home, Defendants made one or more material misrepresentations, including but not limited to, that Defendants F&M Services and Muncy were each an appointed substitute trustee.

388.    In their correspondences to Plaintiffs, Defendants made one or more material misrepresentations, including but not limited to, that they had knowledge that "Chase Home Finance, LLC s/b/m to Chase Manhattan Mortgage Corp." was the current Noteholder of Plaintiffs' mortgage.

389.    In their correspondences to Plaintiffs, Defendants made one or more material misrepresentations, including but not limited to, that the accounting statements they provided for the balance that Plaintiffs allegedly owed on the mortgage were a true and accurate accounting.

390.    Defendants intentionally made these misrepresentations to Plaintiffs with intent to mislead them into believing these representations were true, and Plaintiffs relied on such misrepresentations to their detriment.

391.    As a result of Defendants' misrepresentations, Plaintiffs suffered injury and are entitled to recover actual damages and costs against Defendants.

392.    Plaintiffs also suffered substantial unliquidated and noneconomic damages for the damage to their reputation, loss of their time and their ongoing emotional distress over the potential loss of their home.

393.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiffs' rights, Plaintiffs are entitled to recover punitive damages for such amount as the trier of fact may determine.

### Count VI:  Fraud
### INDIVIDUAL CLAIM
### (Plaintiff McBeth)

394.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

395.    Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

396.    Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Circuit Court for the City of Norfolk, including but not limited to, that EverHome was the current Noteholder of Plaintiff's mortgage.

397.    Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of EverHome purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

398.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

399.    In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee.

400.    In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that EverHome was the current Noteholder of Plaintiff's mortgage.

401.    Defendants intentionally made these misrepresentations to Plaintiff with intent to mislead her into believing these representations were true. Plaintiff relied on these misrepresentations to her detriment.

402.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

403.    Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to her reputation, her time and her ongoing distress over the subject debt.

404.    Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

**Count VII:  Fraud**
**INDIVIDUAL CLAIM**
**(Plaintiff Mbundure)**

405.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

406.     Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

407.     Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Circuit Court for Fairfax County, including but not limited to, that PNC Bank was the current Noteholder of Plaintiff's mortgage.

408.     Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of PNC Bank purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

409.     Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

410.     In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee.

411.     In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that PNC Bank was the current Noteholder of Plaintiff's mortgage.

412.     Defendants intentionally made these misrepresentations to Plaintiff with intent to mislead her into believing these representations were true. Plaintiff relied on these misrepresentations to her detriment.

413.     As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

414.     Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to her reputation, her time and her ongoing distress over the subject debt.

415.     Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

**Count VIII:  Fraud**
**INDIVIDUAL CLAIM**
**(Plaintiff Banks)**

416.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

417.     Plaintiff alleges a cause of action for actual and/or constructive fraud under the common law of the Commonwealth of Virginia.

418.     Defendants made a material false representation in Plaintiff's Substitution of Trustee document filed in the Circuit Court for the City of Virginia Beach, including but not limited to, that Litton Loan Servicing, LP was the current Noteholder of Plaintiff's mortgage.

419.    Upon information and belief, Defendants further misrepresented that the individual who signed the Substitution of Trustee document on behalf of Litton Loan Servicing, LP purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing. In reality, the Defendants prepared the substitute trustee appointment document and signed it themselves where it was notarized by someone who claimed to be the notary whose stamp appeared on the page and who claimed to have witnessed the signature of the alleged representative.

420.    Upon information and belief, Defendants also misrepresented that the individual who notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did have such personal knowledge or such legal standing.

421.    In their correspondence and letters to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Defendant Friedman was an appointed substitute trustee.

422.    In their correspondences to Plaintiff, Defendants made one or more material misrepresentations, including but not limited to, that Litton Loan Servicing, LP was the current Noteholder of Plaintiff's mortgage.

423.    Defendants intentionally made these misrepresentations to Plaintiff with intent to mislead her into believing these representations were true. Plaintiff relied on these misrepresentations to her detriment.

424.    As a result of Defendants' misrepresentations, Plaintiff suffered injury and is entitled to recover actual damages and costs against Defendants.

425.     Plaintiff also suffered substantial unliquidated and noneconomic damages for the damage to her reputation, her time and her ongoing distress over the subject debt.

426.     Additionally, because Defendants' actions were willful and with knowledge of their untruthfulness or with conscious disregard for Plaintiff's rights, Plaintiff is entitled to an award of punitive damages.

### Count IX:  Civil Conspiracy
### INDIVIDUAL CLAIMS
### (Plaintiffs Goodrow, Chatter, Buels, McBeth, Mbundure, Banks)

427.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

428.     Plaintiff alleges a cause of action against Defendants for civil conspiracy under the common law of the Commonwealth of Virginia.

429.     With respect to Mr. Goodrow, Defendants, separate entities and/or persons, along with First Horizon, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted or actual collection of an alleged debt and/or the unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

430.     With respect to Mr. Chatter, Defendants, separate entities and/or persons, along with Chase, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted or actual collection of an alleged debt and/or the unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

431.     With respect to Mr. and Mrs. Buel, Defendants, separate entities and/or persons, along with Chase, accomplished, through concerted action and a preconceived plan and unity of

design and purpose, actions including but not limited to, the attempted or actual collection of an alleged debt and/or the unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

432.    With respect to Ms. McBeth, Defendants, separate entities and/or persons, along with EverHome and Fannie Mae, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted collection of an alleged debt and/or the attempted unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

433.    With respect to Mr. Mbundure, Defendants, separate entities and/or persons, along with PNC Bank and/or Dovenmuehle Mortgage, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted collection of an alleged debt and/or the attempted unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law

434.    With respect to Ms. Banks, Defendants, separate entities and/or persons, along with Litton Loan Servicing, LP and Fannie Mae, accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the attempted collection of an alleged debt and/or the attempted unauthorized foreclosure of Plaintiff's property in violation of Virginia and Federal law.

435.    Furthermore, Defendants accomplished, through concerted action and a preconceived plan and unity of design and purpose, actions including but not limited to, the use of falsified signatures and perjurous statements in their correspondence to Plaintiff and in court filings in violation of Virginia and Federal law.

436.    Defendants' unlawful purpose was to use such fraudulent signatures and sworn statements to make a false statement to the Circuit and Civil Courts – one that the parties knew was false when made and to proceed in the collection of a debt and foreclosure that Defendants knew was not in compliance with the law.

437.    Upon information and belief, with respect to Mr. Goodrow, the Defendants engaged in these actions with First Horizon, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.   The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from First Horizon for the speed with which they are able to conduct foreclosures.

438.    Upon information and belief, with respect to Mr. Chatter, the Defendants engaged in these actions with Chase, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from Chase for the speed with which they are able to conduct foreclosures.

439.    Upon information and belief, with respect to Mr. and Mrs. Buel, the Defendants engaged in these actions with Chase, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.  The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from Chase for the speed with which they are able to conduct foreclosures.

440.    Upon information and belief, with respect to Ms. McBeth, the Defendants engaged in these actions with EverHome and Fannie Mae, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.   The Defendants each

receive monetary benefit from doing so, including, but not limited to, incentive payments from EverHome for the speed with which they are able to conduct foreclosures.

441.    Upon information and belief, with respect to Mr. Mbundure, the Defendants engaged in these actions with PNC Bank and/or Dovenmuehle Mortgage, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.   The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from PNC Bank and/or Dovenmuehle Mortgage for the speed with which they are able to conduct foreclosures.

442.    Upon information and belief, with respect to Ms. Banks, the Defendants engaged in these actions with Litton Loan Servicing, LP and Fannie Mae, under a preconceived plan of unity of design and purpose, to rush Plaintiff through the foreclosure process.   The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from Litton Loan Servicing, LP for the speed with which they are able to conduct foreclosures.

443.    Defendants conducted themselves in this manner with the intent to defraud and with legal and actual malice as to the Plaintiff and to the Courts.   Each of the Plaintiffs is entitled to recover, and each Defendant is obligated to pay, punitive damages.

444.    As a result of Defendants' conduct in furtherance of the conspiracy, Plaintiffs suffered injury and is entitled to recover damages including, but not limited to, actual damages and costs against Defendants.

445.    Plaintiffs also suffered substantial unliquidated and noneconomic damages for the damage to their reputations, their time and  ongoing distress over the alleged subject debt.

**Count X: Violation of 18 U.S.C. § 1961**
**Racketeer Influenced and Corrupt Organizations Act**
**CLASS CLAIM**

446.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

447.    This matter is brought as a class action on behalf a second class – the "RICO Class" - initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants attempted a foreclosure upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

448.    Plaintiffs incorporate their prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

449.    Plaintiffs' proposed class counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiffs' proposed class counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or filed with the Commissioners of Accounts.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

450.    Defendant has conducted and attempted hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished well more than 50 Fannie Mae foreclosures during the last four years.

451.    Plaintiffs' counsel alleges that Defendants uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all foreclosure files.  Her counsel assumes that this may not have always been the case – at some time in the past Defendants' attorneys may have actually signed documents, determined whether a Note was

actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee.  However, they are currently unable to determine when this lawful conduct ended.

452.   There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants constituted a RICO enterprise; (b.) whether Defendants' falsification of foreclosure documents constituted mail or wire fraud; (c.) what remedies are available for such a RICO violation.

453.   The claims of Plaintiffs are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiffs' claims rise or fall.

454.   The Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted such responsibilities.

455.   Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

456.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

457.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved one time.  One win for one consumer would set the law as for every similarly situated consumer.

458.    The Defendants and the mortgage loan servicers (including, by example, Chase, MetLife, PNC, etc.) constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct

corporations or legal entities.

459.    All of these servicers and each Defendant were engaged for a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

460.    Further, the loan servicers and the Defendants existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law.  That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers' homes.

461.    The loan servicers are separate entities and each operates in its own self-interest. They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for the profit of both the Defendants and the servicers.

462.    The racketeering proceeds obtained by Defendant F&M and/or Muncy as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used by each such person in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions.

463.    The enterprise had an effect on interstate commerce. For example, the transmission of the fraudulent substitute trustee documents and lost note affidavits through the United States mail system and through the wires for ultimate transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Additionally, loan servicers and

consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments.

464.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and lost note affidavits. It began sometime as early as 2009 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

465.    The conduct and actions of the Defendants as alleged herein – creating fraudulent affidavits for use in collection lawsuits – violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  They involved an ongoing scheme to defraud consumers and courts, and they used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

466.    Defendants used this practice with respect to numerous documents that it caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants, and all of these contain the same fraudulent documents.

467.    Further, Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants regular way of conducting business.

468.    The Plaintiff, the Circuit Courts, and the Commissioners of Accounts relied on the fraudulent documents when they mistakenly believed that the Defendants were validly appointed

substitute trustees who conducted a proper foreclosure sale.

469. By means of example only, Plaintiffs and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise. The Commissioners of Accounts approved the sales and the accounting of the sales based on the fraudulent documents that the Defendants submitted.

470. Plaintiffs and putative class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962 and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

471. Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**Count XI: Violations of 15 U.S.C. § 1692 et seq.**
**Fair Debt Collections Practices Act**
**CLASS CLAIM**
**(All Plaintiffs)**

472. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

473. Plaintiffs plead Defendants violations of the FDCPA pursuant to 15 U.S.C. §1692c, §1692e, §1692f, and §1692g:

a. 15 U.S.C. § 1692c prohibits a debt collector from communicating directly with a consumer if it is aware that the consumer is represented by an attorney.

b. Generally, § 1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' §1692e also

provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of §1692e prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

> **(2)** The false representation of--
> **(A)** the character, amount, or legal status of any debt; or
> **(B)** any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> **...**
> **(5)** The threat to take any action that cannot legally be taken or that is not intended to be taken.
> **...**
> **(10)** The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

> 15 U.S.C. § 1692e

c.       Section 1692f prohibits generally the use of "unfair or unconscionable means to collect or attempt to collect any debt", and specifically in relevant part:

> **(1)** The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by agreement creating the debt or permitted by law.
> **...**
> (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –
>> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

> 15 U.S.C. §1692f

d.       A debt collector must provide a consumer with the name of the creditor to whom the debt is owed pursuant to Section 1692g:

> **(a)** Notice of debt; contents.

> Within five days after the intial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the intial communication or the consumer has paid the debt, send the consumer a written notice containing –
>
> **...**
>
> **(2)** the name of the creditor to whom the debt is owed.

474.    For their class claim brought pursuant to the FDCPA, the Plaintiffs proposed a class initially defined as follows: [2]

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

475.    Defendants violated §1692e and §1692f as to each class member by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters to the class members.

---

[2] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert.denied*, 125 S.Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc*., 236 F.R.D. 652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

476.   Plaintiffs allege this class definition because all or substantially all of the class members would have received correspondence from the Defendants with a subject line that represented or implicitly threatened that a lawsuit was or would be filed.

477.   Plaintiffs also allege a "Lost Note" subclass initially defined as:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the mortgage note was lost or otherwise unavailable within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

478.   Defendants violated §1692e as to the Lost Note subclass because they forwarded correspondence to consumers that falsely represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1.

479.   Plaintiffs also allege a "Servicer as Creditor" subclass of consumers initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

480.   Defendants violated §1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed.

481.   Plaintiffs also allege an "Inconsistent Demand for Payment" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as conflicting loan payoff and/or reinstatement calculation(s) within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

482. Defendants violated §1692e and §1692f as to the Inconsistent Demand for Payment subclass because they made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers.

483. Plaintiffs also allege an "False Affiliate" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as a letter that misrepresented they or the servicer was "affiliated" with another, separate entity within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

484. Defendants violated §1692e as to the False Affiliate subclass because they made false statements that Defendants or servicers were affiliated with entities from which they were separate and distinct/

485. Plaintiffs also allege an "Failure to Identify Creditor" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and to whom the Defendants failed to identify the creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

486.    Defendants violated §1692g as to the Failure to Identify Creditor subclass because in their initial correspondences to consumers, they failed to identify the creditor to whom the debt was owed.

487.    Plaintiffs allege an "False Statement About Fees" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan where Fannie Mae was the creditor, beneficiary, investor and/or noteholder and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and in that letter or another, demanded payment of fees in excess of $600.00 within the one year period preceding the filing date of the original Complaint in this matter.   Excluded from the subclass are employees of the Defendants.

488.    Defendants violated §1692e and §1692f as to the False Statement About Fees subclass because they made a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated their fees would be capped at $600.00.

489.    Plaintiffs also allege a "Communicating with Represented Party" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as a letter at a time when the Defendants knew the consumers were represented by an attorney within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

490.    Defendants violated §1692c as to the Communicating with a Represented Party subclass because they communicated directly with homeowners who they knew were represented by an attorney.

491.    Plaintiffs allege a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home that enclosed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

492.    Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustees (and/or where the signatures were forged altogether).

493.    Plaintiffs allege a "No Right to Foreclose" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan that was owned or insured by Fannie Mae, Freddie Mac, the Department of Veteran Affairs and/or the Federal Housing Administration and to whom Defendants mailed a letter in an attempt to collect a debt when the prerequisites to foreclosure had not been satisfied within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the class are employees of the Defendants.

494.    Defendants violated §1692e and §1692f as to the No Right to Foreclose subclass because they falsely stated and attempted to or did conduct foreclosure sales on homes where the

Defendants failed to follow the required prerequisites to foreclosure as incorporated into the Deeds of Trust.

495. Plaintiffs incorporate their prior allegations and estimate that the class is so numerous that joinder of all members is impractical.

496. Plaintiffs' counsel has reviewed a substantial number of correspondences and Deeds of Appointment of Substitute Trustee mailed to consumers by the Defendants. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

497. Defendants use the same form correspondences that they send to consumers across Virginia. These form correspondences include the initial correspondences to consumers, lost note letters, substitution of trustees deeds, notices of sale, payoff statements and reinstatement quotes.

498. Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

499. There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendants routinely misrepresented the identity of the creditor, amount, legal status, or character of the debts that they were attempting to collect from Plaintiffs and the putative class members (b.) whether the Defendants falsely represented the compensation that they could lawfully receive as a result of these attempted and/or actual foreclosures (c.) whether the Defendants threatened to take or took action that could not legally be taken (d.) whether Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiffs and the putative class members (e) whether Defendants communicated

directly with consumers who they knew were represented by an attorney and (f) whether Defendants could lawfully foreclose upon Plaintiffs and the putative class members prior to meeting the requirements of the Deed of Trust and/or other regulations and governing law .

500.   The claims of Plaintiffs are typical of those of the class members.  All are based on the same facts, form documents and legal theories.  The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiffs' claims rise or fall.

501.   The Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative classes and have accepted such responsibilities.

502.   Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

503.   Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

504.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.   Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.   Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. The issues at the core of this case are class wide and should be resolved at one time.   One win for one consumer would set the law as for every similarly situated consumer.

505.    As a result, Plaintiffs and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the putative class members, move for class certification and for actual, compensatory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO; for attorneys' fees and costs pursuant to the FDCPA; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

                                        Respectfully submitted,
                                        **JOHN K. GOODROW, et als.**


                                        By_____/s/_____
                                                   Of Counsel

Janelle E. Mason, VSB#82389
Matthew J. Erausquin, VSB#65434
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd., Ste. 600
Alexandria, VA 22314
(703) 273-7770 - Telephone
(888) 892-3512 – Facsimile
janelle@clalegal.com
matt@claleglal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

J. Chapman Petersen, Esq., VSB # 37225
Kristi Cahoon Kelly, Esq., VSB #72791
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
(703) 277-9774
(703) 591-9285 Facsimile
jpetersen@smillaw.com
kkelly@siplfirm.com

Leonard A. Bennett, VSB #37523
Susan M. Rotkis, VSB#40693
Robin A. Abbott, VSB#46596
Gary L. Abbott, VSB#68829
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601

(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net
srotkis@clalegal.com
garyabbott9@msn.com
rabbottlaw@msn.com

*Counsel for Plaintiff*
Richard John Rubin
1300 Canyon Road
Santa Fe, NM 87501
Telephone (505) 983-4418
Facsimile (505) 983-2050
*PRO HAC VICE*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Andrew Biondi
Sands Anderson, PC
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
E-mail:  abiondi@sandsanderson.com

Andrew Todd Rich
Friedman & MacFadyen, PC
1601 Rolling Hills Drive
Suite 125
Richmond VA  23229
E-mail:  trich@fmlaw.com

Cullen Dennis Seltzer
Sands Anderson, PC
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
E-mail:  cseltzer@sandsanderson.com

Douglas Pendleton Rucker, Jr.
1111 E. Main Street
Suite 2400

P.O. Box 1998
Richmond, VA  23219
E-mail:  drucker@sandsanderson.com

                             /s/
                        _____
                        Susan M. Rotkis, VSB #40693
                        Attorney for Plaintiff
                        CONSUMER LITIGATION ASSOCIATES, P.C.
                        763 J. Clyde Morris Blvd. Suite 1A
                        Newport News, VA 23601