**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

MICHELE MCBETH, *individually and on
behalf of all others similarly situated*,

                Plaintiff,

v.                                                 Civil Action No. 3:11cv479

FRIEDMAN & MACFADYEN, P.A.,
F & M SERVICES, L.C.,
and
JOHNIE R. MUNCY,

                Defendants.

## FIRST AMENDED CLASS COMPLAINT

COMES NOW the Plaintiff, Michele McBeth, individually and on behalf of all others similarly situated, by counsel, and as for her First Amended Class Complaint against the Defendants, she alleges as follows:

## INTRODUCTION

1.      Defendants—a now defunct foreclosure mill—engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring that their business model had the lowest cost structure that they could construct. To accomplish these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a neutral trustee, lied to the Circuit Courts through their Commissioners of Accounts, in addition to consumer victims, and others regarding the custody and ownership of mortgage notes and their supposed compliance with Virginia's foreclosure requirements, and in the process largely ignored federal law enacted to protect debtors against overly aggressive debt collectors. Accordingly, Plaintiff brings these claims for actual, statutory, treble, and punitive damages,

declaratory and injunctive relief, costs, and attorneys' fees brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et seq. ("RICO"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA"), and for the Defendants' breach of fiduciary duties.

2.      Furthermore, Plaintiff and the putative class members allege that Defendants acted fraudulently in that they knowingly made a series of false statements and representations in connection with the collection of the alleged debts and of the foreclosures in their efforts to rush through the foreclosure process as quickly as possible. The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from the alleged mortgage servicers and others based in large part on the speed with which they are able to conduct foreclosures. Another benefit obtained by the Defendants by sacrificing their grave responsibilities to ensure the fundamental integrity of the foreclosure process in exchange for speed is a competitive edge against other foreclosure mills. Servicers will refer more cases to the Defendants based on the speed in which they conduct foreclosure sales. Thus, not only do the Defendants lie to consumers and Circuit Courts, but they obtain an unfair advantage against entities that engage in a more thoughtful and deliberative process in an effort to comply with the law. Plaintiff and the putative class members also allege that Defendants violated the FDCPA by sending letters to consumers that contained false statements and material misrepresentations regarding the collection of a debt by a debt collector, attempted to collect "attorneys fees" for themselves which were not due and owing, and initiated foreclosure activities when they had no present right to possession of the property.

**JURISDICTION**

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1367, and 15 U.S.C. § 1692k(d).

## PARTIES

4.      Plaintiff Michele McBeth (hereafter "McBeth" or "Plaintiff") is a natural person who resides in Virginia.   At all times relevant hereto, Plaintiff was a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

5.      Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman") is a now defunct law firm with offices previously in Maryland, Virginia, and Washington D.C., the principal purpose of whose business was the collection of debts, and was located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

6.      Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

7.      Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

## STATEMENT OF FACTS

8.      Defendants operated as a debt collection and foreclosure enterprise. They worked together with other entities as described herein to systemically perpetrate fraud on consumers that ultimately resulted in the loss of thousands of Virginia residents' homes.

9.      Each Defendant, along with the other members of the enterprise, had a specific role in perpetrating a pattern of fraudulent activity.

10.     The principals of Defendant Friedman, Kenneth J. MacFadyen and Mark H. Friedman, created a sham company, Defendant F&M, and used an arbitrarily chosen employee, Muncy (Defendants Friedman and F&M are collectively referred to as "the Friedman entities"), in which they purported to act as a neutral and impartial trustee under thousands of deeds of trust, including the Plaintiff's Deed of Trust.

### *Fannie Mae's Role in the Enterprise*

11.     The Federal National Mortgage Association ("Fannie Mae") is a housing government-sponsored enterprise (GSE). It is a for-profit business and until its more recent financial failure, was a publically traded entity.

12.     Fannie Mae's business model is as a secondary-market participant. It purchases residential mortgage loans from originator sellers who are then able to use those proceeds to originate additional mortgages.  Fannie Mae holds the loans it purchases in its own portfolio or packages them into mortgage backed securities (MBS), which are, in turn, sold to global investors.

13.     With respect to the loans it holds in portfolio, Fannie Mae contracts with loan servicers to collect mortgage payments and handle other customary loan servicing functions, including foreclosures.

14.     In 1997, Fannie Mae established its Retained Attorney Network ("RAN") to provide default-related legal services, such as those associated with foreclosure or bankruptcy.

15.     Fannie Mae does not manage these third party law firms but delegates that responsibility to the loan servicers who are expected to monitor all aspects of the law firms' performance during the foreclosure of Fannie Mae owned loans. The servicers were permitted to

refer foreclosure files to any law firm of their choice, at which time these firms would enter into engagement letters with Fannie Mae.

16.     Then in August 2008 Fannie Mae proposed changes to its RAN model to expand the network to 140 law firms covering 31 jurisdictions. Fannie Mae now required that its loan servicers refer all foreclosure and bankruptcy cases only to attorneys included in its RAN.

17.     Fannie Mae requires that each of its retained attorneys, such as Defendant Friedman, execute an engagement letter, which documents the existence of an attorney-client relationship with Fannie Mae. Fannie Mae also acknowledges that, in most cases, the retained attorney will also represent the servicer and may have signed a separate engagement letter with the servicer. Therefore, Defendant Friedman (nor its sham company or employee that it attempts to use as "substitute trustee") cannot possibly act as a neutral or impartial trustee for Fannie Mae, Wells Fargo's wholly owned subsidiary, EverHome, and the Plaintiff.

18.     With the collapse of the housing market in 2008, home prices declined while serious delinquencies rose at a substantial pace, from 400,000 at the end of 2008 to nearly 1,000,000 at the end of 2009.[1] This, in turn, led to a significant increase in foreclosures.

19.     Between 2007 and 2010, Fannie Mae foreclosures increased to historic levels. In 2010, Fannie Mae foreclosed on 262,078 single-family properties, a 433% increase from 2007.[2] According to an FHFA official, in 2010, Fannie Mae had actually referred 700,000 loans to foreclosure.[3]

20.     As the volume of foreclosures rose, so too did widespread mortgage servicing and foreclosure abuses. In December of 2003, Fannie Mae was first alerted to foreclosure abuse

---

[1] FED. HOUS. FIN. AGENCY, OFFICE OF INSPECTOR GEN. FHFA'S OVERSIGHT OF FANNIE MAE'S DEFAULT-RELATED LEGAL SERVICES 11 (Sep. 30, 2011).
[2] *Id.*
[3] *Id.* at 11 n.13.

allegations when a Fannie Mae shareholder brought to attention the use of false pleadings and affidavits in Florida. In 2005, Fannie Mae hired an outside law firm to investigate the allegations who found that Florida attorneys were routinely filing false pleadings and affidavits.

21.     The report further observed that Fannie Mae did not take steps to ensure the quality of the foreclosure attorneys in its RAN or the quality in which these attorneys processed foreclosures.

22.     Despite having knowledge of this behavior, Fannie Mae did not remedy the conduct. Instead the use of false pleadings and affidavits and foreclosure abuses with respect to Fannie Mae loans spread, with more and more "foreclosure mills", such as the Friedman entities, managing Fannie Mae defaulted loans.

23.     In June 2010, FHFA's Office of Conservatorship Operations spent two days in Florida to investigate the allegations of abuse and to gain a better understanding of foreclosure processing. The resulting report found that servicers, attorneys, and other personnel were overloaded with the volume of foreclosures. The report also noted that law firms in Fannie Mae's RAN were not devoting the time necessary to their cases due to Fannie Mae's flat-fee structure and volume-based processing model.

24.     Again, Fannie Mae failed to remedy the conduct or propose any type of corrections that would result in a system of processing and overseeing its foreclosures to ensure compliance with state and federal regulations.

25.     In 2011, the FHFA concluded its review of Fannie Mae's RAN and Freddie Mac's Designated Counsel Program and concluded that Fannie Mae could have reacted to foreclosure processing abuses sooner because "deteriorating industry conditions over the past

several years should have provided adequate warning to the GSEs to review policies, processes, and controls of other vendors and counterparties including law firms".[4]

26.     Along with Fannie Mae's lack of oversight and complete disregard for the warnings it received about the widespread perpetration of fraud by its servicers and foreclosure law firms in its RAN, Fannie Mae developed its own industry-wide scheme to defraud consumers and forced the participation of its loan servicers and foreclosure attorneys.

27.     Fannie Mae demands that foreclosures be processed in a flat-fee structure and with a volume-based approach. In Virginia, Fannie Mae compensates its third party foreclosure attorneys $600.00 to complete a foreclosure sale from "the cradle to the grave". This does not include certain allowable costs such as recordation costs or service of process costs.

28.     Fannie Mae also provides certain add-on compensations when foreclosures are completed, such as an additional $200.00 if the property is sold to a third party other than Fannie Mae at the foreclosure sale and title is transferred and a $150.00 notary fee for completed foreclosures.

29.     Alternatively, Fannie Mae only pays $350.00 for a deed in lieu of foreclosure, $300.00 if the loan is reinstated after notice of default, and $500.00 if the loan is reinstated after notice of sale.

30.     Thus, Fannie Mae's price structure requires that its retained attorneys churn through foreclosures at a rate and with enough volume to ensure that they make a profit.

31.     From 2006 through 2010, Fannie Mae set a sixty-day maximum for the number of allowable days between the due date of the last paid installment and foreclosure sale date in Virginia.

---

[4] FED. HOUS. FIN. AGENCY, OFFICE OF INSPECTOR GEN. FHFA'S OVERSIGHT OF FANNIE MAE'S DEFAULT-RELATED LEGAL SERVICES 16 (Sep. 30, 2011).

32.     According to Fannie Mae's Servicing Guide, this sixty-day timeframe starts when any Fannie Mae loan is referred to an attorney or trustee for foreclosure proceedings by the loan servicer.  In addition, the Servicing Guide states that servicing entities are required to refer loans to an attorney or trustee between 30-34 days from sending out the notice of acceleration or breach letter. In Virginia, this notice of acceleration or breach letter can be sent thirty days after the borrower's first missed payment.

33.     In essence, Fannie Mae required those that serviced their loans to start foreclosure proceedings approximately thirty days after the borrower missed their first payment.  Fannie Mae then required that the foreclosure sale occur within sixty days of that referral.

34.     If there is any delay in completing the foreclosure process—and the servicer is unable to provide a reasonable explanation for the delay—Fannie Mae requires that the loan servicer pay a compensatory fee, or in reality a penalty fee.

35.     In addition, Fannie Mae had at least two Virginia law firms in their RAN to ensure competition between the law firms so that they would process foreclosure sales as quickly as possible.

36.     This strict timeframe all but ensures that foreclosures are conducted in violation of state and federal laws. This is especially true in light of Virginia Code § 55-59.1(B).

37.     Specifically, the Virginia Code provides:

> If a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced ***and the beneficiary submits to the trustee an affidavit to that effect***, the trustee may nonetheless proceed to sale, provided the beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon expiration of 14 days from the date of mailing of the notice.

Va. Code § 55-59.1(B) (emphasis added).

38.     In practice, the Fannie Mae notes are not "unavailable."  Instead, they are stored with a Fannie Mae designated "custodian."  Fannie Mae has a specific written procedure by which a servicer or foreclosure attorney such as Defendants can request and receive the Note, either physically or for "legal custody."

39.     Specifically, Fannie Mae's Servicing Guide states, "Fannie Mae is at all times the owner of the mortgage note, whether the mortgage loan is in Fannie Mae's portfolio or part of the MBS pool. In addition, Fannie Mae at all times has possession of and is the holder of the mortgage note, except in the limited circumstances expressly described below. Fannie Mae may have direct possession of the note or a custodian may have custody of the note. If Fannie Mae possesses the note through a document custodian, the document custodian has custody of the note for Fannie Mae's exclusive use and benefit." *Servicing Guide*, § 202.07.01, Ownership and Possession of Note by Fannie Mae.

40.     Moreover, Fannie Mae has created a process whereby the servicer, as its agent, can order or request possession of the Note when the servicer begins a foreclosure process:

> In most cases, a servicer will have a copy of the mortgage note that it can use to begin the foreclosure process. However, some jurisdictions require that the servicer produce the original note before or shortly after initiating foreclosure proceedings. If Fannie Mae possesses the note through its designated document custodian, to obtain the note and any other custody documents that are needed, the servicer must submit a request to the designated document custodian's electronic release system.

*Id*., §102

41.     Plaintiff alleges on information and belief that as to herself and putative class member, Defendants never requested or sought custody of the note before sending the notice provided under Va. Code § 55-59.1(B) or even before the date of a foreclosure sale.

42.     If the Friedman entities requested the original note or lost note affidavit from Fannie Mae prior to the foreclosure, using the required form attached hereto as Exhibit "A", they would never be able to comply with the Fannie Mae imposed timeline of sixty days (a timeline which is shortened even more by LPS as discussed later).

43.     Therefore, Defendants Friedman, F&M, and Muncy chose the alternative and more profitable course of proceeding to foreclosure without the original note or lost note affidavit. Instead, they send consumers, including the Plaintiff's, a letter claiming that the original note is unavailable.

44.     Fannie Mae has structured its entire business model around speedy foreclosures that cannot possibly comply with state and federal laws. Moreover, Fannie Mae intentionally set its compensation rates so that it is more profitable for the foreclosure attorneys to foreclose, while attempting to save face and liability by simultaneously claiming that it expects loan servicers and retained attorneys to continue assisting borrowers with alternatives to foreclosure.

45.     Essentially, the servicers and the Defendants are in a proverbial catch 22—either follow the law or follow the Fannie Mae guidelines and get paid, disregarding the law in the process.

46.     Defendants, along with the other participants of the enterprise, chose to disregard the law and follow Fannie Mae's guidelines for its own pecuniary gain.

47.     Furthermore, Fannie Mae not only knew about the mortgage servicing and foreclosure abuses that the Defendants and the rest of the enterprise participants were engaged in, but it promoted these fraudulent activities by its behind the scenes approach in which it forced speedy foreclosures at all costs, even in violation of the law.

48.     Thus, Fannie Mae provided the framework by which the Defendants engaged in 1) conduct 2) of an enterprise 3) through a pattern of 4) racketeering activity.

### Wells Fargo's Mortgage Loan Servicing and Role in the Enterprise

49.     In February of 2012, 49 state attorneys general and the federal government announced a joint state-federal settlement with the country's five largest mortgage servicers, known as the "national mortgage settlement". This settlement included Wells Fargo Bank, N.A.

50.     After allegations of widespread robo-signing within the mortgage industry came to light in October of 2010, state and federal attorneys general launched an investigation into the role of the alleged false affidavits foreclosure proceedings across the nation.   However, the investigation soon uncovered a laundry list of wrongdoing by the mortgage servicers, including lost paperwork, long delays, missed deadlines for loan modifications, and other loan origination issues.

51.     The complaint,[5] filed by 49 states, the District of Columbia, and the United States, alleged that each of the top five servicers, including Wells Fargo, engaged in widespread and systematic conduct amounting to unfair and deceptive practices during the discharge of their duties as loan servicers, including the following:

    a.     failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;
    b.     charging excessive or improper fees for default-related services;
    c.     failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks;
    d.     imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;
    e.     providing borrowers false or misleading information in response to borrower complaints; and
    f.     failing to maintain appropriate staffing, training, and quality control systems.

---

[5] *United States, et al. v. Bank of Am. Corp., et al.*, No. 1:12CV361 (D.D.C. Mar. 12, 2012).

52.     In addition, the complaint alleged that the servicers, specifically Wells Fargo, violated federal laws, program requirements and contractual requirements governing loss mitigation in the course of servicing mortgage loans. This includes:

g.     failing to perform proper loan modification underwriting;
h.     failing to gather or losing loan modification application documentation and other paper work;
i.     failing to provide adequate staffing to implement programs;
j.     failing to adequately train staff responsible for loan modifications;
k.     failing to establish adequate processes for loan modifications;
l.     allowing borrowers to stay in trial modifications for excessive time periods;
m.     wrongfully denying modification applications;
n.     failing to respond to borrower inquiries;
o.     providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;
p.     providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;
q.     providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;
r.     misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;
s.     failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;
t.     falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;
u.     miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;
v.     misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner;
w.     failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;
x.     failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and
y.     misleading borrowers by providing false or deceptive reasons for denial of loan modifications.

53.     Finally, in the course of conducting foreclosures, the complaint alleged that the servicers, including Wells Fargo, engaged in the following wrongdoing:

z.      failing to properly identify the foreclosing party;

aa.     charging improper fees related to foreclosures;

bb.     preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

cc.     preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks;

dd.     executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

ee.     misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

ff.     inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

gg.     inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

54.     This conduct was not restricted to only a few occasions. Instead, it was widespread and constituted Wells Fargo's systematic procedures and ultimately its policy for servicing mortgage loans, specifically those mortgage loans in default.

55.     Much of the wrongdoing listed in the complaint also applied to Wells Fargo's conduct during the servicing and foreclosure of Plaintiff's loan.

56.     For example, during the servicing and attempted foreclosure of Plaintiff's loan, Wells Fargo engaged in activity including, but not limited to:

a.      failing to respond to Plaintiff's inquiries;

b.      failing to provide accurate and timely information to Plaintiff who was in need of, and eligible for, loss mitigation services, including loan modification;

13

c.  failing to perform proper loan modification underwriting;

d.  failing to gather or losing loan modification application documentation and other paper work;

e.  failing to provide adequate staffing to implement its programs;

f.  failing to adequately train staff responsible for loan modifications;

g.  failing to establish adequate processes for loan modifications;

h.  misleading Plaintiff by representing that her loan modification application would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

i.  failing to properly process Plaintiff's application for loan modification, including failing to account for documents submitted by her and failing to respond to Plaintiff's reasonable requests for information and assistance;

j.  permitting and approving the preparation, executing, or filing of affidavits in Plaintiff's foreclosure proceeding without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits;

k.  charging improper fees related to foreclosures; and

l.  inappropriately dual-tracking Plaintiff's foreclosure and loan modification activities and failing to communicate with Plaintiff with respect to foreclosure activities.

57.  Wells Fargo engaged in this behavior and conduct, not because of lack of oversight, but because it was a more profitable business model. Wells Fargo engaged in the widespread conduct of intentionally misleading consumers into believing that their requests for loan modifications or other loss mitigation programs were being processed when, in reality, Wells Fargo simply referred their mortgage loans to foreclosure or inappropriately dual-tracked their foreclosure and loan modification activities. Wells Fargo further defrauded consumers by representing that it had the requisite documents and authority to foreclose on their homes and then fabricating or falsifying the necessary foreclosure documents, or permitting third party vendors to fabricate or falsify these documents with its approval.

58.  Further, Wells Fargo enlisted the aid of third parties, such as LPS and the Defendants, to perpetrate its scheme to defraud consumers, including the Plaintiff.

59.  In carrying out their enterprise through a pattern of racketeering activity, the Defendants utilized the United States Postal Service and the wires, which were an integral part of

carrying out their scheme to defraud consumers. Defendants used the United States Postal Service to send misleading correspondence to consumers and used the wires as the integral means for servicing mortgage loans and later carrying out foreclosures from start to finish at the fastest speed possible, and without regard to propriety or quality.

### *EverHome's Role in the Enterprise*

60.     The Federal Reserve System, the Office of the Comptroller, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (collectively referred to as "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers between November 2010 and January 2011, including EverHome.

61.     The "primary objective of each review was to evaluate the adequacy of controls and governance over servicers' foreclosure processes and assess servicers' authority to foreclose."

62.     To accomplish this task, the Agencies evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 2010.

63.     Examiners also "assessed the accuracy of foreclosure-related documentation, including note endorsements and the assignment of mortgages and deeds of trust, and loan document control."

64.     To ensure consistency with the reviews, the Agencies organized their review, *inter alia*, into the following categories:

1. Policies and procedures, which entailed review of a servicers' policies and procedures to see if they provided adequate controls over the foreclosure process and whether those policies and procedures were sufficient for compliance with applicable laws.

2. Management of third-party service providers, which entailed review of the servicers' oversight of key third parties used throughout the foreclosure process, with a focus on foreclosure attorneys, MERS, and default-service providers such as LPS.

3. Compliance with applicable laws, which checked the adequacy of governance, audits, and controls that servicers had in place to ensure compliance with applicable laws.

4. Critical documents, which evaluated servicers' control over critical documents in the foreclosure process, including the safeguarding of original loan documentation and whether critical foreclosure documents were in the foreclosure files, and whether notes were endorsed and mortgages assigned.

65.     In April 2011, the Agencies published an Executive Summary (the "Report") of their findings and an overview of the potential impacts associated with instances of "foreclosure-processing weaknesses," as well as expectations moving forward.

66.     The Report identified industry wide problems with the servicers, including (1) inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors, (2) lack of sufficient audit trails to show how information set out in the affidavits was linked to servicers' internal records at the time the affidavits were executed, (3) and inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process.

67.     The Report acknowledges that the risks presented by problems are more acute "when those processes are aimed at speed and quantity instead of quality and accuracy." To that end, the Report found that servicers "fostered an operational environment contrary to safe and sound banking practices" by emphasizing speed and cost efficiency over quality accuracy.

68.     In regards to the affidavit and notarization practices, the Report concluded that "[i]ndividuals that signed foreclosure affidavit often did not personally check the documents for accuracy or possess the level of knowledge of the information that they attested to in those affidavits. In addition, some foreclosures documents indicated they were executed under oath, when no oath was administered."

69.     Moreover, the Agencies found "that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits." This practice also lead to staff or external law firms, such as Defendants, to contribute to the preparation and filing of inaccurate affidavits.

70.     The Report also found that "third-party law firms hired by the servicers were nonetheless filing mortgage foreclosure complaints or lost-note affidavits even though proper documentation existed." Additionally, the review of the servicers also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out the foreclosure processes without adequate oversight of those arrangements.

71.     Similarly, the Agencies also determined servicers "generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers." This caused instances in which law firms signed documents on behalf of servicers without having the authority to do so and law firms changing the format and content of affidavits without the knowledge of the servicers, which "raise concerns regarding the legality and propriety of the foreclosure even if the servicer had sufficient documentation available to demonstrate authority to foreclose."

72.     Upon information and belief, much of the wrongdoing listed in the Agencies'
Report applied to EverHome's conduct during the servicing and foreclosure of Plaintiff's loan.

73.     For example, during the servicing and attempted foreclosure of Plaintiff's loan,
EverHome engaged in activity including, but not limited to:

m.      falsely advising Plaintiff that she must be at least three months delinquent in loan payments to qualify for a loan modification

n.      failing to respond to Plaintiff's inquiries;

o.      failing to provide accurate and timely information to Plaintiff who was in need of, and eligible for, loss mitigation services, including loan modification;

p.      failing to perform proper loan modification underwriting;

q.      failing to gather or losing loan modification application documentation and other paper work;

r.      failing to provide adequate staffing to implement its programs;

s.      failing to adequately train staff responsible for loan modifications;

t.      failing to establish adequate processes for loan modifications;

u.      misleading Plaintiff by representing that her loan modification application would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

v.      failing to properly process Plaintiff's application for loan modification, including failing to account for documents submitted by them and failing to respond to Plaintiff's reasonable requests for information and assistance;

w.      permitting and approving the preparation, executing, or filing of affidavits in Plaintiff's foreclosure proceeding without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits;

x.      charging improper fees related to attempted foreclosures; and

y.      inappropriately dual-tracking Plaintiff's foreclosure and loan modification activities and failing to communicate with Plaintiff with respect to attempted foreclosure activities.

74.     EverHome engaged in this behavior and conduct, not because of lack of oversight,
but because it was a more profitable business model. EverHome engaged in the widespread
conduct of intentionally misleading consumers into believing that their requests for loan
modifications or other loss mitigation programs were being processed when, in reality,

EverHome simply referred their mortgage loans to foreclosure or inappropriately dual-tracked their foreclosure and loan modification activities. EverHome further defrauded consumers by representing that it had the requisite documents and authority to foreclose on their homes and then fabricating or falsifying the necessary foreclosure documents, or permitting third party vendors to fabricate or falsify these documents with its approval.

75.     Further, EverHome enlisted the aid of third parties, such as LPS and the Defendants, to perpetrate its scheme to defraud consumers, including the Plaintiff.

76.     In carrying out their enterprise through a pattern of racketeering activity, the Defendants utilized the United States Postal Service and the wires, which were an integral part of carrying out their scheme to defraud consumers. Defendants used the United States Postal Service to send misleading correspondence to consumers and used the wires as the integral means for servicing mortgage loans and later carrying out foreclosures from start to finish at the fastest speed possible, and without regard to propriety or quality.

### Lender Processing Services, Inc.'s Role in the Enterprise

77.     Lender Processing Services, Inc. ("LPS") is a company that assembles the information used to foreclose on consumers' properties.[6] LPS's default services revenue, the portion of LPS that includes foreclosure services quadrupled in annual revenue from $277.8 million in 2006 to more than $1 billion in both 2009 and 2010.[7] Since news about foreclosure fraud was brought to the forefront of the mortgage industry and new regulations and programs have been put in place, such as HAMP, LPS has identified an impact in its revenue.[8]

---

[6] Most of the following facts are taken from the Nevada Attorney General's complaint in *Nevada v. Lender Processing Servs., Inc., et al.*, No. A-11-653289-B (Clark Cnty. Dist. Ct. Dec. 15, 2011), which was filed after an extensive investigation into LPS's business practices.
[7] Mark Basch, *The LPS Solutions*, FLA. TIMES-UNION (Mar. 3, 2011).
[8] LENDER PROCESSING SERVS. INC., ANNUAL REPORT (Form 10-k) 20 (Feb. 29, 2012).

78.     LPS provides customized technology platforms to mortgage loan servicers depending on the status of the consumers' loan. The first such platform is the Mortgage Servicing Package ("MSP") which assists servicers in administering all aspects of loan servicing, such as payment processing, customer service, investor reporting, etc.

79.     The second technology platform, a web-based platform called LPS Desktop ("Desktop"), is designed to aid mortgage servicers service mortgage loans that are in default. Desktop automates and monitors all tasks involved in the foreclosure process, including monitoring deadlines or LPS-imposed timeframes for foreclosure events and tracking and recording all events and communications taken with respect to the foreclosure of the mortgage loan. In addition, Desktop organizes and stores foreclosure related documents such as notices of default and substitution of trustee documents.

80.     Additionally, Desktop generates and manages invoices sent by its network of foreclosure attorney firms to servicers.

81.     LPS provides its Desktop platform to the vast majority of national mortgage servicers and in exchange for which the servicers each have agreements with LPS, referred to as a "Default Services Agreement", to manage all bankruptcy and default related loans for those servicers.

82.     Using LPS's MSP and Desktop platform, LPS is able to manage the core aspects of the foreclosure process on behalf of servicers.

83.     When a loan goes into default, it is coded for foreclosure in the servicer's system, at which time Desktop automatically refers the loan for foreclosure to a law firm or trustee company within LPS's network of firms (a "Network Firm").

84.     Upon information and belief, Defendant Friedman was one of LPS's "Network Firms" and utilized its technology to accept referrals and then proceed to foreclosure.

85.     In order to become a "Network Firm", the firm must enter into a "Network Agreement" a sample copy of which is attached hereto as Exhibit "B". Although this agreement is dated September 1, 2001, exhibits attached thereto show that it was in effect until at least 2007.

86.     Upon information and belief, a substantially similar agreement was in effect in 2010 when Plaintiff's loan was referred from LPS to the Defendants for foreclosure.

87.     Upon acceptance of the referral, LPS charges the Network Firm a referral fee, which LPS labels an "admin fee". LPS requires that this fee be paid regardless of whether a loan is actually foreclosed or which stage the loan is removed from the foreclosure pipeline. Therefore, the admin fee does not depend on any administrative work actually completed, but is assessed solely on the fact that LPS referred a loan to the Network Firm.

88.     For example, as outlined in Ex. B, the "admin fee" for referrals of all loan types, including Freddie Mac, Fannie Mae, FHA, and VA loans, was $125.00 as of 2007. Immediately upon referral of a case to a Network Firm, LPS charges this $125.00 fee.

89.     This "admin fee" amounts to a referral fee or an illegal kickback. These fees are then passed on to the consumer, to be paid at the foreclosure sale, without any indication or disclosure that LPS is paid this referral fee. At the very least, these fees violate state laws or professional rules governing fee-splitting and impermissible referral fees.

90.     Upon information and belief, LPS charged Defendants this referral fee and Defendants paid this referral fee numerous times, including when LPS referred Plaintiff's loan to the Defendants for foreclosure.

21

91.     Desktop then automatically transmits a "referral package", which contains the servicer's information pertaining to the loan, such as copies of the note, screenshots of the unpaid balance, and other details.

92.     LPS constructed its business model so that it became the exclusive means for foreclosure firms to access the millions of dollars in foreclosure related fees held by LPS's servicer-clients. LPS used this powerful position to not only require referral fees or kickbacks from the Network Firms, but also to set its own arbitrary timeline, typically shorter than investor or noteholder imposed timelines, for how long the foreclosure process should take from referral date to sale date.

93.     The Network Firms, including the Defendants, are thus required to comply with LPS's arbitrary deadlines, sacrificing quality for quantity, or else risk being removed from accessing the majority of the country's top twenty servicers—LPS's servicer-clients.

94.     LPS claims that it acts only as a middleman, providing technology and data processing software during the foreclosure referral process. In actuality, LPS handles core responsibilities which were traditionally the responsibility of loan servicers, including, without limitation, providing direction to foreclosure attorneys about how and when to proceed with foreclosure sales or when to take other actions during the foreclosure process.

95.     Therefore, LPS has assigned itself the responsibility of approving or rejecting requests by Network Firms for extending foreclosure sale dates or other deadlines, as well as responding to a variety of other requests or questions submitted by the Network Firms. Thus, the Defendants actually had very little, if any, contact with their servicer "clients" despite their representation otherwise.

96.     In addition to conducting the servicers' core functions and responsibilities, from at least 2006 through 2010, LPS, often using its subsidiary companies, also executed various foreclosure and mortgage related documents on behalf of its servicer-clients, including, but not limited to, assignments of mortgage, substitution of trustee, lien releases, and other documents needed to establish standing to foreclose.

97.     In fact, LPS has faced numerous lawsuits, as well as investigations, by the U.S. Attorney General and other states' Attorneys General with respect to the mass robo-signing scheme in which it participated.

98.     Additionally, in November 2012, a former LPS executive, Lorraine Brown, pleaded guilty to conspiracy to commit mail and wire fraud for her role in LPS's scheme that saw over a million mortgage-related documents created with false signatures and notarizations.[9]

99.     LPS not only obstructs the line of communication between the servicers and foreclosure firms, but LPS also misrepresents its own role in the foreclosure process by claiming to merely provide data and software products when it actually directs the Network Firms through the foreclosure process.

100.    Perhaps LPS's role in directing the Network Firms is best illustrated by the manner in which it rates its Network Firms' performance. LPS's software carefully tracks the speed in which the Network Firm meets LPS's imposed timelines in its system, which is often shorter than investor or Lender imposed timelines. Based on whether the firms complied with LPS timelines, the Network Firms are given an "Attorney Performance Rating" of green, yellow or red. If a Network Firm, including Defendant Friedman, remains in the "red" for too long, LPS

---

[9] Office of Pub. Affairs, Dep't of Justice, http://www.justice.gov/opa/pr/2012/November/12-crm-1400.html (Nov. 20, 2012).

will cease to refer cases to that Network Firm, instead referring the cases to Network Firms who are able to conduct the foreclosures faster.

101.     Time is the only component of the Attorney Performance Rating. The rating does not take into account the quality with which the foreclosures are conducted.

102.     According to LPS, in 2010, Wells Fargo Bank, NA, was its largest customer.[10] Wells Fargo Home Mortgage is a wholly-owned subsidiary of Wells Fargo Bank, NA and utilizes LPS's mortgage loan servicing and default software platforms.

103.     Wells Fargo uses one of more of LPS's software platforms, including, without limitation, MPS and/or Desktop.

104.     Additionally, According to LPS, EverHome is LPS's longest-tenured client and uses its MSP and Desktop software.[11]

105.     Upon information and belief, Wells Fargo and EverHome both used one or more of these software platforms to service Plaintiff's mortgage loan.

106.     Additionally, upon information and belief, Defendant Friedman is one of LPS's Network Firms, and the Friedman entities utilize LPS technology, namely Desktop, during their foreclosure of Wells Fargo serviced mortgage loans, among others.[12]

107.     Upon information and belief, Wells Fargo and/or EverHome used LPS technology to refer Plaintiff's mortgage loan to the Defendants for foreclosure.

108.     Plaintiff alleges that Fannie Mae, Wells Fargo, EverHome, LPS, and the Defendants engaged in all of the above stated conduct with respect to their loan, and thus they

---

[10] LENDER PROCESSING SERVICES, INC., ANNUAL REPORT (2010).
[11] Lender Processing Servs. Inc., *EverHome Mortgage Company Renews Long-term Agreement for Lender Processing Services' Mortgage Servicing Package* (Jan. 31, 2011), http://www.lpsvcs.com/LPSCorporateInformation/NewsRoom/Pages/20110131.aspx.
[12] For example, several of Defendant Friedman's previous employees have listed tasks involving LPS software programs and/or LPS/Fidelity clients while employed with Defendant Friedman on their professional employment profiles (attached as Exhibit "N").

were rushed through the foreclosure process—a process which, in her case, never should have began in the first place.

### The Role of Mark Friedman, Kenneth MacFadyen, and Defendants Friedman, F&M, and Muncy in the Enterprise

109.    Friedman was not simply a parent holding company of F&M. Instead, Defendants Friedman, F&M, and Muncy operated as parts of a single business operation. Mark H. Friedman and Kenneth J. MacFadyen are attorneys and the principals of Defendant Friedman. They organized their law firm, Defendant Friedman, for the sole purpose of conducting foreclosures. They also created a sham company, Defendant F&M, that could be appointed as substitute trustees under the subject deeds of trust that would remain under their sole control and would act at the direction of Defendant Friedman and ultimately themselves.

110.    Mark H. Friedman and Kenneth J. MacFadyen developed this business model and worked with loan servicers, including Wells Fargo and EverHome, as well as LPS to develop a process by which their firm and sham company could conduct foreclosures in Virginia and Maryland as quickly and cheaply as possible.

111.    Mark H. Friedman and Kenneth J. MacFadyen, often acting through Defendant Friedman, provided management and decision-making and operated as the front for contact with the targeted debtor-consumers, the loan servicers, such as EverHome and Wells Fargo in this case, and the third party vendors such as LPS.  Meanwhile Defendant F&M existed as an employee-less paper entity that acted as the "substitute trustee" under the target deeds of trust. Defendant Muncy also acted as a "substitute trustee" under the target deeds of trust, and was often the "substitute trustee" whose name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers, including the Plaintiff.

25

112.    F&M did not operate independently of Friedman. It did not have a separate office, separate management or separate business and income. Instead, the two companies were interrelated and inseparably operated as a single business operation.  In fact, since Defendant Friedman has shut down its business operations, so has Defendant F&M.

113.    Additionally, the majority of "officers" of Defendant F&M were also employees of Defendant Friedman.

114.    F&M had little or no income that was not directly derived from Friedman.

115.    F&M did not have any employees.  Instead, it was a shell entity used by Friedman whose sole purpose was to act as the "substitute trustee" for the mortgage loans that were referred to Defendant Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales.

116.    F&M did not act as "substitute trustee" for any deeds of trust that were not referred to Friedman for debt collection and/or foreclosure proceedings.

117.    Similarly, Muncy did not operate as a "substitute trustee" independent of Friedman, but acted as "substitute trustee" only for those deeds of trust that were referred to Friedman for collection and/or foreclosure proceedings.

118.    Additionally, Muncy is an attorney who was employed by Friedman at the time he was named "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

119.    Friedman, on the other hand, served as the frontline company that dealt directly with targeted consumer debtors. Friedman directed the actions of the personnel who interacted with the debtors and with the loan servicers whose mortgage loans were referred to Friedman for debt collection or foreclosure proceedings by LPS.

120.     Mark H. Friedman, Kenneth J. MacFadyen and Defendants Friedman, F&M, and Muncy collectively accomplished their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that were referred to them by various loan servicers, including Wells Fargo and EverHome.

121.     The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Defendant Friedman.  For example, Friedman employees mailed the correspondence regarding the alleged foreclosure sale to consumers, purchased newspaper space for advertisements of the foreclosure sales, and interacted with the loan servicers, such as Wells Fargo and EverHome, third party vendors, such as LPS, and consumers.

122.     In fact, all letters mailed to consumers were printed on Defendant Friedman's letterhead, regardless of whether the alleged substitute trustees purportedly sent or signed the letter, and the documents submitted to the various Circuit Courts purportedly by Defendants F&M or Muncy, the "substitute trustees", were prepared by and often had a return address for Defendant Friedman.

123.     When the mortgage loans, including the Plaintiff's, were referred to Defendant Friedman for foreclosure, the Defendants did not actually receive the original note prior to instituting foreclosure proceedings.

124.     In fact, rather than locating the entity that was the actual noteholder of the loan or requesting the original note from the servicer prior to commencing the foreclosure process, Defendants used a false "lost note" letter. Defendants' motive was to streamline the foreclosure process and to maintain a positive "Attorney Performance Rating" in LPS's system, thereby ensuring that it would continue to receive foreclosure referrals.

125.    In fact, Defendants did not even seek to determine whether or not the note was available. They never contacted the custodian, the servicer or Fannie Mae to make such inquiry.

126.    Once the mortgage loans were referred to Defendant Friedman, it or LPS created a "Substitution of Trustee" document, which they claimed gave the Defendants the authority to conduct a foreclosure sale under the subject deeds of trust. This substitution of trustee document was either created by Friedman employees or, upon information and belief, for a period of time between at least 2006 and 2010, was also created by LPS.

127.    The Substitution of Trustee document created and used by the Defendants and/or LPS was false and improper in several respects.

128.    The document identified the loan servicers as the "Noteholders". These statements were false.

129.    Defendants did this as an alternative to locating and identifying the actual noteholders of the mortgage loan. Again, this was done in an effort to save time and costs with which they are able to conduct foreclosures and thereby maintain a positive "Attorney Performance Rating" in LPS's system and continue to meet its Fannie Mae imposed deadlines, thereby ensuring that it would continue to receive foreclosure referrals.

130.    Defendant Friedman then sent this document to various third-party entities, such as LPS or the loan servicers, purporting to be the "noteholders" via electronic wires or through the mail, at which time they were allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document was also allegedly notarized.

131.    At the time these documents were filed, the note holder remained Fannie Mae. Neither EverHome, Wells Fargo, LPS nor the Defendants were ever either creditors, note holders or beneficiaries.

132.    Upon information and belief, the individuals who signed these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or legal standing. Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

133.    Other times, these substitute trustee documents were created and signed by Defendant Friedman's employees or principals, such as Mark H. Friedman, as "attorney in fact" for the "noteholder". Therefore, Defendant Friedman essentially attempted to appoint itself as substitute trustee, using its employees and shell company F&M as no more than arbitrarily and fraudulently named substitute trustees.

134.    Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Defendant Friedman's employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

135.    In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by Friedman and presumably so the dates on the first and second pages match or to comply with Defendants' timeline.

136.    Plaintiff alleges that it was Defendant Friedman's policy that employees of its law firm sign official legal documents, many times under oath, for other individuals in the firm. Mark H. Friedman and Kenneth J. MacFadyen, not only were aware of this scheme, they developed the fraudulent process and took part in it. In some cases, Mark H. Friedman and Kenneth J. MacFadyen actually purported to sign the fraudulent substitution of trustee documents and other false affidavits and pleadings, when in reality an undisclosed employee of theirs actually signed the documents.

137.    In fact, in two hearings that took place in Baltimore, Maryland, Defendant Friedman's employees, Kenneth J. MacFadyen and Daniel Menchel, admitted to Friedman's practice of having employees sign documents for other attorneys in the law firm.

138.    Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1    Q      It is your signature?
2    A      Yes.
3    Q      Okay, and is it notarized?
4    A      Yes.
5    Q      On what date is it notarized?
6    A      June 30th.
7    Q      By whom?
8    A      Joann Sottile.
9    Q      Did you appear in front of Ms. Sottile on
10   that date?
11   A      I did not appear in front of her. I gave her
12   stacks of files to notarize after I'd signed them.
13   Q      I'm going to show you what's again in the
14   same group, same group of exhibits, adjustable rate
15   note. And I'm going to show you -- point to a
16   signature at the top.
17   Can you tell me whose signature that is?
18   A      That's my signature for Kenneth MacFadyen. I
19   signed that after I stamped the note, after I review
20   it.
21   Q      Okay.
22   A      And signed Kenneth MacFadyen's name.
```

23    Q    And would there have been a reason why you
24    wouldn't have used your own name?
25    A    No. I think we had a stamp that had Kenneth
1    MacFadyen's name on it. And we used that particular
2    stamp on that particular file.

139.    Additionally, Kenneth J. MacFadyen testified in *MacFadyen v. Young*, Case No.

24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21    Q    Let me -- let me show you the order to
22    docket, suit, and affidavit pursuant to Maryland Rule
23    14-207(b). Your name is at the bottom. Do you know
24    who signed your name?
25    A    No, not to this one. It would have been
1    either Daniel Menchel or Jeffrey Huston.
2    Q    But you don't know?
3    A    I don't know which one signed that one.
4    Q    Okay, let me show you, in this case, a deed
5    of removal and appointment of successor trustees
6    which is liber 11916, page 250, second page -- and ask
7    you who signed that one.
8    A    That would be Daniel Menchel. That's not
9    under oath. I believe he had every right to do that.
10    Q    Okay, but that would be Daniel Menchel's
11    signature?
12    A    That's a Daniel Menchel signature.
13    Q    Okay, let me show you an Atlantic bond, and
14    it's bond number 108147, and ask who signed that.
15    A    That looks to me like a Jeffrey Huston
16    version of Kenneth MacFadyen.

140.    Plaintiff alleges that these actions that took place in Maryland also took place in

Virginia, as it was Defendants' system wide policy.

141.    These documents are a legal nullity and do not actually authorize Defendants

F&M or Muncy to act as substitute trustees.

142.    Defendant Friedman used false signatures or falsely created documents because

doing so allowed the Defendants to process foreclosures at a much higher rate, thereby ensuring

that Defendant Friedman maintained a positive "Attorney Performance Rating" and continued to

receive foreclosure referrals through LPS's system. Without the need to send the document to the actual entity or persons with the authority to appoint a substitute trustee, either electronically or through the mail, Defendants were able to speed up the foreclosure process by days or even weeks. LPS, Wells Fargo and EverHome were well aware that Defendant Friedman was using falsified and misleading documents, and turned a blind eye to the improper signatures for the sake of speeding up the foreclosure process, increasing their bottom lines, and ultimately increasing the profitability of their enterprise. In fact, for a significant portion of time, LPS also engaged in falsifying signatures and notarizations of documents for the same purpose.

143.    After preparing the substitution of trustee documents, Defendants Friedman, Muncy, and/or other Friedman employees then began the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

144.    Upon information and belief, these letters were form letters that Defendants sent to every consumer from whom it attempted to collect a debt and for whom it attempted to conduct a foreclosure sale of the consumer's home, including the Plaintiff in this case.

145.    Defendant Friedman sent three form letters to every consumer for whom they conducted or attempted to conduct a foreclosure sale.

146.    Defendant Friedman's first letter was its initial correspondence letter (sample letters attached hereto as Exhibit "C"). This letter informed the consumer that their loan "has been referred to this office for legal action based upon a default under the terms of the Mortgage/Deed of Trust and Note. This office has been retained to institute foreclosure proceedings under the loan agreement."

147.     Defendant Friedman's letter also identified the consumer's loan servicer as "the current noteholder and/or servicer" of the loan.

148.     This initial correspondence letter also attempted to provide the disclosures required by the FDCPA at 15 U.S.C. § 1692g, provided an alleged amount due on the loan, and outlined the consumers' debt validation rights.

149.     However, the letters listed the relevant loan servicers as the creditor to whom the debt is owed, rather than the actual noteholder of the loan. At no point thereafter did Defendant Friedman provide consumers with the actual noteholder of the loan, but continued to identify the servicer as the noteholder in the rest of its correspondence with consumers.

150.     Defendant Friedman then sent consumers a second letter, a "lost note letter", which was typically dated the same as its initial correspondence letter (sample letters attached hereto as Exhibit "D"). This letter informed the consumer "the undersigned has been appointed by [the loan servicer] as trustee . . . for the purpose of foreclosing on the Deed of Trust/Mortgage. [The loan servicer] is the holder/servicer of the Note."

151.     This letter went on to state that Defendant Friedman/Muncy "do not have the original note in our possession at this time. We do have evidence of the indebtedness referenced above. We have been informed by the Lender that they will forward the original note to us."

152.     This form letter was sent to consumers regardless of whether the consumer's note has been lost or not. In fact, it was sent to consumers whose original note had actually been lost and could not be forwarded by the "Lender".

153.     This statement was made so that the Defendants' claim of authority to foreclose appeared more legitimate and was less likely to be questioned by consumers.

33

154. Additionally, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers. For example, the subject line of these letters is [the loan servicer] v. [the consumer].

155. The "undersigned" of this initial letter who had "been appointed by [the loan servicer] as trustee" was actually Defendant Friedman. Defendant Muncy also signed the letter on behalf of Defendant Friedman. At no point was Defendant Friedman ever even allegedly appointed substitute trustee (except in these letters), including in the substitute trustee document that claims to appoint Defendants Muncy and F&M each as substitute trustees.

156. The third form letter that Defendant Friedman sent to consumers provided notice of a scheduled foreclosure sale date as well as a copy of the alleged substitute trustee document (sample letters attached hereto as Exhibit "E").

157. Again, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers: "[the loan servicer] v. [the consumer]".

158. This second letter also contains the following closing:

Very truly yours,

FRIEDMAN & MacFADYEN, P.A.

Substitute Trustee

159. The notice of the sale, which was also published in newspapers local to the property location, named Defendants Muncy and F&M as substitute trustees. However, for any further information sought about the sale, prospective buyers were directed to contact Defendant Friedman.

160. These letters all contained similar misrepresentations, including but not limited to, an incorrectly identified "noteholder" of the loan, which was actually the loan servicer, a

misrepresentation that Defendant Friedman was the substitute trustee, and a misrepresentation that a lawsuit had been filed or was pending against the consumer.

161.    In some cases, Defendant Friedman also sent additional form letters to consumers. These additional letters were sent when consumers requested reinstatement quotes or payoff amounts (sample letters attached hereto as Exhibit "F").

162.    The "reinstatement quote" letter attempted to provide an amount needed to bring the consumer's loan current. It contained the following language: "This responds to your recent request for the amount necessary to reinstate the above referenced loan and to resolve the pending action."

163.    The letter further stated, "After reinstatement, you will be required to sign the appropriate documents and take other requested action to assist in obtaining a withdrawal of the action." These statements were misleading in that there was no pending action, and these statements misrepresented that there was a filed lawsuit in order to intimidate consumers.

164.    The "payoff statement" letter contained the following statement: "Upon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action and obtain a dismissal of the action."

165.    Again, this was a misrepresentation, as there are no judicial foreclosures in Virginia, nor were there any "actions" that were filed by Defendant Friedman or that Defendant Friedman intended to file in order to conduct a foreclose sale.

166.    Additionally, the payoff statement letter also contained the following: "The information in this letter was provided by [the loan servicer] and Friedman & MacFadyen, P.A. [The loan servicer] acts as the mortgage loan servicer for the investor that owns your loan. The investor has authorized [the loan servicer] to provide this information and to act on its behalf."

167.    Defendants were well aware that there is a difference between the loan servicer and the investor/noteholder/owner of consumers' loans. However, they chose to misrepresent otherwise for easier and speedier foreclosures, to maintain a positive "Attorney Performance Rating", and to continue to receive foreclosure referrals.

168.    Additionally, Defendants often misrepresented the amount due on the loan in its reinstatement quotes and its payoff statements by including attorneys' fees and costs which either had not actually been accrued or, such as in the case of Fannie Mae and Freddie Mac loans, were greater than the amount they were contractually entitled to for conducting the foreclosure from the investor or noteholder.

169.    Consumers relied on these false documents when they subsequently contacted or paid money to the Defendants in attempt to save their homes or when they relocated their families after foreclosure, with the mistaken belief that any of the Defendants were validly appointed substitute trustees and had the authority to sell their homes.

170.    Defendants then (or before the letter was even sent) advertised the foreclosure "trustee sales" in local newspapers throughout Maryland and Virginia naming Defendants F&M and Muncy as the substitute trustees and the contact for information about the property and the foreclosure sale as Defendant Friedman. As with the letters that were mailed to consumers, these advertisements were purchased and obtained by Defendant Freidman's employees.

171.    These foreclosure sale notices were mailed to consumers throughout Virginia and Maryland using the United States post office.

172.    Once the alleged foreclosure sale occurred, Defendants F&M and Muncy purported to create a "Trustees Deed" in which the alleged substitute trustees conveyed the subject property to a grantee. Similar to the other actions, this document was created by

Defendant Friedman, and allegedly signed by one of the substitute trustees. Upon information and belief, after reviewing a substantial amount of documents allegedly containing Muncy's signature, these documents were not actually signed by Muncy. Upon information and belief, other Friedman employees signed Muncy's name on the document.

173.    Further, the grantee listed in the Trustee's Deed was often not the last and highest bidder at the foreclosure sale, but was instead a third party or subsequent purchaser. Pursuant to consumers Deeds of Trust, most of which contain standardized language, after a foreclosure sale, "Trustee . . . shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale . . . ." Additionally, "Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title."

174.    The Defendants consistently fail to do this and instead, when the loan servicer is the purchaser and last and highest bidder, Defendants often grant the property to a third party, such as Fannie Mae. This is done to avoid the imposition of a certain taxes and fees.

175.    After the foreclosure sale, the Defendants subsequently make similar misrepresentations in its trustee accounting report and the documents submitted therewith, to various Commissioners of Accounts across the Commonwealth of Virginia (samples attached hereto as Exhibit "G").

176.    For example, and without limitation, the Defendants list the loan servicer as the noteholder, list a third party as the last and highest bidder, when in reality the loan servicer was the last and highest bidder, and fail to include the "admin fee" paid to LPS.

177.    This is especially true where the noteholder or owner of the loan was Fannie Mae. In those accounting statements, Defendants list Fannie Mae as the last and highest bidder—when

in reality, Fannie Mae never bids but depends on its loan servicers to do so—and lists the loan servicer as the noteholder. This is a clear misrepresentation.

178.    Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which were subsequently mailed to consumers or to the Commissioner of Accounts in the Circuit Courts across the Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents and misrepresentations.

179.    The principles, Mark H. Friedman and Kenneth J. MacFadyen, developed and oversaw these procedures. They knew that their actions, as well as the actions of Defendants Friedman, F&M, and Muncy were not in accordance with the law. Defendants Mark H. Friedman and Kenneth J. MacFadyen also knew that the firm's correspondence contained misrepresentations and that the signatures on the substitution of trustee documents were, more often than not, forged. However, Defendants at the direction of their principals Mark H. Friedman and Kenneth J. MacFadyen, continued to conduct foreclosures in this manner so that the firm would maintain a positive "Attorney Performance Rating in LPS's system and therefore continue to receive foreclosures referrals from LPS.

180.    Defendants were wholly unprepared to act as impartial trustees as they were incentivized to foreclose regardless of whether a foreclosure sale should actually proceed. They typically did not have the notes, did not know whether the borrowers had been offered HAMP modification, did not know whether the prerequisites to foreclosure—especially for FHA or VA loans—had been met, etc., all of which could have caused the foreclosure timelines to be extended, resulted in foreclosure sale cancellations, and caused their "Attorney Performance Rating" to change to "red", ultimately causing them to lose any future foreclosure referrals. In

fact, in most circumstances, they may not even have contact directly with the servicer, let alone the holder, beneficiary, or creditor for the note.

181.    Because of the (mostly monetary profit) incentives from loan servicers, investors, and other third party vendors, like LPS, towards speedy foreclosures without regard to propriety or the law, Defendants were in no way impartial or neutral trustees under the Deeds of Trust.

182.    Defendants were typically paid less than a thousand dollars per foreclosure they conducted, from start to finish. After subtracting the referral fee/kickback that went to Defendant LPS, this required them to conduct foreclosures at a large enough quantity and with minimal attorney or staff time in order to remain profitable. Therefore, quality and impartial discretion was sacrificed for speed and automation, and the careful attention to detail that is required when pursuing a course of action that will expel people from their homes was simply nonexistent.

183.    Additionally, when LPS's "Attorney Performance Rating" was taken into account, it added another layer of incentives for Defendants to conduct foreclosures at the quickest possible speed without regard for any fiduciary duties they owed to the borrower as "substitute trustees" under the subject Deeds of Trust.

184.    Additionally, the pricing scheme under which Defendants were paid further incentivized them to conduct foreclosures sales as quickly as possible without regard to the requirements of the law, rather than working with the consumer debtor to help them remain in their homes, despite the fact that it is actually more beneficial to the investors that loss mitigation is pursued rather than foreclosure.

185.    One example of this can be seen from Fannie Mae's compensation guide. Defendants received *at least* double the amount of money when a non-judicial foreclosure sale was actually completed, as well as additional compensation when the foreclosed property was

39

sold to a third-party other than Fannie Mae. In particular, according to Fannie Mae's servicing guide, Defendants received $925 in fees when a non-judicial foreclosure sale was completed, as opposed to $300 if the mortgage loan was reinstated after recordation of the substitute trustee's deed or $500 if the mortgage loan was reinstated after the notice of sale. Notably, there are no fees listed in the servicing guidelines if a substitution of trustee's deed is not recorded.

186.    The $425-$625 difference in fees is rather significant when considering that Defendant Friedman's and Defendant F&M's *only* source of revenue was the fees they collected from foreclosures, unlike other debt collector law firms that collect various types of consumer debts in addition to foreclosures. Any delay in the foreclosure sale to ensure possession of the necessary documents (such as acceleration letters, notes, lost note affidavits), or even whether prerequisites to foreclosure had been met, not only increased the possibility of reinstatement, but also increased the costs and expenses of these Defendants' sole source of revenue—the flat-fee they received to conduct foreclosures.

187.    This additional compensation, plus the increased cost of complying with the law, motivated these Defendants' deceptive conduct, which can only be characterized as pecuniary— not as perfectly fair and impartial.

### Defendants' Specific Conduct Regarding Michele McBeth

188.    Plaintiff alleges that each of the preceding allegations regarding the Defendants' conduct and scheme to defraud consumers was also engaged in against the Plaintiff. Plaintiff specifically incorporates and adopts for her own specific allegations the details of systemic conduct alleged in the preceding paragraphs.

189.     Plaintiff borrowed $168,000 for her mortgage, as evidenced by a promissory note dated July 29, 2003 ("the Note"). The Note was payable to Wachovia Mortgage Corporation (hereafter "Wachovia").

190.     The Note was secured by a Deed of Trust dated July 29, 2003 and recorded in the Clerk's office for the City of Norfolk.

191.     Plaintiff's Note and Deed of Trust obligated her to repay Wachovia.

192.     Federal National Mortgage Association ("Fannie Mae") purchased Plaintiff's loan subsequent to its origination. Despite such obligation in the Deed of Trust, Fannie Mae provided no documentation of the sale to Plaintiff.

193.     After the sale of Plaintiff's loan to Fannie Mae, EverHome was given the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Fannie Mae. Among its responsibilities as the servicer, EverHome was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing responsibilities were governed by Fannie Mae's Single Family Servicing Guide (the "Guide").

194.     The servicing contract obligated EverHome to follow Fannie Mae's instructions for servicing the loan, particularly the instructions detailed in the Guide.

195.     The Guide further provided instructions to Defendants on its requirements prior to commencing a foreclosure sale.

196.     The instructions in the Guide and other Fannie Mae directives conflicted with established Virginia law.

197.   Plaintiff regularly made her payments to EverHome until August 2009, when she called EverHome to make a payment over the phone and inquire about a modified payment plan. On that phone call, EverHome lowered Plaintiff's monthly payment and qualified her for Making Home Affordable Home Affordable Modification Program (HAMP) to begin September 2009 through December 2009.

198.   Plaintiff made her payments as required under this agreement. However, in mid-November 2009, EverHome sent Plaintiff notice that she did not qualify for a loan modification.

199.   In December 2009, Plaintiff attempted to make a mortgage payment, but EverHome refused to accept the payment, claiming it would invalidate the payment reduction plan.

200.   Plaintiff instead signed a forbearance agreement in mid-December 2009, to begin in January 2010, and made all payments according to that agreement until June 2010 when EverHome informed her that she needed to reapply for financial assistance.

201.   Plaintiff followed all of EverHome's instructions and reapplied for a HAMP modification in June 2010.

202.   However, on or around July 1, 2010 Plaintiff contacted EverHome to make a monthly mortgage payment at which time EverHome informed her that she needed to pay $6,000.00 to bring her loan current or face foreclosure.

203.   EverHome also informed Plaintiff during this phone call that her loan would be serviced by a new company shortly.

204.   On or around July 27, 2010, Wells Fargo forwarded correspondence to Plaintiff indicating that EverHome was transferring the servicing responsibilities of her loan to Wells Fargo effective August 1, 2010. A copy of this correspondence is attached hereto as Exhibit "H".

42

205.    In August 2010, Plaintiff submitted a new HAMP modification application to Wells Fargo.

206.    Over the next several months, Plaintiff received multiple different loan modification agreements from Wells Fargo, all containing different proposed payment amounts.

207.    In the meantime and despite Plaintiff's compliance with her agreed upon payment plans, EverHome and/or Wells Fargo referred Plaintiff's loan to Defendants for foreclosure around July 2010.

208.    EverHome and Wells Fargo's actions were deliberately made so that each would be able to benefit financially from the Plaintiff by adding unnecessary late charges and other fees and assessments to Plaintiff's mortgage.

209.    Additionally, this process allowed other members of the enterprise, such as LPS and the Defendants, to further benefit financially from costs and fees related to foreclosure or attempted foreclosure.

210.    Upon information and belief, this foreclosure referral took place electronically using the wires. Wells Fargo and EverHome use computer programs, such as LPS's software program MSP, in which an account is flagged for foreclosure and then the information is transmitted electronically for foreclosure processing.

211.    Upon information and belief, around July 2010, Wells Fargo and/or EverHome electronically referred Plaintiff's loan to LPS for foreclosure using LPS's MSP or Desktop software.

212.    Upon information and belief, around July 2010, LPS then electronically referred Plaintiff's loan to Defendant Freidman for instituting foreclosure proceedings using LPS's Desktop software.

**Defendants Are "Appointed" to Collect a Debt**

213.    Around July 2010, Defendant Friedman—also using its shell entity, F&M, and its employee, Muncy, as alleged substitute trustees—began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale. Upon information and belief, Defendant Friedman maintains copies of these letters in its records.

214.    Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer who they attempted to collect a debt and conduct a foreclosure sale on their home. Therefore, upon information and belief these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

215.    Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiff and to the putative class members in their records.

216.    Defendants mailed their initial correspondence to Plaintiff, using the United States Postal Service, on or around July 28, 2010. Plaintiff has attached this initial correspondence letters as Exhibit "I".

217.    Upon information and belief, once this letter was sent, Defendant Friedman then updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Wells Fargo and/or EverHome.

218.    In this initial correspondence to Plaintiff, Defendant Friedman stated that EverHome purportedly retained it to foreclose on Plaintiff's home for her alleged failure to make mortgage payments.

219.    The July 28, 2010 correspondence stated that EverHome was the noteholder and/or servicer at the time the letter was prepared. Upon information and belief, this statement

was false. In fact, EverHome was never in possession of the Note. Further, upon information and

belief, the Plaintiff alleges that Defendants did not ever make contact with Fannie Mae to request

custody of the note until at least, if at all, the date of the scheduled foreclosure.

220.    Defendants' July 28, 2010 letter further stated:

> THIS IS A COMMUNICATION FROM A DEBT COLLECTOR THIS
> FIRM IS A DEBT COLLECTOR.
>
> THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY
> INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

221.    Among other things, Defendants' July 28, 2010 letter attempting to collect the

subject debt, states the following:

> hh. that that the total indebtedness "due from the date of default is $158,561.98,"
>
> ii.  that they have calculated a statement of Plaintiff's debt, as of the date of the
>      letter, but to obtain the most current figures, it would be necessary for Plaintiff
>      to contact the Defendants,
>
> jj.  that "[s]hould you wish to reinstate or payoff your loan, or obtain a current
>      statement of your debt for any reason, please contact our foreclosure
>      department at the above telephone number…

222.    This payoff statement included accrued interest of $4,452.34, a "legal fee" of

$600.00, foreclosure expenses of $150.00, late charges of $309.98, and "total fees" of $61.00.

223.    This letter never identified Fannie Mae as the actual noteholder, investor,

beneficiary or owner of Plaintiff's loan.

224.    This letter was sent using Defendant Friedman's letterhead and was signed by

Defendant Muncy on behalf of Defendant Friedman.

225.    On or around July 28, 2010, Defendants sent Plaintiff a second correspondence,

using the United States Postal service (attached hereto as Exhibit "J").

226.   Upon information and belief, once this second letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Wells Fargo and/or EverHome.

227.   The subject line of the second correspondence to Plaintiff was styled as if a lawsuit was to be or had already been filed.  However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff.

228.   For example, the subject line of the second July 28, 2010 correspondence is: "EverHome Mortgage Company v. Michele L. McBeth."

229.   Defendants' letter stated that EverHome had appointed the undersigned, Defendants Friedman and Muncy, as trustees for the purpose of foreclosing on the deed of trust.

230.   The correspondence further stated that the Defendants did not have the original Note in their possession, but that they have evidence of the indebtedness.

231.   Defendants' letter also stated that Defendants "have been informed by the Lender that they will forward the original note to us." Upon information and belief, this statement was false because Defendants possessed no information to believe or represent that the note was "unavailable."

232.   This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

233.   On or around July 28, 2010, Defendant Friedman sent Plaintiff a third letter, using the United States Postal Service, regarding alternatives to foreclosure (attached as Exhibit "K"). The subject line of the third July 28, 2010 correspondence is: "EverHome Mortgage Company v. Michele L. McBeth."

234.    In order to discuss alternatives to foreclosure, Plaintiff was advised to call Defendant Friedman.

235.    This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

236.    Upon information and belief, once this third letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Wells Fargo and/or EverHome.

237.    Defendants sent correspondence to Plaintiff dated August 3, 2010 providing her with a reinstatement quote advising Plaintiff how much to pay them in order to bring her loan current. A copy of this letter is attached hereto as Exhibit "L".

238.    Upon information and belief, once this reinstatement quote letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Wells Fargo and/or EverHome.

239.    Defendants' August 3, 2010 letter was an attempt to collect a debt, and contains a boldface § 1692e(11) disclosure.

240.    The August 3, 2010 letter states the following, among other things, in connection with Defendants' attempts to collect the subject debt:

   A.    States that the amount necessary to reinstate the above-referenced loan and to resolve the pending action in amounts that "are good through August 27, 2010"

   B.    Warns Plaintiff that "if the effective date for the payment quotation stated in this letter continues past the scheduled foreclosure sale date, the foreclosure sale will nonetheless occur unless the loan is reinstated or paid off PRIOR TO the foreclosure sale,"

   C.    States that "(B)ecause of interest, late charges, trustee's and/or attorney's fees and costs (if applicable), and other charges that may vary from day

47

to day or that may change after the date of this communication, the amount due on the day you pay may be greater. You may also owe the amount of any monthly or other payments and late charges that may fall due after the date of this communication. Therefore, prior to making payment, it is necessary for you to verify the exact amount due."

D.     States that "(A)ll funds must be submitted in the form of Certified and/or Cashier's check(s) and/or Money Order(s) and must be made payable to EverHome Mortgage Funds must be sent to the attorney/trustee office listed above."

E.     States that "After reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a withdrawal of the action."

F.     Advises Plaintiff that she should verify the amounts due and owing to insure that they are correct.

G.     And provides an amount demanded for reinstatement of Plaintiff's home mortgage loan.

241.     Defendants' letter to Plaintiff dated August 3, 2010 provides that a total amount of $9,584.79 was needed in order to reinstate her loan and avoid foreclosure. Of this total amount allegedly due, Defendants claimed that Plaintiff owed $1,449.80 for "Current Foreclosure Attorney/Trustee Fees and Costs", $360.34 in late charges, and $15.00 for inspection fees.

242.     The various fees and costs included in Defendants' alleged reinstatement quote dated August 3, 2010 were drastically different from those included in the statement dated July 28, 2010, just several days prior. Upon information and belief, one or both of these accounting statements were false.

243.     Defendants systematically misrepresent the amount of fees and costs they are entitled to pursuant to their contracts with servicers, noteholders, and other entities or that are permitted under the Deed of Trust or by law.

244.     For example, Defendants represented to Plaintiff that they were owed $1,449.80 when their contract with Fannie Mae entitled them only to $600.00.

245. Additionally, Defendants routinely document substantially smaller fee and cost requests in their submissions to the Commissioner of Accounts for confirmation of foreclosure sales, listing an amount of $600.00, than what they demand from consumers such as the Plaintiff.

246. This is evidence not only of the Defendants' collective intentional misrepresentations to consumers, but also of the combined business model in which they, along with Wells Fargo, EverHome, Fannie Mae, and LPS, simply conduct foreclosures with the fastest speed and lowest cost possible without regard to the accuracy of the accounting or the actual amount that consumers owe.

247. Defendant Friedman's August 3, 2010 correspondence also stated that "this responds to your request for the amount necessary to reinstate the above referenced loan and to resolve the pending action."

248. The letter further stated, "After reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a withdrawal of the action." Virginia does not have judicial foreclosures, and there is no "action" against the consumers.

249. On or around August 10, 2010, Defendants forwarded Plaintiff another form letter that provided notice of a sale date and contained a copy of the alleged Substitution of Trustees document. A copy of this letter is attached hereto as Exhibit "M").

250. The August 10, 2010 letter stated that Plaintiff's home would be sold at a foreclosure auction "unless the entire balance of the Note (including all principal, interest and lawful charges) is paid in full before the date of the sale referenced in the attached Notice," and advised Plaintiff to "contact the undersigned immediately" should she "desire to avoid the necessity of a foreclosure sale and satisfy (her) obligation.

251.    The August 10, 2010 correspondence also states:

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

252.    The Substitution of Trustee document sent to the Plaintiff was dated July 27, 2010 and was subsequently filed in the Circuit Court for the City of Norfolk.

253.    Upon information and belief, the Defendants mailed this document to the Circuit Court for the City of Norfolk, using the United States Postal Service, when it requested that it be filed with the City of Norfolk land records.

254.    This document states that EverHome was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared. Upon information and belief, this statement was false.

255.    The Substitution of Trustee document stated that EverHome had appointed Defendants F&M and Muncy as substitute trustees.

256.    Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

257.    Plaintiff's Deed of Trust contains specific provisions for the sale of her Note and the change of loan servicer. Specifically, section 20 states:

The Note or partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

258.    Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

259.    In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all title, power and duties conferred upon Trustee herein and by Applicable law."

260.    Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

261.    Plaintiff's Deed of Trust identifies the Lender of her mortgage as Wachovia. Any authority EverHome possesses to appoint a substitute trustee would have to come from Wachovia or a subsequent noteholder. No such authority appears to exist.

262.    The Substitution of Trustee document was purportedly signed by an "Assistant Vice President" of EverHome, the claimed noteholder, and was thereafter allegedly notarized. At some point after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would fit the appropriate timeline needed for Plaintiff.

263.    Although the Substitution of Trustees Deed is dated July 27, 2010,  the date on the notary block is August 5, 2010.

264.    Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

265. As a result, this alleged Substitution of Trustee document was null and void, and did not actually appoint Defendants F&M and Muncy as substitute trustees.

266. Further, Fannie Mae is the actual noteholder of Plaintiff's loan.

267. None of Defendants' letters to the Plaintiff nor the substitution of trustee document ever identified Fannie Mae as the creditor or the actual owner, beneficiary and/or noteholder of her mortgage loan.

**Defendants Were Fiduciaries Under the Deed of Trust**

268. Defendants claimed that they were appointed substitute trustees under Plaintiff's Deed of Trust.

269. Although Defendant Friedman never claimed to be a substitute trustee in the substitution of trustee document, it did so in letters to the Plaintiff and other consumers. Also, Defendant Friedman acted interchangeably with the actual allegedly appointed substitute trustees throughout the foreclosure process.

270. Well-established Virginia law provides that a trustee under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them and with the caution of a reasonably prudent person

271. Additionally, in executing the trust, the trustee must substantially conform to the stipulations of the deed of trust.

***Defendants' Duty of Notice***

272. Paragraph 22 of Plaintiff's Deed of Trust, among other things, creates the following duties for a trustee:

> If Lender invokes the power of sale, Lender or ***Trustee shall*** give to Borrower, the owner of the Property, and all other persons, ***notice of sale*** as required by ***applicable law***.

273.     Accordingly, Plaintiff's Deed of Trust required Defendants to provide notice in accordance with applicable law, which is defined in the Deed of Trust "as all controlling federal, state and local statutes, regulations, ordinances and administrative rules and order (that have the effect of law) as well as all applicable final non-appealable judicial opinions."

274.     As mentioned previously, Defendants failed to provide notice of the sale in accordance with applicable law, including, but not limited to Virginia Code § 55-59.1(B). Instead, Defendants intentionally breached the requirements of Code § 55-59.1 in order to conduct foreclosures at the fastest speed with lowest cost possible and without regarding to its duties in the Deed of Trust.

275.     The Virginia Code is clear that if the mortgage note is lost or cannot be produced AND the beneficiary submits to the trustee a "lost note affidavit", only then can the trustee proceed to foreclosure sale, provided that written notice has been sent to the consumer that the note is lost or unavailable and that upon expiration of 14 days from the date of mailing, the beneficiary of the note will request the trustee proceed to sale.

276.     This statute provides a clear timeline that Fannie, Wells Fargo and/or Everhome, Friedman, F&M, and Muncy routinely ignore. If a note is lost or cannot be produced, the following steps must be taken: 1) the beneficiary (Fannie) submits to the trustee a lost note affidavit; 2) Fannie provides written notice to the homeowner that the note is lost or unavailable and that request for sale will be made of the trustee upon expiration of 14 days from the date of mailing that notice; and 3) after 14 days of mailing the notice to the consumer, Fannie can request that the trustee proceed to sale.

277.     Instead of complying with this statutory obligation which is incorporated to Plaintiff's Deed of Trust in Paragraph 22, Defendants send a blanket "lost note letter" to every

consumer, including the Plaintiff, claiming that their note is unavailable. This is merely a scheme to bypass the requirements set forth under Virginia law, and to increase the speed with which foreclosures can be processed. Waiting for a lost note affidavit from Fannie, as well as waiting for the written notice to the consumer that the note is lost would add weeks to the timeline, thus Defendants simply omit their obligations under the Deed of Trust for the sake of speed.

278.   Defendants were aware of this requirement, but insisted on instituting foreclosure proceedings against the Plaintiff and other homeowners without providing the requisite notice or obtaining the documents needed to conduct the foreclosure proceedings.

279.   Instead, Defendants did not require *any* documents, aside from a one-page referral form, from the servicer or LPS prior to attempting to conduct a foreclosure sale.

280.   Moreover, the Trustee's duty of notice is predicated on the "[l]ender invoking the power of sale." Despite this prerequisite, upon information and belief, Defendants never actually communicated with Plaintiff's lender.

281.   Additionally, Defendants further breached their fiduciary duty of notice by identifying Everhome Mortgage Company as the beneficiary of the Note pursuant to Code § 55-59.1(B). In particular, Defendants' correspondence dated July 28, 2010, provides "[i]f you believe that you may be subject to a claim by any person or entity other than Everhome Mortgage Company to enforce the Note, then you may petition the Circuit Court of the county or city where the property of some part thereof lies for an order requiring Everhome Mortgage Company to provide adequate protection against such claim."

282.   This notice directly violates Code § 55-59.1(B), which is incorporated into Defendants' fiduciary duties pursuant to Paragraph 22 and provides "[t]he notice shall further advise the person required to pay the instrument that if he believes he may be subject to a claim

by a person other than the beneficiary to enforce the instrument, he may petition the circuit court of the county or city where the property or some part thereof lies for an order requiring the beneficiary to provide adequate protection against any such claim."

283.    At all times relevant hereto, Defendants had knowledge that Everhome was not the beneficiary or holder of the Note as proscribed in Code § 55-59.1(B). Nevertheless, Defendants identified Everhome as the beneficiary to expedite the foreclosure with the lowest cost structure, and with the intent to conceal Fannie's role in the foreclosure because of Fannie's public assurances and guidelines that foreclosure alternatives were its "top priority."[13]

284.    This conduct constitutes a breach of Defendants' fiduciary duty of notice as provided in Paragraph 22 of Plaintiff's Deed of Trust.

### *Defendants' Duty to Advertise*

285.    Paragraph 22 of the Deed of Trust also confers upon a trustee the duty to advertise the sale by public notice in accordance with Applicable Law.

286.    Upon information and belief, Defendants – in effort to expedite foreclosures -- often advertised the sale date before any substitution of trustees deed was executed, and did so as to the Plaintiff.

287.    Thus, Defendants breached their fiduciary duty under Paragraph 22 by advertising the foreclosure when they had no present right to do so.

288.    Moreover, implicit in Defendants' duty to advertise is that Defendants were properly appointed as substitute trustee under the Deed of Trust, which they were not.

---

[13] *See* Statement of Terence Edwards, Executive Vice President, Credit Portfolio Management Fannie Mae, to the U.S. Senate Committee on Banking, Housing, and Urban Affairs (Dec. 1, 2010), available at http://www.fanniemae.com/portal/about-us/media/statements/2010/statement-edwards-senate-comm-banking-housing-urban-affairs.html (last visited Jan. 28, 2013).

289.   Specifically, Paragraph 24 of the Deed of Trust states "[l]ender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law."

290.   Because Defendants improperly appointed themselves without the knowledge of the Lender, any exercise of the duty of advertisement conferred by the Deed of Trust was not authorized under the express terms therein.

### *Duty to Refrain from Personal Interest Conflicting with Interest*

291.   Further, a trustee must refrain from placing himself in a position where his personal interest conflicts with the interests of those parties for whom he acts as a fiduciary.

292.   Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Friedman employed Defendant Muncy.

293.   As explained throughout this complaint, Defendants Friedman, F&M, and Muncy operate on a volume-based business model and are incentivized to churn through foreclosures without any regard to the interests of the consumer. This makes it not only more expensive to process foreclosures in compliance with the law and their fiduciary duties, but also means they will be referred less cases if they do.

294.   They are motivated purely by their own financial gain, and thus none of these parties is an impartial or neutral "substitute trustee".

295.   In fact, Defendant Muncy has consistently maintained in the related *Goodrow* matter that he and the law firm that he works for each have an attorney-client relationship with

every possible entity involved—the supposed investors, noteholders and servicers—on the loans

that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his

interactions with those entities at a deposition, citing the attorney-client privilege as the basis for

not disclosing such information:

```
 9      Q    Okay.  At the time you sent this letter,
10   what evidence of the indebtedness did you have?
11      A    We had the information contained in the
12   referral, not limited to this header document that you
13   have gone through, Exhibit 3.
14      Q    What other information did you have in the
15   referral?
16         MR. BIONDI:  I'm going to object to
17   attorney/client privilege.  The referral would include
18   instructions and requests for advice from a client to
19   Mr. Muncy or lawyers in his firm.
20         MS. KELLY:  So you're instructing him not
21   to answer obviously?
22         MR. BIONDI:  Yes.
23         MS. KELLY:  Just to clarify, are you
24   instructing Mr. Muncy not to answer regarding anything
25   else that may be in the referral documents?

 1         MR. BIONDI:  You had asked what other
 2   information was communicated to Mr. Muncy, who's the
 3   attorney at Friedman & MacFadyen, by the clients,
 4   which is Met Life Home Loans.
 5         MS. KELLY:  In the referral.
 6         MR. BIONDI:  In the referral, which I
 7   don't know what could be in there, whether there's
 8   going to be advice, request for advice, instructions.
 9   Those matters are reasonably to be anticipation of
10   litigation at this point.  I'm sorry.  Take that back.
11   Not litigation.  But it's definitely part of the
12   attorney/client relationship and the purpose of the
13   representation conducting the foreclosure.
```

---

```
16      Q    What instructions did you receive from
17   First Horizon regarding Mr. Goodrow's mortgage loan?
18         MR. BIONDI:  Don't answer that question.
19   Attorney/client privilege.
21      Q    Did you communicate with First Horizon to
```

22   verify that they were the noteholder of Mr. Goodrow's
23   mortgage loan?
24         MR. BIONDI:  Wait a minute.  Same
25   objection.
1   BY MS. KELLY:
2         Q     Did you communicate with Met Life at all
3   to verify who the noteholder was regarding
4   Mr. Goodrow's mortgage loan?
5         MR. BIONDI:  I think I have the same
6   objection.  You're trying to avoid the substance, but
7   you're trying to substitute the substance into the
8   question and then asking the question.
10        Q     Did you communicate with Fannie Mae
11   regarding their investment in Mr. Goodrow's mortgage
12   loan?
13        MR. BIONDI:  I object.  Attorney/client
14   privilege.
16        Q     Did you communicate with Fannie Mae at all
17   regarding their ownership interest in Mr. Goodrow's
18   mortgage loan?
19        MR. BIONDI:  Same objection.

296.    Defendants engaged in this same conduct with respect to the Plaintiff.

***Intentional Violation of Fannie Mae's Guidelines Further Demonstrates Impartiality***

297.    At all times relevant hereto, Defendant Friedman was a "retained attorney" in Fannie Mae's RAN.

298.    Fannie Mae requires that mortgage loans owned by them be serviced according to specified procedures outlined in its Servicing Guide ("the Guide"), and further requires that certain loss mitigation steps must be undertaken prior to a foreclosure sale being authorized.

299.    As a retained attorney for Fannie Mae loans, Defendants had knowledge of Fannie Mae's foreclosure policies and procedures as outlined in the Guide and subsequent directives and agreed to abide by such policies and procedures.

300.    On April 28, 2010, Fannie Mae amended its Servicing Guide to address procedural requirements for foreclosures for loans owed by Fannie Mae. The Guide stated that

the new requirements were "particularly important and material to Fannie Mae's ongoing effort to keep borrowers in their homes and to reduce credit losses."

301.    The Guide states "Fannie Mae requires the servicer and the foreclosure attorney (or trustee) to interact throughout the conduct of foreclosure proceedings." Some of this required interaction includes:

> The servicer must submit a complete referral package to the selected attorney (or trustee). The referral package must include mortgage loan status data (from *Exhibit 1: Mortgage Loan Status Data for Foreclosure Proceedings*) and the documentation the attorney (or trustee) needs to conduct foreclosure proceedings.
> . . . .
>
> The attorney (or trustee) will acknowledge receipt of the referral package (and indicate whether or not it is complete) within two business days. The servicer must provide any required missing documentation to the attorney (or trustee) within five business days after it received the attorney's (or trustee's) request.

FANNIE MAE, FANNIE MAE 2010 SERVICING GUIDE UPDATE PART VII AND PART VIII 801-73–74 (April 2010).

302.    As detailed above, Defendants were required to acknowledge receipt of the referral package from Plaintiff's servicer within two business days. In this acknowledgment, Defendants were required to indicate any documents they needed to conduct the foreclosure, which would have included either the original note or the lost note affidavit pursuant to Virginia Code § 55-59.1(B).

303.    Defendants were aware of this requirement for loans owed by Fannie Mae, but insisted on instituting foreclosure proceedings against the Plaintiff and other homeowners without obtaining the documents needed to conduct the foreclosure proceedings.

304.    Defendants were also aware that they could request the original note which was in Fannie Mae's possession, or even simply "legal custody" with physical possession remaining with Fannie Mae, but routinely chose not to do so.

59

305.    This is merely another example of how Defendants failed to act impartially and disregarded the consumers' interests for those of the loan servicers and investors, as well as their own pecuniary interests.

306.    Defendants F&M, Muncy, and Friedman—to the extent that Friedman was also considered trustee—therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust. Upon information and belief, Defendants also breached this fiduciary duty that they owed to the putative class members.

307.    Further, upon information and belief, Defendants had a copy of Plaintiff's Deed of Trust and were aware that Fannie Mae owned Plaintiff's loan and that they and the servicer were required to comply with the Fannie Mae Servicing Guidelines. Their failure to do so is evidence of their impartiality and breach of their duties as fiduciary to the Plaintiff.

308.    Defendants further breached this duty to the putative class members.

### Count I:  Trustees' Breach of Fiduciary Duties
### (All Defendants)
### <u>CLASS CLAIM</u>

309.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

310.    This matter is also brought as a class action for a "Fiduciary Duty" class, initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a Note for whom Defendants Friedman, F&M, and/or Muncy claimed they were appointed substitute trustees and sent correspondence in an attempt to conduct a foreclosure sale of the real property within the four years prior to the filing of the Complaint, and/or for whom they collected any amount of fees.  Excluded from the class are employees of the Defendants.

311.    Plaintiff incorporates her prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

312.    Plaintiff's counsel is in possession of a substantial number of correspondences that the Defendants mailed to consumers. Plaintiff's counsel is also in possession of a substantial number of Substitution of Trustee documents, Trustee's Deeds and Trustee's Foreclosure Accounting Reports that Defendants filed with the Commissioner Accounts throughout Virginia. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

313.    Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.  Defendants have accomplished well more than 50 foreclosures as a retained attorney in Fannie Mae's RAN during the last four years.

314.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation: (a.) whether Fannie Mae's pricing incentives and forced timelines caused Defendants to violate their duties of notice and advertisement under the deed of trust; (b.) whether Fannie Mae's pricing incentives and forced timelines placed Defendants in a position of personal conflict with the homeowners to whom they were fiduciaries and caused them to act impartially against the consumers; (c.) whether LPS's referral incentives and forced timelines caused Defendants to act impartially against the consumers; (d.) whether these actions constituted Defendants' breach of fiduciary duties; and (e.) what remedies are available for such a breach of fiduciary duty.

61

315.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. Additionally, Defendants incentives and timelines took place uniformly across the potential class members. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

316.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative classes and have accepted such responsibilities.

317.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

318.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

319.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.      As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.   Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.   Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.   Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources.   The issues at the core of this case are classwide and should be resolved at one time.   One win for one consumer would set the law as for every similarly situated consumer.

320.    Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.   To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

321.    Defendants breached their fiduciary duties by failing to act impartially towards the Plaintiff and putative class members due to pricing incentives and forced compliance with unreasonable timelines. Based on the pricing incentives and forced timelines, Defendants acted for their own pecuniary gain so that they remained in Fannie Mae's and LPS's referral network.

322.     This also included Defendants failure to comply with Fannie Mae's Guide for the sake of conducting speedier foreclosures. Defendants repeatedly breached their fiduciary duty to Plaintiff and the putative class including, but not limited to, the following conduct:

a.     By consistently failing to acknowledge receipt of the referral package and failing to request the necessary foreclosure documents in order to expedite the foreclosure process on Plaintiff and the putative class; and

b.     By failing to obtain a complete referral package, including the documents required to conduct a foreclosure under Virginia law prior to conducting the foreclosure.

323.     Defendants' acceptance of any fees resulting from their role as alleged "substitute trustees" were therefore inappropriate.

324.     As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

### Count II: Violation of 18 U.S.C. § 1962(c)
### Racketeer Influenced and Corrupt Organizations Act
### Class Claim

325.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

326.     This matter is brought as a class action on behalf a second class—the "RICO Class" —initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants attempted a foreclosure upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

327.    Plaintiff incorporates her prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

328.    Plaintiff's counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiff's counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or filed with the Commissioners of Accounts.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

329.    Defendants has conducted and attempted hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished well more than fifty foreclosures as a Fannie Mae retained attorney/trustee during the last four years.

330.    Plaintiff's counsel alleges that Defendants uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all foreclosure files.  Her counsel assumes that this may not have always been the case—at some time in the past Defendants may actually have signed documents as indicated on the document's signature block, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee.  However, at some point this conduct ended and the Defendants began conducting their business using the unlawful conduct described herein at least since 2008.

331.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants and the third parties identified herein constituted a RICO

enterprise; (b.) whether Defendants' falsification of foreclosure documents constituted mail or wire fraud; (c.) what remedies are available for such a RICO violation.

332.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

333.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor her counsel has any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative classes and has accepted such responsibilities.

334.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

335.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

336.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil

Procedure is also appropriate in that:

        a.     As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

        b.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants threatened and contacted for a foreclosure are likely unaware of their rights under the law, or of whom they could find to represent them in federal litigation.  Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources.  The issues at the core of this case are classwide and should be resolved one time.  One win for one consumer would set the law as for every similarly situated consumer.

       337.   Plaintiff alleges a cause of action against the Defendants for their violation of 18 U.S.C. § 1962(c).

       338.   As alleged above, the Defendants used an elaborate foreclosure enterprise in order to conduct foreclosures as quickly an as efficiently as possible without regard to Plaintiff's and putative class members' rights under the law.

       339.   For example, and without limitation, when a mortgage loan serviced by Wells Fargo and/or EverHome, including the Plaintiff's loan in this case, allegedly went into default, Wells Fargo and EverHome used LPS's software, including the Desktop platform, to assign the

loan to a Network Firm like the Friedman entities. LPS designed this software, along with an expedited foreclosure timeline, to rate Network Firms solely on how quickly the Network Firm could conduct a foreclosure sale. If a Network Firm could not conduct a foreclosure sale within LPS's timeline, LPS would not refer any more foreclosures to that Network Firm. Wells Fargo and EverHome continued to use LPS's software and referral services because of how quickly foreclosure sales occurred within that system. After the foreclosure was referred to a Network Firm, namely the Defendants here, LPS charged the firm an "admin fee", which was assessed regardless of any administrative work performed, or if a foreclosure sale even occurred. This "admin fee" essentially amounted to a referral fee or illegal kickback.

340.   Mark H. Friedman and Kenneth J. MacFadyen founded a law firm, Defendant Friedman, as well as a sham company, Defendant F&M, solely to conduct foreclosure sales. Mark H. Friedman and Kenneth J. MacFadyen designed their firm and sham company to artificially inflate their "Attorney Performance Rating" in the LPS system by creating fraudulent foreclosure documents in order to drastically increase the speed with which it was able to conduct foreclosures to the detriment of other law abiding trustees.

341.   Upon information and belief, Defendant Friedman and/or Defendant F&M were Network Attorneys in LPS's system and regularly paid LPS's "admin fee". Upon information and belief, when a defaulted mortgage loan was referred to the Friedman entities for foreclosure, they used Defendant Muncy, Kenneth MacFadyen, Mark Friedman and other Friedman employees to create fraudulent documents to initiate the foreclosure process, including the substitution of trustee documents. Upon information and belief, the Friedman entities also used LPS to create fraudulent documents.

342.    Using these fraudulent documents, the Friedman entities and Muncy would then conduct a foreclosure of the consumer's home. LPS and the loan servicers, Wells Fargo and EverHome in this instance, knew of the Defendants' conduct and continued to refer foreclosure cases to them because of how quickly the Defendants were able to conduct foreclosure sales. This in turn allowed Wells Fargo and EverHome to comply with its own required foreclosure timeline set by the investors, Fannie Mae in the Plaintiff's case. These procedures were uniform with respect to foreclosures conducted by the Friedman entities in Virginia and took place against both the Plaintiff and the putative class members.

343.    Wells Fargo, EverHome, LPS, Fannie Mae, Mark H. Friedman, Kenneth J. MacFadyen and each of the Defendants constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

344.    Each Defendant, along with the other members of the enterprise, were engaged in a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

345.    Further, Fannie Mae, LPS, and the loan servicers, including Wells Fargo and EverHome, existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law. That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers' homes.

346.    Fannie Mae, Wells Fargo, EverHome and LPS are each separate entities and operate in their own self-interest.  They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for their own profit

347.    For example, Fannie Mae does not specifically purchase loans that are in default, Wells Fargo and EverHome service loans owned by Fannie Mae regardless of whether they are ultimately foreclosed, and LPS provides software to Wells Fargo and EverHome to assist in servicing mortgage loans, which does not depend on the loan ever going into default.

348.    The racketeering proceeds obtained by the Defendants as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions. Upon information and belief, the proceeds of the foreclosure enterprise were also used to pay LPS's referral fees and illegal kickbacks, which LPS refers to as an "admin fee".

349.    The enterprise had an effect on interstate commerce. For example, and without limitation, the transmission of the fraudulent foreclosure documents and letters through the United States mail system and through the wires for transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments. Additionally, LPS uses the wires and the mail to refer foreclosures to the Defendants, receive their "admin fee", create fraudulent affidavits, and to communicate with the loan servicers such as Wells Fargo and EverHome and the Defendants regarding the foreclosure of

consumers' homes. Proceeds from consumer foreclosure sales and fees from Fannie Mae and the servicers are also paid through the mail and the wires.

350.     In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and the letters to the Plaintiff and other consumers. Wells Fargo, EverHome, LPS, and the Defendants also violated mail and wire fraud statutes when they used LPS's software, including the Desktop platform, to refer loans for foreclosure and to communicate throughout the process that they manufactured to conduct foreclosures in Virginia as quickly and cheaply as possible. Fannie Mae further violated the mail and wire fraud statutes by using the mails and wires to institute its pricing incentives and to submit payments to the loan servicers and the Defendants during this process. This conduct began sometime as early as 2008 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

351.     Although the Defendants' participation in the enterprise has since ceased, it was continuous for a significant portion of time from at least 2008 until 2012.

352.     The conduct and actions of the Defendants as alleged herein—creating fraudulent documents for use in foreclosures—violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.   The Defendants perpetrated an ongoing scheme to defraud consumers and courts, using the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

353.     The Defendants used this practice with respect to numerous documents that they caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's

counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants and all of these contain the same fraudulent documents. Additionally, Plaintiff's counsel has reviewed numerous trustee's reports filed with various Commissioners throughout Virginia and these reports contain the same misrepresentations.

354.    Further, the Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants' regular way of conducting business, namely foreclosures in Virginia and Maryland.

355.    The Plaintiff, the Circuit Courts, and the Commissioner of Accounts relied on the fraudulent documents when they mistakenly believed that Defendants were validly appointed substitute trustees and conducted a proper foreclosure sale.

356.    By means of example only, Plaintiff and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise.  The Commissioners of Accounts approved the sales and the accounting of the sales based on the fraudulent documents that Defendants submitted to them.

357.    Plaintiff and putative class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

358.    Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**Count III: Violations of 15 U.S.C. § 1692, et seq.**
**Fair Debt Collections Practices Act**
**CLASS CLAIM**

359.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

360.    Plaintiff alleges that Defendants violated the FDCPA pursuant to 15 U.S.C. § 1692e, 1692f, and 1692g:

kk.    Generally, § 1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' Section §1692e also provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of §1692e prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

(2) The false representation of--
(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
…
(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
…
(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692e

b.    Section 1692f prohibits generally the use of "unfair or unconscionable means to collect or attempt to collect any debt", and specifically in relevant part:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by agreement creating the debt or permitted by law.
…

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –
(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest…

15 U.S.C. § 1692f.

c.  A debt collector must provide a consumer with the name of the creditor to whom the debt is owed pursuant to Section 1692g:

(a)    Notice of debt; contents.
Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing –
…
   (2) the name of the creditor to whom the debt is owed.

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

361.   For their claim brought pursuant to the FDCPA, the Plaintiff proposes a class initially defined as follows:[14]

---

[14] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert.denied*, 125 S.Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiff's claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

362.   Defendants violated § 1692e and §1692f as to each class member by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters to the class members.

363.   Plaintiff alleges this class definition because all or substantially all of the class members would have received correspondence from the Defendants with a subject line that represented or implicitly threatened that a lawsuit was or would be filed.

364.   Plaintiff also alleges a "Lost Note" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the mortgage note was lost or otherwise unavailable within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

365.   Defendants violated § 1692e as to the Lost Note subclass because they forwarded correspondence to consumers that falsely represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1.

366.   Plaintiff also alleges a "Servicer as Creditor" subclass of consumers initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

367.   Defendants violated § 1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers that contained a false statement and misrepresented

that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed.

368.    Plaintiff also alleges an "Inconsistent Demand for Payment" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as conflicting loan payoff and/or reinstatement calculation(s) within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

369.    Defendants violated §1692e and §1692f as to the Inconsistent Demand for Payment subclass because they made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers.

370.    Plaintiff also alleges a "Failure to Identify Creditor" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and to whom the Defendants failed to identify the creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

371.    Defendants violated §1692g as to the Failure to Identify Creditor subclass because, in their initial correspondences to consumers, they failed to identify the creditor to whom the debt was owed.

372.    Plaintiff alleges a "False Statement About Fees" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan where Fannie Mae was the creditor, beneficiary, investor and/or noteholder and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and in that letter or another, demanded payment of fees in excess of $600.00 within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

373.  Defendants violated §1692e and §1692f as to the False Statement About Fees subclass because they made a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated their fees would be capped at $600.00.

374.  Plaintiff also alleges a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home that enclosed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

375.  Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustee (and/or where the signatures were forged altogether).

376.  Plaintiff alleges a "No Right to Foreclose" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan that was owned or insured by Fannie Mae, Freddie Mac, the Department of Veteran Affairs and/or the Federal Housing

Administration and to whom Defendants mailed a letter in an attempt to collect a debt when the prerequisites to foreclosure had not been satisfied within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

377. Defendants violated §1692e and §1692f as to the No Right to Foreclose subclass because they falsely stated and attempted to or did conduct foreclosure sales on homes where the Defendants failed to follow the required prerequisites to foreclosure as incorporated into the Deeds of Trust.

378. Plaintiff incorporates her prior allegations and estimate that the class is so numerous that joinder of all members is impractical.

379. Plaintiff's proposed class counsel has reviewed a substantial number of correspondences and Appointment of Substitute Trustee documents that Defendants mailed to consumers. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

380. Defendants use the same form correspondences that they send to consumers across Virginia. These form correspondences include the initial correspondences to consumers, lost note letters, substitution of trustees deeds, notices of sale, payoff statements and reinstatement quotes.

381. Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

382. There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendants routinely misrepresented the identity of the creditor, amount,

legal status, or character of the debts that they were attempting to collect from Plaintiff and the putative class members; (b.)  whether the Defendants falsely represented the compensation that they could lawfully receive as a result  of these attempted and/or actual foreclosures; (c.) whether the Defendants threatened to take or took action that could not legally be taken; (d.) whether the Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiff and the putative class members; (e) whether Defendants communicated directly with consumers who they knew were represented by an attorney; and (f) whether Defendants could lawfully foreclose upon Plaintiff and the putative class members prior to meeting the requirements of the Deed of Trust and/or other regulations and governing law.

383.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts, form documents and legal theories.  The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

384.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative classes and has accepted such responsibilities.

385.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

386.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

387.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.      As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

80

388.   As a result, Plaintiff and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the putative class members, respectfully move for class certification and for actual and compensatory, statutory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO and the FDCPA; for her attorneys' fees and costs; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**MICHELE MCBETH,** *on behalf of*
*herself and all others similarly situated*

By_____/s/_____
            Of Counsel

Matthew J. Erausquin, VSB No. 65434
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:   (703) 273-7770
Fax:   (888) 892-3512
matt@clalegal.com
janelle@clalegal.com

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:   (757) 930-3660

Fax:     (757) 930-3662
lenbennett@clalegal.com
srotkis@clalegal.com

Dale W. Pittman, VSB No. 15673
*Counsel for the Plaintiff*
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel:     (804) 861-6000
Fax:     (804) 861-3368
dale@pittmanlawoffice.com

Kristi Cahoon Kelly, VSB No. 72791
*Counsel for the Plaintiff*
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Tel:     (703) 277-9774
Fax:     (703) 591-9285
kkelly@siplfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of January, 2013, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Douglas P. Rucker, Jr.
Andrew Biondi
Cullen D. Seltzer
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, V A 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
drucker@sandsanderson.com
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

*Counsel for the Defendants*


_____
/s/
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
janelle@clalegal.com
