**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| JOHN K. GOODROW, *individually and on behalf of all others similarly situated*, )<br>)<br>) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:11cv020 |
| ) | |
| FRIEDMAN & MACFADYEN, P.A. )<br>JOHNIE R. MUNCY, and )<br>F&M SERVICES, L.C. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## SECOND AMENDED CLASS COMPLAINT

COMES NOW the Plaintiff, John K. Goodrow, individually and on behalf of all others similarly situated, by counsel, and as for his Second Amended Class Complaint against the Defendants, he alleges as follows:

## INTRODUCTION

1.      Defendants—a now defunct foreclosure mill—engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and conducting foreclosures as cheaply as possible. To accomplish these goals, Defendants worked together to create falsified documents, lied to Commissioners of Accounts, consumer victims, and others regarding the custody and ownership of mortgage notes and compliance with Virginia's foreclosure requirements, and largely ignored federal law enacted to protect debtors against overly aggressive debt collectors. Accordingly, Plaintiff brings this class action alleging claims for actual, treble, and punitive damages, declaratory and injunctive relief, costs, and attorneys' fees brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §1961, *et seq.* ("RICO"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and for the Defendants' breach of fiduciary duty.

## JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1367, and 15 U.S.C. § 1692k(d).

## PARTIES

3.      Plaintiff John K. Goodrow (hereafter "Goodrow" or "Plaintiff") is a natural person and a consumer within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

4.      Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman") is a now defunct law firm with offices in Maryland, Virginia, and Washington D.C., the principal purpose of whose business was the collection of debts, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

5.      Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

6.      Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

7.      Defendants regularly collect or attempt to collect debts owed or due or asserted to be owed or due another, and each is a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(6).  Defendants moreover use one or more instrumentalities of

interstate commerce or the mails in a business the principal purpose of which is the enforcement of security interests.

## STATEMENT OF FACTS

8.      Defendants operated as a debt collection and foreclosure enterprise. They worked together with other entities as described herein to systemically perpetrate fraud on consumers that ultimately resulted in the loss of thousands of Virginia residents' homes.

9.      Each Defendant, along with the other members of the enterprise, had a specific role in perpetrating a pattern of fraudulent activity.

10.     The principals of Defendant Friedman, Kenneth J. MacFadyen and Mark H. Friedman, created a sham company, Defendant F&M, and used an arbitrarily chosen employee, Muncy (Defendants Friedman and F&M are collectively referred to as "the Friedman entities"), in which they purported to act as a neutral and impartial trustee under thousands of deeds of trust, including the Plaintiff's Deed of Trust.

### *Fannie Mae's Role in the Enterprise*

11.     The Federal National Mortgage Association ("Fannie Mae") is a housing government-sponsored enterprise (GSE).  It is a for-profit business and until its more recent financial failure, was publically traded entity.

12.     Fannie Mae's business model is as a secondary-market participant. It purchases residential mortgage loans from originator sellers who are then able to use those proceeds to originate additional mortgages.  Fannie Mae holds the loans it purchases in its own portfolio or packages them into mortgage backed securities (MBS), which are, in turn, sold to global investors.

13.     With respect to the loans it holds in portfolio, Fannie Mae contracts with loan servicers to collect mortgage payments and handle other customary loan servicing functions, including foreclosures.

14.     In 1997, Fannie Mae established its Retained Attorney Network ("RAN") to provide default-related legal services, such as those associated with foreclosure or bankruptcy.

15.     Fannie Mae does not manage these third party law firms but delegates that responsibility to the loan servicers who are expected to monitor all aspects of the law firms' performance during the foreclosure of Fannie Mae owned loans. The servicers were permitted to refer foreclosure files to any law firm of their choice, at which time these firms would enter into engagement letters with Fannie Mae.

16.     Then in August 2008 Fannie Mae proposed changes to its RAN model to expand the network to 140 law firms covering 31 jurisdictions. Fannie Mae now required that its loan servicers refer all foreclosure and bankruptcy cases only to attorneys included in its RAN.

17.     Fannie Mae requires that each of its retained attorneys, such as Defendant Friedman, execute an engagement letter, which documents the existence of an attorney-client relationship with Fannie Mae. Fannie Mae also acknowledges that, in most cases, the retained attorney will also represent the servicer and may have signed a separate engagement letter with the servicer. Therefore, Defendant Friedman (nor its sham company or employee that it attempts to use as "substitute trustee") cannot possibly act as a neutral or impartial trustee for Fannie Mae, MetLife Bank, and the Plaintiff.

18. With the collapse of the housing market in 2008, home prices declined while serious delinquencies rose at a substantial pace, from 400,000 at the end of 2008 to nearly 1,000,000 at the end of 2009.[1] This, in turn, led to a significant increase in foreclosures.

19. Between 2007 and 2010, Fannie Mae foreclosures increased to historic levels. In 2010, Fannie Mae foreclosed on 262,078 single-family properties, a 433% increase from 2007.[2] According to an FHFA official, in 2010, Fannie Mae had actually referred 700,000 loans to foreclosure.[3]

20. As the volume of foreclosures rose, so too did widespread mortgage servicing and foreclosure abuses. In December of 2003, Fannie Mae was first alerted to foreclosure abuse allegations when a Fannie Mae shareholder brought to attention the use of false pleadings and affidavits in Florida. In 2005, Fannie Mae hired an outside law firm to investigate the allegations who found that Florida attorneys were routinely filing false pleadings and affidavits.

21. The report further observed that Fannie Mae did not take steps to ensure the quality of the foreclosure attorneys in its RAN or the quality in which these attorneys processed foreclosures.

22. Despite having knowledge of this behavior, Fannie Mae did not remedy the conduct. Instead the use of false pleadings and affidavits and foreclosure abuses with respect to Fannie Mae loans spread, with more and more "foreclosure mills", such as the Friedman entities, managing Fannie Mae defaulted loans.

---

[1] FED. HOUS. FIN. AGENCY, OFFICE OF INSPECTOR GEN. FHFA'S OVERSIGHT OF FANNIE MAE'S DEFAULT-RELATED LEGAL SERVICES 11 (Sep. 30, 2011).
[2] Id.
[3] Id. at 11 n.13.

23.     In June 2010, FHFA's Office of Conservatorship Operations spent two days in Florida to investigate the allegations of abuse and to gain a better understanding of foreclosure processing. The resulting report found that servicers, attorneys, and other personnel were overloaded with the volume of foreclosures. The report also noted that law firms in Fannie Mae's RAN were not devoting the time necessary to their cases due to Fannie Mae's flat-fee structure and volume-based processing model.

24.     Again, Fannie Mae failed to remedy the conduct or propose any type of corrections that would result in a system of processing and overseeing its foreclosures to ensure compliance with state and federal regulations.

25.     In 2011, the FHFA concluded its review of Fannie Mae's RAN and Freddie Mac's Designated Counsel Program and concluded that Fannie Mae could have reacted to foreclosure processing abuses sooner because "deteriorating industry conditions over the past several years should have provided adequate warning to the GSEs to review policies, processes, and controls of other vendors and counterparties including law firms".[4]

26.     Along with Fannie Mae's lack of oversight and complete disregard for the warnings it received about the widespread perpetration of fraud by its servicers and foreclosure law firms in its RAN, Fannie Mae developed its own industry-wide scheme to defraud consumers and forced the participation of its loan servicers and foreclosure attorneys.

27.     Fannie Mae demands that foreclosures be processed in a flat-fee structure and with a volume-based approach. In Virginia, Fannie Mae compensates its third party foreclosure

---

[4] FED. HOUS. FIN. AGENCY, OFFICE OF INSPECTOR GEN. FHFA'S OVERSIGHT OF FANNIE MAE'S DEFAULT-RELATED LEGAL SERVICES 16 (Sep. 30, 2011).

attorneys $600.00 to complete a foreclosure sale from "the cradle to the grave". This does not include certain allowable costs such as recordation costs or service of process costs.

28.     Fannie Mae also provides certain add-on compensations when foreclosures are completed, such as an additional $200.00 if the property is sold to a third party other than Fannie Mae at the foreclosure sale and title is transferred and a $150.00 notary fee for completed foreclosures.

29.     Alternatively, Fannie Mae only pays $350.00 for a deed in lieu of foreclosure, $300.00 if the loan is reinstated after notice of default, and $500.00 if the loan is reinstated after notice of sale.

30.     Thus, Fannie Mae's price structure requires that its retained attorneys churn through foreclosures at a rate and with enough volume to ensure that they make a profit.

31.     From 2006 through 2010, Fannie Mae set a sixty-day maximum for the number of allowable days between the due date of the last paid installment and foreclosure sale date in Virginia.

32.     According to Fannie Mae's Servicing Guide, this sixty-day timeframe starts when any Fannie Mae loan is referred to an attorney or trustee for foreclosure proceedings by the loan servicer.  In addition, the Servicing Guide states that servicing entities are required to refer loans to an attorney or trustee between 30-34 days from sending out the notice of acceleration or breach letter. In Virginia, this notice of acceleration or breach letter can be sent thirty days after the borrower's first missed payment.

33.     In essence, Fannie Mae required those that serviced their loans to start foreclosure proceedings approximately thirty days after the borrower missed their first payment.  Fannie Mae then required that the foreclosure sale occur within sixty days of that referral.

34.     If there is any delay in completing the foreclosure process—and the servicer is unable to provide a reasonable explanation for the delay—Fannie Mae requires that the loan servicer pay a compensatory fee, or in reality a penalty fee.

35.     In addition, Fannie Mae had at least two Virginia law firms in their RAN to ensure competition between the law firms so that they would process foreclosure sales as quickly as possible.

36.     This strict timeframe all but ensures that foreclosures are conducted in violation of state and federal laws. This is especially true in light of Virginia Code § 55-59.1(B).

37.     Specifically, the Virginia Code provides:

> If a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced *and the beneficiary submits to the trustee an affidavit to that effect*, the trustee may nonetheless proceed to sale, provided the beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon expiration of 14 days from the date of mailing of the notice.

Va. Code § 55-59.1(B) (emphasis added).

38.     In practice, the Fannie Mae notes are not "unavailable."  Instead, they are stored with a Fannie Mae designated "custodian."  Fannie Mae has a specific written procedure by which a servicer or foreclosure attorney such as Defendants can request and receive the Note, either physically or for "legal custody."

39.     Specifically, Fannie Mae's Servicing Guide states, "Fannie Mae is at all times the owner of the mortgage note, whether the mortgage loan is in Fannie Mae's portfolio or part of the MBS pool. In addition, Fannie Mae at all times has possession of and is the holder of the mortgage note, except in the limited circumstances expressly described below. Fannie Mae may have direct possession of the note or a custodian may have custody of the note. If Fannie Mae

possesses the note through a document custodian, the document custodian has custody of the note for Fannie Mae's exclusive use and benefit." *Servicing Guide*, § 202.07.01, Ownership and Possession of Note by Fannie Mae.

40.    Moreover, Fannie Mae has created a process whereby the servicer, as its agent, can order or request possession of the Note when the servicer begins a foreclosure process:

> In most cases, a servicer will have a copy of the mortgage note that it can use to begin the foreclosure process. However, some jurisdictions require that the servicer produce the original note before or shortly after initiating foreclosure proceedings. If Fannie Mae possesses the note through its designated document custodian, to obtain the note and any other custody documents that are needed, the servicer must submit a request to the designated document custodian's electronic release system.

*Id.*, §102

41.    Plaintiff alleges on information and belief as to each Plaintiff and putative class member, Defendants never requested or sought custody of the note before sending the notice provided under Va. Code § 55-59.1(B) or even before the date of a foreclosure sale.

42.    If the Friedman entities requested the original note or lost note affidavit from Fannie Mae prior to the foreclosure, using the required form attached hereto as Exhibit "A", they would never be able to comply with the Fannie Mae imposed timeline of sixty days (a timeline which is shortened even more by LPS as discussed later) And they would thus risk losing business or part of their fixed price fee.

43.    Therefore, Defendants Friedman, F&M, and Muncy chose the alternative and more profitable course of proceeding to foreclosure without the original note or lost note affidavit. Instead, they send consumers, including the Plaintiff, a letter claiming that the original note is unavailable.

44.    Fannie Mae has structured its entire business model around speedy foreclosures that cannot possibly comply with state and federal laws. Moreover, Fannie Mae intentionally set

its compensation rates so that it is more profitable for the foreclosure attorneys to foreclose, while attempting to save face and liability by simultaneously claiming that it expects loan servicers and retained attorneys to continue assisting borrowers with alternatives to foreclosure.

45.     Essentially, the servicers and the Defendants are in a proverbial catch 22—either follow the law or follow the Fannie Mae guidelines and get paid, disregarding the law in the process.

46.     Defendants, along with the other participants of the enterprise, chose to disregard the law and follow Fannie Mae's guidelines for its own pecuniary gain.

47.     Furthermore, Fannie Mae not only knew about the mortgage servicing and foreclosure abuses that the Defendants and the rest of the enterprise participants were engaged in, but it promoted these fraudulent activities by its behind the scenes approach in which it forced speedy foreclosures at all costs, even in violation of the law.

48.     Thus, Fannie Mae provided the framework by which the Defendants engaged in 1) conduct 2) of an enterprise 3) through a pattern of 4) racketeering activity.

### MetLife Bank's Mortgage Loan Servicing and Role in the Enterprise

49.     The Federal Reserve System, the Office of the Comptroller, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (collectively referred to as "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers between November 2010 and January 2011, including MetLife.

50.     The "primary objective of each review was to evaluate the adequacy of controls and governance over servicers' foreclosure processes and assess servicers' authority to foreclose."

51.     To accomplish this task, the Agencies evaluated each servicer's self-assessments of their foreclosure policies and processes; assessed each servicer's foreclosure operating procedures and controls; interviewed servicer staff involved in preparation of foreclosure documents; and reviewed, collectively for all servicers, approximately 2,800 borrower foreclosure files that were in various stages of the foreclosure process between January 1, 2009, and December 2010.

52.     Examiners also "assessed the accuracy of foreclosure-related documentation, including note endorsements and the assignment of mortgages and deeds of trust, and loan document control."

53.     To ensure consistency with the reviews, the Agencies organized their review, *inter alia*, into the following categories:

1.  Policies and procedures, which entailed review of a servicers' policies and procedures to see if they provided adequate controls over the foreclosure process and whether those policies and procedures were sufficient for compliance with applicable laws.

2.  Management of third-party service providers, which entailed review of the servicers' oversight of key third parties used throughout the foreclosure process, with a focus on foreclosure attorneys, MERS, and default-service providers such as LPS.

3.  Compliance with applicable laws, which checked the adequacy of governance, audits, and controls that servicers had in place to ensure compliance with applicable laws.

4.  Critical documents, which evaluated servicers' control over critical documents in the foreclosure process, including the safeguarding of original loan documentation and whether critical foreclosure documents were in the foreclosure files, and whether notes were endorsed and mortgages assigned.

54.     In April 2011, the Agencies published an Executive Summary (the "Report") of their findings and an overview of the potential impacts associated with instances of "foreclosure-processing weaknesses," as well as expectations moving forward.

55.     The Report identified industry wide problems with the servicers, including (1) inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors, (2) lack of sufficient audit trails to show how information set out in the affidavits was linked to servicers' internal records at the time the affidavits were executed, (3) and inadequate policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process.

56.     The Report acknowledges that the risks presented by problems are more acute "when those processes are aimed at speed and quantity instead of quality and accuracy." To that end, the Report found that servicers "fostered an operational environment contrary to safe and sound banking practices" by emphasizing speed and cost efficiency over quality accuracy.

57.     In regards to the affidavit and notarization practices, the Report concluded that "[i]ndividuals that signed foreclosure affidavit often did not personally check the documents for accuracy or possess the level of knowledge of the information that they attested to in those affidavits. In addition, some foreclosures documents indicated they were executed under oath, when no oath was administered."

58.     Moreover, the Agencies found "that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits." This practice also lead to staff or external law firms, such as Defendants, to contribute to the preparation and filing of inaccurate affidavits.

59.     The Report also found that "third-party law firms hired by the servicers were nonetheless filing mortgage foreclosure complaints or lost-note affidavits even though proper

documentation existed." Additionally, the review of the servicers also revealed that all of the servicers relied heavily on outsourcing arrangements with outside counsel and other third-party vendors to carry out the foreclosure processes without adequate oversight of those arrangements.

60.     Similarly, the Agencies also determined servicers "generally did not properly structure, carefully conduct, or prudently manage their third-party vendor relationships with outside law firms and other third-party foreclosure services providers." This caused instances in which law firms signed documents on behalf of servicers without having the authority to do so and law firms changing the format and content of affidavits without the knowledge of the servicers, which "raise concerns regarding the legality and propriety of the foreclosure even if the servicer had sufficient documentation available to demonstrate authority to foreclose."

61.     Upon information and belief, much of the wrongdoing listed in the Agencies' Report applied to MetLife's conduct during the servicing and foreclosure of Plaintiff's loan.

62.     For example, during the servicing and attempted foreclosure of Plaintiff's loan, MetLife engaged in activity including, but not limited to:

   a.    falsely advising Plaintiff that he must be at least three months delinquent in loan payments to qualify for a loan modification
   b.    failing to respond to Plaintiff's inquiries;
   c.    failing to provide accurate and timely information to Plaintiff who was in need of, and eligible for, loss mitigation services, including loan modification;
   d.    failing to perform proper loan modification underwriting;
   e.    failing to gather or losing loan modification application documentation and other paper work;
   f.    failing to provide adequate staffing to implement its programs;
   g.    failing to adequately train staff responsible for loan modifications;
   h.    failing to establish adequate processes for loan modifications;
   i.    misleading Plaintiff by representing that their loan modification application would be handled promptly when it regularly failed to act on loan modifications in a timely manner;
   j.    failing to properly process Plaintiff's application for loan modification, including failing to account for documents submitted by himand failing to respond to Plaintiff's reasonable requests for information and assistance;

13

k.      permitting and approving the preparation, executing, or filing of affidavits in Plaintiff's foreclosure proceeding without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits;

l.      charging improper fees related to foreclosures; and

m.      inappropriately dual-tracking Plaintiff's foreclosure and loan modification activities and failing to communicate with Plaintiff with respect to foreclosure activities which ultimately resulted in the loss of his home.

63.     MetLife engaged in this behavior and conduct, not because of lack of oversight, but because it was a more profitable business model. MetLife engaged in the widespread conduct of intentionally misleading consumers into believing that their requests for loan modifications or other loss mitigation programs were being processed when, in reality, MetLife simply referred their mortgage loans to foreclosure or inappropriately dual-tracked their foreclosure and loan modification activities. MetLife further defrauded consumers by representing that it had the requisite documents and authority to foreclose on their homes and then fabricating or falsifying the necessary foreclosure documents, or permitting third party vendors to fabricate or falsify these documents with its approval.

64.     Further, MetLife enlisted the aid of third parties, such as LPS and the Defendants, to perpetrate its scheme to defraud consumers, including the Plaintiff.

65.     In carrying out their enterprise through a pattern of racketeering activity, the Defendants utilized the United States Postal Service and the wires, which were an integral part of carrying out their scheme to defraud consumers. Defendants used the United States Postal Service to send misleading correspondence to consumers and used the wires as the integral means for servicing mortgage loans and later carrying out foreclosures from start to finish at the fastest speed possible, and without regard to propriety or quality.

***Lender Processing Services, Inc.'s Role in the Foreclosure of Mortgage Loans***

66.    Lender Processing Services, Inc. ("LPS") is a company that assembles the information used to foreclose on consumers' properties.[5] LPS's default services revenue, the portion of LPS that includes foreclosure services, quadrupled in annual revenue from $277.8 million in 2006 to more than $1 billion in both 2009 and 2010.[6] Since news about foreclosure fraud was brought to the forefront of the mortgage industry and new regulations and programs have been put in place, such as HAMP, LPS has identified an impact in its revenue.[7]

67.    LPS provides customized technology platforms to mortgage loan servicers depending on the status of the consumers' loan. The first such platform is the Mortgage Servicing Package ("MSP") which assists servicers in administering all aspects of loan servicing, such as payment processing, customer service, investor reporting, etc.

68.    The second technology platform, a web-based platform called LPS Desktop ("Desktop"), is designed to aid mortgage servicers service mortgage loans that are in default. Desktop automates and monitors all tasks involved in the foreclosure process, including monitoring deadlines or LPS-imposed timeframes for foreclosure events and tracking and recording all events and communications taken with respect to the foreclosure of the mortgage loan. In addition, Desktop organizes and stores foreclosure related documents such as notices of default and substitution of trustee documents.

69.    Additionally, Desktop generates and manages invoices sent by its network of foreclosure attorney firms to servicers.

---

[5] Most of the following facts are taken from the Nevada Attorney General's complaint in *Nevada v. Lender Processing Servs., Inc., et al.*, No. A-11-653289-B (Clark Cnty. Dist. Ct. Dec. 15, 2011), which was filed after an extensive investigation into LPS's business practices.
[6] Mark Basch, *The LPS Solutions*, FLA. TIMES-UNION (Mar. 3, 2011).
[7] LENDER PROCESSING SERVS. INC., ANNUAL REPORT (Form 10-k) 20 (Feb. 29, 2012).

70.     LPS provides its Desktop platform to the vast majority of national mortgage servicers and in exchange the servicers each have agreements with LPS, referred to as a "Default Services Agreement", to manage all bankruptcy and default related loans for those servicers.

71.     Using LPS's MSP and Desktop platform, LPS is able to manage the core aspects of the foreclosure process on behalf of servicers.

72.     When a loan goes into default, it is coded for foreclosure in the servicer's, such as MetLife Bank's, system, at which time Desktop automatically refers the loan for foreclosure to a law firm or trustee company within LPS's network of firms (a "Network Firm").

73.     Upon information and belief, Defendant Friedman was one of LPS's "Network Firms" and utilized its technology to accept referrals and then proceed to foreclosure.

74.     In order to become a "Network Firm", the firm must enter into a "Network Agreement" a sample copy of which is attached hereto as Exhibit "B". Although this agreement is dated September 1, 2001, exhibits attached thereto show that it was in effect until at least 2007.

75.     Upon information and belief, a substantially similar agreement was in effect in when Plaintiff's loan was referred from LPS to Defendant Friedman.

76.     Upon acceptance of the referral, LPS charges the Network Firm a referral fee, which LPS labels an "admin fee". LPS requires that this fee be paid regardless of whether a loan is actually foreclosed or which stage the loan is removed from the foreclosure pipeline. Therefore, the admin fee does not depend on any administrative work actually completed, but is assessed solely on the fact that LPS referred a loan to the Network Firm.

77.     For example, as outlined in Ex. B, the "admin fee" for referrals of all loan types, including Freddie Mac, Fannie Mae, FHA, and VA loans, was $125.00 as of 2007. Immediately upon referral of a case to a Network Firm, LPS charges this $125.00 fee.

78.     This "admin fee" amounts to a referral fee or, often, an illegal kickback. These fees are then passed on to the consumer, to be paid at the foreclosure sale, as well as, in certain cases, to government entities such as Fannie Mae, Freddie Mac, the Federal Housing Administration, or the Department of Veteran's Affairs. At the very least, these referral fees violate state laws or professional rules governing fee-splitting and impermissible referral fees.

79.     Desktop then automatically transmits a "referral package", which contains the servicer's information pertaining to the loan, such as copies of the note, screenshots of the unpaid balance, and other details.

80.     LPS constructed its business model so that it became the exclusive means for foreclosure firms to access the millions of dollars in foreclosure related fees held by LPS's servicer-clients. LPS used this powerful position to not only require referral fees or kickbacks from the Network Firms, but also to set its own arbitrary timeline for how long the foreclosure process should take from referral date to sale date.

81.     The Network Firms, like Defendant Friedman, are thus required to comply with LPS's arbitrary deadlines, sacrificing quality for quantity, or else risk being removed from accessing the majority of the country's top twenty servicers—LPS's servicer-clients.

82.     LPS claims that it acts only as a middleman, providing technology and data processing software during the foreclosure referral process. In actuality, LPS handles core responsibilities which were traditionally the responsibility of loan servicers, including, without

limitation, providing direction to foreclosure attorneys about how and when to proceed with foreclosure sales or when to take other actions during the foreclosure process.

83.     Therefore, LPS has assigned itself the responsibility of approving or rejecting requests by Network Firms for extending foreclosure sale dates or other deadlines, as well as responding to a variety of other requests or questions submitted by the Network Firms. Therefore, the Network Firms, including Defendant Friedman, actually have very little, if any, contact with their servicer "clients" despite their representation otherwise.

84.     In addition to conducting the servicers' core functions and responsibilities, from at least 2006 through 2010, LPS also executed various foreclosure and mortgage related documents on behalf of its servicer-clients, including, but not limited to, assignments of mortgage, substitution of trustee, lien releases, and other documents needed to establish standing to foreclose.

85.     In fact, LPS has faced numerous lawsuits, as well as investigations, by the U.S. Attorney General and other states' Attorneys General with respect to the mass robo-signing scheme in which it participated.

86.     Additionally, in November 2012, a former LPS executive, Lorraine Brown, pleaded guilty to conspiracy to commit mail and wire fraud for her role in LPS's scheme that saw over a million mortgage-related documents created with false signatures and notarizations.[8]

87.     LPS not only obstructs the line of communication between the servicers and foreclosure firms, but LPS also misrepresents its own role in the foreclosure process by claiming

---

[8] Office of Public Affairs, Dep't of Justice, http://www.justice.gov/opa/pr/2012/November/12-crm-1400.html (Nov. 20, 2012).

to only provide data and software products when it actually directs the Network Firms through the foreclosure process.

88.      Perhaps LPS's role in directing the Network Firms is best illustrated by the manner in which it rates its Network Firms' performance. LPS's software carefully tracks the speed in which the Network Firm meets LPS's imposed timelines in its system, which is often shorter than investor or Lender imposed timelines. Based on whether the firms complied with LPS timelines, the Network Firms are given an "Attorney Performance Rating" of green, yellow or red. If a Network Firm, including Defendant Friedman, remains in the "red" for too long, LPS will cease to refer cases to that Network Firm, instead referring the cases to Network Firms who are able to conduct the foreclosures faster.

89.      Time is the only metric of the Attorney Performance Rating. The rating does not take into account the quality with which the foreclosures are conducted.

90.      Upon information and belief, MetLife Bank uses one of more of LPS's software platforms, including, without limitation, MPS and/or Desktop.

91.      Upon information and belief, MetLife Bank used one or more of these software platforms to service Plaintiff's mortgage loan.

92.      Additionally, upon information and belief, Defendant Friedman is one of LPS's Network Firms and utilizes LPS technology, namely Desktop, during its foreclosure of MetLife Bank serviced mortgage loans, among others. [9]

93.      Upon information and belief, MetLife Bank used LPS technology to refer Plaintiff's mortgage loan to Defendant Friedman for foreclosure.

---

[9] For example, several of Defendant Friedman's previous employees have listed tasks involving LPS software programs and/or LPS/Fidelity clients while employed with Defendant Friedman on their professional employment profiles (attached as Exhibit "P").

94.     Additionally, Plaintiff alleges that MetLife Bank, LPS, and the Defendants engaged in all of the above stated conduct with respect to his loan, and thus he was rushed through the foreclosure process without respect to the validity of the documents needed to conduct a foreclosure sale in Virginia, such as the substitution of trustee documents.

### The Role of Mark Friedman, Kenneth MacFadyen, and Defendants Friedman, F&M, and Muncy in the Enterprise

95.     Friedman was not simply a parent holding company of F&M.   Instead, Defendants Friedman, F&M, and Muncy operated as parts of a single business operation. Mark Friedman and Kenneth MacFadyen are attorneys and the principals of Defendant Friedman. They organized their law firm, Defendant Friedman, for the sole purpose of conducting foreclosures. They also created a sham company, Defendant F&M, that could be appointed as substitute trustees under the subject deeds of trust that would remain under their sole control and would act at the direction of Defendant Friedman.

96.     Defendant Friedman, at the direction of Mark Friedman and Keneth MacFadyen, provided management and decision-making and operated as the front for contact with the targeted debtor-consumers, the loan servicers, such as MetLife Bank, and the third party vendors, such as LPS, while Defendant F&M existed as an employee-less paper entity that acted as the "substitute trustee" under the target deeds of trust. Muncy also acted as a "substitute trustee" under the target deeds of trust, and was often the "substitute trustee" whose name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers.

97.     Mark Friedman and Kenneth MacFadyen developed this business model in order to artificially inflate their "Attorney Performance Rating" in the LPS system and thereby

continue to get more foreclosure referrals, to the detriment of trustees and other foreclosure firms that were conducting foreclosures more slowly in an effort to comply with the law.

98.     F&M did not operate independent of Defendant Friedman.  It did not have a separate office, separate management or separate business and income. Instead, the two companies were interrelated and inseparably operated as a single business operation.  In fact, since Friedman has shut down its business operations, so has F&M.

99.     Additionally, the majority of "officers" of F&M were also employees of Defendant Friedman.

100.    F&M had little or no income that was not directly derived from Defendant Friedman.

101.    F&M did not have any employees.   Instead, it was a shell entity used by Defendant Friedman whose sole purpose was to act as the "substitute trustee" for the mortgage loans that were referred to Defendant Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales.

102.    F&M did not act as "substitute trustee" for any deeds of trust that were not referred to Defendant Friedman for debt collection and/or foreclosure proceedings.

103.    Similarly, Muncy did not operate as "substitute trustee" independent of Defendant Friedman, but acted as "substitute trustee" only for those deeds of trust that were referred to Defendant Friedman for collection and/or foreclosure proceedings.

104.    Additionally, Muncy is an attorney who was employed by Defendant Friedman at the time he was named "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

105.    Defendant Friedman, on the other hand, served as the frontline company that dealt directly with targeted consumer debtors. Defendant Friedman directed the actions of the personnel who interacted with the debtors and with the loan servicers whose mortgage loans were referred to Friedman for debt collection or foreclosure proceedings by LPS.

106.    Mark Friedman, Kenneth MacFadyen and Defendants Friedman, F&M, and Muncy collectively accomplished their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that were referred to them by various loan servicers, including MetLife Bank.

107.    The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Defendant Friedman.  For example, Defendant Friedman employees mailed the correspondence regarding the alleged foreclosure sale to consumers, purchased newspaper space for advertisements of the foreclosure sales, and interacted with the loan servicers, such as MetLife Bank, third party vendors, such as LPS, and consumers.

108.    In fact, all letters mailed to consumers were printed on Defendant Friedman's letterhead, regardless of whether the alleged substitute trustees purportedly sent or signed the letter, and the documents submitted to the various Circuit Courts purportedly by Defendants F&M or Muncy, the "substitute trustees", were prepared by and often had a return address for Defendant Friedman.

109.    When the mortgage loans, including the Plaintiff's, were referred to Defendant Friedman for foreclosure, Defendant Friedman did not actually receive the original note prior to instituting foreclosure proceedings.

110.    In fact, rather than locating the entity that was the actual noteholder of the loan or requesting the original note from the servicer prior to commencing the foreclosure process, Defendant Friedman used a false "lost note" letter. Defendant Friedman's motive was to streamline the foreclosure process and to maintain a positive "Attorney Performance Rating" in LPS's system, thereby ensuring that it would continue to receive foreclosure referrals.

111.    In fact, Defendants did not even seek to determine whether or not the note was available.  They never contacted the custodian, the servicer or Fannie Mae to make such inquiry.

112.    Once the mortgage loans were referred to Defendant Friedman, it created a "Substitution of Trustee" document, which it claimed gave it, or its shell company and employee, Defendants F&M and Muncy, the authority to conduct a foreclosure sale under the subject deeds of trust. This substitution of trustee document was either created by Defendant Friedman employees or, upon information and belief, for a period of time between 2006 and 2010, was also created by LPS.

113.    The Substitution of Trustee document created by Defendant Friedman and/or LPS was false and improper in several respects.

114.    The document identified the loan servicers, including in this case, MetLife Bank, as the "Noteholders". These statements were false.

115.    Defendant Friedman did this as an alternative to locating and identifying the actual noteholders of the mortgage loan. Again, this was done in an effort to save time and costs with which they are able to conduct foreclosures and thereby maintain a positive "Attorney Performance Rating" in LPS's system, thereby ensuring that it would continue to receive foreclosure referrals.

116.    Defendant Friedman then sent this document to various third-party entities, such as LPS, purporting to be the "noteholders" or loan servicers, via electronic wires or through the mail, at which time they were allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document was also allegedly notarized.

117.    At the time these documents were filed, the note holder remained Fannie Mae. Neither MetLife, LPS nor the Defendants were ever either creditors, note holders or beneficiaries.

118.    Upon information and belief, the individuals who signed these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

119.    Other times, these substitute trustee documents were created and signed by Defendant Friedman and/or its employees, such as Mark Friedman, as "attorney in fact" for the "noteholder". Therefore, Defendant Friedman essentially attempted to appoint itself as substitute trustee, using its employees and shell company F&M as no more than arbitrarily and fraudulently named trustees.

120.    Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

121.    In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by Defendant Friedman and presumably so the dates on the first and second pages match or so that the dates fit into Defendants' timeline.

122.    Plaintiff alleges that it was Defendant Friedman's policy that employees of its law firm sign official legal documents, many times under oath, for other individuals in the firm.

123.    In fact, in two hearings that took place in Baltimore, Maryland, the Friedman employees, Kenneth MacFadyen and Daniel Menchel, admitted to Friedman's practice of having employees sign documents for other attorneys in the law firm.

124.    Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1     Q     It is your signature?
2     A     Yes.
3     Q     Okay, and is it notarized?
4     A     Yes.
5     Q     On what date is it notarized?
6     A     June 30th.
7     Q     By whom?
8     A     Joann Sottile.
9     Q     Did you appear in front of Ms. Sottile on
10    that date?
11    A     I did not appear in front of her. I gave her
12    stacks of files to notarize after I'd signed them.
13    Q     I'm going to show you what's again in the
14    same group, same group of exhibits, adjustable rate
15    note. And I'm going to show you -- point to a
16    signature at the top.
17    Can you tell me whose signature that is?
18    A     That's my signature for Kenneth MacFadyen. I
19    signed that after I stamped the note, after I review
20    it.
21    Q     Okay.
22    A     And signed Kenneth MacFadyen's name.
```

23    Q    And would there have been a reason why you
24    wouldn't have used your own name?
25    A    No. I think we had a stamp that had Kenneth
1    MacFadyen's name on it. And we used that particular
2    stamp on that particular file.

125.    Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No.

24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

21    Q    Let me -- let me show you the order to
22    docket, suit, and affidavit pursuant to Maryland Rule
23    14-207(b). Your name is at the bottom. Do you know
24    who signed your name?
25    A    No, not to this one. It would have been
1    either Daniel Menchel or Jeffrey Huston.
2    Q    But you don't know?
3    A    I don't know which one signed that one.
4    Q    Okay, let me show you, in this case, a deed
5    of removal and appointment of successor trustees
6    which is liber 11916, page 250, second page -- and ask
7    you who signed that one.
8    A    That would be Daniel Menchel. That's not
9    under oath. I believe he had every right to do that.
10    Q    Okay, but that would be Daniel Menchel's
11    signature?
12    A    That's a Daniel Menchel signature.
13    Q    Okay, let me show you an Atlantic bond, and
14    it's bond number 108147, and ask who signed that.
15    A    That looks to me like a Jeffrey Huston
16    version of Kenneth MacFadyen.

126.    Plaintiff alleges that these actions that took place in Maryland also took place in

Virginia, as it was Defendants' system wide policy.

127.    These documents are a legal nullity and do not actually authorize Defendants

F&M or Muncy to act as substitute trustees.

128.    Friedman used false signatures or falsely created documents because doing so

allowed the Defendants to process foreclosures at a much higher rate, thereby ensuring that

Defendant Friedman maintained a positive "Attorney Performance Rating" and continued to

receive foreclosure referrals through LPS's system. Without the need to send the document to the actual entity or persons with the authority to appoint a substitute trustee, either electronically or through the mail, Defendants were able to speed up the foreclosure process by days or even weeks. LPS and MetLife Bank were well aware that Defendant Friedman was using falsified and misleading documents, and turned a blind eye to the improper signatures for the sake of speeding up the foreclosure process, increasing their bottom lines, and ultimately increasing the profitability of their enterprise. In fact, for a significant portion of time, LPS also engaged in falsifying signatures and notarizations of documents for the same purpose.

129.    After preparing the substitution of trustee documents, Defendants Friedman, Muncy, and/or other Friedman employees then began the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

130.    Upon information and belief, these letters were form letters that Defendant Friedman sent to every consumer from whom it attempted to collect a debt and for whom it attempted to conduct a foreclosure sale of the consumer's home, including the Plaintiff in this case.

131.    Defendant Friedman sent three form letters to every consumer for whom they conducted or attempted to conduct a foreclosure sale.

132.    Defendant Friedman's first letter was its initial correspondence letter (sample letters attached hereto as Exhibit "C"). This letter informed the consumer that their loan "has been referred to this office for legal action based upon a default under the terms of the Mortgage/Deed of Trust and Note. This office has been retained to institute foreclosure proceedings under the loan agreement."

27

133.    Friedman's letter also identified the consumer's loan servicer as "the current noteholder and/or servicer" of the loan.

134.    This initial correspondence letter also attempted to provide the disclosures required by the FDCPA at 15 U.S.C. § 1692g, provided an alleged amount due on the loan, and outlined the consumers' debt validation rights.

135.    However, the letters listed the relevant loan servicers as the creditor to whom the debt is owed, rather than the actual noteholder of the loan. At no point thereafter did Defendant Friedman provide consumers with the actual noteholder of the loan, but continued to identify the servicer as the noteholder in the rest of its correspondence with consumers.

136.    Friedman then sent consumers a second letter, which was typically dated the same as its initial correspondence letter (sample letters attached hereto as Exhibit "D"). This letter informed the consumer "the undersigned has been appointed by [the loan servicer] as trustee . . . for the purpose of foreclosing on the Deed of Trust/Mortgage. [The loan servicer] is the holder/servicer of the Note."

137.    This letter went on to state that Defendant Friedman/Muncy "do not have the original note in our possession at this time. We do have evidence of the indebtedness referenced above. We have been informed by the Lender that they will forward the original note to us."

138.    This form letter was sent to consumers regardless of whether the consumer's note has been lost or not. In fact, it was sent to consumers whose original note had actually been lost and could not be forwarded by the "Lender".

139.    This statement was made so that Defendant Friedman's claim of authority to foreclose appeared more legitimate and was less likely to be questioned by consumers.

140.    Additionally, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers. For example, the subject line of these letters is [the loan servicer] v. [the consumer].

141.    The "undersigned" of this initial letter who "has been appointed by [the loan servicer] as trustee" was actually Defendant Friedman. Defendant Muncy also signed the letter on behalf of Defendant Friedman. At no point was Defendant Friedman ever even allegedly appointed substitute trustee (except in these letters), including in the substitute trustee document that claims to appoint Defendants Muncy and F&M each as substitute trustees.

142.    The third form letter that Defendant Friedman sent to consumers provided notice of a scheduled foreclosure sale date as well as a copy of the alleged substitute trustee document (sample letters attached hereto as Exhibit "E").

143.    Again, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers: "[the loan servicer] v. [the consumer]".

144.    This letter also contains the following closing:

Very truly yours,

FRIEDMAN & MacFADYEN, P.A.

Substitute Trustee

145.    The notice of the sale, which was also published in newspapers local to the property location, named Defendants Muncy and F&M as substitute trustees. However, for any further information sought about the sale, prospective buyers were directed to contact Defendant Friedman.

146.    These letters all contained similar misrepresentations, including but not limited to, an incorrectly identified "noteholder" of the loan, which was actually the loan servicer, a

misrepresentation that Defendant Friedman was the substitute trustee, and a misrepresentation that a lawsuit had been filed or was pending against the consumer.

147.    In some cases, Defendant Friedman also sent additional form letters to consumers. These additional letters were sent when consumers requested reinstatement quotes or payoff amounts (sample letters attached hereto as Exhibit "F").

148.    The "reinstatement quote" letter attempted to provide an amount needed to bring the consumer's loan current. It contained the following language: "This responds to your recent request for the amount necessary to reinstate the above referenced loan and to resolve the pending action."

149.    The letter further stated, "After reinstatement, you will be required to sign the appropriate documents and take other requested action to assist in obtaining a withdrawal of the action. These statements were misleading in that there was no pending action, and these statements misrepresented that there was a filed lawsuit in order to intimidate consumers.

150.    The "payoff statement" letter contained the following statement: "Upon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action and obtain a dismissal of the action."

151.    Again, this was a misrepresentation, as there are no judicial foreclosures in Virginia, nor were there any "actions" that were filed by Defendant Friedman or that Defendant Friedman intended to file in order to conduct a foreclose sale.

152.    Additionally, the payoff statement letter also contained the following: "The information in this letter was provided by [the loan servicer] and Friedman & MacFadyen, P.A. [The loan servicer] acts as the mortgage loan servicer for the investor that owns your loan. The investor has authorized [the loan servicer] to provide this information and to act on its behalf."

153.    Defendants Friedman, Muncy & F&M were well aware that there is a difference between the loan servicer and the investor/noteholder/owner of consumers' loans. However, they chose to misrepresent otherwise for easier and speedier foreclosures, to maintain a positive "Attorney Performance Rating", and to continue to receive foreclosure referrals.

154.    Additionally, Defendant Friedman often misrepresented the amount due on the loan in its reinstatement quotes and its payoff statements by including attorneys' fees and costs which either had not actually been accrued or, such as in the case of Fannie Mae and Freddie Mac loans, were greater than the amount they were contractually entitled to for conducting the foreclosure from the investor or noteholder.

155.    Consumers relied on these false documents when they subsequently contacted or paid money to Defendants Friedman, F&M, and/or Muncy in attempt to save their homes or when they relocated their families after foreclosure, with the mistaken belief that these Defendants were validly appointed substitute trustees and had the authority to sell their homes.

156.    Defendants Friedman, F&M, and Muncy then advertised the foreclosure "trustee sales" in local newspapers throughout Maryland and Virginia and listed the contact as Defendant Friedman for information about the property and the foreclosure sale. As with the letters that were mailed to consumers, these advertisements were purchased and obtained by Freidman employees.

157.    These foreclosure sale notices were mailed to consumers throughout Virginia and Maryland using the United States post office.

158.    Once the alleged foreclosure sale occurred, Defendants F&M and Muncy created a "Trustees Deed" in which the alleged substitute trustees conveyed the subject property to a grantee. Similar to the other actions, this document was created by Defendant Friedman, and

allegedly signed by one of the substitute trustees. Upon information and belief, after reviewing a substantial amount of documents allegedly containing Muncy's signature, these documents were not actually signed by Muncy. Upon information and belief, other Defendant Friedman employees signed Muncy's name on the document.

159.    Further, the grantee listed in the Trustee's Deed was often not the last and highest bidder at the foreclosure sale, but was instead a third party or subsequent purchaser. Pursuant to consumers Deeds of Trust, most of which contain standardized language, after a foreclosure sale, "Trustee . . . shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale . . . ." Further, "Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title."

160.    The Defendants consistently fail to do this and instead, when the loan servicer is the purchaser and last and highest bidder, Defendants often grant the property to a third party, such as Fannie Mae. This is done to avoid the imposition of a certain taxes and fees.

161.    After the foreclosure sale, the Defendants subsequently make similar misrepresentations in its trustee accounting report and the documents submitted therewith, to various Commissioners of Accounts across the Commonwealth of Virginia (samples attached hereto as Exhibit "G").

162.    For example, and without limitation, the Defendants list the loan servicer as the noteholder, list a third party as the last and highest bidder, when in reality the loan servicer was the last and highest bidder, and fail to include the "admin fee" paid to LPS.

163.    This is especially true where the noteholder or owner of the loan was Fannie Mae. In those accounting statements, Defendants list Fannie Mae as the last and highest bidder—when

in reality, Fannie Mae never bids but depends on its loan servicers to do so—and lists the loan servicer as the noteholder. This is a clear misrepresentation.

164.    Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which were subsequently mailed to consumers or to the Commissioner of Accounts in the Circuit Courts across the Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

165.    The principles, Mark Friedman and Kenneth MacFadyen developed and oversaw these procedures. They knew that their actions, as well as the actions of Defendants Friedman, F&M, and Muncy were not in accordance with the law. Mark Friedman and Kenneth MacFadyen also knew that the firm's correspondence contained misrepresentations and that the signatures on the substitution of trustee documents were, more often than not, forged. However, Defendants Friedman, F&M, and Muncy, at the direction of their principals Mark Friedman and Kenneth MacFadyen, continued to conduct foreclosures in this manner so that the firm would maintain a positive "Attorney Performance Rating in LPS's system and therefore continue to receive foreclosures referrals from LPS.

166.    Defendants were wholly unprepared to act as impartial trustees as they were incentivized to foreclose regardless of whether a foreclosure sale should actually proceed. They typically did not have the notes, did not know whether the borrowers had been offered HAMP modification, did not know whether the prerequisites to foreclosure—especially for FHA or VA loans—had been met, etc., all of which could have caused the foreclosure timelines to be extended, resulted in foreclosure sale cancellations, and caused their "Attorney Performance Rating" to change to "red", ultimately causing them to lose any future foreclosure referrals. In

fact, in most circumstances, they may not even have contact directly with the servicer, let alone the holder, beneficiary or creditor for the note.

167.    Because of the (mostly monetary profits) incentives from loan servicers, investors, and other third party vendors, like LPS, towards speedy foreclosures without regard to propriety or the law, Defendants were in no way impartial or neutral trustees under the Deeds of Trust.

168.    Defendants were typically paid less than a thousand dollars per foreclosure they conducted, from start to finish. After subtracting the referral fee/kickback that went to LPS, this required them to conduct foreclosures at a large enough quantity and with minimal attorney or staff time in order to remain profitable. Therefore, quality and impartial discretion was sacrificed for speed and automation, and the careful attention to detail that is required when pursuing a course of action that will expel people from their homes was simply nonexistent.

169.    Additionally, when LPS's "Attorney Performance Rating" was taken into account, it added another layer of incentives for Defendants Friedman, F&M, and Muncy to conduct foreclosures at the quickest possible speed without regard for any fiduciary duties they owed to the borrower as "substitute trustees" under the subject Deeds of Trust.

170.    Additionally, the pricing scheme under which Defendants were paid further incentivized them to conduct foreclosures sales as quickly as possible without regard to the requirements of the law, rather than working with the consumer debtor to help them remain in their homes, despite the fact that it is actually more beneficial to the investors that loss mitigation is pursued rather than foreclosure.

171.    One example of this can be seen from Fannie Mae's compensation guide. Defendants received *at least* double the amount of money when a non-judicial foreclosure sale

was actually completed, as well as additional compensation when the foreclosed property was sold to a third-party other than Fannie Mae. In particular, according to Fannie Mae's servicing guide, Defendants received $925 in fees when a non-judicial foreclosure sale was completed, as opposed to $300 if the mortgage loan was reinstated after recordation of the substitute trustee's deed or $500 if the mortgage loan was reinstated after the notice of sale. Notably, there are no fees listed in the servicing guidelines if a substitution of trustee's deed is not recorded.

172.    The $425-$625 difference in fees is rather significant when considering that Friedman's and F&M's *only* source of revenue was the fees they collected from foreclosures, unlike other debt collector law firms that collect various types of consumer debts in addition to foreclosures. Any delay in the foreclosure sale to ensure possession of the necessary documents (such as acceleration letters, notes, lost note affidavits), or even whether prerequisites to foreclosure had been met, not only increased the possibility of reinstatement, but also increased the costs and expenses of these Defendants' sole source of revenue—the flat-fee they received to conduct foreclosures.

173.    This additional compensation, plus the increased cost of complying with the law, motivated these Defendants' deceptive conduct, which can only be characterized as pecuniary— not as perfectly fair and impartial.

**Defendants' Specific Conduct Regarding John K. Goodrow**

174.    Plaintiff borrowed $290,000 in order to refinance his mortgage, as evidenced by a promissory note dated October 26, 2005 ("the Note"). The Note was payable to First Horizon Home Loan Corporation (hereafter "First Horizon"). The Plaintiff specifically incorporates and adopts for his own specific allegations the details of systemic conduct alleged in the preceding paragraphs.

175.    The Note was secured by a Deed of Trust dated October 26, 2005 ("the Deed of Trust") and recorded in the Clerk's office of Fairfax County Circuit Court.

176.    Plaintiff's Note and Deed of Trust obligated him to repay First Horizon Home Loans. On August 31, 2008, MetLife completed an acquisition of the servicing arm of First Horizon, including Mr. Goodrow's mortgage loan.

177.    Federal National Mortgage Association ("Fannie Mae") purchased Plaintiff's loan subsequent to its origination. Despite such obligation in the Deed of Trust, Fannie Mae provided no documentation of the sale to Plaintiff.

178.    After the sale of Plaintiff's loan to Fannie Mae, First Horizon Home Loans, then Met Life Home Loans (hereafter "Met Life") was given the responsibility of performing certain functions (commonly known in the mortgage industry as "servicing") related to Plaintiff's loan in accordance with its contract with Fannie Mae. Among its responsibilities as the servicer, Met Life was responsible for collecting payments from Plaintiff, communicating with Plaintiff regarding loss mitigation alternatives, and responding to any default by Plaintiff, including by hiring and managing foreclosure counsel. The servicing responsibilities were governed by Fannie Mae's Single Family Servicing Guide (the "Guide").

179.     The servicing contract obligated Met Life to follow Fannie Mae's instructions for servicing the loan, particularly the instructions detailed in the Guide.

180.    The Guide provided instructions to Defendants on its requirements prior to commencing a foreclosure sale.

181.    The instructions in the Guide and other Fannie Mae directives often conflicted with established Virginia law.

182.   Plaintiff regularly made his payments to Met Life until he began to experience financial difficulties.

183.   In the Summer of 2008, Plaintiff was no longer able to work due to a disability.

184.   In the Fall of 2008, Plaintiff contacted his mortgage servicer, MetLife, in an effort to pursue loss mitigation options while he awaited his Social Security disability payments.

185.   Plaintiff submitted a complete loan modification package to his servicer, MetLife.

186.   MetLife received Plaintiff's loan modification package and told the Plaintiff that he was under consideration for a loan modification.

187.   While MetLife was evaluating the Plaintiff's eligibility for a loan modification, it also referred his mortgage to foreclosure.

188.   While he was being evaluated for a loan modification, Plaintiff was also applying for Social Security disability benefits. While he was waiting for his disability benefits, MetLife placed the Plaintiff on a temporary forbearance plan.

189.   When Plaintiff received his disability benefits, he forwarded the required information to MetLife to supplement his loan modification application.

190.   However, by the time that MetLife received Plaintiff's additional information, which it needed to complete an evaluation for a loan modification, the Plaintiff's home had already been sold through a foreclosure sale conducted by the Defendants.

**Defendants Are "Appointed" to Collect a Debt**

191.   In approximately 2008, Defendant Friedman—also using its shell entity, F&M, and its employee, Muncy, as alleged substitute trustees—began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts

demanded were not paid, they would conduct an alleged foreclosure sale. Upon information and belief, Defendant Friedman maintains copies of these letters in its records.

192.    Upon information and belief, these correspondences were form correspondences that the Defendants sent to every consumer from whom they attempted to collect a debt and conduct a foreclosure sale. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

193.    Upon information and belief, Defendants maintain copies of these letters sent to the Plaintiff and to the putative class members in their records.

194.    Upon information and belief, Defendants mailed their initial correspondence to the Plaintiff, using the United States Postal Service, on or around October 8, 2008. Plaintiff has attached this initial correspondence letter as Exhibit "H".

195.    Upon information and belief, once this letter was sent, Defendant Friedman then updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and MetLife.

196.    Upon information and belief, in this initial correspondence to the Plaintiff, Defendant Friedman stated that "MetLife Home Loans, a division of MetLife Bank NA" retained it to foreclose on Plaintiff's home for their alleged failure to make mortgage payments.

197.    Upon information and belief, this correspondence stated that "MetLife Home Loans, a division of MetLife Bank NA" was the "current noteholder and/or servicer" of Plaintiff's loan. Upon information and belief, this statement was false.  In fact, MetLife was never in possession of the note.  Further, on information and belief, the Plaintiff alleges that Defendants never made contact with Fannie Mae to request custody of the note until at least, if at all, the date of the scheduled foreclosure.

198.    This letter never identified Fannie Mae as the actual noteholder, investor, or owner of Plaintiff's loan.

199.    This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

200.    Defendants sent Plaintiff a second correspondence, using the United States Postal service, dated October 9, 2008 (attached hereto as Exhibit "I").

201.    Upon information and belief, once this second letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and MetLife.

202.    The subject line of the second correspondence to Plaintiff was styled as if a lawsuit was to be or had already been filed.  However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff.

203.    For example, the second letter dated October 9, 2008 that Defendants sent to Plaintiff was styled "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow".

204.    Defendants' letter stated that "MetLife Home Loans, a division of MetLife Bank NA" had appointed the undersigned, Defendants Friedman and Muncy, as trustees for the purpose of foreclosing on the deed of trust.

205.    The correspondence further stated that the Defendants did not have the original Note in their possession, but that they have evidence of the indebtedness.

206.    Defendants' letter also stated that Defendants "have been informed by the Lender that they will forward the original note to us." Upon information and belief, this statement was false.

207.  This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

208.  Upon information and belief, Defendant Friedman sent Plaintiff a third letter, using the United States Postal Service, dated October 9, 2008 regarding alternatives to foreclosure. The subject line of the third October 9, 2008 correspondence is: "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow".

209.  In order to discuss alternatives to foreclosure, Plaintiff was advised to call Defendant Friedman.

210.  This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

211.  Defendants sent Plaintiff a letter dated November 24, 2008, which is attached hereto as Exhibit "J".

212.  This letter provided a payoff statement to Plaintiff. It stated that the amount owed on Plaintiff's account was $293,965.23, through December 9, 2008.

213.  Of the total amount allegedly due, Defendants claimed that Plaintiff owed $2,001.00 for "Current Foreclosure Attorney/Trustee Fees and Costs". The statement included various other amounts for fees and costs allegedly related to Plaintiff's account, including, among others, interest in the amount of $8,507.96, property inspection cost of $15.00, an appraisal fee of $95.00, and corporate advance balance of $0.00.

214.  Defendants sent a second letter to Plaintiff dated November 24, 2008 in which they provided a reinstatement quote necessary to avoid foreclosure, through December 9, 2008. Attached hereto as Exhibit "K".

215.    Defendants' second November 24, 2008 letter stated that Plaintiff must pay $14,441.27 in order to reinstate his loan and avoid foreclosure. Of the total amount allegedly due, Defendants claimed that Plaintiff owed $2,001.00 for "Current Foreclosure Attorney/Trustee Fees and Costs".

216.    However, this second November 24, 2008 correspondence included various fees and costs allegedly due that conflicted with Defendants first payoff statement. For example, this statement included an inspection fee of $60.00, appraisal fee of $0.00, corporate advance balance of $15.00, and did not include any interest as being due.

217.    Defendants send similar conflicting accounting statements to consumers, and upon information and belief sent them to the putative class members. This is evidence of not only the Defendants' intentional misrepresentations to consumers, but also of their business model in which they, along with LPS, Fannie Mae, and MetLife, simply conducted foreclosures with the fastest speed and lowest cost possible.

218.    This letter also stated that upon receipt of the necessary funds Friedman & MacFadyen "will take appropriate action to obtain a dismissal of the action" implying that there was a lawsuit filed against the Plaintiff.  Virginia does not have judicial foreclosures, and there is no "action" against the consumers.

219.    Defendants sent Plaintiff a letter dated January 11, 2010. Attached hereto as Exhibit "L".

220.    The subject line of letter - "MetLife Home Loans a division of MetLife Bank, NA v. John K. Goodrow" - was styled as if a lawsuit was to be or had already been filed.  However, none of the Defendants ever filed a lawsuit or intended to file a lawsuit against Plaintiff.

221.    All of Defendants' letters to the Plaintiff also included one or both of the following notices:

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

THIS IS A COMMUNICATION FROM A DEBT COLLECTOR THIS FIRM IS A DEBT COLLECTOR.

222.    None of Defendants' letters to the Plaintiff ever identified Fannie Mae as the creditor, the actual owner, beneficiary and/or holder of his mortgage loan.

223.    Defendants also systematically misrepresent the amount of fees and costs they are entitled to pursuant to their contract with Fannie Mae and under the Guide.

224.    In fact, Defendants routinely document substantially smaller fee and cost requests in their submissions to the Commissioner of Accounts for confirmation of foreclosure sales, listing an amount of $600.00, less than what they demand from consumers such as the Plaintiff

225.    Additionally, at times, Defendant Friedman signed the letters to the Plaintiff and putative class as Substitute Trustee. The substitute trustee document for the Plaintiff and the putative class never purported to appoint Defendant Friedman as substitute trustee.

226.    The various letters to the Plaintiff and putative class included an alleged Substitution of Trustee document.

227.    The Substitution of Trustee document that Defendants sent to the Plaintiff was dated October 8, 2008, notarized on October 21, 2008 and was subsequently filed in the Fairfax County Circuit Court on November 10, 2008. Attached hereto as Exhibit "M".

228.    This document stated that "First Horizon Home Loans, a division of First Tennessee National Association" (hereafter "First Horizon") was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared.  Upon information and belief, this statement was

42

false. At this time, First Horizon had already sold the servicing of Plaintiff's loan to MetLife as the Defendants' prior correspondence indicated.

229.   The Substitution of Trustee document stated that the First Horizon had appointed Defendants F&M and Muncy as substitute trustees.

230.   Defendants' statement that First Horizon appointed them as substitute trustees is in direct contradiction to their October 9, 2008 letter that states they were appointed by MetLife as substitute trustees. One or both, of these statements is false.

231.   Defendants claim that the Substitution of Trustee document gives them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

232.   Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

233.   Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

234.   In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder."

235.   Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

236.    Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon.

237.    However, upon information and belief, Fannie Mae was the Noteholder at the time the Substitution of Trustee document was created. Therefore, First Horizon no longer possessed the authority to appoint a substitute trustee.

238.    The Substitution of Trustee document was purportedly signed by an "Assistant Vice President" of First Horizon, the claimed noteholder, and was thereafter allegedly notarized. Even after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match.

239.    Although the Substitution of Trustees Deed is dated October 8, 2008, the date on the notary block is October 21, 2008.

240.    Upon information and belief, the individuals who signed any sworn statements on behalf of the "Noteholders" or thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

241.    Fannie Mae is the actual noteholder of Plaintiff's loan.

242.    The Defendants failed to disclose that Fannie Mae was the creditor to whom the debt was owed and the noteholder of his loan in their correspondences to Plaintiff, and further falsely represented in the substitution of trustee document that "First Horizon Home Loans, a division of First Tennessee National Association" was the current noteholder of his loan.

**Defendants Foreclose on Plaintiff's Home**

243.     Defendants' correspondence January 11, 2010 correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

244.     The foreclosure sale allegedly took place on February 3, 2010, at which time Plaintiff's home was sold for $318,022.37, and a Trustee's Deed dated February 3, 2010 ("the Trustee's Deed") purported to convey the property to a Grantee. Plaintiff attaches a copy of this Trustee's Deed as Exhibit "N".

245.     The Trustee's Deed stated that First Horizon Home Loans, A Division of First Tennessee National Bank was the current Noteholder at the time the document was prepared. Upon information and belief, this statement was false.

246.     The Trustee's Deed further stated that Defendants Muncy and F&M were appointed Substitute Trustees. Fannie Mae, MetLife, LPS, and the Defendants knew that the document allegedly appointing Muncy and F&M incorrectly named the alleged loan servicer, as the noteholder, and that the signature of Marcia Williams was without any personal knowledge and notarized nearly two weeks after the date of the signature. Fannie Mae, MetLife, LPS, and the Defendants therefore knew that this document was null and void. Thus, the statement that Muncy and F&M were appointed substitute trustee was also false.

247.     Further, upon information and belief, Johnie R. Muncy did not personally sign this trustee's deed. Instead, an undisclosed individual employed by Defendant Friedman signed Muncy's name. As previously alleged, this was done to increase the quantity of trustee's deeds that could be created and thus again speed up the time in which foreclosures could be conducted.

248.     On February 9, 2010, this document was allegedly notarized by Fannie A. Winston, at which time Johnie R. Muncy purportedly appeared before Ms. Winston and

acknowledged his "signature". Upon information and belief, this was not actually signed by Ms. Winston nor was the document notarized in the presence of Muncy, as it was Defendant Friedman's policy to have individuals sign on behalf of others.

249.    Although Plaintiff does not know the exact date the foreclosure proceeds were collected, according to the foreclosure sale advertisement, approximately $25,000.00 was due on February 3, 2010 and the remaining balance was due within fifteen days of the sale. Upon information and belief, the proceeds were then distributed among the Defendants, MetLife, and the Noteholder of Plaintiff's loan using a combination of the United States Postal Service and electronic wires.

250.    This Trustee's Deed was subsequently filed in the Fairfax County Circuit Court on February 16, 2010. Upon information and belief, in order to file this Trustee's Deed, the document was mailed to the Fairfax County Circuit Court using the United States Postal Service sometime between February 9, 2010 and February 15, 2010.

251.    The Defendants thereafter filed a foreclosure accounting statement with the Commissioner of Accounts for Fairfax County on July 29, 2010 ("the Accounting Statement"). Upon information and belief, this accounting statement was also mailed to the Commissioner of Accounts using the United States Postal Service sometime around July 26, 2010, presumably a few days prior to the Commissioner's receipt.

252.    Included with the Accounting Statement, Defendants also submitted the fraudulently created substitute trustee and trustee's deed documents to the Commissioner.

253.    This statement accounts for a "Trustee's Commission" of $600.00 that Defendants collected from the foreclosure proceeds.

254.    Upon information and belief, the $600.00 included an undisclosed "admin fee", which was in reality a referral fee that was paid to LPS for its role in referring Plaintiff's loan to the Defendants for foreclosure.

255.    The failure to disclose the "admin fee" constituted another misrepresentation, this time of the actual allocation of proceeds and the payment of third parties during the Plaintiff's alleged foreclosure.

256.    Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents and the false foreclosure accounting statement to the Commissioner.

257.    The Commissioner of Accounts relied on the falsified documents and the false trustee accounting report when he approved the sale on August 2, 2010.

258.    The Accounting Statement was subsequently recorded in the Fairfax County Circuit Court on November 17, 2010 (attached hereto as Exhibit "O").

259.    Therefore, the Plaintiff lost his home as a direct and proximate result of the combination of each Defendant's actions and the pattern of racketeering activity in which the Defendants' engaged. Without the scheme and artifice to defraud Plaintiff into being rushed through the foreclosure process and the purposeful failure to evaluate his financial condition for a loan modification when he submitted his application, Plaintiff would not have lost his home.

**Defendants Were Fiduciaries Under the Deed of Trust**

260.    Defendants claimed that they were appointed substitute trustees under Plaintiff's Deed of Trust.

261.    Although Defendant Friedman never claimed to be a substitute trustee in the substitution of trustee document, it did so in letters to the Plaintiff and other consumers. Also,

Defendant Friedman acted interchangeably with the actual allegedly appointed substitute trustees throughout the foreclosure process.

262.    Well-established Virginia law provides that a trustee under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them and with the caution of a reasonably prudent person

263.    Additionally, in executing the trust, the trustee must substantially conform to the stipulations of the deed of trust.

### Defendants' Duty of Notice

264.    Paragraph 22 of Plaintiff's Deed of Trust, among other things, creates the following duties for a trustee:

> If Lender invokes the power of sale, Lender or **Trustee shall** give to Borrower, the owner of the Property, and all other persons, **notice of sale** as required by **Applicable Law**. (emphasis added).

265.    Accordingly, Plaintiff's Deed of Trust required Defendants to provide notice in accordance with Applicable Law, which is defined in the Deed of Trust "as all controlling federal, state and local statutes, regulations, ordinances and administrative rules and order (that have the effect of law) as well as all applicable final non-appealable judicial opinions."

266.    As mentioned in Paragraph 35, Defendants failed to provide notice of the sale in accordance with applicable law, including, but not limited to Virginia Code § 55-59.1(B). Instead, Defendants intentionally breached the requirements of Code § 55-59.1 in order to conduct foreclosures at the fastest speed with lowest cost possible and without regarding to its duties in the Deed of Trust.

267.    The Virginia Code is clear that if the mortgage note is lost or cannot be produced AND the beneficiary submits to the trustee a "lost note affidavit", only then can the trustee

proceed to foreclosure sale, provided that written notice has been sent to the consumer that the note is lost or unavailable and that upon expiration of 14 days from the date of mailing, the beneficiary of the note will request the trustee proceed to sale.

268.    This statute provides a clear timeline that Fannie, MetLife, Friedman, F&M, and Muncy routinely ignore. If a note is lost or cannot be produced, the following steps must be taken: 1) the beneficiary (Fannie) submits to the trustee a lost note affidavit; 2) Fannie provides written notice to the homeowner that the note is lost or unavailable and that request for sale will be made of the trustee upon expiration of 14 days from the date of mailing that notice; and 3) after 14 days of mailing the notice to the consumer, Fannie can request that the trustee proceed to sale.

269.    Instead of complying with this statutory obligation which is incorporated to Plaintiff's Deed of Trust in Paragraph 22, Defendants send a blanket "lost note letter" to every consumer, including the Plaintiff, claiming that their note is unavailable. This is merely a scheme to bypass the requirements set forth under Virginia law, and to increase the speed with which foreclosures can be processed. Waiting for a lost note affidavit from Fannie, as well as waiting for the written notice to the consumer that the note is lost would add weeks to the timeline, thus Defendants simply omit their obligations under the Deed of Trust for the sake of speed.

270.    Defendants were aware of this requirement, but insisted on instituting foreclosure proceedings against the Plaintiff and other homeowners without providing the requisite notice or obtaining the documents needed to conduct the foreclosure proceedings.

271.    Instead, Defendants did not require *any* documents, aside from a one-page referral form, from the servicer or LPS prior to attempting to conduct a foreclosure sale.

272. Moreover, the Trustee's duty of notice is predicated on the "[l]ender invoking the power of sale." Despite this prerequisite, upon information and belief, Defendants never actually communicated with Plaintiff's lender.

273. Additionally, Defendants further breached their fiduciary duty of notice by identifying MetLife as the beneficiary of the Note pursuant to Code § 55-59.1(B). In particular, Defendants' correspondence dated October 9, 2008, provides "[i]f you believe that you may be subject to a claim by any person or entity other than MetLife Home Loans a division of MetLife Bank, NA to enforce the Note, then you may petition the Circuit Court of the county or city where the property of some part thereof lies for an order requiring MetLife Home Loans a division of MetLife Bank, NA to provide adequate protection against such claim."

274. This notice directly violates Code § 55-59.1(B), which is incorporated into Defendants' fiduciary duties pursuant to Paragraph 22 and provides "[t]he notice shall further advise the person required to pay the instrument that if he believes he may be subject to a claim by a person other than the beneficiary to enforce the instrument, he may petition the circuit court of the county or city where the property or some part thereof lies for an order requiring the beneficiary to provide adequate protection against any such claim."

275. At all times relevant hereto, Defendants had knowledge that MetLife was not the beneficiary or holder of the Note as proscribed in Code § 55-59.1(B). Nevertheless, Defendants identified MetLife as the beneficiary to expedite the foreclosure with the lowest cost structure, and with the intent to conceal Fannie's role in the foreclosure because of Fannie's public assurances and guidelines that foreclosure alternatives were its "top priority."[10]

---

[10] *See* Statement of Terence Edwards, Executive Vice President, Credit Portfolio Management Fannie Mae, to the U.S. Senate Committee on Banking, Housing, and Urban Affrais (Dec. 1,

276.    This conduct constitutes a breach of Defendants' fiduciary duty of notice as provided in Paragraph 22 of Plaintiff's Deed of Trust.

### *Defendants' Duty to Advertise*

277.    Paragraph 22 of the Deed of Trust also confers upon a trustee the duty to advertise the sale by public notice in accordance with Applicable Law.

278.    Upon information and belief, Defendants – in effort to expedite foreclosures -- often advertised the sale date before any substitution of trustees deed was executed, and did so as to the Plaintiff.

279.    Thus, Defendants breached their fiduciary duty under Paragraph 22 by advertising the foreclosure when they had no present right to do so.

280.    Moreover, implicit in Defendants' duty to advertise is that Defendants were properly appointed as substitute trustee under the Deed of Trust, which they were not.

281.    Specifically, Paragraph 24 of the Deed of Trust states "[l]ender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law."

282.    Because Defendants improperly appointed themselves without the knowledge of the Lender, any exercise of the duty of advertisement conferred by the Deed of Trust was not authorized under the express terms therein.

### *Duty to Refrain from Personal Interest Conflicting with Interest*

---

2010), available at http://www.fanniemae.com/portal/about-us/media/statements/2010/statement-edwards-senate-comm-banking-housing-urban-affairs.html (last visited Jan. 28, 2013).

283.    Further, a trustee must refrain from placing himself in a position where his personal interest conflicts with the interests of those parties for whom he acts as a fiduciary.

284.    Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Friedman employed Defendant Muncy.

285.    As explained throughout this complaint, Defendants Friedman, F&M, and Muncy operate on a volume-based business model and are incentivized to churn through foreclosures without any regard to the interests of the consumer. This makes it not only more expensive to process foreclosures in compliance with the law and their fiduciary duties, but also means they will be referred less cases if they do.

286.    They are motivated purely by their own financial gain, and thus none of these parties is an impartial or neutral "substitute trustee".

287.    In fact, Defendant Muncy has consistently maintained in the related *Goodrow* matter that he and the law firm that he works for each have an attorney-client relationship with every possible entity involved—the supposed investors, noteholders and servicers—on the loans that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his interactions with those entities at a deposition, citing the attorney-client privilege as the basis for not disclosing such information:

```
 9      Q    Okay.  At the time you sent this letter,
10   what evidence of the indebtedness did you have?
11      A    We had the information contained in the
12   referral, not limited to this header document that you
13   have gone through, Exhibit 3.
14      Q    What other information did you have in the
15   referral?
16           MR. BIONDI:  I'm going to object to
```

17    attorney/client privilege.  The referral would include
18    instructions and requests for advice from a client to
19    Mr. Muncy or lawyers in his firm.
20         **MS. KELLY:  So you're instructing him not**
21    **to answer obviously?**
22         **MR. BIONDI:  Yes.**
23         MS. KELLY:  Just to clarify, are you
24    instructing Mr. Muncy not to answer regarding anything
25    else that may be in the referral documents?

1         MR. BIONDI:  You had asked what other
2    information was communicated to Mr. Muncy, who's the
3    attorney at Friedman & MacFadyen, by the clients,
4    which is Met Life Home Loans.
5         MS. KELLY:  In the referral.
6         MR. BIONDI:  In the referral, which I
7    don't know what could be in there, whether there's
8    going to be advice, request for advice, instructions.
9    Those matters are reasonably to be anticipation of
10   litigation at this point.  I'm sorry.  Take that back.
11   Not litigation.  But it's definitely part of the
12   attorney/client relationship and the purpose of the
13   representation conducting the foreclosure.

---

16      Q    What instructions did you receive from
17   First Horizon regarding Mr. Goodrow's mortgage loan?
18         **MR. BIONDI:  Don't answer that question.**
19   **Attorney/client privilege.**
20      Q    Did you communicate with First Horizon to
22   verify that they were the noteholder of Mr. Goodrow's
23   mortgage loan?
24         MR. BIONDI:  Wait a minute.  Same
25   objection.
1    BY MS. KELLY:
2       Q    Did you communicate with Met Life at all
3    to verify who the noteholder was regarding
4    Mr. Goodrow's mortgage loan?
5         MR. BIONDI:  I think I have the same
6    objection.  You're trying to avoid the substance, but
7    you're trying to substitute the substance into the
8    question and then asking the question.
10      Q    Did you communicate with Fannie Mae
11   regarding their investment in Mr. Goodrow's mortgage
12   loan?
13         MR. BIONDI:  I object.  Attorney/client

14    privilege.
16        Q    Did you communicate with Fannie Mae at all
17    regarding their ownership interest in Mr. Goodrow's
18    mortgage loan?
19            MR. BIONDI:  Same objection.

288.    Defendants engaged in this same conduct with respect to the Plaintiff.

### *Intentional Violation of Fannie Mae's Guidelines Further Demonstrates Impartiality*

289.    At all times relevant hereto, Defendant Friedman was a "retained attorney" in Fannie Mae's RAN.

290.    Fannie Mae requires that mortgage loans owned by them be serviced according to specified procedures outlined in its Servicing Guide ("the Guide"), and further requires that certain loss mitigation steps must be undertaken prior to a foreclosure sale being authorized.

291.    As a retained attorney for Fannie Mae loans, Defendants had knowledge of Fannie Mae's foreclosure policies and procedures as outlined in the Guide and subsequent directives and agreed to abide by such policies and procedures.

292.    On April 28, 2010, Fannie Mae amended its Servicing Guide to address procedural requirements for foreclosures for loans owed by Fannie Mae. The Guide stated that the new requirements were "particularly important and material to Fannie Mae's ongoing effort to keep borrowers in their homes and to reduce credit losses."

293.    The Guide states "Fannie Mae requires the servicer and the foreclosure attorney (or trustee) to interact throughout the conduct of foreclosure proceedings." Some of this required interaction includes:

> The servicer must submit a complete referral package to the selected attorney (or trustee). The referral package must include mortgage loan status data (from *Exhibit 1: Mortgage Loan Status Data for Foreclosure Proceedings*) and the documentation the attorney (or trustee) needs to conduct foreclosure proceedings.
> . . . .

54

> The attorney (or trustee) will acknowledge receipt of the referral package (and indicate whether or not it is complete) within two business days. The servicer must provide any required missing documentation to the attorney (or trustee) within five business days after it received the attorney's (or trustee's) request.

FANNIE MAE, FANNIE MAE  2010 SERVICING GUIDE UPDATE PART VII AND PART VIII 801-73–74 (April 2010).

294.    As detailed above, Defendants were required to acknowledge receipt of the referral package from Plaintiff's servicer within two business days. In this acknowledgment, Defendants were required to indicate any documents they needed to conduct the foreclosure, which would have included either the original note or the lost note affidavit pursuant to Virginia Code § 55-59.1(B).

295.    Defendants were aware of this requirement for loans owed by Fannie Mae, but insisted on instituting foreclosure proceedings against the Plaintiff and other homeowners without obtaining the documents needed to conduct the foreclosure proceedings.

296.    Defendants were also aware that they could request the original note which was in Fannie Mae's possession, or even simply "legal custody" with physical possession remaining with Fannie Mae, but routinely chose not to do so.

297.    This is merely another example of how Defendants failed to act impartially and disregarded the consumers' interests for those of the loan servicers and investors, as well as their own pecuniary interests.

298.    Defendants F&M, Muncy, and Friedman—to the extent that Friedman was also considered trustee—therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust. Upon information and belief, Defendants also breached this fiduciary duty that they owed to the putative class members

299.    Further, upon information and belief, Defendants had a copy of Plaintiff's Deed of Trust and were aware that Fannie Mae owned Plaintiff's loan and that they and the servicer were required to comply with the Fannie Mae Servicing Guidelines. Their failure to do so is evidence of their impartiality and breach of their duties as fiduciary to the Plaintiff.

300.    Defendants further breached this duty to the putative class members. As a result of the Defendants' conduct, combined with that of the entire enterprise, the Plaintiff ultimately lost his home in a foreclosure sale.

### Count I:  Trustees' Breach of Fiduciary Duties
### (All Defendants)
### CLASS CLAIM

301.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

302.    This matter is brought as a class action for a " Fiduciary Duty Class" class, initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a Note for whom Defendants Friedman, F&M, and/or Muncy claimed they were appointed substitute trustee and sent correspondence in an attempt to conduct a foreclosure sale of the real property within the four years prior to the filing of the Complaint, and/or for whom they collected any amount of fees.  Excluded from the class are employees of the Defendants.

303.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

304.    Plaintiff's counsel is in possession of a substantial number of correspondences that the Defendants mailed to consumers. Plaintiff's counsel is also in possession of a substantial number of Substitution of Trustee documents, Trustee's Deeds and Trustee's Foreclosure Accounting Reports that Defendants filed with the Commissioner Accounts throughout Virginia.

These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

305.    Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.  Defendants have accomplished well more than 50 foreclosures as a retained attorney in Fannie Mae's RAN during the last four years.

306.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation: (a.) whether Fannie Mae's pricing incentives and forced timelines caused Defendants to violate their duties of notice and advertisement under the deed of trust; (b.) whether Fannie Mae's pricing incentives and forced timelines placed Defendants in a position of personal conflict with the homeowners to whom they were fiduciaries and caused them to act impartially against the consumers;; (c.) whether LPS's referral incentives and forced timelines caused Defendants to act impartially against the consumers; (d.) whether Defendants' acted impartially by failing to obtain the original note or a lost note affidavit prior to commencing foreclosure proceedings; (e.) whether these actions constituted Defendants' breach of fiduciary duties (f.) what remedies are available for such a breach of fiduciary duty.

307.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. Additionally, Defendants incentives and timelines took place uniformly across the potential class members. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

308.    The Plaintiff will fairly and adequately protect the interests of the class.   The Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.   Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this action. The Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

309.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

310.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

311.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources.  The issues at the core of this case are classwide and should be resolved at one time.  One win for one consumer would set the law as for every similarly situated consumer.

312.    The Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

313.    Defendants breached their fiduciary duties by failing to act impartially towards the Plaintiff and putative class members due to pricing incentives and forced compliance with unreasonable timelines. Based on the pricing incentives and forced timelines, Defendants acted for their own pecuniary gain so that it remained in Fannie Mae's and LPS's referral network.

314.    This also included Defendants failure to comply with Fannie Mae's Guide for the sake of conducting speedier foreclosures. Defendants repeatedly breached their fiduciary duty to Plaintiff and the putative class including, but not limited to, the following conduct:

a.      By consistently failing to acknowledge receipt of the referral package and failing to request the necessary foreclosure documents in order to expedite the foreclosure process on Plaintiff and the putative class; and

b.      By failing to obtain a complete referral package, including the documents required to conduct a foreclosure under Virginia law prior to conducting the foreclosure.

315.    Defendants' acceptance of any fees resulting from their role as alleged "substitute trustees" were therefore inappropriate.

316.    As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

**Count II: Violation of 18 U.S.C. § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act**
**CLASS CLAIM**

317.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

318.    This matter is brought as a class action on behalf a second class—the "RICO Class" —initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants attempted a foreclosure upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

319.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

320.    Plaintiff's counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiff's counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or

filed with the Commissioners of Accounts.  These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

321.    Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures. Defendants have accomplished more than fifty VA foreclosures during the last four years.

322.    Plaintiff's counsel alleges that Defendants uniformly used the set of fraudulent processes and business actions, as demonstrated in this case, across all foreclosure files.  His counsel assumes that this may not have always been the case—at some time in the past Defendants may actually have signed documents as indicated on the document's signature block, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee. However, at some point this conduct ended and the Defendants began conducting their business using the unlawful conduct described herein at least since 2008.

323.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants and the third parties identified herein constituted a RICO enterprise; (b.) whether Defendants' falsification of foreclosure documents constituted mail or wire fraud; and (c.) what remedies are available for such a RICO violation.

324.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

325.   The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

326.   Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

327.   Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

328.   Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.   As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.       A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources.  The issues at the core of this case are classwide and should be resolved one time.  One win for one consumer would set the law as for every similarly situated consumer.

329.    Plaintiff alleges a cause of action against the Defendants for their violation of 18 U.S.C. § 1962(c).

330.    As alleged above, the Defendants used an elaborate foreclosure enterprise in order to conduct foreclosures as quickly an as efficiently as possible without regard to the Plaintiff's and putative class members' rights under the law.

331.    For example, and without limitation, when a mortgage loan serviced by MetLife Bank, including the Plaintiff's loan, went into default, MetLife Bank used LPS's software, including the Desktop Platform, to assign the loan to a Network Firm like the Friedman entities. LPS designed this software, along with an expedited foreclosure timeline, to rate Network Firms solely on how quickly the Network Firm could conduct a foreclosure sale. If a Network Firm could not conduct a foreclosure sale within LPS's timeline, LPS would not refer any more foreclosures to that Network Firm. MetLife Bank continued to use LPS's software and referral services because of how quickly foreclosure sales occurred within that system. After the foreclosure was referred to a Network Firm, namely the Defendants here, LPS charged the firm

an "admin fee", which was assessed regardless of any administrative work performed, or if a foreclosure sale even occurred. This "admin fee" basically amounted to a referral fee or illegal kickback.

332.    Upon information and belief, Defendant Friedman and/or Defendant F&M were Network Attorneys in LPS's system and regularly paid LPS's "admin fee". Upon information and belief, when a defaulted mortgage loan was referred to the Friedman entities for foreclosure, they used Defendant Muncy, Kenneth MacFadyen, Mark Friedman and other Friedman employees to create fraudulent documents to initiate the foreclosure process, including the substitution of trustee documents. Upon information and belief, the Friedman entities also used LPS to create fraudulent documents.

333.    Using these fraudulent documents, the Friedman entities and Muncy would then conduct a foreclosure of the consumer's home. LPS and the loan servicers, MetLife in this instance, knew of the Defendants' conduct and continued to refer foreclosure cases to them because of how quickly the Defendants were able to conduct foreclosure sales. This in turn allowed MetLife to comply with its own required foreclosure timeline set by the investors, Fannie Mae in the Plaintiff's case. These procedures were uniform with respect to foreclosures conducted by the Friedman entities in Virginia and took place against both the Plaintiff and the putative class members.

334.    MetLife, LPS, Fannie Mae, Mark H. Friedman, Kenneth J. MacFadyen and each of the Defendants constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

335.    Each Defendant was engaged in a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

336.    Further, Fannie Mae, LPS, and the loan servicers, including MetLife, existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law. That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers' homes.

337.    Fannie Mae, MetLife, and LPS are each separate entities and operate in their own self-interest.  They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for their own profit.

338.    For example, Fannie Mae does not specifically purchase loans that are in default, MetLife services loans owned by Fannie Mae regardless of whether they are ultimately foreclosed, and LPS provides software to MetLife to assist in servicing mortgage loans, which does not depend on the loan ever going into default.

339.    The racketeering proceeds obtained by the Defendants as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions. Upon information and belief, the proceeds of the foreclosure enterprise were also used to pay LPS's referral fees and illegal kickbacks, which LPS refers to as an "admin fee".

340.    The enterprise had an effect on interstate commerce. For example, and without limitation, the transmission of the fraudulent foreclosure documents and letters through the United States mail system and through the wires for transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants, by use of the United States mail system or via electronic wires also affected

interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court land record recording fees are paid in Maryland and Virginia. Loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments. Additionally, LPS uses the wires and the mail to refer foreclosures to the Defendants, receive their "admin fee", create fraudulent affidavits, and to communicate with the loan servicers such as MetLife and the Defendants regarding the foreclosure of consumers' homes. Proceeds from consumer foreclosure sales and fees from Fannie Mae and the servicers are also paid through the mail and the wires.

341.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and the letters to the Plaintiff and other consumers. MetLife, LPS, and the Defendants also violated mail and wire fraud statutes when they used LPS's software, including the Desktop platform, to refer loans for foreclosure and to communicate throughout the process that they manufactured to conduct foreclosures in Virginia as quickly and cheaply as possible. Fannie Mae further violated the mail and wire fraud statutes by using the mails and wires to institute its pricing incentives and to submit payments to the loan servicers and the Defendants during this process. This conduct began sometime as early as 2008 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

342.    Although the Defendants' participation in the enterprise has since ceased, it was continuous for a significant portion of time from at least 2008 until 2012.

343.    The conduct and actions of the Defendants as alleged herein—creating fraudulent documents for use in foreclosures—violated the federal mail and wire fraud statutes, 18 U.S.C.

§§ 1341, 1343.   The Defendants perpetrated an ongoing scheme to defraud consumers and courts, and used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

344.   The Defendants used this practice with respect to numerous documents that they caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants and all of these contain the same fraudulent documents. Additionally, Plaintiff's counsel has reviewed numerous trustee's reports filed with various Commissioners throughout Virginia and these reports contain the same misrepresentations.

345.   Further, the Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants' regular way of conducting business, namely foreclosures in Virginia and Maryland.

346.   The Plaintiff, the Circuit Courts, and the Commissioner of Accounts relied on the fraudulent documents when they mistakenly believed that Defendants were validly appointed substitute trustees and conducted a proper foreclosure sale.

347.   By means of example only, Plaintiff and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise.  The Commissioners of Accounts approved the sales and the accounting of the sales based on the fraudulent documents that Defendants submitted to them.

348.   Plaintiff and putative class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

349.    Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**Count III: Violations of 15 U.S.C. § 1692, et seq.**
**Fair Debt Collections Practices Act**
**CLASS CLAIM**

350.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

351.    Plaintiff alleges that Defendants violated the FDCPA purusant to 15 U.S.C. §1692e, §1692f, and §1692g of the FDCPA, which provides as follows:

a.      Generally, §1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' Section §1692e also provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

> (2) The false representation of--
> (A) the character, amount, or legal status of any debt; or
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
>       …
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>       …
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

68

15 U.S.C. § 1692e

b.       Section 1692f prohibits generally the use of "unfair or unconscionable

means to collect or attempt to collect any debt", and specifically in relevant part:

> (1) The collection of any amount (including any interest, fee, charge, or
> expense incidental to the principal obligation) unless such amount is
> expressly authorized by agreement creating the debt or permitted by law.
>       …
> (6) Taking or threatening to take any nonjudicial action to effect
> dispossession or disablement of property if –
> (A) there is no present right to possession of the property claimed as
> collateral through an enforceable security interest;

15 U.S.C. § 1692f.

c.       A debt collector must provide a consumer with the name of the creditor to

whom the debt is owed pursuant to § 1692g:

> a.       Notice of debt; contents.
> Within five days after the initial communication with a consumer in connection
> with the collection of any debt, a debt collector shall, unless the following
> information is contained in the initial communication or the consumer has paid
> the debt, send the consumer a written notice containing –
>       …
> (2) the name of the creditor to whom the debt is owed.

352.    For their class claim brought pursuant to the FDCPA, the Plaintiff proposes a class

initially defined as  follows:[11]

---

[11] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert. denied*, 125 S. Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

353.   Defendants violated §1692e and §1692f as to each class member by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters to the class members.

354.   Plaintiff alleges this class definition because all or substantially all of the class members would have received correspondence from the Defendants with a subject line that represented or implicitly threatened that a lawsuit was or would be filed.

355.   Plaintiff also alleges a "Lost Note" subclass initially defined as:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the mortgage note was lost or otherwise unavailable within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

356.   Defendants violated §1692e as to the Lost Note subclass because they forwarded correspondence to consumers that falsely represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1.

357.   Plaintiff also alleges a "Servicer as Creditor" subclass of consumers initially defined as follows:

---

class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home, as well as correspondence stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

358.   Defendants violated §1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed.

359.   Plaintiff also alleges an "Inconsistent Demand for Payment" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home as well as conflicting loan payoff and/or reinstatement calculation(s) within the one year period preceding the filing date of the original Complaint in this matter.  Excluded from the subclass are employees of the Defendants.

360.   Defendants violated §1692e and §1692f as to the Inconsistent Demand for Payment subclass because they made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers.

361.   Plaintiff also alleges an "Failure to Identify Creditor" subclass initially defined as follows:

All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home and to whom the Defendants failed to identify the creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

362.    Defendants violated §1692g as to the Failure to Identify Creditor subclass because in their initial correspondences to consumers, they failed to identify the creditor to whom the debt was owed.

363.    Plaintiff alleges a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and to whom the Defendants sent a letter regarding a possible foreclosure sale of their home that enclosed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

364.    Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustees (and/or where the signatures were forged altogether).

365.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

366.    Plaintiff's proposed class counsel has reviewed a substantial number of correspondences and Appointment of Substitute Trustee documents mailed to consumers by the Defendants. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

367.    Defendants use the same form correspondences that they send to consumers

across Virginia. These form correspondences include the initial correspondences to consumers, lost note letters, substitution of trustees deeds, notices of sale, payoff statements and reinstatement quotes.

368.    Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

369.    There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether Defendants routinely misrepresented the identity of the creditor, amount, legal status, or character of the debts that they were attempting to collect from Plaintiff and the putative class members; (b.)  whether the Defendants falsely represented the compensation that they could lawfully receive as a result of these attempted and/or actual foreclosures; (c.)  whether the Defendants threatened to take or took action that could not legally be taken; (d.)  whether the Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiff and the putative class members; and (e) whether Defendants could lawfully foreclose upon Plaintiff and the putative class members prior to meeting the requirements of the Deed of Trust and/or other regulations and governing law.

370.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.  The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period.  The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

371.    The Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff

has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions.  Neither Plaintiff nor his counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

372.    Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper.  Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm.  The primary asset available for all class members is the limited insurance fund held by Defendants.

373.    Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

374.    Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.    As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.  Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment

as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  As well, individual litigation of the uniform issues in this case would be a waste of resources – class counsels', Defendants' and the Court's.  The issues at the core of this case are classwide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

375.   As a result, Plaintiff and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the putative class members, respectfully moves for class certification and for actual and compensatory, statutory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO and the FDCPA; for his attorneys' fees and costs; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**JOHN K. GOODROW**

By_____/s/_____
                    Of Counsel

Matthew J. Erausquin, VSB#65434
Janelle E. Mason, VSB#82389
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd., Ste. 600

Alexandria, VA 22314
(703) 273-7770 - Telephone
(888) 892-3512 – Facsimile
matt@claleglal.com
janelle@clalegal.com

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
dale@pittmanlawoffice.com

J. Chapman Petersen, Esq., VSB # 37225
Kristi Cahoon Kelly, Esq., VSB #72791
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
(703) 277-9774
(703) 591-9285 Facsimile
jpetersen@smillaw.com
kkelly@siplfirm.com

Leonard A. Bennett, VSB #37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net
srotkis@clalegal.com

*Counsel for Plaintiff*

Richard John Rubin
1300 Canyon Road
Santa Fe, NM 87501
Telephone (505) 983-4418
Facsimile (505) 983-2050
*PRO HAC VICE*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of January, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Andrew Biondi
Cullen Dennis Seltzer
Sands Anderson, PC
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

Andrew Todd Rich
Friedman & MacFadyen, PC
1601 Rolling Hills Drive
Suite 125
Richmond VA  23229
trich@fmlaw.com

Douglas Pendleton Rucker, Jr.
1111 E. Main Street
Suite 2400
P.O. Box 1998
Richmond, VA  23219
drucker@sandsanderson.com

*Counsel for the Defendants*

_____/s/_____
Janelle E. Mason, VSB No. 82389
*Attorney for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd., Ste. 600
Alexandria, VA 22314
(703) 273-7770 - Telephone
(888) 892-3512 – Facsimile
janelle@clalegal.com