**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| ALLEN CHATTER, *individually and on behalf of others similarly situated,* )<br>)<br>) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:11cv613 |
| ) | |
| FRIEDMAN & MACFADYEN, P.A., )<br>F & M SERVICES, L.C., )<br>JOHNIE R. MUNCY, )<br>) | |
| Defendants. ) | |

_____)

## SECOND AMENDED CLASS COMPLAINT

COMES NOW the Plaintiff, Allen Chatter, individually and on behalf of others similarly situated, by counsel, and as for his Second Amended Class Complaint against the Defendants, he alleges as follows:

## INTRODUCTION

1.      Defendants—a now defunct foreclosure mill—engaged in a systemic practice of law-skirting and deception designed for the dual purposes of speeding up consumer foreclosures and ensuring that their business model had the lowest cost structure that they could construct.  To accomplish these ends, Defendants falsified documents, created a shell entity falsely claiming to serve as a neutral trustee, lied to the Circuit Courts through their Commissioners of Accounts, in addition to consumer victims, and others regarding the custody and ownership of mortgage notes and their supposed compliance with Virginia's foreclosure requirements, and in the process largely ignored federal law enacted to protect debtors against overly aggressive debt collectors.  Accordingly, Plaintiff brings these claims for actual, statutory, treble, and punitive damages,

declaratory and injunctive relief, costs, and attorneys' fees brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, *et seq.* ("RICO"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), and for the Defendants' breach of fiduciary duties.

2.     Furthermore, Plaintiffs and the putative class members allege that Defendants acted fraudulently in that they knowingly made a series of false statements and representations in connection with the collection of the alleged debts and of the foreclosures in their efforts to rush through the foreclosure process as quickly as possible. The Defendants each receive monetary benefit from doing so, including, but not limited to, incentive payments from the alleged mortgage servicers and others based in large part on the speed with which they are able to conduct foreclosures. Another benefit obtained by the Defendants by sacrificing their grave responsibilities to ensure the fundamental integrity of the foreclosure process in exchange for speed is a competitive edge against other foreclosure mills. Servicers will refer more cases to the Defendants based on the speed in which they conduct foreclosure sales. Thus, not only do the Defendants lie to consumers and Circuit Courts, but they also obtain an unfair advantage against entities that engage in a more thoughtful and deliberative process in an effort to comply with the law. Plaintiffs and the putative class members also allege that Defendants violated the FDCPA by sending letters to consumers that contained false statements and material misrepresentations regarding the collection of a debt by a debt collector, attempted to collect "attorneys fees" for themselves which were not due and owing, and initiated foreclosure activities when they had no present right to possession of the property.

## JURISDICTION

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

**PARTIES**

4.     Plaintiff Allen Chatter (hereafter "Chatter" or "Plaintiff") is a natural person and a resident of the Commonwealth of Virginia.

5.     Defendant Friedman & MacFadyen, P.A. (hereafter "Friedman & MacFadyen") is a now defunct law firm with offices previously in Maryland, Virginia, and Washington D.C., the principal purpose of whose business was the collection of debts, and was located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

6.     Defendant F&M Services, L.C. (hereafter "F&M") is a limited liability company, the principal purpose of whose business is the collection of debts and who purported to be a Substitute Trustee under Plaintiff's Deed of Trust, and is located at 1601 Rolling Hills Drive, Surry Building, Suite 125, Richmond, Virginia 23229.

7.     Defendant Johnie R. Muncy (hereafter "Muncy") is an attorney employed by Friedman & MacFadyen, P.A. who purported to be a Substitute Trustee under Plaintiff's Deed of Trust.

**STATEMENT OF FACTS**

8.     Defendants operated as a debt collection and foreclosure enterprise. They worked together with other entities as described herein to perpetrate fraud on consumers that ultimately resulted in the loss of thousands of Virginia residents' homes.

9.     Each Defendant, along with the other members of the enterprise, had a specific role in perpetrating a pattern of fraudulent activity.

10.     The principals of Defendant Friedman, Kenneth J. MacFadyen and Mark H. Friedman, created a sham company, Defendant F&M, and used an arbitrarily chosen employee, Muncy (Defendants Friedman and F&M are collectively referred to as "the Friedman entities"),

in which they purported to act as a neutral and impartial trustee under thousands of deeds of trust, including the Plaintiffs' Deed of Trust.

### *Defendant Chase's Mortgage Loan Servicing and Role in the Enterprise*

11.     In February 2012, 49 state attorneys general and the federal government announced a joint state-federal settlement with the country's five largest mortgage servicers, known as the "national mortgage settlement". This settlement included JPMorgan Chase Bank, N.A.

12.     After allegations of widespread robo-signing within the mortgage industry came to light in October 2010, state and federal attorneys general launched an investigation into the role of the alleged false affidavits foreclosure proceedings across the nation.   However, the investigation soon uncovered a laundry list of wrongdoing by the mortgage servicers, including lost paperwork, long delays, missed deadlines for loan modifications, and other loan origination issues.

13.     The complaint,[1] filed by 49 states, the District of Columbia, and the United States, alleged that each of the top five servicers, including Chase, engaged in widespread and systematic conduct amounting to unfair and deceptive practices during the discharge of their duties as loan servicers, including the following:

      a.      failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;

      b.      charging excessive or improper fees for default-related services;

      c.      failing to properly oversee third party vendors involved in servicing activities on behalf of the Banks;

      d.      imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

      e.      providing borrowers false or misleading information in response to borrower complaints; and

---

[1] *United States, et al. v. Bank of Am. Corp., et al.*, No. 1:12CV361 (D.D.C. Mar. 12, 2012).

f.     failing to maintain appropriate staffing, training, and quality control systems.

14.     In addition, the complaint alleged that the servicers, specifically Chase, violated federal laws, program requirements and contractual requirements governing loss mitigation in the course of servicing mortgage loans. This includes:

a.     failing to perform proper loan modification underwriting;
b.     failing to gather or losing loan modification application documentation and other paper work;
c.     failing to provide adequate staffing to implement programs;
d.     failing to adequately train staff responsible for loan modifications;
e.     failing to establish adequate processes for loan modifications;
f.     allowing borrowers to stay in trial modifications for excessive time periods;
g.     wrongfully denying modification applications;
h.     failing to respond to borrower inquiries;
i.     providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;
j.     providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;
k.     providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;
l.     misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;
m.     failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;
n.     falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;
o.     miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;
p.     misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner;
q.     failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;
r.     failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

5

        s.      misleading borrowers by providing false or deceptive reasons for denial of loan modifications.

15.    Finally, in the course of conducting foreclosures, the complaint alleged that the servicers, including Chase, engaged in the following wrongdoing:

        a.      failing to properly identify the foreclosing party;

        b.      charging improper fees related to foreclosures;

        c.      preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

        d.      preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks;

        e.      executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

        f.      misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

        g.      inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; and

        h.      inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

16.    This conduct was not restricted to only a few occasions. Instead, it was widespread and constituted Chase's systematic procedures and ultimately its policy for servicing mortgage loans, specifically those mortgage loans in default.

17.    Much of the wrongdoing listed in the complaint also applied to Chase's conduct during the servicing and foreclosure of Plaintiff's loan.

18.    For example, during the servicing and foreclosure of Plaintiff's loan, Chase engaged in activity including, but not limited to:

        a.      failing to respond to Plaintiff's inquiries;

b.  failing to provide accurate and timely information to Plaintiff who was in need of, and eligible for, loss mitigation services, including loan modification;

c.  failing to perform proper loan modification underwriting;

d.  failing to gather or losing loan modification application documentation and other paper work;

e.  failing to provide adequate staffing to implement its programs;

f.  failing to adequately train staff responsible for loan modifications;

g.  failing to establish adequate processes for loan modifications;

h.  misleading Plaintiff by representing that his loan modification application would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

i.  failing to properly process Plaintiff's application for loan modification, including failing to account for documents submitted by him and failing to respond to Plaintiff's reasonable requests for information and assistance;

j.  permitting and approving the preparation, executing, or filing of affidavits in Plaintiff's foreclosure proceeding without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits;

k.  charging improper fees related to foreclosures; and

l.  inappropriately dual-tracking Plaintiff's foreclosure and loan modification activities and failing to communicate with Plaintiff with respect to foreclosure activities.

19.    Chase engaged in this behavior and conduct, not because of lack of oversight, but because it was a more profitable business model. Chase engaged in the widespread conduct of intentionally misleading consumers into believing that their requests for loan modifications or other loss mitigation programs were being processed when, in reality, Chase simply referred their mortgage loans to foreclosure or inappropriately dual-tracked their foreclosure and loan modification activities. Chase further defrauded consumers by representing that it had the requisite documents and authority to foreclose on their homes and then fabricating or falsifying the necessary foreclosure documents, or permitting third party vendors to fabricate or falsify these documents with its approval.

20.    Further, Chase enlisted the aid of third parties, such as Defendant LPS and Friedman, to carry out its scheme to defraud consumers, including the Plaintiff.

21.     By engaging in these activities, Chase and its third-party vendors, the remaining Defendants in this Complaint, engaged in 1) conduct 2) of an enterprise 3) through a pattern of 4) racketeering activity.

22.     In carrying out their enterprise through a pattern of racketeering activity, the Defendants utilized the United States Postal Service and the wires, which were an integral part of carrying out their scheme to defraud consumers. Defendants used the United States Postal Service to send misleading correspondence to consumers and used the wires as the integral means for servicing mortgage loans and later carrying out foreclosures "from the cradle to the grave" at the fastest speed possible, without regard to propriety or quality.

### Lender Processing Services, Inc.'s Role in the Enterprise

23.     Lender Processing Services, Inc. (hereafter "LPS") is a company that assembles the information used to foreclose on consumers' properties.[2] LPS's default services revenue, the portion of LPS that includes foreclosure services quadrupled in annual revenue from $277.8 million in 2006 to more than $1 billion in both 2009 and 2010.[3] Since news about foreclosure fraud was brought to the forefront of the mortgage industry and new regulations and programs have been put in place, such as HAMP, LPS has identified an impact in its revenue.[4]

24.     LPS provides customized technology platforms to mortgage loan servicers depending on the status of the consumers' loan. The first such platform is the Mortgage Servicing Package ("MSP") which assists servicers in administering all aspects of loan servicing, such as payment processing, customer service, investor reporting, etc.

---

[2] Most of the following facts are taken from the Nevada Attorney General's complaint in *Nevada v. Lender Processing Servs., Inc., et al.*, No. A-11-653289-B (Clark Cnty. Dist. Ct. Dec. 15, 2011), which was filed after an extensive investigation into Defendant LPS's business practices.
[3] Mark Basch, *The LPS Solutions*, Fla. Times-Union (Mar. 3, 2011).
[4] Lender Processing Servs. Inc., Annual Report (Form 10-k) 20 (Feb. 29, 2012).

25.     The second technology platform, a web-based platform called LPS Desktop ("Desktop"), is designed to aid mortgage servicers service mortgage loans that are in default. Desktop automates and monitors all tasks involved in the foreclosure process, including monitoring deadlines or LPS-imposed timeframes for foreclosure events and tracking and recording all events and communications taken with respect to the foreclosure of the mortgage loan. In addition, Desktop organizes and stores foreclosure related documents such as notices of default and substitution of trustee documents.

26.     Additionally, Desktop generates and manages invoices sent by its network of foreclosure attorney firms to servicers.

27.     LPS provides its Desktop platform to the vast majority of national mortgage servicers and in exchange for which the servicers each have agreements with LPS, referred to as a "Default Services Agreement", to manage all bankruptcy and default related loans for those servicers.

28.     Using LPS's MSP and Desktop platform, LPS is able to manage the core aspects of the foreclosure process on behalf of servicers.

29.     When a loan goes into default, it is coded for foreclosure in the servicer's, such as Chase's, system, at which time Desktop automatically refers the loan for foreclosure to a law firm or trustee company within LPS's network of firms (a "Network Firm").

30.     Upon information and belief, Defendant Friedman was one of LPS's "Network Firms" and utilized its technology to accept referrals and then proceed to foreclosure.

31.     In order to become a "Network Firm", the firm must enter into a "Network Agreement" a sample copy of which is attached hereto as Exhibit "A". Although this agreement

is dated September 1, 2001, exhibits attached thereto show that it was in effect until at least 2007.

32. Upon information and belief, a substantially similar agreement was in effect in 2010 when Plaintiff's loan was referred from LPS to the Defendants for foreclosure.

33. Upon acceptance of the referral, Defendant LPS charges the Network Firm a referral fee, which LPS labels an "admin fee". LPS requires that this fee be paid regardless of whether a loan is actually foreclosed or which stage the loan is removed from the foreclosure pipeline. Therefore, the admin fee does not depend on any administrative work actually completed, but is assessed solely on the fact that LPS referred a loan to the Network Firm.

34. For example, as outlined in Ex. A, the "admin fee" for referrals of all loan types, including Freddie Mac, Fannie Mae, FHA, and VA loans, was $125.00 as of 2007. Immediately upon referral of a case to a Network Firm, LPS charges this $125.00 fee.

35. This "admin fee" amounts to a referral fee or an illegal kickback. These fees are then passed on to the consumer, to be paid at the foreclosure sale, without any indication or disclosure that LPS is paid this referral fee. At the very least, these fees violate state laws or professional rules governing fee-splitting and impermissible referral fees.

36. Upon information and belief, LPS charged Defendants this referral fee and Defendants paid this referral fee numerous times, including when LPS referred Plaintiffs' loan to the Defendants for foreclosure.

37. Desktop then automatically transmits a "referral package", which contains the servicer's information pertaining to the loan, such as copies of the note, screenshots of the unpaid balance, and other details.

38.     LPS constructed its business model so that it became the exclusive means for foreclosure firms to access the millions of dollars in foreclosure related fees held by LPS's servicer-clients. LPS used this powerful position to not only require referral fees or kickbacks from the Network Firms, but also to set its own arbitrary timeline for how long the foreclosure process should take from referral date to sale date.

39.     The Network Firms, including the Defendants, are thus required to comply with LPS's arbitrary deadlines, sacrificing quality for quantity, or else risk being removed from accessing the majority of the country's top twenty servicers—LPS's servicer-clients.

40.     LPS claims that it acts only as a middle-man, providing technology and data processing software during the foreclosure referral process. In actuality, LPS handles core responsibilities which were traditionally the responsibility of loan servicers, including, without limitation, providing direction to foreclosure attorneys about how and when to proceed with foreclosure sales or when to take other actions during the foreclosure process.

41.     Therefore, LPS has assigned itself the responsibility of approving or rejecting requests by Network Firms for extending foreclosure sale dates or other deadlines, as well as responding to a variety of other requests or questions submitted by the Network Firms. Thus, the Defendants actually had very little, if any, contact with their servicer "clients" despite their representation otherwise.

42.     In addition to conducting the servicers' core functions and responsibilities, from at least 2006 through 2010, LPS also executed various foreclosure and mortgage related documents on behalf of its servicer-clients, including, but not limited to, assignments of mortgage, substitution of trustee, lien releases, and other documents needed to establish standing to foreclose.

43.     In fact, LPS has faced numerous lawsuits, as well as investigations by the U.S. Attorney General and other states' Attorneys General with respect to the mass robo-signing scheme in which it participated.

44.     Additionally, in November 2012, a former LPS executive, Lorraine Brown, pleaded guilty to conspiracy to commit mail and wire fraud for her role in LPS's scheme that saw over a million mortgage-related documents created with false signatures and notarizations.[5]

45.     LPS not only obstructs the line of communication between the servicers and foreclosure firms, but LPS also misrepresents its own role in the foreclosure process by claiming to merely provide data and software products when it actually directs the Network Firms through the foreclosure process.

46.     Perhaps LPS's role in directing the Network Firms is best illustrated by the manner in which it rates its Network Firms' performance. LPS's software carefully tracks the speed in which the Network Firm meets LPS's imposed timelines in its system, which is often shorter than investor or Lender imposed timelines. Based on whether the firms complied with LPS timelines, the Network Firms are given an "Attorney Performance Rating" of green, yellow or red. If a Network Firm, including Defendant Friedman, remains in the "red" for too long, LPS will cease to refer cases to that Network Firm, instead referring the cases to Network Firms who are able to conduct the foreclosures faster.

47.     Time is the only component of the Attorney Performance Rating. The rating does not take into account the quality with which the foreclosures are conducted.

---

[5] Office of Pub. Affairs, Dep't of Justice, http://www.justice.gov/opa/pr/2012/November/12-crm-1400.html (Nov. 20, 2012).

48. According to LPS, JPMorgan Chase Bank, NA, is its second largest customer.[6] Chase is a wholly-owned subsidiary of JPMorgan Chase and utilizes LPS's mortgage loan servicing and default platforms.

49. Chase uses one of more of Defendant LPS's software platforms, including, without limitation, MPS and/or Desktop.

50. Upon information and belief, Chase used one or more of these software platforms to service Plaintiff's mortgage loan.

51. Additionally, upon information and belief, Defendant Friedman is one of LPS's Network Firms and utilizes LPS technology, namely Desktop, during its foreclosure of Chase serviced mortgage loans, among others.[7]

52. Upon information and belief, Defendant Chase used LPS technology to refer Plaintiff's mortgage loan to Defendant Friedman for foreclosure.

53. Additionally, Plaintiff alleges that Chase, LPS, and Friedman engaged in all of the above stated conduct with respect to his loan, and thus he was rushed through the foreclosure process—a process which, in his case, lasted just over one month—without respect to the validity of the documents needed to conduct a foreclosure sale in Virginia, such as the substitution of trustee documents, or whether all of the prerequisites to foreclosure, including those listed in his Deed of Trust, had been met.

### *The Role of Mark Friedman, Kenneth MacFadyen, and Defendants Friedman, F&M, and Muncy in the Enterprise*

---

[6] Lender Processing Services, Inc., Annual Report (Form 10-k) (Feb. 19, 2011).
[7] For example, several of Defendant Friedman's previous employees have listed tasks involving LPS software programs and/or LPS/Fidelity clients while employed with Defendant Friedman on their professional employment profiles (attached as Exhibit "J").

54.    Friedman was not simply a parent holding company of F&M.    Instead, Defendants Friedman, F&M, and Muncy operated as parts of a single business operation. Mark Friedman and Kenneth MacFayen are attorneys and the principals of Defendant Friedman. They organized their law firm, for the sole purpose of conducting foreclosures. They organized their law firm, Defendant Friedman, for the sole purpose of conducting foreclosures. They also created a sham company, Defendant F&M, that could be appointed as substitute trustees under the subject deeds of trust that would remain under their sole control and would act at the direction of Defendant Friedman and ultimately themselves.

55.    Mark H. Friedman and Kenneth J. MacFadyen developed this business model and worked with loan servicers, including Chase, as well as LPS to develop a process by which their firm and sham company could conduct foreclosures in Virginia and Maryland as quickly and cheaply as possible.

56.    Further, Mark H. Friedman and Kenneth J. MacFadyen instituted its law-violating policies in order to artificially inflate their "Attorney Performance Rating" in the LPS system and thereby continue to get more foreclosure referrals, to the detriment of trustees and other foreclosure firms that were conducting foreclosures more slowly in an effort to comply with the law.

57.    Mark H. Friedman and Kenneth J. MacFadyen, often acting through Defendant Friedman, provided management and decision-making and operated as the front for contact with the targeted debtor-consumers, the loan servicers, such as Chase in this case, and the third party vendors such as LPS. Meanwhile Defendant F&M existed as an employee-less paper entity that acted as the "substitute trustee" under the target deeds of trust.  Defendant Muncy also acted as a "substitute trustee" under the target deeds of trust, and was often the "substitute trustee" whose

name appears in various documents filed with the Circuit Courts throughout the Commonwealth of Virginia and in correspondence with consumers, including the Plaintiff.

58.     F&M did not operate independent of Friedman. It did not have a separate office, separate management or separate business and income. Instead, the two companies were interrelated and inseparably operated as a single business operation. In fact, since Defendant Friedman has shut down its business operations, so has Defendant F&M.

59.     Additionally, the majority of "officers" of F&M were also employees of Defendant Friedman.

60.     F&M had little or no income that was not directly derived from Friedman.

61.     F&M did not have any employees. Instead, it was a shell entity used by Friedman whose sole purpose was to act as the "substitute trustee" for the mortgage loans that were referred to Defendant Friedman for the purpose of collecting delinquent debts and/or conducting foreclosure sales.

62.     F&M did not act as "substitute trustee" for any deeds of trust that were not referred to Friedman for debt collection and/or foreclosure proceedings.

63.     Similarly, Muncy did not operate as "substitute trustee" independent of Friedman, but acted as "substitute trustee" only for those deeds of trust that were referred to Friedman for collection and/or foreclosure proceedings.

64.     Additionally, Muncy is an attorney who was employed by Friedman at the time he was named "substitute trustee" for various deeds of trust, including the Plaintiff's deed of trust.

65.     Friedman, on the other hand, served as the frontline company that dealt directly with targeted consumer debtors. Friedman directed the actions of the personnel who interacted

with the debtors and with the loan servicers whose mortgage loans were referred to Friedman for debt collection or foreclosure proceedings by LPS.

66. Mark H. Friedman, Kenneth J. MacFadyen and Defendants Friedman, F&M, and Muncy collectively accomplished their debt collection and foreclosure enterprise by instituting foreclosure proceedings against consumers for mortgage loans that were referred to them by various loan servicers, including Chase.

67. The personnel and resources used to accomplish and transact these proceedings are nearly all those maintained in the name of Defendant Friedman. For example, Friedman employees mailed the correspondence regarding the alleged foreclosure sale to consumers, purchased newspaper space for advertisements of the foreclosure sales, and interacted with the loan servicers, such as Defendant Chase, third party vendors, such as LPS, and consumers.

68. In fact, all letters mailed to consumers were printed on Defendant Friedman's letterhead, regardless of whether the alleged substitute trustees purportedly sent or signed the letter, and the documents submitted to the various Circuit Courts purportedly by Defendants F&M or Muncy, the "substitute trustees", were prepared by and often had a return address for Defendant Friedman.

69. When the mortgage loans, including the Plaintiff's, were referred to Defendant Friedman for foreclosure, the Defendants did not actually receive the original note prior to instituting foreclosure proceedings.

70. Rather than locating the entity that was the actual noteholder of the loan or requesting the original note from the servicer prior to commencing the foreclosure process, Defendant Friedman used a false "lost note" letter. Defendants' motive was to streamline the

foreclosure process and to maintain a positive "Attorney Performance Rating" in LPS's system, thereby ensuring that it would continue to receive foreclosure referrals.

71.     In fact, Defendants did not even seek to determine whether or not the note was available. They never contacted the custodian, the servicer or Fannie Mae to make such inquiry.

72.     Once the mortgage loans were referred to Defendant Friedman, it or LPS created a "Substitution of Trustee" document, which they claimed gave the Defendants the authority to conduct a foreclosure sale under the subject deeds of trust. This substitution of trustee document was either created by Friedman employees or, upon information and belief, for a period of time between at least 2006 and 2010, was also created by LPS.

73.     The Substitution of Trustee document created and used by the Defendants and/or LPS was false and improper in several respects.

74.     The document identified the loan servicers as the "Noteholders". These statements were false.

75.     Defendants did this as an alternative to locating and identifying the actual noteholders of the mortgage loan. Again, this was done in an effort to save time and costs with which they are able to conduct foreclosures and thereby maintain a positive "Attorney Performance Rating" in LPS's system, thereby ensuring that it would continue to receive foreclosure referrals from loan servicers.

76.     Defendant Friedman then sent this document to various third-party entities, such as LPS or the loan servicers, purporting to be the "noteholders" via electronic wires or through the mail, at which time they were allegedly signed by individuals claiming to have the authority to appoint substitute trustees under the subject deeds of trust. The document was also allegedly notarized.

77.     At the time these documents were filed, Chase was not the note holder. Neither Chase, LPS nor the Defendants were ever either creditors, note holders or beneficiaries.

78.     Upon information and belief, the individuals who signed these sworn statements on the substitution of trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or legal standing.   Upon information and belief, certain individuals who either signed these statements or purported to notarize them did not do so personally.

79.     Other times, these substitute trustee documents were created and signed by Defendant Friedman's employees or principals, such as Mark H. Friedman, as "attorney in fact" for the "noteholder". Therefore, Defendant Friedman essentially attempted to appoint itself as substitute trustee, using its employees and shell company F&M as no more than arbitrarily and fraudulently named substitute trustees.

80.     Plaintiff's counsel has reviewed numerous substitution of trustee documents prepared and signed by Friedman employees, and upon information and belief, individuals who either signed these statements or purported to notarize them did not do so personally.

81.     In these instances, the first page of these documents does not even have the same font as the signature page. Further, the date on the notary block is filled out with a different pen or marker, presumably by a different individual employed by Friedman and presumably so the dates on the first and second pages match or so that the dates fit into Defendants' timeline.

82.     Plaintiff alleges that it was Defendant Friedman's policy that employees of its law firm sign official legal documents, many times under oath, for other individuals in the firm. Mark H. Friedman and Kenneth J. MacFadyen, not only were aware of this scheme, they developed the

fraudulent process and took part in it. In some cases, Mark H. Friedman and Kenneth J. MacFadyen actually purported to sign the fraudulent substitution of trustee documents and other false affidavits and pleadings, when in reality an undisclosed employee of theirs actually signed the documents.

83. In fact, in two hearings that took place in Baltimore, Maryland, the Friedman employees, Kenneth MacFadyen and Daniel Menchel, admitted to Friedman's practice of having employees sign documents for other attorneys in the law firm.

84. Daniel Menchel testified in *MacFadyen v. Wedmore*, Case No. 240100003525 (Balt. Cir. Ct. May 5, 2011) as follows:

```
1    Q      It is your signature?
2    A      Yes.
3    Q      Okay, and is it notarized?
4    A      Yes.
5    Q      On what date is it notarized?
6    A      June 30th.
7    Q      By whom?
8    A      Joann Sottile.
9    Q      Did you appear in front of Ms. Sottile on
10   that date?
11   A      I did not appear in front of her. I gave her
12   stacks of files to notarize after I'd signed them.
13   Q      I'm going to show you what's again in the
14   same group, same group of exhibits, adjustable rate
15   note. And I'm going to show you -- point to a
16   signature at the top.
17   Can you tell me whose signature that is?
18   A      That's my signature for Kenneth MacFadyen. I
19   signed that after I stamped the note, after I review
20   it.
21   Q      Okay.
22   A      And signed Kenneth MacFadyen's name.
23   Q      And would there have been a reason why you
24   wouldn't have used your own name?
25   A      No. I think we had a stamp that had Kenneth
1    MacFadyen's name on it. And we used that particular
2    stamp on that particular file.
```

85. Additionally, Kenneth MacFadyen testified in *MacFadyen v. Young*, Case No. 24009003576 (Balt. Cir. Ct. May 6, 2011) as follows:

```
21   Q       Let me -- let me show you the order to
22   docket, suit, and affidavit pursuant to Maryland Rule
23   14-207(b). Your name is at the bottom. Do you know
24   who signed your name?
25   A       No, not to this one. It would have been
1    either Daniel Menchel or Jeffrey Huston.
2    Q       But you don't know?
3    A       I don't know which one signed that one.
4    Q       Okay, let me show you, in this case, a deed
5    of removal and appointment of successor trustees
6    which is liber 11916, page 250, second page -- and ask
7    you who signed that one.
8    A       That would be Daniel Menchel. That's not
9    under oath. I believe he had every right to do that.
10   Q       Okay, but that would be Daniel Menchel's
11   signature?
12   A       That's a Daniel Menchel signature.
13   Q       Okay, let me show you an Atlantic bond, and
14   it's bond number 108147, and ask who signed that.
15   A       That looks to me like a Jeffrey Huston
16   version of Kenneth MacFadyen.
```

86. Plaintiff alleges that these actions also took place with respect to the substitution of trustee document in his case.

87. These documents are a legal nullity and do not actually authorize Defendants F&M or Muncy to act as substitute trustees.

88. Friedman used its employees to sign as attorney in fact for the loan servicers because doing so allowed the Defendants to process foreclosures at a much higher rate, thereby ensuring that Defendant Friedman maintained a positive "Attorney Performance Rating" and continued to receive foreclosure referrals through LPS's system. Without the need to send the document to the actual entity or persons with the authority to appoint a substitute trustee, either electronically or through the mail, Defendants were able to speed up the foreclosure process by

days or even weeks. LPS and Chase were well aware that Defendant Friedman was using its own employees to sign these documents as "attorney in fact" for Chase, and turned a blind eye to the improper signatures for the sake of speeding up the foreclosure process, increasing their bottom lines, and ultimately increasing the profitability of their enterprise. In fact, for a significant portion of time, LPS also engaged in falsifying signatures and notarizations of documents for the same purpose.

89.     After preparing the substitution of trustee documents, Defendants Friedman, Muncy, and/or other Friedman employees then began the process of mailing various letters and notices of foreclosure to consumers, including copies of these fraudulently created substitute trustee documents.

90.     Upon information and belief, these letters were form letters that Defendants sent to every consumer from whom it attempted to collect a debt and for whom it attempted to conduct a foreclosure sale of the consumer's home, including the Plaintiff in this case.

91.     Defendants sent three form letters to every consumer for whom they conducted or attempted to conduct a foreclosure sale.

92.     Defendant Friedman's first letter was its initial correspondence letter (sample letters attached hereto as Exhibit "B"). This letter informed the consumer that their loan "has been referred to this office for legal action based upon a default under the terms of the Mortgage/Deed of Trust and Note. This office has been retained to institute foreclosure proceedings under the loan agreement."

93.     Defendant Friedman's letter also identified the consumer's loan servicer as "the current noteholder and/or servicer" of the loan.

94.     This initial correspondence letter also attempted to provide the disclosures required by the FDCPA at 15 U.S.C. § 1692g, provided an alleged amount due on the loan, and outlined the consumers' debt validation rights.

95.     However, the letters listed the relevant loan servicers as the creditor to whom the debt is owed, rather than the actual noteholder of the loan. At no point thereafter did Friedman provide consumers with the actual noteholder of the loan, but continued to identify the servicer as the noteholder in the rest of its correspondence with consumers.

96.     Defendant Friedman then sent consumers a second letter, a "lost note letter", which was typically dated the same as its initial correspondence letter (sample letters attached hereto as Exhibit "C"). This letter informed the consumer "the undersigned has been appointed by [the loan servicer] as trustee . . . for the purpose of foreclosing on the Deed of Trust/Mortgage. [The loan servicer] is the holder/servicer of the Note."

97.     This letter went on to state that Defendants Friedman/Muncy "do not have the original note in our possession at this time. We do have evidence of the indebtedness referenced above. We have been informed by the Lender that they will forward the original note to us."

98.     This form letter was sent to consumers regardless of whether the consumer's note has been lost or not. In fact, it was sent to consumers whose original note had actually been lost and could not be forwarded by the "Lender".

99.     This statement was made so that Defendant Friedman's claim of authority to foreclose appeared more legitimate and was less likely to be questioned by consumers.

100.     Additionally, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers. For example, the subject line of these letters is "[the loan servicer] v. [the consumer]".

101.    The "undersigned" of this initial letter who "has been appointed by [the loan servicer] as trustee" was actually Defendant Friedman. Defendant Muncy also signed the letter on behalf of Defendant Friedman. At no point was Defendant Friedman ever even allegedly appointed substitute trustee (except in these letters), including in the substitute trustee document that claims to appoint Defendants Muncy and F&M each as substitute trustees.

102.    The third form letter that Defendant Friedman sent to consumers provided notice of a scheduled foreclosure sale date as well as a copy of the alleged substitute trustee document (sample letters attached hereto as Exhibit "D").

103.    Again, the subject line of this letter was styled so as to appear that a lawsuit had been filed or was pending against the consumers: "[the loan servicer] v. [the consumer]".

104.    This second letter also contains the following closing:

Very truly yours,

FRIEDMAN & MacFADYEN, P.A.

Substitute Trustee

105.    The notice of the sale, which was also published in newspapers local to the property location, named Defendants Muncy and F&M as substitute trustees. However, for any further information sought about the sale, prospective buyers were directed to contact Defendant Friedman.

106.    These letters all contained similar misrepresentations, including but not limited to, an incorrectly identified "noteholder" of the loan, which was actually the loan servicer, a misrepresentation that Defendant Friedman was the substitute trustee, and a misrepresentation that a lawsuit had been filed or was pending against the consumer.

107.     In some cases, Defendant Friedman also sent additional form letters to consumers. These additional letters were sent when consumers requested reinstatement quotes or payoff amounts (sample letters attached hereto as Exhibit "E").

108.     The "reinstatement quote" letter attempted to provide an amount needed to bring the consumer's loan current. It contained the following language: "This responds to your recent request for the amount necessary to reinstate the above referenced loan and to resolve the pending action."

109.     The letter further stated, "After reinstatement, you will be required to sign the appropriate documents and take other requested action to assist in obtaining a withdrawal of the action. These statements were misleading in that there was no pending action, and these statements misrepresented that there was a filed lawsuit in order to intimidate consumers.

110.     The "payoff statement" letter contained the following statement: "Upon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action and obtain a dismissal of the action."

111.     Again, this was a misrepresentation, as there are no judicial foreclosures in Virginia, nor were there any "actions" that were filed by Defendant Friedman or that Defendant Friedman intended to file in order to conduct a foreclose sale.

112.     Additionally, the payoff statement letter also contained the following: "The information in this letter was provided by [the loan servicer] and Friedman & MacFadyen, P.A. [The loan servicer] acts as the mortgage loan servicer for the investor that owns your loan. The investor has authorized [the loan servicer] to provide this information and to act on its behalf."

113.     Defendants Friedman, Muncy & F&M were well aware that there is a difference between the loan servicer and the investor/noteholder/owner of consumers' loans. However, they

chose to misrepresent otherwise for easier and speedier foreclosures, to maintain a positive "Attorney Performance Rating", and to continue to receive foreclosure referrals.

114. Additionally, Defendants often misrepresented the amount due on the loan in its reinstatement quotes and its payoff statements by including attorneys' fees and costs which either had not actually been accrued or were greater than the amount they were contractually entitled to for conducting the foreclosure from the investor or noteholder.

115. Consumers relied on these false documents when they subsequently contacted or paid money to Defendants (or even the loan servicers) in attempt to save their homes or when they relocated their families after foreclosure, with the mistaken belief that any of the Defendants were validly appointed substitute trustees and had the authority to sell their homes.

116. Defendants then (or before the letter was even sent) advertised the foreclosure "trustee sales" in local newspapers throughout Maryland and Virginia naming Defendants F&M and Muncy as the substitute trustees and the contact for information about the property and the foreclosure sale as Defendant Friedman. As with the letters that were mailed to consumers, these advertisements were purchased and obtained by Defendant Freidman's employees.

117. These foreclosure sale notices were mailed to consumers throughout Virginia and Maryland using the United States post office.

118. Once the alleged foreclosure sale occurred, Defendants F&M and Muncy purported to create a "Trustees Deed" in which the alleged substitute trustees conveyed the subject property to a grantee. Similar to the other actions, this document was created by Defendant Friedman, and allegedly signed by one of the substitute trustees. Upon information and belief, after reviewing a substantial amount of documents allegedly containing Muncy's

signature, these documents were not actually signed by Muncy. Upon information and belief, other Friedman employees signed Muncy's name on the document.

119.    Further, the grantee listed in the Trustee's Deed was often not the last and highest bidder at the foreclosure sale, but was instead a third party or subsequent purchaser. Pursuant to consumers Deeds of Trust, most of which contain standardized language, after a foreclosure sale, "Trustee . . . shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale . . . ." Additionally, "Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title.

120.    The Defendants consistently fail to do this and instead, when the loan servicer is the purchaser and last and highest bidder, Defendants often grant the property to a third party, such as Fannie Mae. This is done to avoid the imposition of a certain taxes and fees.

121.    After the foreclosure sale, the Defendants subsequently make similar misrepresentations in its trustee accounting report and the documents submitted therewith, to various Commissioners of Accounts across the Commonwealth of Virginia (samples attached hereto as Exhibit "F").

122.    For example, and without limitation, the Defendants list the loan servicer as the noteholder, list a third party as the last and highest bidder, when in reality the loan servicer was the last and highest bidder, and fail to include the "admin fee" paid to LPS.

123.    In accounting statements, Defendants often list the investor or actual owner of the loan as the last and highest bidder—when in reality, the noteholders or investors typically do not bid but depend on their loan servicers to do so—and lists the loan servicer as the noteholder. This is a clear misrepresentation.

124. Plaintiff's counsel has reviewed a considerable amount of documents created by Defendants, which were subsequently mailed to consumers or to the Commissioner of Accounts in the Circuit Courts across the Commonwealth of Virginia, and has identified a pattern and practice of fraudulently created documents.

125. The principles, Mark H. Friedman and Kenneth J. MacFadyen, developed and oversaw these procedures. They knew that their actions, as well as the actions of Defendants Friedman, F&M, and Muncy were not in accordance with the law. Defendants Mark H. Friedman and Kenneth J. MacFadyen also knew that the firm's correspondence contained misrepresentations and that the signatures on the substitution of trustee documents were, more often than not, forged. However, Defendants at the direction of their principals Mark H. Friedman and Kenneth J. MacFadyen, continued to conduct foreclosures in this manner so that the firm would maintain a positive "Attorney Performance Rating in LPS's system and therefore continue to receive foreclosures referrals from LPS.

126. Defendants were wholly unprepared to act as trustees as they were incentivized to foreclose regardless of whether a foreclosure sale should actually proceed. They typically did not have the notes, did not know whether the borrowers had been offered HAMP modification, did not know whether the prerequisites to foreclosure—especially for FHA or VA loans—had been met, etc., all of which could have caused the foreclosure timelines to be extended, resulted in foreclosure sale cancellations, and caused their "Attorney Performance Rating" to change to "red", ultimately causing them to lose any future foreclosure referrals. In fact, in most circumstances, they may not even have contact directly with the servicer, let alone the holder, beneficiary or creditor for the note.

127.    Because of the (mostly monetary profit) incentives from loan servicers, investors, and other third party vendors, like LPS, towards speedy foreclosures without regard to propriety or the law, Defendants Friedman, F&M and Muncy were in no way impartial or neutral trustees under the Deeds of Trust.

128.    Defendants were typically paid less than a thousand dollars per foreclosure they conducted, from start to finish. After subtracting the referral fee/kickback that went to Defendant LPS, this required them to conduct foreclosures at a large enough quantity and with minimal attorney or staff time in order to remain profitable. Therefore, quality and impartial discretion was sacrificed for speed, and the careful attention to detail that is required when pursuing a course of action that will expel people from their homes was simply nonexistent.

129.    Additionally, when LPS's "Attorney Performance Rating" was taken into account, it added another layer of incentives for Friedman, F&M, and Muncy to conduct foreclosures at the quickest possible speed and automation without regard for any fiduciary duties they owed to the borrower as "substitute trustees" under the subject Deeds of Trust.

130.    Additionally, the pricing scheme under which Defendants are paid further incentivized them to conduct foreclosures sales as quickly as possible without regard to the requirements of the law, rather than working with the consumer debtor to help them remain in their homes, despite the fact that it is actually more beneficial to the investors that loss mitigation is pursued rather than foreclosure.

131.    The low fees paid per foreclosure are rather significant when considering that Friedman's and F&M's *only* source of revenue was the fees they collected from foreclosures, unlike other debt collector law firms that collect various types of consumer debts in addition to foreclosures. Any delay in the foreclosure sale to ensure possession of the necessary documents

(such as acceleration letters, notes, lost note affidavits), or even whether prerequisites to foreclosure had been met, not only increased the possibility of reinstatement, but also increased the costs and expenses of these Defendants' sole source of revenue—the flat-fee they received to conduct foreclosures.

132.    This additional compensation, plus the increased cost of complying with the law, motivated these Defendants' deceptive conduct, which can only be characterized as pecuniary— not as perfectly fair and impartial.

**Defendants' Specific Conduct Regarding Allen Chatter**

133.    Plaintiff alleges that each of the preceding allegations regarding the Defendants' conduct and scheme to defraud consumers was also engaged in against the Plaintiff. The Plaintiff specifically incorporates and adopts for his own specific allegations the details of systemic conduct alleged in the preceding paragraphs.

134.    Plaintiff borrowed $423,675.00 for his mortgage, as evidenced by a promissory note dated February 20, 2008 (hereafter "the Note"). The Note was payable to First Horizon Home Loans (hereafter "First Horizon").

135.    The Note was secured by a deed of trust dated February 20, 2008 (hereafter the "Deed of Trust") and recorded in the Clerk's office of the Fairfax County Circuit Court.

136.    Plaintiff's Note and Deed of Trust obligated him to repay First Horizon.

137.    At some point, Defendant Chase became the servicer of Plaintiff's loan. As servicer, Chase acted on behalf of the owner of the loan to conduct certain customary servicing functions such as collecting and recording payments, communicating with the homeowner, and assessing late fees.

138. Plaintiff's mortgage loan was a U.S. Department of Veterans Affairs ("VA") guaranteed loan, and as such is insured against loss if the loan goes into default.

139. Because of this low-risk status, the VA expressly incorporated certain provisions and guidelines into the Deed of Trust that requires note holders and servicers to abide by a defined set of regulations and procedures as codified under Title 38 of the United States Code and in regulations issued by the VA.

140. Plaintiff's Deed of Trust includes a VA Guaranteed Loan and Assumption Policy Rider which contains the following language: "This VA Guaranteed Loan and Assumption Policy Rider is made this 20th day of February, 2008, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith . . . ."

141. The VA Policy Rider goes on to state the following:

> VA Guaranteed Loan Covenant: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
>
> If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of an sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

142. "The Secretary [of Veteran's Affairs] has the authority to prescribe all rules and regulations which are necessary to carry out the laws administered by the Department [of Veteran's Affairs] and are consistent with those laws . . . ." 38 U.S.C. § 501. This includes "any

rule, regulation, guideline, or other published interpretation or order . . . issued pursuant to the authority granted by this section or any other provision of this title." *See id.*

143.    As part of the authority granted to the VA and its Secretary to carry out the VA guaranteed loans program, the VA developed the VA Servicer Guide[8].

144.    Defendant Chase is well aware of these requirements, and further agrees to abide by the laws and regulations of the VA by accepting the servicing rights and obligations of a VA guaranteed mortgage.

145.    In fact, the VA unambiguously states to loan servicers of VA guaranteed loans: "Clear guidelines on program administration: VA gives you clear guidelines on all aspects of servicing VA loans. These functions include current and delinquent servicing, loss mitigation, foreclosure, transfers of custody, claim submission, and event reporting. ***Since you act on VA's behalf, you are expected to comply with VA guidelines***." VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 1–2 (Version 1.2 July 2009) (emphasis added).

146.    Additionally, as stated in Plaintiff's Deed of Trust, the VA laws, Regulations, and guidelines govern the rights, duties, and liabilities of both the borrower and the lender. These laws, regulations, and guidelines were instituted to protect borrowers and "ensure veterans receive every reasonable opportunity to retain their homes". VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 2 (Version 1.2 July 2009)

147.    These laws and regulations require that the loan-servicing program be maintained in such a way as to assure prompt responses to inquiries from borrowers. 38 C.F.R. 36.4278(b)(1).

---

[8] A copy of this guide can be found at
www.benefits.va.gov/homeloans/docs/va_servicer_guide.pdf

148. The VA regulations further require that "[i]n the event the holder has not established contact with the borrower(s) and has not determined the financial circumstances of the borrower(s) or established a reason for the default or obtained agreement to a repayment plan from the borrower(s), *then a face-to-face interview with the borrower(s) or a reasonable effort to arrange such a meeting is required*." 38 C.F.R. 36.4278(g)(iv).

149. Additionally, the VA Servicer Guide provides:

VA prefers[9] that you first consider loss mitigation options that keep the veteran in their [sic] home. VA requires you to choose the best option for all parties and asks that you consider options as early in the delinquency as possible.
     . . . .

*When alternatives to foreclosure are not possible*, the loan should be referred for foreclosure as quickly as possible. VA encourages you to continue to pursue loss mitigation options even after initiating the foreclosure process. If a loss mitigation option looks promising, *VA would expect you to postpone the foreclosure action*.

VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 72–73 (Version 1.2 July 2009) (emphasis added).

150. The VA Servicer Guide further requires that, "[servicers] have the primary role in loss mitigation. [Servicers] are *required* to comply with VA regulations for considering and completing loss mitigation options." VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 72 (Version 1.2 July 2009) (emphasis added).

151. The VA Servicer guide provides detailed instructions on how to complete evaluations for loss mitigation options, and in fact, devotes an entire section to loss mitigation. *See* VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE § 5 (Version 1.2 July 2009).

---

[9] This was updated to reflect a "preferred" order of considering loss mitigation options in July 2009. The VA Servicing Guide "required" servicers to first consider loss mitigation options at the time Plaintiff's mortgage contract was entered into.

152.    The VA preferred order for home retention options or alternatives to foreclosure consists of 1) repayment plan, 2) special forbearance, 3) loan modification, 4) compromise sale, 5) deed-in-lieu of foreclosure, and finally, *if all of those options fail*, 6) foreclosure. *See* Veterans Benefits Admin., U.S. Dep't of Veterans Affairs, VA Servicer Guide 73 (Version 1.2 July 2009).

153.    "Once [servicers] have evaluated all loss mitigation options and determined that they were infeasible, [they] can refer a loan to foreclosure." Veterans Benefits Admin., U.S. Dep't of Veterans Affairs, VA Servicer Guide 96 (Version 1.2 July 2009).

154.    "If the default cannot be resolved through loss mitigation options, [servicers] may refer a loan for foreclosure. . . . As mentioned in Chapter 5, Loss Mitigation, [servicers] are encouraged to pursue a loss mitigation option even if [they] have already referred a case to foreclosure." Veterans Benefits Admin., U.S. Dep't of Veterans Affairs, VA Servicer Guide 97 (Version 1.2 July 2009).

155.    "Failure to consider a loss mitigation option – *[Servicers] are required to pursue loss mitigation options before referring a loan to foreclosure* unless there are extenuating property circumstances that create the need to accelerate foreclosure. Otherwise, if [they] do not consider a loss mitigation option, this results in a determination of inadequate servicing." Veterans Benefits Admin., U.S. Dep't of Veterans Affairs, VA Servicer Guide 99 (Version 1.2 July 2009) (emphasis added).

156.    "If VA determines that [the servicer was] at fault for a failure to complete an approved loss mitigation option, this results in inadequate servicing on the loan." Veterans Benefits Admin., U.S. Dep't of Veterans Affairs, VA Servicer Guide 99 (Version 1.2 July 2009).

157.     "If foreclosure is the *only available option*, [servicers] must follow state foreclosure law, schedule the foreclosure sale, order an appraisal, determine net value, determine the foreclosure sale bid, and report foreclosure sale events to VA." VETERANS BENEFITS ADMIN., U.S. DEP'T OF VETERANS AFFAIRS, VA SERVICER GUIDE 94 (Version 1.2 July 2009) (emphasis added).

158.     The VA unambiguously and clearly reiterates the requirement that servicers of VA guaranteed loans first pursue and consider loss mitigation options prior to foreclosure.

159.     As servicer of a VA guaranteed loan, Chase was obligated by contract and by law to follow the VA's instructions for servicing Plaintiff's loan.

160.     Around early to mid-2010, Plaintiff began experiencing financial hardship and sought assistance from Chase in the attempt to make his loan payments more affordable and prevent foreclosure. Around May of 2010, Plaintiff submitted a complete application for a loan modification to Chase.

161.     After sending Chase the completed modification application, Plaintiff called Chase to verify its receipt. Chase verified that it had received the application.

162.     Despite the explicit instructions from the VA, Plaintiff's request for assistance went ignored. Chase never evaluated his financial circumstances, established the reason for his default or obtained an agreement for a repayment plan, let alone even contacted Plaintiff to inform him whether his loan modification was approved or denied.

163.     Chase never offered nor made any attempts to arrange a face-to-face interview with the Plaintiff.

164.     Despite the VA's clear instructions that Chase evaluate Plaintiff's financial condition and consider loss mitigation options, Chase failed to do so.

165.    Instead, Chase referred Plaintiff's loan to foreclosure.

166.    Chase's conduct during its servicing and attempted foreclosure of Plaintiff's mortgage loan perfectly captures the type of conduct that led to its participation in the national mortgage settlement and countless lawsuits against it across the country. Additionally, it exemplifies Chase's role in the present enterprise.

167.    Upon information and belief, Plaintiff's foreclosure referral took place electronically using the wires. Upon information and belief, Chase uses computer programs, such as LPS's software program LPS Desktop, in which an account is flagged for foreclosure and then the information is transmitted electronically for foreclosure processing.

168.    Upon information and belief, around mid-late July of 2010, Chase electronically referred Plaintiff's loan to LPS for foreclosure using LPS's MSP or Desktop software.

169.    Upon information and belief, around mid-late July of 2010, LPS then electronically referred Plaintiff's loan to Defendant Freidman for instituting foreclosure proceedings using LPS's Desktop software.

170.    Around late July of 2010, Defendant Friedman—also using its shell entity, Defendant F&M, and its employee, Defendant Muncy, as alleged substitute trustees—began sending various correspondences to the Plaintiff in an attempt to collect the alleged debt and further threatened that if the amounts demanded were not paid, they would conduct an alleged foreclosure sale. Upon information and belief, Defendant Friedman maintains copies of these letters in its records that can be more specifically identified once produced in discovery.

171.    Upon information and belief, these correspondences were the same form correspondences that Defendants sent to every consumer who they attempted to collect a debt

and conduct a foreclosure sale on their home. Therefore, upon information and belief, these form correspondences were sent not only to the Plaintiff, but to the putative class members as well.

172. Defendant Friedman mailed its initial correspondence to Plaintiff, using the United States Postal Service, sometime around July 27, 2010. Plaintiff alleges that the initial letter Defendant Friedman sent to him was the same or substantially the same as the form letters attached as Ex. B.

173. Upon information and belief, once this letter was sent, Defendant Friedman updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Chase.

174. Upon information and belief, this letter from Defendant Friedman stated that Chase Home Finance, LLC retained it to foreclose on Plaintiff's home for his alleged failure to make mortgage payments.

175. Upon information and belief, this correspondence stated that Chase Home Finance, LLC was the "current noteholder and/or servicer" of Plaintiff's loan and provided an alleged amount of indebtedness due from the date of default.

176. This letter was sent using Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

177. Upon information and belief, Defendant Friedman mailed its second correspondence to Plaintiff, the "lost note letter", using the United States Postal Service, sometime around July 27, 2010. Plaintiff alleges that the "lost note letter" Defendant Friedman sent to him was the same or substantially the same as the form letters attached as Ex. C.

178. Upon information and belief, once this second letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Chase.

179. Upon information and belief, the subject line of the letter Defendants sent to him was styled "Chase Home Finance, LLC v. Allen Chatter."

180. This subject line of the letter to Plaintiff was styled as if a lawsuit was pending or was to be filed. However, none of the Defendants ever filed or intended to file a lawsuit against Plaintiff.

181. Upon information and belief, the first sentence of this letter to Plaintiff stated, "The undersigned has been appointed by Chase Home Finance, LLC as trustee under the referenced Deed of Trust/Mortgage (the "Trustee") for the purpose of foreclosing on the Deed of Trust/Mortgage. . . . We are writing to tell you that we do not have the original note in our possession at this time. We do have evidence of the indebtedness referenced above."

182. The letter further stated that Defendants "have been informed by the Lender that they will forward the original note to us." Upon information and belief, this statement was false. In fact, Chase was never in possession of the note. Further, upon information and belief, the Plaintiff alleges that Defendants did not ever request custody of the note until at least, if at all, the date of the scheduled foreclosure. Defendants possessed no information to believe or represent that the note was "unavailable."

183. Upon information and belief, this letter was sent with Defendant Friedman's letterhead and was signed by Defendant Muncy on behalf of Defendant Friedman.

184. Upon information and belief, sometime between July 27, 2010 and August 10, 2010, Defendants Friedman, F&M, and Muncy mailed another letter to Plaintiff, using the

United States Postal Service, in which they provided notice of a foreclosure sale and provided copy of alleged substitution of trustee document. Plaintiff alleges that the notice of sale correspondence that Defendant Friedman sent to him was the same or substantially the same as the form letters attached as Ex. D.

185. Upon information and belief, once this notice of sale letter was sent, Defendant Friedman again updated the event in the LPS Desktop program, which was transmitted electronically to both LPS and Chase.

186. Defendants' letter to the Plaintiff also included the Substitution of Trustee document attached hereto as Exhibit "G".

187. The alleged Substitution of Trustee document was dated July 22, 2010, and was subsequently filed in the Fairfax County Circuit Court on August 20, 2010.

188. Upon information and belief, the Defendants mailed this document to the Fairfax County Circuit Court, using the United States Postal Service, when it requested that it be filed with the Fairfax County land records.

189. This document stated that Chase Home Finance, LLC was the Noteholder of Plaintiff's mortgage loan at the time that it was prepared. Upon information and belief, this statement was false.

190. The Substitution of Trustee document stated that Chase had appointed Defendants F&M and Muncy as substitute trustees.

191. Defendants claim that the Substitution of Trustee document gave them the authority to foreclose on Plaintiff's home, by appointing Defendants Muncy and F&M each as substitute trustees.

192.    Plaintiff's Deed of Trust contains specific provisions for the sale of his Note and the change of loan servicer. Specifically, section 20 states:

> The Note (together with this Security Instrument) can be sold one or more times without prior notice to the Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note.

193.    Plaintiff's Deed of Trust explicitly recognizes a difference between the "Loan Servicer" and the "Noteholder".

194.    In section 24, Plaintiff's Deed of Trust provides that only the "Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all title, power and duties conferred upon Trustee herein and by Applicable law."

195.    Section 22 of Plaintiff's Deed of Trust provides the Lender with the right of acceleration and to invoke a power of sale.

196.    Plaintiff's Deed of Trust identifies the Lender of his mortgage as First Horizon Home Loans. Any authority Chase possesses to appoint a substitute trustee would have to come from First Horizon or a subsequent noteholder. No such authority appears to exist.

197.    The Substitution of Trustee document was purportedly signed by Mark H. Friedman, as "Attorney-in-Fact" for the purported Noteholder on July 22, 2010 and was thereafter allegedly notarized.

198.    At some point after that, the date on the notary block was filled out, presumably once the first page of the document was created so that the dates would match. Plaintiff alleges this based on the different font typefaces that can be seen on the document, as well as the

different types of pens that were used for the signature of Mark. H. Friedman, the notary, and the date blocks.

199.    Therefore, Defendant Friedman essentially attempted to appoint itself, using its employees and shell company F&M, as substitute trustee. Defendant Friedman does this in order to process foreclosures at a much faster speed, with complete disregard for the Plaintiff's rights, the lack of authority it possesses to appoint itself or its employee/shell company as substitute trustee.

200.    Again, this Substitution of Trustee document was a form document used by the Defendants, and Plaintiff alleges that it was Defendants policy and procedure to have Mark Friedman (or someone on his behalf) sign these documents as "Attorney-in-Fact" of the loan servicer, have it notarized at a later time, and have the notary block filled in at an even different time.

201.    Upon information and belief, the signature on Plaintiff's alleged substitute trustee document is not the actual signature of Mark. H. Friedman.  Upon information and belief, and based on prior testimony of Mark H. Friedman and Kenneth J. MacFadyen, it was Defendant Friedman's policy to have other undisclosed persons sign Mark H. Friedman's name to these allegedly official documents.

202.    Upon information and belief, the individual who thereafter allegedly notarized the Substitution of Trustee document purporting to have personal knowledge of the facts contained in the sworn statement or the legal standing to take the actions described therein, did not have such personal knowledge or such legal standing.  Upon information and belief, the alleged notary, Caitlyn Lynn Carter, who purported to notarize the document, did not do so personally, nor was the signature of Mark H. Friedman signed in her presence. Upon information and belief,

and based on prior testimony of Mark H. Friedman and Kenneth J. MacFadyen, it was Defendant Friedman's policy to have undisclosed persons notarize documents on behalf of others, and for those documents to be notarized at a later time than when the documents were actually signed.

203. As a result, this alleged Substitution of Trustee document was null and void, and did not actually appoint Defendants F&M and Muncy as substitute trustees.

204. At no time did the Defendants disclose the actual noteholder or owner of Plaintiff's loan.

**Defendants Were Fiduciaries Under the Deed of Trust**

205. Defendants claimed that they were appointed substitute trustees under Plaintiffs' Deed of Trust.

206. Although Defendant Friedman never claimed to be a substitute trustee in the substitution of trustee document, it did so in letters to the Plaintiff (and other consumers). Also, Defendant Friedman acted interchangeably with the actual allegedly appointed substitute trustees throughout the foreclosure process

207. Well-established Virginia law provides that a trustee under a deed of trust is a fiduciary for both the borrower and the noteholder and must act impartially between them and with the caution of a reasonably prudent person.

208. Additionally, in executing the trust, the trustee must substantially conform to the stipulations of the deed of trust.

***Defendants' Duty of Notice***

209. Paragraph 22 of Plaintiff's Deed of Trust, among other things, creates the following duties for a trustee: "If Lender invokes the power of sale, Lender or ***Trustee shall*** give

to Borrower, the owner of the Property, and all other persons, ***notice of sale*** as required by ***Applicable Law***."

210.     Accordingly, Plaintiffs' Deed of Trust required Defendants to provide notice in accordance with applicable law, which is defined in the Deed of Trust "as all controlling federal, state and local statutes, regulations, ordinances and administrative rules and order (that have the effect of law) as well as all applicable final non-appealable judicial opinions."

211.     As mentioned above, Defendant failed to provide notice of the sale in accordance with applicable law, including, but not limited to, Virginia Code § 55-59.1(B). Instead, Defendant intentionally breached the requirements of Code § 55-59.1 in order to conduct foreclosures at the fastest speed with lowest cost possible and without regarding to its duties in the Deed of Trust.

212.     The Virginia Code is clear that if the mortgage note is lost or cannot be produced AND the beneficiary submits to the trustee a "lost note affidavit", only then can the trustee proceed to foreclosure sale, provided that written notice has been sent to the consumer that the note is lost or unavailable and that upon expiration of 14 days from the date of mailing, the beneficiary of the note will request the trustee proceed to sale.

213.     This statute provides a clear timeline that the owner of the loan, Chase, Friedman, F&M, and Muncy routinely ignore. If a note is lost or cannot be produced, the following steps must be taken: 1) the beneficiary submits to the trustee a lost note affidavit; 2) the beneficiary provides written notice to the homeowner that the note is lost or unavailable and that request for sale will be made of the trustee upon expiration of 14 days from the date of mailing that notice; and 3) after 14 days of mailing the notice to the consumer, the beneficiary can request that the trustee proceed to sale.

214.     Instead of complying with this statutory obligation, which is incorporated to Plaintiff's Deed of Trust in Paragraph 22, Defendants send a blanket "lost note letter" to every consumer, including the Plaintiff, claiming that their note is unavailable. This is merely a scheme to bypass the requirements set forth under Virginia law, and to increase the speed with which foreclosures can be processed. Waiting for a lost note affidavit from Fannie, as well as waiting for the written notice to the consumer that the note is lost would add weeks to the timeline, thus Defendants simply omit their obligations under the Deed of Trust for the sake of speed.

215.     Defendants were aware of this requirement, but insisted on instituting foreclosure proceedings against the Plaintiff and other homeowners without providing the requisite notice or obtaining the documents needed to conduct the foreclosure proceedings.

216.     Instead, Defendants did not require *any* documents, aside from a one-page referral form from Chase or LPS prior to attempting to conduct a foreclosure sale.

217.     Moreover, the Trustee's duty of notice is predicated on the "[l]ender invoking the power of sale." Despite this prerequisite, upon information and belief, Defendants never actually communicated with Plaintiff's lender.

218.     Additionally, Defendants further breached their fiduciary duty of notice by identifying Chase Home Finance, LLC as the beneficiary of the Note pursuant to Code § 55-59.1(B). In particular, Defendants' lost note letter to the Plaintiff, provides "[i]f you believe that you may be subject to a claim by any person or entity other than Chase Home Finance, LLC to enforce the Note, then you may petition the Circuit Court of the county or city where the property of some part thereof lies for an order requiring Chase Home Finance, LLC to provide adequate protection against such claim."

219.     This notice directly violates Code § 55-59.1(B), which is incorporated into Defendants' fiduciary duties pursuant to Paragraph 22 and provides "[t]he notice shall further advise the person required to pay the instrument that if he believes he may be subject to a claim by a person other than the beneficiary to enforce the instrument, he may petition the circuit court of the county or city where the property or some part thereof lies for an order requiring the beneficiary to provide adequate protection against any such claim."

220.     At all times relevant hereto, Defendants had knowledge that Chase Home Finance, LLC was not the beneficiary or holder of the Note as proscribed in Code § 55-59.1(B). Nevertheless, Defendants identified Chase as the beneficiary to expedite the foreclosure with the lowest cost structure, despite the VA's guidelines that loss mitigation options were evaluated prior to instituting foreclosure proceedings.

221.     This conduct constitutes a breach of Defendants' fiduciary duty of notice as provided in Paragraph 22 of Plaintiffs' Deed of Trust.

***Defendants' Duty to Advertise***

222.     Paragraph 22 of the Deed of Trust also confers upon a trustee the duty to advertise the sale by public notice in accordance with Applicable Law.

223.     Upon information and belief, Defendants—in effort to expedite foreclosures—often advertised the sale date before any substitution of trustees deed was executed, and did so as to the Plaintiff.

224.     Thus, Defendants breached their fiduciary duty under Paragraph 22 by advertising the foreclosure when they had no present right to do so.

225.     Moreover, implicit in Defendants' duty to advertise is that Defendants were properly appointed as substitute trustee under the Deed of Trust, which they were not.

226.     Specifically, Paragraph 24 of the Deed of Trust states "[l]ender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law."

227.     Because Defendants improperly appointed themselves without the knowledge of the Lender, any exercise of the duty of advertisement conferred by the Deed of Trust was not authorized under the express terms therein.

### *Duty to Refrain from Personal Interest Conflicting with Interest*

228.     Further, a trustee must refrain from placing himself in a position where his personal interest conflicts with the interests of those parties for whom he acts as a fiduciary.

229.     Upon information and belief, the alleged Substitute Trustees maintain a financial interest in Defendant Friedman. Defendant F&M is a company that consists of many of the same persons employed by Defendant Friedman while Defendant Muncy was employed by Defendant Friedman.

230.     This financial interest is well beyond that which is typically permitted between entities, as explained throughout this complaint. Defendants Friedman, F&M, and Muncy are incentivized to process foreclosures without any regard to the interests of the consumer. They are motivated purely by their own financial gain, and thus none of these parties is an impartial or neutral "substitute trustee".

231.     In fact, Defendant Muncy has consistently maintained in the related *Goodrow* matter that he and the law firm that he works for each have an attorney-client relationship with every possible entity involved – the supposed investors, noteholders and servicers – on the loans that he ultimately attempts to foreclose upon, and has refused to answer questions regarding his

interactions with those entities at a deposition, citing the attorney-client privilege as the basis for

not disclosing such information:

    9      Q   Okay.  At the time you sent this letter,
10  what evidence of the indebtedness did you have?
11      A   We had the information contained in the
12  referral, not limited to this header document that you
13  have gone through, Exhibit 3.
14      Q   What other information did you have in the
15  referral?
16       MR. BIONDI:  I'm going to object to
17  attorney/client privilege.  The referral would include
18  instructions and requests for advice from a client to
19  Mr. Muncy or lawyers in his firm.
20      **MS. KELLY:  So you're instructing him not**
21  **to answer obviously?**
22      **MR. BIONDI:  Yes.**
23      MS. KELLY:  Just to clarify, are you
24  instructing Mr. Muncy not to answer regarding anything
25  else that may be in the referral documents?

    1      MR. BIONDI:  You had asked what other
    2  information was communicated to Mr. Muncy, who's the
    3  attorney at Friedman & MacFadyen, by the clients,
    4  which is Met Life Home Loans.
    5      MS. KELLY:  In the referral.
    6      MR. BIONDI:  In the referral, which I
    7  don't know what could be in there, whether there's
    8  going to be advice, request for advice, instructions.
    9  Those matters are reasonably to be anticipation of
10  litigation at this point.  I'm sorry.  Take that back.
11  Not litigation.  But it's definitely part of the
12  attorney/client relationship and the purpose of the
13  representation conducting the foreclosure.

16      Q   What instructions did you receive from
17  First Horizon regarding Mr. Goodrow's mortgage loan?
18      **MR. BIONDI:  Don't answer that question.**
19  **Attorney/client privilege.**
20      Q   Did you communicate with First Horizon to
21  verify that they were the noteholder of Mr. Goodrow's
22  mortgage loan?
23      MR. BIONDI:  Wait a minute.  Same
24  objection.

1    BY MS. KELLY:
2        Q    Did you communicate with Met Life at all
3    to verify who the noteholder was regarding
4    Mr. Goodrow's mortgage loan?
5            MR. BIONDI:  I think I have the same
6    objection.  You're trying to avoid the substance, but
7    you're trying to substitute the substance into the
8    question and then asking the question.
10       Q    Did you communicate with Fannie Mae
11   regarding their investment in Mr. Goodrow's mortgage
12   loan?
13           MR. BIONDI:  I object.  Attorney/client
14   privilege.
16       Q    Did you communicate with Fannie Mae at all
17   regarding their ownership interest in Mr. Goodrow's
18   mortgage loan?
19           MR. BIONDI:  Same objection.

232.    Defendants business model of proceeding with foreclosures at all costs in order to comply with LPS's arbitrarily set deadlines and retain a "green" rating as well as to continue receiving foreclosure referrals demonstrates its impartiality.

233.    Yet, Defendants purposefully conducted themselves in a manner so as to speed through Plaintiff's foreclosure without complying with their duties as trustees for the sole fact that it was to their pecuniary benefit to do so.

234.    Defendants therefore breached this fiduciary duty of impartiality under Plaintiff's Deed of Trust.

235.    Defendants further breached this duty to the putative class members.

**Defendants Foreclose on Plaintiff's Home**

236.    Defendants' correspondence to Plaintiff stated that Plaintiff's home would be foreclosed and sold unless Plaintiff paid the entire balance they claimed was due on the Note in full prior to the date of the scheduled foreclosure sale.

237. The foreclosure sale allegedly took place on September 1, 2010, at which time Plaintiff's home was sold for $300,917.49, and a Trustee's Deed dated September 1, 2010 ("the Trustee's Deed") purported to convey the property to a Grantee. Plaintiff attaches a copy of this Trustee's Deed as Exhibit "H".

238. The Trustee's Deed stated that Chase Home Finance, LLC was the current Noteholder at the time the document was prepared. Upon information and belief, this statement was false.

239. The Trustee's Deed further stated that Defendants Muncy and F&M were appointed Substitute Trustees. Chase, LPS, and the Defendants knew that the document allegedly appointing Muncy and F&M incorrectly named the loan servicer, Chase, as the noteholder, and that the signature of Mark H. Friedman was false. Chase, LPS, and the Defendants therefore knew that this document was null and void. Thus, the statement that Muncy and F&M were appointed substitute trustee was also false.

240. Further, upon information and belief, Johnie R. Muncy did not personally sign this trustee's deed. Instead, an undisclosed individual employed by Defendant Friedman signed Muncy's name. As previously alleged, this was done to increase the quantity of trustee's deeds that could be created and thus again speed up the time in which foreclosures could be conducted.

241. On (Sunday) October 13, 2010, this document was allegedly notarized by Darlene Kay Byers, at which time Johnie R. Muncy purportedly appeared before Ms. Byers and acknowledged his "signature". Upon information and belief, this was not actually signed by Ms. Byers nor was the document notarized in the presence of Muncy, as it was Defendant Friedman's policy to have individuals sign on behalf of others.

242. Although Plaintiff does not know the exact date the foreclosure proceeds were collected, according to the foreclosure sale advertisement, approximately $30,000.00 was due on September 1, 2010 and the remaining balance was due within fifteen days of the sale. Upon information and belief, the proceeds were then distributed among the Defendants, Chase, and the Noteholder of Plaintiff's loan using a combination of the United States Postal Service and electronic wires.

243. This Trustee's Deed was subsequently filed in the Fairfax County Circuit Court on October 19, 2010. Upon information and belief, in order to file this Trustee's Deed, the document was mailed to the Fairfax County Circuit Court using the United States Postal Service sometime between October 13, 2010 and October 19, 2010.

244. The Defendants thereafter filed a foreclosure accounting statement with the Commissioner of Accounts for Fairfax County on February 22, 2011 ("the Accounting Statement"). Upon information and belief, this accounting statement was also mailed to the Commissioner of Accounts using the United States Postal Service sometime around February 22, 2012, presumably a few days prior to the Commissioner's receipt.

245. Included with the Accounting Statement, Defendants also submitted the fraudulently created substitute trustee and trustee's deed documents to the Commissioner.

246. This statement accounts for a "Trustee's Commission" of $600.00 that Defendants collected from the foreclosure proceeds.

247. Upon information and belief, the $600.00 included an undisclosed "admin fee", which was in reality a referral fee that was paid to LPS for its role in referring Plaintiff's loan to the Defendants for foreclosure.

248. The failure to disclose the "admin fee" constituted another misrepresentation, this time of the actual allocation of proceeds and the payment of third parties during the Plaintiff's alleged foreclosure.

249. Defendants made further misrepresentations to the Commissioner when they submitted the fraudulently created substitute trustee and trustee's deed documents and the false foreclosure accounting statement to the Commissioner.

250. The Commissioner of Accounts relied on the falsified documents and the false trustee accounting report when he approved the sale on October 25, 2011.

251. The Accounting Statement was subsequently recorded in the Fairfax County Circuit Court on November 17, 2011 (attached hereto as Exhibit "I").

252. Therefore, the Plaintiff lost his home as a direct and proximate result of the combination of each Defendant's actions and the pattern of racketeering activity in which the Defendants' engaged. Without the scheme and artifice to defraud Plaintiff into being rushed through the foreclosure process and the purposeful failure to evaluate his financial condition for a loan modification when he submitted his application, as well as the other prerequisites to foreclosure required by his VA-insured loan, Plaintiff would not have lost his home.

### Count I:  Trustees' Breach of Fiduciary Duties
### CLASS CLAIM

253. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

254. This matter is also brought as a class action for a "Fiduciary Duty" class, initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a Note for whom Defendants Friedman, F&M, and/or Muncy claimed they were

appointed substitute trustees and sent correspondence in an attempt to conduct a foreclosure sale of the real property within the four years prior to the filing of the Complaint, and/or for whom they collected any amount of fees. Excluded from the class are employees of the Defendants.

255.     Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

256.     Plaintiff's counsel is in possession of a substantial number of correspondences that the Defendants mailed to consumers. Plaintiff's counsel is also in possession of a substantial number of Substitution of Trustee documents, Trustee's Deeds and Trustee's Foreclosure Accounting Reports that Defendants filed with the Commissioner Accounts throughout Virginia. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

257.     Defendants Friedman, F&M, Mark Friedman, Kenneth MacFadyen and/or Muncy have conducted and attempted hundreds of foreclosures in Virginia.  A review of just Fairfax County land records for 2011 shows well over two hundred such foreclosures.

258.     There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members.  For example, and without limitation:  (a.) whether LPS's referral incentives and forced timelines caused Defendants to violate their duties of notice and advertisement under the deed of trust; (b.) whether Defendants' acted impartially by failing to obtain the original note or a lost note affidavit prior to commencing foreclosure proceedings; (c.) whether LPS's referral incentives and forced timelines caused Defendants to act impartially against the consumers; (d.) whether these actions constituted Defendants' breach of fiduciary duties; and (e.) what remedies are available for such a breach of fiduciary duty.

259. Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories. The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

260. The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

261. Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is proper. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

262. Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

263. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a.      As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member.   Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues.  Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually.  Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation.  Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources.  The issues at the core of this case are classwide and should be resolved at one time.  One win for one consumer would set the law as for every similarly situated consumer.

264.   Plaintiff and the putative class allege a cause of action for Defendants' breach of fiduciary duties under the subject Deed of Trust.  To the extent that they were properly appointed as trustees, Defendants were the fiduciaries for both the Plaintiff and the putative class and the noteholder, creditor, beneficiary and/or investor, thus owing fiduciary duties to both parties.

265.   Defendants breached their fiduciary duties by failing to act impartially towards the Plaintiffs and putative class members due to pricing incentives and forced compliance with unreasonable timelines. Based on the pricing incentives and forced timelines, Defendants acted for their own pecuniary gain so that they remained in LPS's referral network.

266.    Further, as described above, Defendants failed to comply with the Deed of Trust with respect to their duties of notice and advertisement of the foreclosure sale.

267.    As a result, Plaintiff and the putative class suffered injury and are entitled to recover actual damages and costs against Defendants.

### Count II: Violation of 18 U.S.C. § 1962(c)
### Racketeer Influenced and Corrupt Organizations Act
### CLASS CLAIM

268.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

269.    This matter is brought as a class action on behalf a second class—the "RICO Class"—initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which property Defendants drafted, executed and recorded a foreclosure Trustee's Deed upon such Deed of Trust within the four years prior to the filing of the Complaint.  Excluded from the class are employees of the Defendants.

270.    Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

271.    Plaintiffs' counsel has a substantial number of correspondences and Substitute Trustee documents that Defendants mailed to consumers. Plaintiff's counsel also has a substantial number of Trustees Deeds and Reports that Defendants mailed to consumers and/or filed with the Commissioners of Accounts.   These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

272.    Defendants have conducted and attempted hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

273. Plaintiff's counsel alleges that Defendants' use of the set of fraudulent processes and business actions demonstrated in this case were uniformly followed by Defendants across all foreclosure files. His counsel assumes that this may not have always been the case—at some time in the past Defendants actually signed documents as indicated on the document's signature block, determined whether a Note was actually lost and confirmed the actual creditor/servicer before claiming their appointment as Trustee. However, at some point this conduct ended and the Defendants began conducting their business using the unlawful conduct described herein at least since 2008.

274. There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendants constituted a RICO enterprise; (b.) whether Defendants' falsification of foreclosure documents constituted mail or wire fraud; and (c.) what remedies are available for such a RICO violation.

275. Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories. The letters, deed of appointment of substitute trustee, and trustees deeds are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

276. The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative classes and has accepted such responsibilities.

277. Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure is appropriate. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

278. Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

279. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. Additionally, individual litigation of the

uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are classwide and should be resolved one time. One win for one consumer would set the law as for every similarly situated consumer.

280.    Plaintiff alleges a cause of action against the Defendants for their violation of 18 U.S.C. § 1962(c).

281.    As alleged above, the Defendants used an elaborate foreclosure enterprise in order to conduct foreclosures as quickly an as efficiently as possible without regard to the Plaintiff's and putative class members' rights under the law.

282.    For example, and without limitation, when a mortgage loan serviced by Chase, including the Plaintiff's loan, went into default, Chase used LPS's software, including the Desktop Platform, to assign the loan to a Network Firm. LPS designed this software, along with an expedited foreclosure timeline, to rate Network Firms solely on how quickly the Network Firm could conduct a foreclosure sale. If a Network Firm could not conduct a foreclosure sale within LPS's timeline, LPS would not refer any more foreclosures to that Network Firm. Chase continued to use LPS's software and referral services because of how quickly foreclosure sales occurred within that system. After the foreclosure was referred to a Network Firm, LPS charged the firm an "admin fee", which was assessed regardless of any administrative work performed, or if a foreclosure sale even occurred. This "admin fee" basically amounted to a referral fee or illegal kickback.

283.    Mark Friedman and Kenneth MacFadyen founded a law firm, Defendant Friedman, as well as a sham company, Defendant F&M, solely to conduct foreclosure sales. Mark Friedman and Kenneth MacFadyen designed their firm and sham company to artificially inflate their "Attorney Performance Rating" in the LPS system by creating fraudulent foreclosure

documents in order to drastically increase the speed with which it was able to conduct foreclosures to the detriment of other law abiding trustees.

284.     Upon information and belief, Defendant Friedman and/or Defendant F&M were Network Attorneys in LPS's system and regularly paid LPS's "admin fee". Upon information and belief, when a defaulted mortgage loan was referred to the Friedman entities for foreclosure, they used Defendant Muncy, Kenneth MacFadyen, Mark Friedman and other Friedman employees to create fraudulent documents to initiate the foreclosure process, including the substitution of trustee documents. Upon information and belief, the Friedman entities also used LPS to create fraudulent documents.

285.     Using these fraudulent documents, Defendants would then conduct a foreclosure of the consumer's home. LPS and the loan servicers, Chase in this instance, knew of the Defendants' conduct and continued to refer foreclosure cases to them because of how quickly the Defendants were able to conduct foreclosure sales. This in turn allowed Chase to comply with its own required foreclosure timeline set by the investors. These procedures were uniform with respect to foreclosures conducted by the Defendants in Virginia against both the Plaintiff and the putative class members.

286.     Chase, LPS, Mark H. Friedman, Kenneth J. MacFadyen, and each of the Defendants constitute an "enterprise" as defined by 18 U.S.C § 1961, as distinct corporations or legal entities.

287.     Each Defendant, along with the other members of the enterprise, was engaged in a common economic purpose of enabling the collection and/or foreclosure of consumer mortgage loans.

288.     Further, the loan servicers, Chase in this case, and LPS existed as an enterprise outside the function of conducting foreclosures in violation of state and federal law.  That is, they were not associated with one another merely for the purpose of wrongfully foreclosing on consumers' homes.

289.     Chase and LPS are each separate entities and operates in their own self-interest. They are organizationally structured in a defined set of relationships and roles and are so engaged for an ongoing continuous business relationship for their own profit.

290.     For example, Chase services loans regardless of whether they are ultimately foreclosed, and LPS provides software to Chase to assist in servicing mortgage loans, which does not depend on the loan ever going into default.

291.     The racketeering proceeds obtained by the Defendants as a result of the activities of the enterprise ultimately flowed to Defendant Friedman.  The proceeds were also used in continued furtherance of the enterprise, including, but not limited to paying the salaries of the employees who continued to sign and transmit the affidavits through the mail, as well as the salaries of those who supervised them and directed their actions. Upon information and belief, the proceeds of the foreclosure enterprise were also used to pay LPS's referral fees and illegal kickbacks, which LPS refers to as an "admin fee".

292.     The enterprise had an effect on interstate commerce. For example, and without limitation, the transmission of the fraudulent foreclosure documents and letters through the United States mail system and through the wires for transmission to consumers and various state courts affected interstate commerce. The transmission of the racketeering proceeds to the Defendants by use of the United States mail system or via electronic wires also affected interstate commerce. Its consumer targets are scattered throughout Virginia and Maryland. Court

land record recording fees are paid in Maryland and Virginia. Loan servicers and consumers both make payments to Defendants using the United States mails and the wires, such as by electronic payments. Additionally, LPS uses the wires and the mail to refer foreclosures to the Defendants, receive their "admin fee", create fraudulent affidavits, and to communicate with the loan servicers such as Chase and the Defendants regarding the foreclosure of consumers' homes. Proceeds from consumer foreclosure sales and fees from Chase are also paid through the mail and the wires.

293.    In their enterprise, the Defendants engaged in a pattern of racketeering activity. This pattern of racketeering activity includes among other things, violations of the mail and wire fraud statutes when the Defendants mailed and transmitted by computers the fraudulent substitute trustee documents and the letters to the Plaintiff and other consumers. Chase, LPS, and the Defendants also violated mail and wire fraud statutes when they used LPS's software, including the Desktop platform, to refer loans for foreclosure and to communicate throughout the process that they manufactured to conduct foreclosures in Virginia as quickly and cheaply as possible. This conduct began sometime as early as 2008 and continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

294.    Although the Defendants' participation in the enterprise has since ceased, it was continuous for a significant portion of time from at least 2008 until 2012.

295.    The conduct and actions of the Defendants as alleged herein—creating fraudulent documents for use in foreclosures—violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  The Defendants perpetrated an ongoing scheme to defraud consumers and courts, and used both the mails and the interstate wires to send these documents to the consumers, the courts, and the entities whose employees supposedly signed the documents.

296.     The Defendants used this practice with respect to numerous documents that they caused to be filed in Circuit Courts across the Commonwealth of Virginia for years. Plaintiff's counsel has reviewed the actual land records from dozens of foreclosures conducted by the Defendants and all of these contain the same fraudulent documents. Additionally, Plaintiff's counsel has reviewed numerous trustee's reports filed with various Commissioners throughout Virginia and these reports contain the same misrepresentations.

297.     Further, the Defendants and the enterprise follow the same unlawful procedures in Maryland for the same purposes, and with the same results, victims and methods of committing the offense alleged herein. The facts alleged herein constitute the Defendants' regular way of conducting business, namely foreclosures in the states of Virginia and Maryland.

298.     The Plaintiff, the Circuit Courts, and the Commissioner of Accounts relied on the fraudulent documents when they mistakenly believed that Defendants were validly appointed substitute trustees conducted a proper foreclosure sale.

299.     By means of example only, Plaintiffs and the putative class lost their homes or were forced to pay funds to prevent a foreclosure sale from occurring as a direct result of the Defendants' enterprise.  The Commissioner of Accounts approved the sale and the accounting of the sale based on the fraudulent documents that Defendants submitted to him.

300.     Plaintiff and putative class members were injured as a result of the Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, the cost of this suit, and reasonable attorneys' fees.

301.     Plaintiff and the putative class also seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled

herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

### Count III: Violations of 15 U.S.C. § 1692 et seq.
### Fair Debt Collections Practices Act
### CLASS CLAIM

302.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

303.     Plaintiff alleges that Defendants violated the FDCPA pursuant to 15 U.S.C. §1692e, §1692f, and §1692g of the FDCPA, which provides as follows:

a.     Generally, §1692e prohibits debt collectors from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' Section §1692e also provides a non-exhaustive list of 'conduct' that satisfies this general prohibition. Amongst the non-exclusive list of prohibited misrepresentations, in addition to the general proscription of against using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", are:

> (2) The false representation of--
> (A) the character, amount, or legal status of any debt; or
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> …
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
> …
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

> 15 U.S.C. § 1692e

b.     Section 1692f prohibits generally the use of "unfair or unconscionable means to collect or attempt to collect any debt", and specifically in relevant part:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by agreement creating the debt or permitted by law.

    …

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if –

(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

15 U.S.C. § 1692f.

304.    For his class claim brought pursuant to the FDCPA, the Plaintiff proposes a class initially defined as follows:[10]

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which the Defendants filed a trustee's deed and/or foreclosure accounting within the one-year period preceding the filing date of the original Complaint in this matter. Excluded from the class are employees of the Defendants.

305.    Plaintiff also alleges a "Servicer as Creditor" subclass of consumers initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which the Defendants filed a trustee's deed and/or foreclosure accounting, stating that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

---

[10] Regardless of what is alleged as a proffered class definition in a complaint, the Court is free to define the class as it finds more appropriate. *Bratcher v. Nat'l Standard Life Ins. Co.* (*In re Monumental Life Ins. Co.*), 365 F.3d 408, 414 (5th Cir. 2004) *cert. denied*, 125 S. Ct. 277 (2004); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 655 (D. Idaho 2006) ("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination."). *See also Woods v. Stewart Title Guaranty Company*, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

306. Defendants violated §1692e as to the "Servicer as Creditor" subclass because they forwarded correspondence to consumers and the Commissioners of Accounts that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed. Defendants additionally filed a Trustee's Deed that contained this same misrepresentation.

307. Plaintiff alleges a "Defective Appointment of Substitute Trustee" subclass initially defined as follows:

> All natural persons who were the record owners in fee simple of real property located in Virginia that by a recorded Deed of Trust secured payment of a loan and for which the Defendants filed a trustee's deed and/or foreclosure accounting that listed a purported Deed of Appointment of Substitute Trustee when the Defendants had no right to possession of the property, within the one year period preceding the filing date of the original Complaint in this matter. Excluded from the subclass are employees of the Defendants.

308. Defendants violated §1692e and §1692f as to the Defective Appointment of Substitute Trustee subclass because they falsely stated to the Plaintiff and the Commissionwers of Accounts that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustees (and/or where the signatures were forged altogether).

309. Plaintiff incorporates his prior allegations and estimates that the class is so numerous that joinder of all members is impractical.

310. Plaintiff's proposed class counsel has reviewed a substantial number of trustee's deeds and foreclosure accountings prepared by the Defendants. These documents have remained consistent and uniform across time, Virginia jurisdictions and consumers.

311. Defendants have conducted and attempted to conduct hundreds of foreclosures in Virginia. A review of just Fairfax County land records for 2011 shows well over 200 such foreclosures.

312. There are questions of law and fact common to the class, which common issues predominate over any issues involving only individual class members. For example, and without limitation: (a.) whether Defendants routinely misrepresented the identity of the creditor, amount, legal status, or character of the debts that they were attempting to collect from Plaintiff and the putative class members; (b.) whether the Defendants falsely represented the compensation that they could lawfully receive as a result of these attempted and/or actual foreclosures; (c.) whether the Defendants threatened to take or took action that could not legally be taken; and (d.) whether the Defendants used false representations and deceptive means in their attempts to collect money from the Plaintiffs and the putative class members.

313. Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories. The letters and deed of appointment of substitute trustee are standardized and used across all Virginia jurisdictions and the full class period. The violations alleged are the same and the class claims will rise and fall entirely based upon whether or not Plaintiff's claims rise or fall.

314. The Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the putative class and has accepted such responsibilities.

315. Certification of a class under Rule 23(b)(1) of the Federal Rules of Civil

Procedure is proper. Prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Defendants have closed their law firm. The primary asset available for all class members is the limited insurance fund held by Defendants.

316. Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate declaratory relief with respect to the class as a whole.

317. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the classes predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual damages issues. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Further, most consumers who Defendants will have threatened and contacted for a foreclosure would likely be unaware of their rights under the law, or who they could find to represent them in federal litigation. Additionally, individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this

case are classwide and should be resolved at one time. One win for one consumer would set the law as for every similarly situated consumer.

318. As a result, Plaintiff and the putative class members identified above are entitled to recover statutory damages, actual damages, reasonable attorney's fees, and costs against Defendants pursuant to 15 U.S.C. § 1692k.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for compensatory, punitive and treble damages against the Defendants; for declaratory and injunctive relief pursuant to RICO; for reinstatement of his mortgage, rescission of the foreclosure sale, and specific performance of his Deed of Trust; for his attorneys' fees and costs; and such other relief the Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**ALLEN CHATTER**


By_____/s/_____
              Of Counsel

Matthew J. Erausquin, VSB No. 65434
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com
janelle@clalegal.com

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.

763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:    (757) 930-3660
Fax:    (757) 930-3662
lenbennett@clalegal.com
srotkis@clalegal.com

Dale W. Pittman, VSB No. 15673
*Counsel for the Plaintiff*
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel:    (804) 861-6000
Fax:    (804) 861-3368
dale@pittmanlawoffice.com

Kristi Cahoon Kelly, VSB No. 72791
*Counsel for the Plaintiff*
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Tel:    (703) 277-9774
Fax:    (703) 591-9285
kkelly@siplfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January, 2013, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Douglas P. Rucker, Jr.
Andrew Biondi
Cullen D. Seltzer
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, V A 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
drucker@sandsanderson.com
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

*Counsel for the Defendants*

 

 

 

_____/s/_____
Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
janelle@clalegal.com