IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JOHN K. GOODROW,<br><br>Plaintiff,<br><br>v.<br><br>FRIEDMAN & MACFADYEN, P.A., et al.,<br><br>Defendants. | Civil Action No.: 3:11-cv-00020-MHL<br>(Consolidated) |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## CONSOLIDATED MOTION TO DISMISS THE AMENDED COMPLAINTS

Defendant law firm Friedman & MacFadyen, P.A., defendant trustee F&M Services, L.C., and defendant Johnie R. Muncy (collectively, **"Defendants"**), by counsel and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, make the following points and cite the following authorities in support of their Consolidated Motion to Dismiss.

## I.
## INTRODUCTION

Less than two months ago, this Court considered and rejected claims brought by Banks and Chatter that bear striking resemblance to the six amended complaints (the **"Amended Complaints"**) now before the Court. *Goodrow v. Friedman & MacFadyen, P.A.*, 2012 U.S. Dist. LEXIS 182188 (E.D. Va. Dec. 27, 2012) [hereinafter *Goodrow II*]. When the Court granted leave to amend, it gave Plaintiffs' counsel unmistakable directions by which Plaintiffs could attempt to replead viable claims. *See id.* at *33, *45–46; Order, No. 3:11cv20 (E.D. Va. Dec. 27, 2012) [ECF No. 107]. Yet, the Amended Complaints repeat the same facts and failed theories that this Court previously rejected. In some instances, Plaintiffs even reallege claims that Plaintiffs' counsel previously abandoned in light of existing law.

The increased quantity of Plaintiffs' allegations does nothing to enhance their quality. There are fundamental defects in Plaintiffs' Amended Complaints:  They fail to state viable claims for breach of fiduciary duty and for violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"); and, since the Fourth Circuit's opinion in *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365 (4th Cir. 2012), this Court has been instructed to examine the materiality of misrepresentations and deceptive conduct under the Fair Debt Collection Practices Act ("FDCPA"), so their FDCPA allegations no longer survive a motion to dismiss.

Once again, Defendants direct the Court to reality:  Plaintiffs defaulted on their deed of trust loans.  A servicing company, the agent of the lender and beneficiary of the loan, declared default and accelerated the balance.  The servicer then retained Defendants to foreclose on the properties securing the loans.  These were commonplace transactions involving a lender enforcing its interests in property securing unpaid loans.

Plaintiffs repeat rejected theories on which foreclosing law firms and trustees have been sued.  They allege that out-of-state mortgage servicing companies—beyond any possible firsthand knowledge of Plaintiffs—did not possess the deed of trust notes when the servicers' employees/agents signed documents substituting the Defendants as trustees.  This conjecture cannot plausibly support the conclusion that the signatory to the substitution of trustee deeds did not possess the notes or lacked authority to make substitutions, despite the agency relationship between servicers and lenders.

Despite their rhetoric, the Amended Complaints are little more than contract claims. Defendants were agents and attorneys of the servicer and lender in each instance.  According to long-standing Virginia case law, any duties Defendants owed arise not by common law, but rather by contract.  The deed of trust and note contractually bind the lender and mortgagor, under whose direction the lawyers act to enforce such terms.  Courts are clear that fiduciary duties of

2

fairness and impartiality running from a trustee to a mortgagor apply to the trustee's faithful execution of the terms of the deed of trust. To the extent Defendants failed to comply with these terms, including any statutory default provision in the deeds of trust, the Plaintiffs' claims lie against the lender, not its agents. Plaintiffs have muddied the waters with a protracted and misguided set of allegations sounding in tort. As before, the Amended Complaints should be dismissed—this time, without leave to amend.

## II.
## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). A plaintiff must "state a claim to relief that is plausible on its face," pleading "content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court need not accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), or legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court may consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic. *Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006); *Moore v. Flagstar Bank*, 6 F. Supp. 2d. 496 (E.D. Va. 1997). The Court may consider those documents without converting the motion to one for summary judgment. *Crouch v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 152548 (E.D. Va. Nov. 29, 2011) (considering deed of trust).

## III.
## SUMMARY OF FACTUAL ALLEGATIONS

1.      Each of the Plaintiffs mortgaged the purchase of real property pursuant to a

promissory note (collectively, the "**Notes**"). *See* Banks ¶ 178; Buel ¶ 172; Chatter ¶ 134; Goodrow ¶ 174; Mbundure ¶ 138; McBeth ¶ 189.

2.      Each Note was secured by a deed of trust (collectively, the "**Deeds of Trust**"). *See* Banks ¶ 179 (*see also* **Exhibit 1**); Buel ¶ 173 (*see also* **Exhibit 2**); Chatter ¶ 135 (*see also* **Exhibit 3**); Goodrow ¶ 175 (*see also* **Exhibit 4**); Mbundure ¶ 139 (*see also* **Exhibit 5**); McBeth ¶ 190 (*see also* **Exhibit 6**).

3.      Plaintiffs' Deeds of Trusts were purchased by Federal National Mortgage Association ("**Fannie Mae**"), guaranteed under the U.S. Department of Veterans Affairs ("**VA**"), or assigned to Mortgage Electronic Registration System, Inc. ("**MERS**") as nominee for PNC Bank, N.A. ("**PNC Bank**").  Banks ¶ 181 (purchased by Fannie Mae); Buel ¶ 175 (purchased by Fannie Mae); Chatter ¶ 138 (guaranteed by VA); Goodrow ¶ 177 (purchased by Fannie Mae); Mbundure ¶ 141 (assigned to MERS); McBeth ¶ 192 (purchased by Fannie Mae).

4.      Various companies serviced Plaintiffs' Deed of Trust loans (collectively, the "**Servicers**").  *See* Banks ¶ 182 (Litton Loan Servicing); Buel ¶ 176 (JPMorgan Chase Bank, N.A); Chatter ¶ 137 (JPMorgan Chase Bank, N.A.); Goodrow ¶ 178 (Met Life Home Loans); Mbundure ¶ 143 (PNC Bank); McBeth ¶ 193 (EverHome).

5.      Each of the Plaintiffs stopped making payments under the terms of the Note and went into default.  *See* Banks ¶¶ 186–88; Buel ¶¶ 180–87; Chatter ¶¶ 160–65; Goodrow ¶¶ 183–87; Mbundure ¶¶ 144–46; McBeth ¶¶ 205–07.

6.      As a result of these defaults, Defendants F&M Services and Muncy were appointed as substitute trustees by Substitution of Trustee documents (collectively, the "**Substitutions of Trustee**").  *See* Banks ¶¶ 209–10, 213; Buel ¶ 205 (*see* **Exhibit 7**); Chatter ¶¶ 186–90; Goodrow ¶¶ 225–29; Mbundure ¶¶ 180–85; McBeth ¶¶ 249–55.

7.      At the direction of the Servicers, Defendants mailed a series of letters to Plaintiffs

in connection with Plaintiffs' default. *See* Banks ¶¶ 193–207; Buel ¶¶ 194–207; Chatter ¶¶ 172–84; Goodrow ¶¶ 194–219; Mbundure ¶¶ 153–78; McBeth ¶¶ 216–49.

8.      Defendants communicated with the Servicers through the web-based servicing platform provided by Lender Processing Services, Inc. ("**LPS**"). *See* Banks ¶¶ 190–92, 196, 201, 208; Buel ¶¶ 188–90; Chatter ¶¶ 167–69; Goodrow ¶¶ 195, 201; Mbundure ¶¶ 147–49, 154, 159; McBeth ¶¶ 210–12, 217.

9.      Banks, Chatter, and Goodrow allege that their properties were sold at foreclosure sales. *See* Banks ¶ 264; Chatter ¶ 237; Goodrow ¶ 244. Those properties were conveyed by trustee's deeds (collectively, the "**Trustee's Deeds**"). *See* Banks Ex. J; Chatter Ex. H; Goodrow Ex. N. The Buels allege that they reinstated their loan. *See* Buel ¶ 264.

10.     In their Amended Complaints, Plaintiffs allege Defendants' actions constitute breaches of fiduciary duty, violations of the Racketeer Influenced and Corrupt Organizations Act,[1] and the Fair Debt and Collections Practices Act.[2] They also attempt to make class claims on behalf of others, whom they claim are similarly situated.

## IV.
## ARGUMENT

### A.      Plaintiffs' Breach of Fiduciary Duty Claims Should Be Dismissed (Counts I).

This Court afforded Plaintiffs leave to amend their fiduciary duties claims "to the extent Plaintiffs can allege . . . which **specific duties** arising under the Deed of Trust Defendants breached." *Goodrow v. Friedman & MacFadyen, P.A.*, 2012 U.S. Dist. LEXIS 182188, at *33 (E.D. Va. Dec. 27, 2012) [hereinafter *Goodrow II*] (emphasis added); *see also* Order, No. 3:11cv20 (E.D. Va. Dec. 27, 2012) [ECF No. 107] (granting Goodrow, McBeth, Mbundure, and

---

[1]      18 U.S.C. § 1961 *et seq.*
[2]      15 U.S.C. § 1692 *et seq.*

5

Buel leave to correct legal deficiencies in their proposed amended complaints). Many of the "duties" Plaintiffs identify are not found in the Deeds of Trust. Others do not state a claim upon which relief can be granted. Accordingly, Plaintiffs' claims for breach of fiduciary duty fail and should be dismissed without leave to amend.

### 1.    Plaintiffs' Deeds of Trust Do Not Contain the Allegedly-Violated "Duties."

In *Goodrow II*, this Court once again affirmed that "deeds of trust are treated under the same principles as contracts, and the trustee only owes those duties that are listed in the deed of trust." *Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *21 (quoting *Carter v. Countrywide Home Loans, Inc.*, 2008 U.S. Dist. LEXIS 67014, at *30 (E.D. Va. Sept. 2, 2008)).[3] Accordingly, Plaintiffs' allegations as to "duties" not found in the Deeds of Trust fail to state a claim and must be dismissed.

### a.    Defendants Have No Duty of Due Diligence Under the Deeds of Trust.

A trustee under a deed of trust owes no duty of due diligence. *See, e.g.*, *Horvath v. Bank of New York*, 2010 U.S. Dist. LEXIS 19965, at *5 (E.D. Va. Jan 29, 2010), *aff'd*, 641 F.3d 617 (4th Cir. 2011) ("[A] trustee under a deed of trust has no such duty of diligence, and trustees only owe duties listed in the deed of trust.").[4] Banks and Chatter conceded this principle previously. *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *28 n.9 ("Plaintiffs concede *Horvath's* finding that a trustee has no duty of due diligence to, among other things, check behind a lender's basis to foreclose."). Nevertheless, Plaintiffs now allege that Defendants violated their fiduciary

---

[3]    *See also Horvath v. Bank of N.Y., N.A.*, 2010 U.S. Dist. LEXIS 19965, at *4 (E.D. Va. Jan. 29, 2010); *Sheppard v. BAC Home Loans Servicing, LP*, No. 3:11cv62, 2012 U.S. Dist. LEXIS 7654, at *26 (W.D. Va. Jan. 24, 2012); *Sincere v. BAC Home Loans Servicing, LP*, 2011 U.S. Dist. LEXIS 149650, at *23 (W.D. Va. Dec. 30, 2011).
[4]    *See also McInnis v. BAC Home Loan Servicing, LP*, 2012 U.S. Dist. LEXIS 13653, at *17 (E.D. Va. Jan. 13, 2012).

duties by failing to ensure compliance with preconditions to foreclosure and by failing to ensure that they received certain documents. *See* Banks ¶ 293; Buel ¶ 278; Goodrow ¶ 314; McBeth ¶ 322. Plaintiffs do not identify any provisions in the Deeds of Trust giving rise to these alleged obligations. As before, Plaintiffs claims should be dismissed. *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *30–31 (dismissing identical claims because Banks and Chatter could not identify any provision in the deeds of trust giving rise to the alleged duties).[5]

### b.    Fannie Mae's Servicing Guide Does Not Create Fiduciary Duties.

Plaintiffs lack standing to directly enforce the terms of the Fannie Mae Servicing Guide (the "Servicing Guide"). *See Correll v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 12960, at *11–12 (E.D. Va. Feb. 2, 2012) ("Courts have also uniformly rejected the contention that individuals have a right to sue as third-party beneficiaries to contracts between mortgage providers and Fannie Mae.").[6] The Deeds of Trust do not expressly or implicitly incorporate the terms of the Servicing Guide.[7] In *Goodrow II,* this Court opined that the terms of the Servicing Guide have no evidentiary value in determining whether Defendants breached their fiduciary duties. *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *20 n.8 ("Given that courts consistently find that borrowers lack standing to enforce contracts between loan servicers and lenders, a court would weigh any evidentiary value accordingly."). Still, Plaintiffs allege that Defendants breached their fiduciary duties by failing to comply with the Servicing Guide. *See*

---

[5]    Recasting these allegations under a duty to remain impartial has proven equally unpersuasive. *See Goodrow II*, 2102 U.S. Dist. LEXIS 182188, at *28 n.9.

[6]    *See also Condel v. Bank of Am., N.A.*, 2012 U.S. Dist. LEXIS 93206, at *18 (E.D. Va. July 5, 2012); *Acuna v. Chase Home Fin., LLC*, 2011 U.S. Dist. LEXIS 52971, at *11 (E.D. Va. May 16, 2011).

[7]    And any argument to the contrary must fail. *See Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 405 (S.D.N.Y. 2010); *Kariguddaiah v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 65561, at *12–13 (N.D. Cal. July 1, 2010).

Banks ¶ 293[8]; Buel ¶ 278; Goodrow ¶ 314; McBeth ¶ 322.  Any fiduciary duty claim predicated on these allegations should be dismissed without leave to amend.

**c.    Plaintiffs Do Not Plead a Plausible Breach of the Duty of Impartiality.**

Plaintiffs rely on a "duty of impartiality" to indict the alleged economic arrangements between Defendants and various third parties, as well as the timing of foreclosure proceedings. Banks ¶ 292; Buel ¶ 277; Chatter ¶ 265; Goodrow ¶ 313; Mbundure ¶ 238; McBeth ¶ 321.  These claims fail as a matter of law because the duties alleged are not grounded in the Deeds of Trust.

There is no common law duty of impartiality owed to borrowers by trustees beyond the terms of the deed of trust. *Sheppard v. BAC Home Loans Servicing, LP*, 2012 U.S. Dist. LEXIS 7654, at *25–26 (W.D. Va. Jan 24, 2012).  Moreover, a trustee under a deed of trust may serve as counsel to the creditor without rendering the sale voidable, *Cerceo v. Shmidheiser*, 1997 U.S. App. LEXIS 13680, at *12 (4th Cir. June 10, 1997) (citing VA. CODE ANN. § 26-58); and a trustee has no obligation to arrange a loan modification, *see McInnis v. BAC Home Loan Servicing, LP*, 2012 U.S. Dist. LEXIS 13653, at *17 (E.D. Va. Jan. 13, 2012) ("The Substitute Trustees have no role in determining whether or not Plaintiff could be granted a permanent loan modification . . . .").  Plaintiffs do not suggest that Defendants' compensation structure violates the terms of the Deeds of Trust; nor do Plaintiffs allege that Defendants failed to comply with timelines contained in the Deeds of Trust.  Accordingly, Plaintiffs' claims should be dismissed.

## 2.    Plaintiffs' Recourse to the Code of Virginia Is Similarly Unavailing.

Seizing on the phrase "applicable law" in the various Deeds of Trust, Plaintiffs allege that Defendants have breached their fiduciary duties under Virginia Code sections 55-59.1 and 55-

---

[8]    Curiously, Banks previously alleged and—at least in part—withdrew this claim. *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *20 n.8.

59.2. As a preliminary matter, many of the notice requirements for sale under a deed of trust are only governed by the Code of Virginia if they are not otherwise set forth in the deed of trust, *e.g.*, VA. CODE ANN. § 55-59.2(A)(2), and Plaintiffs once again fail to produce the Deeds of Trust. Moreover, Plaintiffs must plead the duty, breach, and damages sustained to state an actionable claim for breach of fiduciary duty. *Carstensen v. Chrisland Corp.*, 247 Va. 433, 443–44, 442 S.E.2d 660, 666 (1994). Even assuming Plaintiffs have identified a duty incorporated into the Deeds of Trust, Plaintiffs have failed to establish a material breach or the damages sustained.

### a. Plaintiffs Do Not State a Plausible Claim Under the Notice Provisions of the Code of Virginia (VA. CODE ANN. § 55-59.1).

Plaintiffs allege that Defendants failed to comply with the notice provisions of the Virginia Code because: (1) Defendants violated section 55-59.1(B); (2) the duty of notice is predicated on the "[l]ender invoking the power of sale"; and (3) Defendants identified the servicer as the beneficiary of the Note. *See generally* Banks ¶¶ 227–36; Buel ¶¶ 229–38; Chatter ¶¶ 211–20; Goodrow ¶¶ 266–75; Mbundure ¶¶ 203–11; McBeth ¶¶ 274–82. Notably, Plaintiffs do not contend they did not receive notice. *See, e.g.*, Goodrow ¶ 142. Instead, Plaintiffs invent immaterial defects in an attempt to state a claim. These claims must fail.

**First**, Plaintiffs' attempts to establish a cause of action under section 55-59.1(B) once again fail. Nothing in Virginia Code section 55-59.1 requires that a lost note affidavit be provided to the homeowner. *See* VA. CODE ANN. § 55-59.1(B) ("If a note or other evidence of indebtedness secured by a deed of trust is lost or for any reason cannot be produced and the beneficiary submits **to the trustee** an affidavit to that effect, the trustee may nonetheless proceed to sale . . . ." (emphasis added)). Furthermore, Plaintiffs' legal conclusion that the trustee must possess either the note or a lost note affidavit before taking any action is unsupported by the Deeds of Trust, Virginia statute, and the case law addressing this issue. In fact, as one court

observed, "there is no statutory requirement concerning the timing of the Affidavit of Lost Note." *Buzbee v. U.S. Bank, N.A.*, 2012 Va. Cir. LEXIS 39, *11 (Fairfax County May 2, 2012).   Finally, the notices are not materially false or misleading—even assuming the Note was not lost or permanently unavailable. *See infra* Part IV.C.3.a.

**Second**, Plaintiffs again fail to acknowledge that a loan servicer may invoke the power of sale as agent for the beneficiary.[9]  In *Larota-Florez v. Goldman Sachs Mortg. Co.*, 719 F. Supp. 2d 636 (E.D. Va. 2010), *aff'd*, 441 F. App'x 202 (4th Cir. 2011), the Eastern District recently affirmed this principle:

> As servicer, Litton has the right to collect payments on behalf of the holder and the right to foreclose upon default.  Therefore, **Litton's appointment of Professional as substitute trustee under the Deed of Trust was authorized as a matter of contract and agency law**.
>
> Litton had authority to foreclose and exercised that authority to appoint Professional as trustee to sell the Property at foreclosure.

*Id.* at 641 (emphasis added).  And in *Goodrow II*, this Court declined to disagree.  *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *26.  Plaintiffs' own allegations suggest that a servicer is the agent of the beneficiary.  *See, e.g.*, Goodrow ¶ 40 ("Fannie Mae has created a process whereby the servicer, as its agent, can order or request possession of the Note . . . .").  Courts have further debunked Plaintiffs' allegations that Defendants "appointed themselves." *See, e.g.*, *Sheppard*, 2012 U.S. Dist. LEXIS 7654, at *19 n.7, *28 n.8 ("Plaintiff cites no authority for the proposition that this system of deputizing employees of other institutions within the mortgage industry to make assignments on MERS's behalf invalidates such assignments.  To the contrary,

---

[9]     Presumably, Plaintiffs do not contend that only the original **lender** may invoke the power of sale.  Plaintiffs' Deeds of Trust (signed by Plaintiffs) specifically contemplate that various parties might exercise the right to foreclose and sell the securing property. *See, e.g.*, Exhibit 1, at 3 ("MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to the right to foreclose and sell the property . . . .").

there have been decisions finding assignments valid in spite of the practice.").

Moreover, nothing in the Deeds of Trust or the law prohibits a lender from authorizing an agent to substitute a trustee. The Virginia Code provides that appointment of a substitute trustee is the "right and the power" of the lender. VA. CODE ANN. § 55-59(9). To argue for a restriction on the lender's ability to delegate its right and power, and to recognize a right of action for the alleged "breach" of such rights, is completely incongruous with the intent of the statute and the Deeds of Trust.[10]

**Third**, Plaintiffs cannot state a claim for breach of fiduciary duty based on what is—at most—a hyper-technical defect in the notice. Plaintiffs contend that Defendants' notices misrepresented the servicers as beneficiaries of the Note, but Plaintiffs' own allegations represent that Defendants identified the servicer as the "holder/servicer of the Note." *See, e.g.*, Goodrow ¶ 136; Goodrow Ex. D. By Plaintiffs' own allegations, therefore, Defendants represent that the servicer is **either** the servicer **or** the holder of the Note. At least one of these must be true. Assuming, however, that Defendants' statement is factually incorrect, Plaintiffs do not allege that this inaccuracy caused any damage—an essential element of all fiduciary duty claims. *Carstensen*, 247 Va. at 443–44, 442 S.E.2d at 666. Plaintiffs admit that they were in default; they do not allege that they were prepared to cure the default; they acknowledge that they received the notice; and they do not contend that the foreclosure was credited to the wrong debt. Furthermore, Virginia Code section 55-59.1(C) provides that "[f]ailure to comply with the

---

[10]    Plaintiffs do not allege that the lenders disavowed Defendants' appointment as trustees. Thus, even if the lenders did not authorize Defendants' appointment, they certainly ratified it. If a "'principal, with knowledge of all the facts, adopts or acquiesces in the acts done under an assumed agency, he cannot be heard afterwards to impeach them under pretense that they were done without authority.'" *Winston v. Gordon*, 115 Va. 899, 907, 80 S.E. 756, 760 (1914). And, when a principal, after being informed, fails to disavow the act, "he makes it his own." *Id.* at 907; *accord Coastal Pharm. Co. v. Goldman*, 213 Va. 831, 839, 195 S.E.2d 848, 854 (1973). Any act of disavowal must occur "within a reasonable time." *Higginbotham v. May*, 90 Va. 233, 239, 17 S.E. 941, 943 (1893).

requirements of notice of default contained in this section shall not affect the validity of the sale." Plaintiffs do not establish plausible damages; therefore, they fail to state a claim.

      **b.**      **Plaintiffs Do Not State a Plausible Claim Under the Advertisement Provisions of the Code of Virginia (VA. CODE ANN. § 55-59.2).**

Plaintiffs base their claims that Defendants violated their duty to advertise under section 55-59.2 on speculation that "Defendants . . . advertis[ed] the foreclosure when they had no present right to do so" and the false assertion that Defendants were never properly appointed. Banks ¶ 240; Buel ¶ 242; Chatter ¶ 225; Goodrow ¶ 279; Mbundure ¶ 215; McBeth ¶ 287. Plaintiffs' allegations concerning the validity of Defendants' appointment are addressed elsewhere in this brief. *See, e.g.*, *supra* Part IV.A.2.a; *infra* Part IV.C.1c. Even assuming that Plaintiffs have plausibly alleged Defendants lacked authority as substitute trustees, they fail to establish any damage sustained.

The fundamental purpose of Virginia Code section 55-59.2 is to ensure that foreclosure sales are advertised. *See Deep v. Rose*, 234 Va. 631, 635, 364 S.E.2d 228, 230 (1988) ("Code § 55-59.2 evidences a strong legislative concern with the sufficiency of advertisements preceding foreclosure sales, with a purpose to insure a degree of publication that will generate sufficient interest to obtain the highest price available as well as to offer the debtor reasonable time to redeem the debt."). Thus, courts routinely find that while the timeline imposed by section 55-59.2 is mandatory, other requirements are construed less stringently. *See, e.g.*, *Wood v. MorEquity, Inc.*, 331 F. App'x 243, 244–45 (4th Cir. 2009) (requiring that a party challenging an advertisement demonstrate material prejudice).[11]

Plaintiffs plainly acknowledge that Defendants advertised the foreclosure sales. Banks

---

[11]      *See also Riley v. Robey*, 122 F. Supp. 2d 684 (W.D. Va. 2000); *Virginia Hous. Dev. Auth. v. Fox Run Ltd. P'ship*, 255 Va. 356, 497 S.E.2d 747 (1998).

¶ 239; Buel ¶ 241; Chatter ¶ 224; Goodrow ¶ 278; Mbundure ¶ 214; McBeth ¶ 286.   Any

additional "errors" identified in the Amended Complaints did not materially prejudice the sale.[12]

Accordingly, Plaintiffs have not stated a claim for Defendants' breach of fiduciary duties

premised on Virginia Code section 55-59.2.

**B.   Plaintiffs' Claims Under the Racketeer Influenced and Corrupt Organizations Act Should Be Dismissed (Counts II).**

Plaintiffs continue to force claims into a RICO mold, merely as a way to treble their

damages and secure attorney's fees.   Under 18 U.S.C. § 1962(c), Plaintiffs are required, but fail,

to "allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

Plaintiff[s] must additionally show that (5) [they were] injured in [their] business or property (6)

by reason of the RICO violation.'"   *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va.

2003), *aff'd*, 129 F. App'x 1, 8 (4th Cir. 2005) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S.

479, 496–97 (1985)).   First, Plaintiffs lack standing to bring a RICO claim in the absence of

detrimental reliance and proximate cause.   Second, Plaintiffs yet again fail to establish a RICO

enterprise owing to the lack of a common purpose among the identified actors.   Third, Plaintiffs

cannot establish a pattern of racketeering activity that identifies Defendants as engaged in the

type of "widespread fraud" that is subject to the powerful tool of RICO.   *See Menasco, Inc. v.*

*Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).

**1.   Plaintiffs Lack Standing to Assert a RICO Claim.**

Under 18 U.S.C. § 1964(c), Plaintiffs bear the burden of proving that they were "injured

---

[12]   For example, Goodrow alleges that the advertisements listed Defendant Friedman as the contact.   *See* Goodrow ¶ 156.   First, Virginia Code section 55-59.3 requires only that "either a trustee or the party secured or **his agent or attorney**" be listed.   (emphasis added). Second, Goodrow cannot plausible allege that this "error" materially prejudiced the sale— especially considering Goodrow also alleges that Defendant Friedman and Defendant F&M are one in the same.   *Cf.* Goodrow ¶¶ 98–102.

in [their] business or property **by reason of** a violation of section 1962 of this chapter" (emphasis added). Indeed, a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property **by the conduct constituting the violation**." *Sedima*, 473 U.S. at 496–97 (emphasis added). To establish standing, "(1) the plaintiff must have detrimentally relied on the predicate acts of racketeering activity; (2) the predicates [sic] acts must be the proximate cause of injury to the plaintiff; and (3) the plaintiff must suffer actual injury." *Choimbol v. Fairfield Resorts, Inc.*, 428 F. Supp. 2d 437, 444 (E.D. Va. 2006) (citing *Brandenburg v. Seidel*, 859 F.2d 1179, 1188 n.10 (4th Cir. 1988)). While detrimental reliance and proximate cause are closely related, the Fourth Circuit has effectively bifurcated the causation analysis for mail and wire fraud to require that Plaintiffs "plausibly allege both that [(i)] they detrimentally relied some way on the fraudulent mailing, and [(ii)] that the mailing was a proximate cause of the alleged injury to their business or property." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996).

The United States Court of Appeals for the Fourth Circuit explained that "a showing of reliance on the predicate act of fraud ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 337 (quoting *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993)). After all,

> Inasmuch as an injury may have more than one proximate cause, our rule that reliance be shown in civil RICO fraud actions does not also dictate that the fraud be the sole legal cause of the plaintiff's injury, so long as it is a legal cause. The only caveat is that, where fraud is alleged as a proximate cause of the injury, the fraud must be a "classic" one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation.

*Id.* To hold otherwise would improperly" read the traditional proximate cause concerns of tort law completely out of civil RICO, leaving only a cause-in-fact requirement." *Brandenburg*, 859 F.2d at 1189 n.11.

14

### a. Plaintiffs Plead No Facts to Show Their Detrimental Reliance on the Predicate Acts of Mail and Wire Fraud.

At the outset, detrimental reliance must not be presumed. "Presumed reliance under civil RICO is generally disfavored outside of certain narrow contexts," which the Supreme Court of the United States has limited to "fraud-on-the-market theories" such as securities litigation. *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 561 (E.D. Va. 2000) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988)). As alleged, Plaintiffs "relied" on the mailings "when they mistakenly believed that Defendants were validly appointed substitute trustees and conducted a proper foreclosure sale." Banks ¶ 322; Buel ¶ 311; Chatter ¶ 298; Goodrow ¶ 346; Mbundure ¶ 271; McBeth ¶ 355. Plaintiffs' reliance, in the context of contractual obligations, differs starkly from the presumed reliance of an investor on the integrity of the open securities market.

Plaintiffs' single, conclusory allegation of reliance implies they took no action in defense of their foreclosure by relying on Defendants' mailings and wires. Banks ¶ 321; Buel ¶ 346; Chatter ¶ 298; Goodrow ¶ 311; Mbundure ¶ 271; McBeth ¶ 355. This cannot, by itself, establish detrimental reliance. Plaintiffs fail to establish **how** they were defrauded by this belief, particularly in the absence of allegations regarding actions Plaintiffs could have taken to prevent foreclosure or reinstatement. Indeed, Plaintiffs cannot in good faith allege their right to take any preventive action because they defaulted on the mortgages foreclosed by Defendants. *See* Banks ¶¶ 18, 68, 309; Buel ¶¶ 18, 62, 295; Chatter ¶¶ 16, 25, 282; Goodrow ¶¶ 19, 68, 331; Mbundure ¶¶ 30, 258; McBeth ¶¶ 18, 79, 339.[13] At best, Plaintiffs challenge the foreclosure **process**—for example, the use of the "unavailable note" affidavit—to suggest the Defendants lacked authority

---

[13] *See Collins v. Mortg. Elec. Registration Sys., Inc.*, 2012 U.S. Dist. LEXIS 33460 (M.D. Tenn. 2012) (recently holding that a 73-page, 272 paragraph complaint failed to state a RICO claim for the wrongful institution of foreclosure proceedings where the plaintiffs had defaulted and alleged no more than "sweeping general statements and arguments that may or may not be specific to Plaintiff's mortgage loan").

to foreclose.  These arguments are disposed of in Parts IV.A.2.a, *supra*, and IV.B.2.a, *infra*.

For example, in *Chisolm v. TranSouth Fin. Corp.*, in a "revolving repossession" scheme, car buyers alleged that when defendants repossessed their cars, the car buyers received no credit for the proper resale price, which would have entitled them to a surplus.  95 F.3d at 334.  However, because the car buyers failed to allege facts showing actual reliance on the defendant's mailings to inform them of their rights and assure protection of the same, the Fourth Circuit affirmed dismissal of the RICO claim for lack of reliance.  *Id.* at 338.  Similarly, no showing has been made here.  Although the Fourth Circuit allowed amendment in *Chisolm* because no amendment had been previously granted, this Court should note that after multiple amendment attempts, Plaintiffs again have failed to allege their ability to cure default or their right to remain owners of the foreclosed homes.

Further in *American Chiropractic v. Trigon Healthcare*, 367 F.3d 212 (4th Cir. 2004), chiropractors brought a RICO claim alleging that Trigon promised by mail to reimburse all services according to a particular billing method.  *Id.* at 233–34.  The chiropractors purchased Trigon's insurance, after which Trigon refused to reimburse spinal manipulation services by this billing method.  *Id.* at 234.  The trial court properly refused standing because the mailing said only "most" claims would be so reimbursed, and excluded spine manipulation services.  *Id.* at 235.  Thus, the chiropractors were not entitled to reimbursements and "could not justifiably rely" on the mailings to state a RICO claim.  *Id.*  Similarly, by the time Defendants mailed the foreclosure notices to the Plaintiffs, nothing affected the right to foreclose.

Finally, in *Choimbol v. Fairfield Resorts, Inc.*, immigrant workers alleged a RICO claim against an employer who paid them with mailed paychecks omitting overtime pay.  428 F. Supp. 2d at 441.  Because the workers were "receiving less money than they were entitled" to under federal law, the Eastern District of Virginia held the workers had standing under RICO.  *Id.* at

16

445.   Plaintiffs, however, have not alleged, and indeed, *cannot* in good faith allege, their entitlement to prevent foreclosure because of their default.

Therefore, Counts II of the Amended Complaints must be dismissed for lack of reliance.

### b.   Plaintiffs Cannot Establish Proximate Cause Between the Predicate Acts and the Injury.

Plaintiffs also fail to plead proximate cause, which is fatal to their RICO standing. *Dominican Republic v. AES Corp.,* 466 F. Supp. 2d 680, 692 (E.D. Va. 2006) ("If proximate cause cannot be established, the Court may dismiss the RICO claim.").   After all, "[i]t is not enough that a civil RICO plaintiff prove that, but for the defendant's violation, he would not have been injured; he must also show that the violation *proximately* caused the harm." *Chisolm*, 95 F.3d at 336 (citing *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see Caviness*, 983 F.2d at 1305.   Proximate cause determines "whether the conduct has been so significant and important a cause that the defendant should be held responsible." *Chisolm*, 95 F.3d at 336 (quoting *Brandenburg* at 1189); *see D'Addario*, 264 F. Supp. 2d at 388.

In the Fourth Circuit, "[t]he legal cause determination is properly one for the court, taking into consideration such factors as the foreseeability of the particular injury, the **intervention of other independent causes**, and the factual directness of the causal connection." *Brandenburg*, 859 F.2d at 1189 (emphasis added).   Indeed, "[w]here the injuries were more appropriately attributable to intervening causes that were not predicate acts under RICO, the RICO action could not lie." *Mid-Atlantic Telecom, Inc. v. Long Distance Servs.*, 18 F.3d 260, 263 (4th Cir. 1994).   In this case, an intervening cause exists to negate Plaintiffs' conclusory and tenuous causal connection between the alleged mailings and the injury of foreclosure or reinstatement: the fact that Plaintiffs defaulted on their mortgages. The Fourth Circuit, like many other circuits, has declined to find standing in the face of an intervening cause. *See, e.g., Kramer v. Bachan*

17

*Aerospace Corp.*, 912 F.2d 151 (6th Cir. 1990) (no standing to plaintiff whose injuries resulted not from a RICO violation but from discharge after reporting the employer's RICO scheme); *O'Malley v. O'Neill*, 887 F.2d 1557 (11th Cir. 1989) (similar facts and holding).

In *Caviness v. Derand Resources Corp.*, investors in oil and gas partnerships did not receive the returns promised by the defendants' mailings. 983 F.2d at 1298. The Fourth Circuit affirmed the trial court's refusal to find standing because there was "no assertion by the plaintiffs that the stated misrepresentations were even material to their reason for investing. Most acknowledged that they invested primarily for tax reasons, and many acknowledged not having read the memoranda, or at least not in any detail." *Id.* at 1305. Here, Plaintiffs allege no facts to demonstrate how the mailings and wires were material to the resulting foreclosures.

In *Brandenburg v. Seidel*, the plaintiffs asserted RICO claims against the officers and directors of an insolvent savings and loan for losses suffered when the deposit insurance system collapsed. 859 F2d at 1189. The plaintiffs made deposits in reliance on mailed promotional materials containing statements about the stability of the industry. *Id.* at 1188. The causal connection between the mailings and the depositors' losses was too tenuous because it ignored the more immediate causes of the plaintiffs' injuries: the institution's failure to maintain adequate reserves and negligent oversight. *Id.* at 1188–89. Likewise, the intervening cause of the Plaintiffs' default is more appropriately attributable to the Plaintiffs' injuries. As a matter of law, therefore, the Amended Complaints do not establish the required "adequate causal nexus between that injury [(i.e., foreclosure)] and the predicate acts of racketeering activity alleged [(i.e., Defendants' mailings to Plaintiffs)]." *See id.* at 1187.

The mailings, while part of the foreclosure process, merely distract from the Plaintiffs' default. Plaintiffs focus on their failed attempts to mitigate their debts—before Defendants ever enter the picture—further distracts from this intervening cause. *See* Banks ¶¶ 186–88 (noting

18

financial hardship and inability to secure loan modification before Litton referred to foreclosure); Buel ¶¶ 180–90 (same, but with Chase); Chatter ¶¶ 160–65 (same, but with Chase); Goodrow ¶¶ 183–90 (noting disability and inability to secure loan modification before MetLife referred to foreclosure); Mbundure ¶¶ 144–46 (noting financial hardship and inability to complete short sale before PNC referred to foreclosure); McBeth ¶¶ 197–211 (noting financial hardship and inability to secure loan modification before Wells Fargo referred to foreclosure).[14]   At no time do Plaintiffs, in the many hundreds of paragraphs comprising their Amended Complaints, ever allege that they were compliant with the terms of their home mortgage loans.   Any suggestion under the circumstances of these Amended Complaints that Plaintiffs complied with their loan obligations would be implausible to say the least.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

These attempted loan modifications and short sales did not entitle Plaintiffs to remain in their homes.  *See McInnis v. BAC Home Loan Servicing, LP*, 2012 U.S. Dist. LEXIS 13653, at *8–9, 17 (E.D. Va. Jan. 13, 2012) ("The Substitute Trustees have no role in determining whether or not Plaintiff could be granted a permanent loan modification . . . .") (citing nine opinions holding that "there is no private right of action for individual borrowers to assert claims against lenders for violations of HAMP"); *see also* Part IV.A.1.c, *supra*.  In fact, the Amended

---

[14]     *See Burkart v. Mortg. Elec. Registration Sys., Inc.*, 2012 U.S. Dist. LEXIS 140794, at *17–19 (W.D. Wa. Sept. 28, 2012).  In this recent case, plaintiffs brought RICO claims after Bank of America ("BofA") advised them to skip loan payments in order to qualify for loan modification.  *Id.* at *3.  Plaintiffs allegedly followed this advice to obtain a loan modification, yet BofA also declared the loan in default and accelerated payment.  *Id.*  The plaintiffs incurred late charges and other fees throughout a protracted negotiation and brought, among other things, a lawsuit under the FDCPA and RICO.  *Id.*  The Western District of Washington noted a lack of reliance and held that no RICO claim could be asserted for the alleged wrongful institution of foreclosure proceedings, which contained numerous allegations of defects in the foreclosure process.  *Id.* at *13, 18 ("[T]he Burkarts sprinkle their complaint liberally with conclusory accusations of fraud, but they never explain **how** they were defrauded . . . .   They do not explain how they relied on a robo-signed document to their detriment." (emphasis added)).

Complaints belie any such right by tending to show that Defendants dealt exclusively with defaulted mortgages. *See, e.g.*, Banks ¶ 309; Buel ¶ 295; Chatter ¶ 282; Goodrow ¶ 331; Mbundure ¶ 258; McBeth ¶ 339. Further, no legal basis exists to support the claim that servicers "inappropriately dual-tracked their foreclosure and loan modification activities." *See* Banks ¶ 25; Buel ¶ 57; Chatter ¶ 19; Goodrow ¶ 63; McBeth ¶ 57; McBeth ¶ 25. These allegations only highlight that the critical decision to foreclose was made not by Defendants, but by the various servicers, which comprises a legal cause more material to Plaintiffs' injury than Defendants' use of form letters. Indeed, Plaintiffs' alleged injury of foreclosure was foreseeable **regardless** of Defendant's actions and only as a proximate result of Plaintiff's default and the servicers' decision to foreclose. Therefore, the Court should dismiss Counts II of the Amended Complaints for lack of standing.

### c.   Buel, Mbundure, and McBeth Have Failed to Allege Injury Sufficient to Obtain Standing.

Several Plaintiffs lack sufficient allegations of injury. The Buel Amended Complaint contradicts itself alleging both foreclosure, Buel ¶ 312, and reinstatement, Buel ¶ 264. Mbundure conspicuously omits any allegations that after the foreclosure sale, the real property was conveyed by deed of trust, *compare* Mbundure ¶ 225, *with* Banks ¶ 264; Chatter ¶ 237; Goodrow ¶ 244. Further, McBeth curiously omits any allegations of her injury. *Compare* McBeth ¶¶ 1–308, *with* Banks ¶¶ 263–79; Chatter ¶¶ 236–53; Goodrow ¶¶ 242–59. In fact, no foreclosure occurred in McBeth. These three Plaintiffs have not, in good faith, alleged facts to support their conclusory allegations of foreclosure. In the absence of plausible claims for injury, therefore, Buel, Mbundure, and McBeth cannot plausibly allege that the predicate acts caused any harm to the real properties, so this Court should dismiss Counts II of these Amended Complaints now.

### 2.     Plaintiffs Cannot Establish a RICO Enterprise.

Plaintiffs again fail to allege an "association-in-fact" enterprise (*i.e.*, an enterprise comprised of several entities), which requires a showing that the disparate entities shared a "common purpose which animated" the association-in-fact's members. *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Plaintiffs have failed to plead the requisite common purpose.

Plaintiffs allege that Defendants were involved in the business of foreclosing on homes whose owners had defaulted on their home mortgage obligations.  Banks ¶ 18, 68, 309; Buel ¶ 18, 62, 295; Chatter ¶ 16, 25, 282; Goodrow ¶ 19, 68, 331; Mbundure ¶ 30, 258; McBeth ¶ 18, 79, 339.  Plaintiffs have not pleaded, and cannot plead in good faith, that foreclosing on delinquent mortgages is unlawful or improper, much less corrupt.  Nor can they plead in good faith that a person or entity who makes money in the process of foreclosing on delinquent mortgages is behaving in an unlawful or improper manner.

That failure to plead is fatal to Plaintiffs' RICO claim against Defendants because "[a] goal of making money establishes a common purpose [for purposes of 18 U.S.C. § 1961] **where the enterprise members sought to profit from the alleged illegal activity**." *United States v. Tillett,* 763 F.2d 628, 631 (4th Cir. 1985) (common purpose to profit from selling illegal marijuana) (emphasis added); *see also United States v. Batts*, 171 F. App'x 977, 981 (4th Cir. 2006) (common purpose of dealing cocaine); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006) (common purpose of profiting from harboring illegal aliens).  In the Amended Complaints, however, Plaintiffs have failed to adequately plead any illegal activity from which the enterprise members "sought to profit."

### a.     Defendants' Use of "Unavailable Note Affidavits" Was Not Illegal.

Plaintiffs rely, for their unfounded allegation of illegality, primarily on a misconstruction

of the use of so-called "unavailable note affidavits" made pursuant to Virginia Code section 55-59.1(B). *See* Banks ¶ 37 *et seq.*; Buel ¶ 37 *et seq.*; Chatter ¶ 211 *et seq.*; Goodrow ¶ 37 *et seq.*; Mbundure ¶ 203 *et seq.*; McBeth ¶ 37 *et seq.* Plaintiffs allege that Defendants should not have prepared "unavailable note affidavits" because procedures exist by which the notes could have been obtained by Defendants at some time subsequent to the preparation of these affidavits. *Id.* But Virginia Code section 55-59.1 has no provision limiting the use of an "unavailable note affidavit" to such narrow circumstances. Indeed, section 55-59.1(B) provides for exactly the opposite permissible use. It permits use of an "unavailable note" affidavit if it cannot be produced "**for any reason**." Surely, "any reason" includes "not in the Defendant's possession at the time the affidavit is prepared." *See* Banks ¶ 140, 204; Buel ¶ 134, 206; Chatter ¶ 97, 181; Goodrow ¶ 137, 205; Mbundure ¶ 99, 163; McBeth ¶ 151, 230.

Plaintiffs argue that "any reason" means only "unavailable even after request is made to Fannie Mae pursuant to Fannie Mae procedures." This strained construction of "any reason" is without foundation in the plain text of the Virginia statute. *See Goodrow II*, 2102 U.S. Dist. LEXIS 182188, at *24–26; *see also infra* Part IV.C.3.a. Lawfully preparing "unavailable note affidavits" cannot be construed as illegal activity that supports a finding of a "common purpose" for a RICO claim if the "unavailable note affidavits" are, themselves, not unlawful.

> **b.    Plaintiffs Do Not Plausibly Allege that Defendants Had the Common Purpose of Profiting from Servicer Activities.**

Plaintiffs also rely, for their unfounded common purpose of illegal activity, on a host of allegations about Chase Home Finance, JPMorgan Chase Bank, N.A., Litton Loan Servicing, MetLife, PNC, and Wells Fargo Bank, N.A., made either in a different lawsuit or in a review by federal agencies. *See* Banks ¶¶ 49–60; Buel ¶¶ 49–54; Chatter ¶¶ 11–16; Goodrow ¶¶ 49–60; Mbundure ¶¶ 11–22; McBeth ¶¶ 49–54, 60–71. None of the parties to the Amended Complaints,

however, were parties to these federal agency reviews or lawsuits, including settlement, the terms of which are not alleged.

While Plaintiffs contend that third party litigants or federal agencies said in other lawsuits or reviews that these various servicers defrauded some consumers, Plaintiffs in this case do not allege that Defendants had anything to do with that.  Their failure to make even general allegations that Defendants participated in any fraud with these servicers emphasizes, of course, the absence of *specific* allegations with any particularity at all.  *See Hessek v. N. Am. Mortg. Ins. Servs.*, 2003 U.S. Dist. LEXIS 27361, at *3 (E.D. Va. Oct. 17, 2003), *aff'd*, 94 F. App'x 981 (4th Cir. 2004) (requiring "greater particularity" of "the specific facts that establish an 'enterprise'"). Indeed, Plaintiffs do not allege that any of Defendants even *knew* anything about the activity alleged in other lawsuits or in a federal agency reviews against the various servicers, much less that Defendants had the common purpose of profiting from the servicers' allegedly unlawful activity.  On this central question, the Amended Complaints are simply silent.

> **c.**     **Plaintiffs' Conclusion That Defendants Paid Lender Processing Services an Illegal "Kickback" Is Belied by the Allegations in the Amended Complaints.**

Plaintiffs also allege that Defendants paid Lender Processing Services, Inc., ("LPS") an illegal or unethical "kickback." *See* Banks ¶ 78; Buel ¶ 72; Chatter ¶ 35; Goodrow ¶ 78; Mbundure ¶ 40; McBeth ¶ 89.  But the Amended Complaints, by their own terms, demonstrate nothing unlawful about Defendants' payment of the $125 "admin fee" to LPS.  Plaintiffs allege that LPS administered all aspects of loan servicing and aided mortgage servicers to service mortgage loans that are in default.  *See* Banks ¶¶ 67–68; Buel ¶¶ 61–62; Chatter ¶¶ 24–25; Goodrow ¶¶ 67–68; Mbundure ¶¶ 29–30; McBeth ¶¶ 78–79 (noting Defendant Friedman used LPS services "to accept referrals and then proceed to foreclosure" on cases).  LPS, in turn,

provided to Defendants the applicable servicer's information pertaining to the loan, such as copies of the note, screenshots of unpaid balances, and other details related to the loan. *See* Banks ¶ 80; Buel ¶¶ 73–74; Chatter ¶ 37; Goodrow ¶ 79; Mbundure ¶ 41; McBeth ¶ 91.   A company would be expected to charge a user a fee for this wide range of services provided by LPS.   Because LPS charged Defendants $125 for these services, regardless of whether the foreclosures occurred, the fee does not appear to be an illegal "kickback" and is more akin to an ordinary exchange for services.   Plaintiffs' allegation that this arrangement is a "kickback" does not make it so. *See, e.g.*, 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Act proscribing bribes by health care providers in exchange for referrals but not fees for services).

### d. Plaintiffs' Claims That Defendants Created a "Sham" Corporation Do Not Plausibly Allege Criminal Activity or a Common Purpose to Profit from Criminal Activity.

Plaintiffs allege that Defendants Mark Friedman and Kenneth MacFadyen formed a law firm, Defendant Friedman, for the sole purpose of conducting foreclosures. *See* Banks ¶ 97; Buel ¶ 91; Chatter ¶ 54; Goodrow ¶ 95; Mbundure ¶ 57; McBeth ¶ 109.   Of course, this conduct is not inherently unlawful.   Plaintiffs also allege that Defendants Mark Friedman and Kenneth MacFadyen formed another entity, Defendant F&M, to serve as a substitute trustee in foreclosures. *Id.*   While the Plaintiffs take every opportunity to call Defendant F&M a "sham" company, the Amended Complaints contain no allegations about what the "sham" might be.   It is not unlawful for Defendants Friedman and MacFadyen to form a corporation to serve as substitute trustee in certain cases, and Plaintiffs do not allege that it is.

### e. Plaintiffs' Allegations of Improper Substitute Trustee Document Preparation Do Not Plausibly Allege a Common Purpose to Profit from Illegal Activity.

Plaintiffs' claims that Defendants improperly prepared substitute trustee documents do

not assert that any other alleged member of the purported enterprise was either aware of or profited from these documents, much less had a "common purpose" to do so. *See* Banks ¶ 101; Buel ¶ 95 *et seq.*; Chatter ¶ 58 *et seq.*;  Goodrow ¶ 98; Mbundure ¶ 60 *et seq.*; McBeth ¶ 112 *et seq.*  Indeed, Plaintiffs' claims that their own mortgage was improperly foreclosed stem exclusively from their claim that they wished to renegotiate the terms of their mortgage loan but were unsuccessful. *See* Banks ¶¶ 186–88; Buel ¶¶ 180–90; Chatter ¶¶ 160–65; Goodrow ¶¶ 183–90; Mbundure ¶¶ 144–46; McBeth ¶¶ 197–211. But Plaintiffs do not allege they were contractually or otherwise entitled to such a renegotiation and, more importantly, do not allege that they had not breached the terms of their mortgage loan. Against the cavalcade of allegations that mailings and wires provided by Defendants were erroneous in one particular way or another, Plaintiffs' failure to allege that they were not in default or could cure the same is conspicuous. Plaintiffs do not plausibly claim full compliance with the terms of their loans. In short, Plaintiffs seek to convert their own failure to make contractually-required payments into a claim that the entities to which they owed money were corrupt for insisting on payment. This is not a common purpose to profit from illegal activity upon which a RICO claim may be predicated. *See Avalo v. Regional Trustee Svcs. Corp.*, 2013 U.S. DIST. LEXIS 18248 (W.D. Wa. Feb. 11, 2013) ("The Court is not aware of any reported opinion in the country holding that the foreclosure on a Deed of Trust when the loan is admittedly in default is a RICO violation. Indeed, Plaintiffs concede that their only support for this claim is the claim that the Defendants are not authorized to foreclose.").

### 3.      Plaintiffs Do Not Plausibly Allege a Pattern of Racketeering Activity Based on Mail and Wire Fraud.

#### a.      Plaintiffs Cannot Establish Continuity.

Plaintiffs have again failed to allege a pattern of racketeering activity under 18 U.S.C.

§ 1961(5), which is met by establishing "continuity plus relationship." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). Specifically, Plaintiffs fail to allege "the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties." *Flip Mortg. v. McElhone,* 841 F.2d 531, 538 (4th Cir. 1988). Clearly, continuity cannot be established as an open-ended concept because the Plaintiffs concede that Defendants are now a defunct operation. *See, e.g.*, Banks ¶ 1.

But the Amended Complaints provide no facts to "prov[e] a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 239–41. For such closed-ended continuity, "a multi-factor test must be satisfied, and a careful assessment must be made of the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 259 (4th Cir. 2011) (internal quotation omitted).

With respect to time, "in order for closed-ended continuity to exist, the racketeering activity **must usually have taken place over the course of many years**." *CVLR Performance Horses, Inc. v. Wynne,* 852 F. Supp. 2d 705, 723–25 (W.D. Va. 2012) (emphasis added) (surveying dozens of closed-end RICO cases and finding that a closed-period of racketeering activity of three 3 to 4 years "is also not especially long or noteworthy. Rather it represents a time period closer to the low-end of the relevant [closed-continuity] spectrum."). Predicate acts lasting no more than a few months to even a year have been shown to fail to state a RICO claim. *See, e.g., E. Publ'g & Adver., Inc. v. Chesapeake Publ'g & Adver., Inc.,* 895 F.2d 971, 973 (4th Cir. 1990) (holding that mail and wire fraud acts over 3 months was not enough); *Menasco,* 886

26

F.2d at 684 (holding that mail and wire fraud acts over 1 year was not enough); *Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 843(E.D. Va. 2007) (finding plaintiffs failed to allege RICO based on 3 acts of mail fraud and 1 act of wire fraud that took place over the limited period of one year and directed to a single individual).

These cases mandate the dismissal of the Amended Complaints, in which the predicate acts spanned less time.  The alleged series of form letters mailed to most Plaintiffs does not exceed a time period of two months.  *See* Banks ¶¶ 193–207 (August 17, 2010 to August 24, 2010); Buel ¶¶ 194–207 (September 29, 2010 to October 29, 2010); Chatter ¶¶ 172–84 (July 27, 2010 to August 2010); Goodrow ¶¶ 194–219 (October 8, 2008 to January 11, 2010); Mbundure ¶¶ 153–78 (August 2, 2010 to September 22, 2010); McBeth ¶¶ 216–49 (July 28, 2010 to August 10, 2010).  In Goodrow, the mailings span 13 months—including a gap in time while foreclosure paused between November 2008 and January 2010—but even this time period fails to establish closed-end continuity.  Goodrow ¶¶ 194–219; *see Menasco*, 886 F.2d at 684.  Further, the Amended Complaints identify "wires" that not only fail to involve the Plaintiffs, thereby negating any reliance, but also omit specific reference to date, time, or the identity of sender or receiver in contravention of the heightened pleading standards of Rule 9(b).  *See* Banks ¶¶ 190–92, 196, 201, 208; Buel ¶¶ 188–90, 195; Chatter ¶¶ 167–69, 173, 178, 185; Goodrow ¶¶ 195, 201; Mbundure ¶¶ 147–49, 154, 159; McBeth ¶¶ 210–12, 217.  *See also D'Addario*, 264 F. Supp. 2d at 397 (applying Rule 9(b) to RICO actions based on mail and wire fraud).

The number of victims specifically identified undermines continuity because each Amended Complaint fails to identify any victims in addition to the named Plaintiff with the requisite specificity, merely referring to other victims as "consumers." *See e.g.*, Banks ¶ 8.  This type of pleading was rejected in *Menasco* and should be rejected here as well.  *See Menasco*, 886 F.2d at 684 (noting allegations that defendants committed fraud against "various other

27

individuals" was too general to satisfy Rule 9(b) and therefore could not be relied upon to establish a RICO pattern). Notably, the district courts in Virginia have refused to find a pattern in cases with more victims than these six Plaintiffs. *See, e.g., Baker v. Sturdy Built Mfg. Inc.,* 2007 U.S. Dist. LEXIS 78428 (E.D. Va. 2007) (Hudson, J.) (holding that mail and wire fraud occurring over 5 years aimed at 10 victims failed under RICO); *Foster v. Wintergreen Real Estate Co.,* 363 F. App'x 269, 272 (4th Cir. 2010) (holding that hundreds of mail and wire fraud acts over 8 years targeted at 500+ victims, involving four schemes failed under RICO).

Therefore, Plaintiffs merely allege a few predicate acts (ranging from 1 to 5 specific acts of mail fraud) spanning from 2 months to one year, targeted at no more than one victim (at best, no more than 6), according to a single common scheme, and without multiple distinct injuries (alleging a single injury of foreclosure). These claims cannot establish a RICO pattern.

### b.    Plaintiffs Cannot Represent a RICO Class Action.

The deficiencies in the Plaintiffs' pattern allegations further undermine their ability to assert a RICO class action because, as alleged, the Court cannot identify a single plaintiff who can adequately represent the class. After all, in *Anderson v. Westinghouse Savannah River Co.,* the Fourth Circuit explained a court "cannot certify a class action in which the class representative is not part of the class and does not 'possess the same interest and suffer the same injury' as the class members." 406 F.3d 248, 260 (4th Cir. 2005) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 338 (4th Cir. 1998) (refusing to certify a class for a plaintiff who sought to represent two sub-classes of plaintiffs, with whom she did not have the same interest and had not suffered the same injury)). A plaintiff who fails to plead pattern with the requisite Rule 9(b) particularity cannot represent a class on a RICO claim. *See, e.g., Godfredson v. JBC Legal Group, P.C.,* 387 F. Supp. 2d 543, 552 (E.D.N.C. 2005) (refusing to

certify a RICO class action for plaintiffs who merely alleged that the defendant debt-collection law practice injured unnamed class members, and who could not show, even as to those named, reliance on or injury from acts of mail and wire fraud).

In the absence of standing, a common purpose, and a continuous pattern of racketeering activity, it is difficult to see how Counts II can remain when the Fourth Circuit has "reserved RICO liability for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Al-Abood v. Elshamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Menasco,* 886 F.2d at 684 (4th Cir. 1989)). Accordingly, Counts II of the Amended Complaints must be dismissed.

## C. Plaintiffs' Claims Under the Fair Debt Collection Practices Act Should Be Dismissed (Counts III).

Plaintiffs allege that Defendants violated §§ 1692g, 1692e, and 1692f of the Fair Debt Collection Practices Act. 15 U.S.C. § 1692 *et seq.* These claims should be dismissed because: (1) many of Plaintiffs' allegations are barred by the FDCPA's one-year limitations period; (2) the servicer may be considered a creditor under the FDCPA; (3) Defendants' communications do not contain deceptive representations, or such representations are not material; and (4) Plaintiffs' failing § 1692e claims must also fail under § 1692f. Furthermore, because Plaintiffs' individual claims fail, they cannot support a class action.

### 1. The FDCPA's Statute of Limitations Bars Claims Not Made Within One Year of the Alleged Violation.

An FDCPA claim must be commenced "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). For communications, a claim under the FDCPA accrues when the debt collector sends the notice or communication. *See Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 701 (E.D. Va. 2010), *aff'd,* 441 F. App'x 166 (4th Cir. 2011) ("An

alleged FDCPA violation occurs, and the action accrues, when the alleged debt collector sends the debtor the notice of default.").[15]  In many cases, Plaintiffs attach to the Amended Complaints the correspondence that they allege violates the FDCPA.  This Court can and should consider the exhibits in determining which claims are time-barred.

>    **a.    Banks's Claims Are Completely Barred by the FDCPA's One-Year Limitations Period.**

Banks alleges that Defendants' correspondences contain misrepresentations and that Defendants were not properly appointed as substitute trustee.  *See* Banks ¶¶ 326, 329, 331.[16] Banks filed her initial Complaint in this matter on September 16, 2011.  *See* Complaint, No. 3:11cv614 (E.D. Va. Sept. 16, 2011) [ECF No. 1].  An examination of the exhibits she now attaches to her Amended Complaint reveals that her claims are barred.[17]

Defendants were appointed as substitute trustee more than a year prior to the filing of Banks's initial Complaint.  *See* Banks Ex. I.  None of the communications with Banks occurred within a year of her filing.  *See, e.g.*, Banks Ex. H.  Moreover, the foreclosure sale on Banks's property occurred on September 14, 2010—a year and two days before she filed her initial Complaint.  *See* Banks Ex. J.  Accordingly, all debt collection activities occurred outside of the limitations period.

In an apparent last-ditch effort, Banks attempts to state a claim for alleged misrepresentations to Commissioners of Accounts.  First, Banks does not attach this alleged

---

[15]    *See also Stewart v. Bierman*, 859 F. Supp. 2d 754, 760 (D. Md. 2012) (quoting *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 501 (D. Md. 2004)); *Vitullo v. Mancini*, 684 F. Supp. 2d 747, 753 (E.D. Va. 2010).

[16]    Banks makes these allegations on behalf of a purported class.  Because Banks's individual claims fail, her class claims must necessarily fail.

[17]    In fact, Banks previously "amended out" her FDCPA allegations when faced with identical statute of limitations arguments.  *See* Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint, No. 3:11cv614 (E.D. Va. Aug. 24, 2012) [ECF No. 20]; First Amended Class Complaint, No. 3:11cv614 (E.D. Va. Sept. 18, 2012) [ECF No. 56].

correspondence to her Amended Complaint. Second, the foreclosure sale extinguishes the debt and disables the property. That is, once Banks's property was sold, no "debt" remained to collect, rendering the FDCPA inapplicable. *See Calkins v. Shapiro & Anderson, L.L.P.*, 2005 U.S. Dist. LEXIS 33185, at *16–17 (D. Ariz. Dec. 13, 2005) ("Shapiro & Anderson did not have any contact with Plaintiffs until after the foreclosure sale of the property . . . . Thus, at the time Shapiro & Anderson contacted Plaintiffs there was no longer any "debt" to collect from Plaintiffs. **There being no "debt" to collect, the FDCPA does not apply.**" (emphasis added)); *see also Davidson v. JP Morgan Chase N.A.*, 2011 U.S. Dist. LEXIS 135573, at *10–11 (N.D. Cal. Nov. 23, 2011). Because any misrepresentation in the Trustee's Deed and accounting occurred when there was no debt to collect, Banks cannot state a claim under the FDCPA.

> **b.     Chatter's Claims Are Completely Barred by the FDCPA's One-Year Limitations Period.**

Like Banks, Chatter alleges that Defendants made misrepresentations in various correspondences and were not properly appointed as substitute trustee. *See* Chatter ¶¶ 306, 308.[18] And like Banks, all of Chatter's claims under the FDCPA are barred.[19]

Chatter filed his initial Complaint on September 16, 2011. *See* Complaint, No. 3:11cv613 (E.D. Va. Sept. 16, 2011) [ECF No. 1]. Defendants were appointed as substitute trustee more than a year prior to Chatter's initial Complaint. *See* Chatter Ex. G. Furthermore, the Trustee's Deed reveals that the foreclosure sale occurred on September 1, 2010. *See* Chatter Ex. H. All correspondence with Chatter would have necessarily occurred before the sale. The

---

[18]     Chatter makes these allegations on behalf of a purported class. Because Chatter's individual claims fail, his class claims must necessarily fail.

[19]     Once again, Chatter previously "amended out" his FDCPA allegations when faced with identical statute of limitations arguments. *See* Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint, No. 3:11cv613 (E.D. Va. Aug. 24, 2012) [ECF No. 26]; First Amended Class Complaint, No. 3:11cv20 (E.D. Va. Sept. 18, 2012) [ECF No. 65].

filing of the Trustee's Deed and accounting with the Commissioner of Accounts occurred after extinguishment of the debt and disablement of the property. *See supra* Part IV.C.1.a.  Thus, Chatter makes no allegations under the FDCPA that could possibly fall within one year preceding the filing of his initial Complaint.

### c.  Goodrow Attaches Correspondence Barred by the FDCPA's Statute of Limitations.

Goodrow filed his initial Complaint on January 10, 2011. *See* Complaint, No. 3:11cv20 (E.D. Va. Jan. 10, 2011) [ECF No. 1].  He now attempts to assert FDCPA violations for correspondences received in 2008.[20]  Goodrow alleges that Defendants failed to identify the creditor to whom the debt was owed in their initial correspondence. *See* Goodrow ¶ 363.  Yet, Goodrow received that initial correspondence on October 8, 2008. *See* Goodrow Ex. H. Goodrow also claims that Defendants made inconsistent demands for payment, represented that the Note was lost or unavailable, and were improperly appointed, but these claims are also time-barred. *Compare* Goodrow ¶¶ 356, 360, 364, *with* Goodrow Exs. I (dated October 9, 2008), J (dated November 24, 2008), K (dated November 24, 2008), and M (dated October 8, 2008). Defendants resumed foreclosure activity in early 2010, and only those communications and actions postdating January 10, 2010 are potentially actionable.

### d.  The Buels Attach Correspondence Barred by the FDCPA's Statute of Limitations.

The Buels filed their initial Complaint on October 26, 2011.  Complaint, No. 3:11cv716 (E.D. Va. Oct. 26, 2011) [ECF No. 1].  In their Amended Complaint, the Buels assert violations

---

[20]  In previous iterations of his Complaint, Goodrow acknowledged that these correspondences were insufficient to state a claim under the FDCPA. *See* Goodrow First Amended Complaint and Demand for Jury Trial n.2, No. 3:11cv20 (E.D. Va. Feb. 25, 2011) [ECF No. 7] ("[T]he FDCPA's one year statute of limitations may render certain of the Defendants' debt collection misconduct inactionable . . . .").

of the FDCPA based on various alleged misrepresentations and because Defendants had not been properly appointed. Buel ¶¶ 318, 321, 327. In large part, they base these claims on correspondence sent outside of the FDCPA's limitation period. Buel Exs. H (dated September 29, 2010), I (dated September 29, 2010), and J (dated September 29, 2010). Accordingly, any alleged violations of the FDCPA stemming from these documents necessarily fail to state claims upon which relief can be granted.

### 2. Plaintiffs Fail to State a Claim that Defendants Violated § 1692g of the FDCPA in Their Initial Correspondence to Consumers.

Plaintiffs claim that Defendants violated §1692g of the FDCPA by listing the servicer on their initial correspondence. They allege that the servicer is not the creditor of the debt, and that the FDCPA requires that the beneficiary be identified as the creditor. Goodrow ¶ 362; Mbundure ¶ 287; McBeth ¶ 371. The initial correspondences sent in Banks, Buel, Chatter, and Goodrow fall outside of the FDCPA's statute of limitations. *See supra* Part IV.C.1. Furthermore, Mbundure attaches only a partial letter, which does not support his allegations. *See* Mbundure Ex. G. Thus, only McBeth's initial letter is properly before this Court. In that letter, Defendants identify "EverHome Mortgage Company [as] the current noteholder and/or servicer." McBeth Ex. I.

McBeth's claim fails for three reasons. First, the statutory language of the FDCPA does not specifically require that the "beneficiary" be disclosed. *See* 15 U.S.C. § 1692g(a)(2) (requiring that the initial communication contain "the name of the creditor to whom the debt is owed"). Second, mortgage servicing companies tend to be creditors under the FDCPA. *See Bradford v. HSBC Mortg. Corp.*, 829 F. Supp. 2d 340, 348 n.16 (E.D. Va. 2011) ("[B]ecause 'mortgagors[] and mortgage servicing companies' tend to be creditors, they generally 'are not debt collectors and are statutorily exempt from liability under the FDCPA." (quoting *Ruggia v.*

*Washington Mut.*, 719 F. Supp. 2d 642, 648 (E.D. Va. 2010))).   Finally, a noteholder has the power to enforce the deed of trust note, which includes the power to collect payments and the power to enforce acceleration and foreclosure remedies.   *See generally Horvath v. Bank of N.Y., N.A.*, 641 F.3d 617 (4th Cir. 2011).   Accordingly, since identifying the servicer and/or noteholder as the creditor is not incorrect, Plaintiffs fail to state a claim under § 1692g.

### 3.   Plaintiffs Do Not Plausibly Allege that Defendants Made False, Deceptive, or Misleading Representations; Nor Are the Alleged Representations Material.

Throughout their Amended Complaints, Plaintiffs allege that every uncrossed "*t*" and undotted "*i*" constitutes a misrepresentation under the FDCPA.   The FDCPA does not intend this level of scrutiny.   First, the provisions of the FDCPA presume that the debtor possess "a basic level of understanding and willingness to read with care," *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 136 (4th Cir. 1996); and the FDCPA prevents liability for "bizarre or idiosyncratic interpretations of collection notices," *Sunga v. Rees Broome, P.C.*, 2010 U.S. Dist. LEXIS 25590, at *7 (E.D. Va. Mar. 18, 2010).   Second, false but immaterial statements are not actionable under the FDCPA.   *See Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012).[21]   Generally, "in order for a false statement to violate the FDCPA, it must affect a consumer's ability to make intelligent decisions with respect to the alleged debt." *Penn v. Cumberland*, 2012 U.S. Dist. LEXIS 104565, at *15 (E.D. Va. July 25, 2012). Plaintiffs' allegations either do not constitute actionable misrepresentations or are immaterial—or both.

### a.   The "Lost Note Letter" Does Not Support an FDCPA Claim.

Plaintiffs allege that "Defendants . . . forwarded correspondence to consumers that falsely

---

[21]   *See also Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010); *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757 (7th Cir. 2009); *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009); *Starosta v. MBNA Am. Bank, N.A.*, 244 F. App'x 939 (11th Cir. 2007).

represented that the note was lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1" in violation of various provisions of the FDCPA. Goodrow ¶ 356; Mbundure ¶ 281; McBeth ¶ 365. All Plaintiffs generally aver that Defendants sent these letters, but only Buel, Goodrow, Mbundure, and McBeth attach the specific letter they received. Buel Ex. I, Goodrow Ex. I, Mbundure Ex. H, McBeth, Ex. J. These allegations fail to state a valid FDCPA claim because the "Lost Note Letters" are: (1) not collection activity; (2) not false, misleading, or deceptive; and (3) not material.

**First**, the statutory notice letter does not constitute debt collection activity. Section 1692e of the FDCPA provides that "[a] debt collector may not use any false, deceptive or misleading representation or means **in connection with the collection of any debt**." 15 U.S.C. § 1692e (emphasis added). In *Blick v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 41266 (W.D. Va. Mar. 27, 2012), the Court considered a similar letter used by the Bierman firm ("BGWW") and determined that it was not sent in connection with the collection of any debt:

> The most BGWW's letter says about the debt is that "the Beneficiary hereby informs you that the Promissory Note . . . is unavailable as of the date of mailing this letter." To construe BGWW's informational notice as an express or implied demand for payment would require the Court to strain considerably in its interpretation of the letter.

*Id.* at \*27–28 n.8 (citations omitted).

Here, the Court need only look at the letters to recognize that its subject matter is restricted to notices provided for in Virginia Code section 55-59.1(B). The letters do not: (1) mention the amount of the debt; (2) demand payment of a debt; or (3) solicit a response regarding a debt. *Cf. Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 374–75 (4th Cir. 2006). And, while there is an FDCPA-type warning at the bottom of the letter, the Fourth Circuit has recently held that inclusion of such a warning is not to be considered evidence of debt collection activity. *See Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 334 (4th Cir.

2012) ("[A] debt collector should not be penalized for taking the precaution of including the disclaimer within its initial written communication to the debtor, in the event the debt is subject to the FDCPA."). Thus, the statutory notice letter is not an attempt to collect a debt and therefore cannot provide the basis for an FDCPA violation.

**Second**, in order to find that the letter violates § 1692e, this Court must also find that it contains a false, deceptive, or misleading representation. It does not. The plain language of the letter provides:

> We are writing to tell you that we do not have the original note in our possession at this time. We do have evidence of the indebtedness referenced above. We have been informed by the Lender that they will forward the original note to us. We want you to be aware of your statutory rights under Virginia Law.

*E.g.*, Goodrow Ex. I. Importantly, the letter does not state that the note is lost or permanently unavailable, and it does not necessitate that Defendants proceed without the note. Nevertheless, Plaintiffs' allegations contort the language of the letter to suggest that it is inconsistent with section 55-59.1(B).

Section 55-59.1(B) requires notice when the note is either lost **"or for any reason cannot be produced."** VA. CODE ANN. § 55-59.1(B); *see also Van v. BAC Home Loan Servicing LP*, 2010 U.S. Dist. LEXIS 145216, at *10 (E.D. Va. Sept. 23, 2010) ("The statute requires that notice be given when a note is for any reason not available . . . ."). In the letters, Defendants advise Plaintiffs that the note is not in their possession presently, and that the lender has represented that the original note will be mailed to them. "Any reason" certainly encompasses this set of facts. Accordingly, this Court must disregard the broad language of the statute to reach the conclusion Plaintiffs attempt to reach—that the note must be "lost or unavailable" before a trustee can send a statutory notice letter. This Court has already declined to do so. *See Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *26 ("This Court has trouble reading this broad

statutory language otherwise.").

Moreover, section 55-59.1(B) does not require that a trustee possess an affidavit in order to send a statutory notice letter to the borrower. To the contrary, section 55-59.1(B) provides that the beneficiary must submit an affidavit only in order for the trustee **"to proceed to sale"**. Va. Code Ann. § 55-59.1(B). Courts examining this issue agree: "[T]here is no statutory requirement concerning the timing of the Affidavit of Lost Note." *Buzbee v. U.S. Bank, N.A.*, 2012 Va. Cir. LEXIS 39, *11 (Fairfax County May 2, 2012); *see also Goodrow II*, 2012 U.S. Dist. LEXIS 182188, at *26; *Van*, 2010 U.S. Dist. LEXIS 145216, at *10.

**Third**, unless a statement is material, it is not actionable under § 1692e. A statement about the present unavailability of the original Notes made on behalf of the beneficiaries, long before any foreclosure sale is scheduled, would not mislead even the least sophisticated consumer so as to prevent him from making some choice intelligently. To the contrary, the letter lays out for Plaintiffs their possible recourse in the event the trustee does proceed to sale under Virginia Code section 55-59.1(B) and Plaintiffs believe they are subject to multiple claims concerning the same debt. The letter does not prevent intelligent choice; it informs intelligent choice. *Cf. Broughman v. Chiari & Ilecki, LLP*, 2102 U.S. Dist. LEXIS 166658, at *10 (W.D.N.Y. Nov. 21, 2012) (finding technically false statement immaterial because it informed the consumer that he had a specified time in which to act). The statements that allegedly violate § 1692e are not materially false, misleading or deceptive, and because of this, Plaintiffs fail to state a claim for violation of the FDCPA for the content of the letters. *See Warren*, 676 F.3d 365 (4th Cir. 2012); *Hahn v. Triumph P'ships LLC*, 557 F.3d 755 (7th Cir. 2009).

### b. Plaintiffs' Claims Regarding the "Court Case" Style Fail to State a Material Violation of the FDCPA.

Plaintiffs allege that Defendants violated the Fair Debt Collection Practices Act by using

a "court case" style in the subject line of their letters. Banks ¶ 326; Buel ¶ 318; Goodrow ¶ 353; Mbundure ¶ 278; McBeth ¶ 362. Specifically, Plaintiffs contend that the "v." is an expression of "intent and entitlement to file a lawsuit," and they deem this a deceptive practice under the FDCPA. Defendants disagree.

The two letters that employ this convention are the statutory notice letter, *e.g.*, Goodrow Ex. D; and the notice of trustee's sale letter, *e.g.*, Goodrow Ex. E. The FDCPA requires a court to evaluate each of these communications "as a whole, not sentence-by-sentence," because even the least sophisticated consumer is bound to read a communication in its entirety. *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 472 (E.D. Va. 2011) [hereinafter *Goodrow I*] (citing *Vitullo v. Mancini*, 684 F. Supp.2d 747, 756 (E.D. Va. 2010)).[22]  When viewed as a whole, neither letter conveys a false threat of litigation.

The statutory notice letter is not an attempt to collect a debt, so it is not susceptible to an FDCPA claim. *Blick*, 2012 U.S. Dist. LEXIS 41266, at *27; *see also supra* Part IV.C.3.a.  To the extent this Court diverges from the *Blick* opinion, however, the letter is clear that no court case is pending. Defendants alert Plaintiffs to the possibility of foreclosure without the original note and invite Plaintiffs to petition the "Circuit Court of the county or city where the property or some part thereof lies"[23] if they believe some other party holds the claim. The letter clearly states that Plaintiffs would have to initiate a lawsuit regarding the foreclosure. Moreover, there is no reference to a particular court, jurisdiction, case number, pleading, the debt, particular

---

[22]   *See also Penn v. Cumberland*, 2012 U.S. Dist. LEXIS 104565, at *19 (E.D. Va. July 2012) ("[O]ne must look at the statement itself, in context to determine whether it is material.").

[23]   Virginia Code section 55-59.1(B) contains this exact phrase. If the Court were to rule that this contributes to a false threat of litigation, it would hold that this state statutory requirement is incongruous with the FDCPA. Courts generally interpret statutes in such a way that they do not conflict with one another. *See Shumate v. Patterson*, 943 F.2d 362, 365 (4th Cir. 1991) (noting that "statutes should be read in harmony and not in conflict").

remedies, or anything that would ordinarily accompany a reference to a collection action.  In the context of this letter, the "v." is not sufficient to communicate a threat of pending litigation— even applying the least sophisticated consumer standard.

With regard to the notice of trustee's sale letter, again, everything in the letter communicates the non-judicial nature of the foreclosure.  Nowhere is there reference to litigation or a debt collection lawsuit.  The letter states that the subject property will be sold at public auction, "if the balance of the Note is not paid in full before the date of the sale referenced in the attached Notice."  That Notice gives a legal description of the property and identifies the date, time and place of the auction and terms for bidding.  Also enclosed is the Substitution of Trustee's Deed, which makes no mention of a lawsuit or court activity.  In the context of the entire communication, the "v." in the subject line of the notice of trustee's sale letter simply does not convey the alleged intention or entitlement to file a lawsuit on its own.

Even assuming, *arguendo*, the "court case" style constitutes deceptive conduct, Plaintiffs cannot allege that this misrepresentation is material.  To be material, a statement must have the capacity to mislead a consumer to take some course of action.  *Stewart v. Bierman*, 859 F. Supp. 2d 754, 764–65 (D. Md. 2012).[24]  There is nothing a consumer would do differently because of the "court case" style, and Plaintiffs have not alleged this to be so.  Indeed, nowhere do Plaintiffs allege that they contacted Defendants or a court for fear that a lawsuit had been filed.  *Cf. id.* at 764 ("[Plaintiffs] fail to allege that they relied on or were misled because someone other than the substitute trustee affixed his or her signature to an otherwise correct document . . . .").  Even the least sophisticated consumer knows that a lawsuit cannot be maintained without process service of suit papers or some communication from a court.  Accordingly, the materiality requirement

---

[24]     *See also Penn*, 2012 U.S. Dist. LEXIS 104565, at *15 ("[I]n order for a false statement to violate the FDCPA, it must affect a consumer's ability to make intelligent decisions with respect to the alleged debt." (citing *Donohue*, 592 F.3d at 1033–34)).

has not been met, and the alleged violations of the FDCPA based on the "court case" style should be dismissed for failure to state claims.

      **c.**    **Defendants Did Not Materially Misrepresent Their Appointment As Substitute Trustee or Their Right to Foreclose.**

Plaintiffs make numerous allegations challenging the Substitution of Trustee document, and, consequently, Defendants' authority to foreclose. Banks ¶ 331; Buel ¶ 327; Chatter ¶ 308; Goodrow ¶ 364; Mbundure ¶ 289; McBeth ¶ 375. Those claims not already barred by the FDCPA's one-year limitations period fail to state a claim.

**First**, a servicer may validly appoint a substitute trustee. *See supra* Part IV.A.2.a. Furthermore, courts have found no issue with a foreclosure firm acting as "attorney in fact" for the servicer or beneficiary. *Id.*

**Second**, the method of applying signatures to foreclosure documentation is irrelevant to the debtor and therefore immaterial. In *Bierman*, for example, the Court distinguished the means of signing documents from the substance contained within the documents, rightly finding that whether or not a document is "robo-signed" has no bearing on a mortgagor, whereas it is the information contained in the document that has the potential to impact decision-making. *Bierman*, 859 F. Supp. 2d at 763–65. In essence, the Court identified "robo-signing" allegations as a red herring. Other courts agree.

In *Perkins v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 149973, *18–23 (S.D. Ohio Oct. 18, 2012), a district court judge in Ohio dissected all the flaws within the "robo-signing" claims ubiquitous to foreclosure litigation. In dispensing with a fraud allegation, the Court recognized: (1) robo-signing does not equate with falsity; (2) robo-signing is not a proximate cause of a defaulting mortgagor's injury because it does not change the fact of default or the amount of the debt; and (3) there is no intent to cause reliance or actual reliance that arises

due to a document having been signed by a person who had no personal knowledge of it – especially when that document is not particularly directed to a plaintiff.  *Id.*[25]  This rationale is equally applicable to the FDCPA claims before this Court.

The district court judge in *Bjorn v. Lender Processing Services*, 2011 U.S. Dist. LEXIS 1210 (S.D. Cal. Jan. 5, 2011), pointed to the elephant in the room, explaining:

> Even assuming the signature on the notice of foreclosure sale isn't authentic, Bjorn hasn't explained the link between forgery and fraud.  The amended complaint makes generalized allegations of misbehavior and dishonesty in the mortgage industry and government, but none of this relates specifically to his claim.  He comes closest to identifying fraud in paragraph 5 of his response to the OSC, where he argues that if signatures were forged, or "robo-signed," the signed documents have no legal effect, and both foreclosure and eviction were illegally obtained.  That said, there is no allegation the trustee did not in fact agree to the sale, or that someone other than the rightful owner of the note obtained a non-judicial foreclosure.  **Nor do any factual allegations show Bjorn relied on the alleged forgery, or that he was not in default.**

*Id.* at *5–6. (emphasis added).

In the present case, Plaintiffs allege that the Defendants misrepresented their authority to foreclose by sending Plaintiffs copies of robo-signed substitution of trustee documents.  But, even taking the robo-signing allegation as true, it is not the manner in which documents were signed that affects a trustee's authority.

**Third**, Defendants are not required to prove in court that they had the noteholder's authority.  Plaintiffs attempt to recast the widely-rejected "show me the note" theory.  Although Plaintiffs claim that the Servicers were not the noteholders at the time that Substitution of Trustee documents were prepared, they bring no claims against the Servicers.  Instead, Plaintiffs proceed against Defendants for the Servicers' alleged lack of authority.  There are no allegations

---

[25]       *See also Ethridge v. Countrywide Home Loans, Inc.*, 2012 U.S. Dist. LEXIS 158620, at *13–14 (E.D. Mich. Oct. 16, 2012) (without allegation of reliance, such as pleading that plaintiff made double payments, there can be no fraud claim based on a robo-signed assignment); *Burkart v. Mortgage Elec. Registration Sys.*, 2012 U.S. Dist. LEXIS 140794 (W.D. Wash. Sept. 28, 2012) (reliance lacking).

from the beneficiaries that the Servicers lacked authority, but Plaintiffs would have this Court permit them standing to claim that the Servicers did not act with the authority of the beneficiaries. Just as the Servicers would not be compelled to prove their authority to Plaintiffs, Defendants are not required to prove the Servicers' authority either.

In *Pham v. Bank of New York*, 2012 U.S. Dist. LEXIS 51194, at *6 (E.D. Va. Apr. 10, 2012), the Court considered a trustee's motion to dismiss claims that it attempted foreclosure without proper authorization. In *Pham*, the Court recognized the plaintiff's claim for what it was—a repurposed "show me the note" theory. *Id.* at *11. Acknowledging that the "show me the note" defense to foreclosure has been widely rejected as "contrary to Virginia's non judicial foreclosure laws," the Court held that "a substitute trustee . . . should not be required to prove in court that it has the noteholder's authority." *Id.* at *11–12. In support of its position, the Court reasoned:

> To conclude otherwise would allow borrowers to compel judicial intervention in *any foreclosure proceeding where a deed of trust has changed hands or a substitute trustee has been appointed*. This result would be plainly contrary to Virginia law, which allows a trustee to foreclose on a loan in default, even if the original note cannot be found, without first seeking a court order.

*Id.* at *12–13 (emphasis added) (citing *Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 623 (4th Cir. 2011)).

Here, Plaintiffs assert an FDCPA claim based on little more than the legal conclusion that a substitute trustee was somehow incorrectly appointed. Plaintiffs admit the properties were collateral for enforceable security interests. Plaintiffs do not—and cannot—allege that they were not in default under the terms of that security interest. Plaintiffs make no allegation that some other party had authority to appoint Defendants. In fact, the sole basis for Plaintiffs' claim is the allegation that the Servicers did not hold the Notes. Yet, the Servicers are not required to possess or produce the original Note to commence foreclosure. *See Pham*, 2012 U.S. Dist.

LEXIS 51194, at *11–12; *see also* Va. Code Ann. § 55-59.1; *Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 623 n.3 (4th Cir. 2011); *Gallant v. Deutsche Bank Nat'l Trust*, 766 F. Supp. 2d 714, 720–721 (W.D. Va. 2011). Accordingly, Defendants are not required to prove that the Servicers held the Notes at any particular time either.

### d. Defendants' Identification of the Servicers As Noteholders Does Not Constitute a Material Misrepresentation.

Plaintiffs attempt to recast their prior claim under § 1692g as false, deceptive, or misleading representation under § 1692e. Specifically, Plaintiffs allege that "Defendants . . . forwarded correspondence to consumers and the Commissioners of Accounts that contained a false statement and misrepresented that the servicer was the beneficiary, noteholder, investor and/or creditor to whom the debt was owed. Defendat's [sic] additionally filed a Trustee's Deed that contained this same misrepresentation." Banks ¶ 329; Buel ¶ 321; Chatter ¶ 306; Goodrow ¶ 358; Mbundure ¶ 283; McBeth ¶ 367. As discussed above, Plaintiffs do not plausibly allege a misrepresentation under the FDCPA. *See supra* Part IV.C.2. Furthermore, these representations are not material.

The servicer is the face of the creditor throughout the mortgage relationship. It is the company that sends the monthly invoices, handles all inquiries from the mortgagor, sends out late and default notices, informs the mortgagor of acceleration, and handles reinstatements and applications for abatements and modifications. As the investor's agent, a servicer's dealings with the mortgagor bind the investor. Payments made to the servicer are routinely credited to the mortgagor's account with the investor, and the servicer is the conduit of information from the mortgagor to the investor. Thus, identifying the servicer as the creditor does not affect the mortgagor's decision in any way and is likely to create less confusion than merely listing the investor with whom mortgagors have no contact. *See Donohue*, 592 F.3d at 1034 (explaining

that materiality is determined by whether the statement impacts the ability of the debtor to make intelligent decisions about their debt).  Plaintiffs' § 1692e claim therefore fails to state a valid cause of action.

> **e.    Alleged Misrepresentations Concerning Attorneys' Fees Fail to State Violations of the FDCPA.**

Buel and McBeth make conclusory allegations that Defendants "made a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated that their fees would be capped at $600.00." Buel ¶ 325; McBeth ¶ 373.  Even taking their factual allegations as true, Plaintiffs fail to state valid FDCPA claims.

Deeds of trust dictate the remedies available in the event of a mortgagor's default. *Dillard v. Serpell*, 138 Va. 694, 123 S.E. 343 (1924).  In the instant cases, each Deed of Trust specified that the lender may recover collection costs.  Particularly, the Buel and McBeth Deeds of Trust provide in Section 22:  "Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence."  Exhibit 2 § 22, at 13; Exhibit 6 § 22, at 13–14.  It is emphatically not an FDCPA violation to seek attorneys' fees and costs when the consumer has previously agreed to pay such fees and costs.  *See Singer v. Pierce & Assocs.*, 383 F.3d 596, 598 (7th Cir. 2004) ("[A] debt collector may include attorney fees and collection costs in the dunning letter when the underlying contractual relationship between the debtor and creditor provided for the recovery of such fees and costs.").[26]  But Plaintiffs allege that because Fannie Mae's contract with foreclosure firms caps one fee at $600, any demand for costs and fees exceeding $600 is a violation of the FDCPA.  Plaintiffs' allegations miss the mark.

---

[26]    *See also Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565 (7th Cir. 2004); *Shapiro v. Riddle & Assocs., P.C.*, 240 F. Supp. 2d 287, 289–90 (S.D.N.Y.), *aff'd*, 351 F.3d 63 (2d Cir. 2003); *Bull v. Asset Acceptance, LLC*, 444 F. Supp. 2d 946, 949 (N.D. Ind. 2006).

Through its servicers, Fannie Mae paid Defendants to enforce the Deeds of Trust. The $600 referred to by Plaintiffs is particular to a trustee conducting a foreclosure, but there is other work outside the scope of that $600. Section 22 of the Deeds of Trust permits recovery of fees and costs for all of lender's remedies listed in that section, including potential reinstatement (cure), acceleration, and demand for payoff. Defendants sent notices and pursued those remedies, incurring related fees. Defendants advertised foreclosure sales and incurred advertising costs. Title examinations added costs. Each step in the process costs lenders more money. These additional costs are reflected in Plaintiffs' exhibits.

In McBeth, for example, Defendants list $600 in "legal fees" in their initial letter. McBeth Ex. I. Then, in their payoff letter, Defendants list $1449.80 in "Current Foreclosure Attorney/Trustee Fees and Costs." McBeth Ex. L.[27] The latter figure includes different charges than the first figure and is contained in a letter sent later in time. Such variances are not indicative of falsity or deception and do not plausibly support a violation of the FDCPA. *See Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009) (finding no violation of FDCPA when the demand letter misidentified principal and interest figures, but correctly stated the amount of the debt, as a "hypertechnical [violation] at best").

Even assuming any of these variances are false, they are not material. In *Maynard v. Bryan W. Cannon, P.C.*, 401 F. App'x 389, 395–96 (10th Cir. 2010), for example, the Tenth Circuit Court of Appeals rejected the argument that any error in how the debt is calculated is grounds for an FDCPA violation. That Court characterized and rejected the debtor's argument as follows:

---

[27]     Fannie Mae Form 571 Reference Guide outlines the attorney fees Fannie Maw pays for foreclosures in each state, but it also outlines all of the other costs and fees that can be reimbursed and a process for seeking additional approval of attorney fees beyond the standard amount. This information can be obtained on the internet at: http://www.msionline.com/wp-content/themes/MSI_Online/pdf/Fannie_Mae_Servicing_Guide.pdf.

She therefore is seeking to impose liability on a debt collector who either (1) overstated the amount due, by listing the original loan amount instead of the arrearage, or (2) understated the amount due, by listing only the original principal amount, not the total amount she owed with accrued interest. Her reasoning, that any incorrect statement of the amount owed, no matter in which direction the debt collector erred, nor the amount of the error, results in strict liability for the debt collector, is **unfounded** in the text of the FDCPA and is **at odds with its purpose of preventing "abusive, deceptive, and unfair debt collection practices."**

*Id.* at 395 (emphasis added).

Applying the Fourth Circuit's newly-adopted materiality standard, this Court should reject Plaintiffs' claims—concerning hypertechnical violations, at best—as immaterial.

### f. Alleged Inconsistent Demands for Payment Fail to State a Claim Under the Fair Debt Collection Practices Act.

In an effort to develop an additional FDCPA class, Plaintiffs recast their previous allegations about fees and costs into allegations that Defendants "made a series of conflicting and/or false statements about the amount of the debt that was due on the dates that the form correspondences were forwarded to the consumers." Buel ¶ 323; Goodrow ¶ 360[28]; Mbundure ¶ 285; McBeth ¶ 369. Mbundure's and McBeth's allegations of inconsistencies are easily explained by the timing and type of communication sent. Buel fails to allege a material violation of the Fair Debt Collection Practices Act.

The amount of the "Current Foreclosure Attorney/Trustee Fees and Costs" identified in the letters to Plaintiffs necessarily changes over time. Many federal courts have recognized the "Catch 22" faced by those demanding a debt. On the one hand, the FDCPA requires that a debt collector disclose the amount of the debt. *See* 15 U.S.C. § 1692g(a)(1). On the other hand, most credit agreements call for accruing interest and/or attorneys' fees, so the amount claimed is always changing. In *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 564–65 (7th Cir. 2004), the

---

[28]     As further explained, *supra* Part IV.C.1.c, Goodrow's claims are barred by the statute of limitations.

Seventh Circuit addressed this predicament:

> To collect attorneys' fees from Fields, Wilber necessarily had to specify an amount that it intended to charge (or had already charged) for its services. Fields, of course, could negotiate this payment or contest the reasonableness of the fees through a lawsuit. But when a debtor has contractually agreed to pay attorneys' fees and collection costs, a debt collector may, without a court's permission, state those fees and costs and include that amount in the dunning letter.[29]

Indeed, many courts have found a debt collector's nondisclosure of fees and costs to constitute a violation under the FDCPA. *E.g.*, *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 875 (7th Cir. 2000). Accordingly, Defendants included the total amount of the debt—an amount that is ever-changing and, therefore, arguably incorrect by the time it reaches the consumer. Defendants did not violate FDCPA by doing so.

Mbundure complains about inconsistencies between the figures contained in Exhibit G (default amount of $254,761.85 on 8/02/2010) and the default figure listed in Exhibit J (default amount of $258,814.03 on 9/22/2010). These figures are separated by nearly two months. Payments were missed; interest accrued; Defendants expended more time and effort in the foreclosure process. Consequently, the amount due increased.

McBeth received a letter identifying a default amount of $158,561.98 on July 28, 2010 (Exhibit I), and a reinstatement quote figure of $9.584.79 on August 3, 2010 (Exhibit L) (the amount it takes to cure default and get back on schedule with making payments). Considering the difference between the two types of quotes, it is logical that a default figure will vary significantly from a payoff figure.[30] Plaintiffs are comparing apples to oranges. Moreover, these

---

[29]    *See also Schaefer v. ARM Receivable Mgmt., Inc.*, 2011 U.S. Dist. LEXIS 77828, 2011 WL 2847768, at *5 (D.Mass. July 19, 2011) (finding that a debt collector's letter stating a correct amount ($3,864.09) as the "current amount due" for a credit card debt and a letter more than two months later accurately stating the "total due" as a different amount ($3,904.97) does not violate section 1692e(2)(A) simply because the initial letter did not inform the consumer that the debt would increase over time.).

[30]    Similarly, Mbundure's reinstatement quote figure of $12,755.84 on August 18,

figures are conveyed by Defendants in a straightforward manner. Each letter explains its distinct purpose (default or payoff or reinstatement). Each letter addresses the debts at different times and itemizes the categories of charges and amounts claimed for each category. In light of FDCPA's presumption that Plaintiffs possess "a basic level of understanding and willingness to read with care," they do not state plausible claims that the numbers are incorrect, false, or deceptive in any way. *Nat'l Fin.*, 98 F.3d at 136.

The Buels claim the October 27, 2010 letter stated a total payoff figure of $113,806.30, while the October 29, 2010 payoff figure was $111,800.30. While this isolated inconsistency may have raised questions for the Buels, the FDCPA requires that misrepresentations be material. The difference between these two amounts is less than 2% of the total due. Moreover, each letter states that the figure is "subject to our further audit and verification" and provides the Buels with the complete contact information for Defendants, inviting them to write or call for further information or an "updated figure." *See* Buel Exs. K, L. Finally, the Buels cannot claim these letters prevented them from reinstating their loan. *See* Buel ¶ 264. Applying the facts alleged by the Buels, the changing figures are not material, and therefore fail to state a claim.

### 4.     Plaintiffs Fail to State a Claim that Defendants Used Unconscionable or Unfair Means to Collect a Debt in Violation of the FDCPA.

Finally, Plaintiffs allege that Defendants' actions constitute unfair and unconscionable means to collect or attempt to collect a debt in violation of § 1692f of the FDCPA. These allegations do not state a claim because Plaintiffs have not alleged any misconduct under § 1692f beyond what Plaintiffs assert violate other provisions of the FDCPA.

In *Foti v. NCO Fin. Sys.*, the Southern District of New York found that "§ 1692f may provide a cause of action for conduct that is not specifically listed in that section or other

---

2010 (Exhibit I) does not evidence any inconsistency with the default and payoff figures.

provision of FDCPA." 424 F. Supp. 2d 643, 667 (S.D.N.Y. 2006). However, the Court concluded that because the plaintiffs' complaint did **"not identify any misconduct beyond that which Plaintiffs assert violate other provisions of the FDCPA,"** Defendant's motion to dismiss the § 1692f claim should be granted. *Id.* (emphasis added).[31]

All of Plaintiffs' allegations are asserted for actions arising under § 1692e. *See, e.g.,* Goodrow ¶¶ 350–75. Plaintiffs fail to allege any conduct separate and distinct from the alleged § 1692e violations. Plaintiffs do not allege any separate facts in support of a claim that Defendants engaged in unfair or unconscionable practices under § 1692f. Accordingly, and for the reasons stated above, Plaintiffs' § 1692f claims should be dismissed.

## V.
## CONCLUSION

**WHEREFORE,** Defendants respectfully request that this Court grant their Consolidated Motion to Dismiss the Amended Complaints and award them such other and further legal and equitable relief as this Court deems just and proper.

---

[31]     *See also Penn,* 2012 U.S. Dist. LEXIS 104565, at *32; *Bierman,* 859 F. Supp. 2d at 765; *Eslava v. Allianceone Receivables Mgmt.,* 2012 U.S. Dist. LEXIS 135275, *11–12 (S.D. Ala. Sept. 20, 2012); *Johnson v. BAC Home Loans Servicing, LP,* 867 F. Supp. 2d 766 (E.D.N.C. 2011).

DATED:    February 25, 2013

Respectfully Submitted,

**FRIEDMAN & MACFADYEN, P.A.**
**JOHNIE R. MUNCY**
**and**
**F&M SERVICES, L.C.**

By Counsel

_____/s/  Cullen D. Seltzer_____
Douglas P. Rucker, Jr. (VSB # 12776)
Andrew Biondi (VSB # 48100)
Cullen D. Seltzer (VSB # 35923)
Faith A. Alejandro (VSB # 80076)
Eric C. Howlett (VSB # 82237)
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, VA 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
Email:  drucker@sandsanderson.com
Email:  abiondi@sandsanderson.com
Email:  cseltzer@sandsanderson.com
Email:  falejandro@sandsanderson.com
Email:  ehowlett@sandsanderson.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Dale W. Pittman, Esq.
The Law Office of Dale W. Pittman, P.C.
112-A W. Tabb Street
Petersburg, Virginia 23803
Telephone: 804-861-6000
Facsimile: 804-861-3368
dale@pittmanlawoffice.com
*Counsel for Plaintiff*

John C. Petersen, Esq.
Surovell Isaacs Petersen & Levy PLC
4010 University Drive
Suite 200
Fairfax, Virginia 22030
Telephone: 703-251-5400
Facsimile: 703-591-9285
jpetersen@siplfirm.com
*Counsel for Plaintiff*

Kristi Cahoon Kelly, Esq.
Surovell Isaacs Peterson & Levy PLC
4010 University Drive
Suite 200
Fairfax, Virginia 22030
Telephone: 703-277-9774
Facsimile: 703-591-2149
kkelly@siplfirm.com
*Counsel for Plaintiff*

Leonard Anthony Bennett, Esq.
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, 1-A
Newport News, Virginia 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
lenbennett@cox.net
*Counsel for Plaintiff*

Matthew J. Erausquin, Esq.
Consumer Litigation Associates, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia  22314
Telephone:  703-273-6080
Facsimile:  888-892-3512
matt@clalegal.com
*Counsel for Plaintiff*

Richard J. Rubin, Esq.
1300 Canyon Road
Santa Fe, New Mexico  87501
Telephone:  505-983-4418
Facsimile:  505-983-2050
dickrubin@cs.com
*Counsel for Plaintiff*


                    /s/ Cullen D. Seltzer
Douglas P. Rucker, Jr. (VSB # 12776)
Andrew Biondi (VSB # 48100)
Cullen D. Seltzer (VSB # 35923)
Faith A. Alejandro (VSB # 80076)
Eric C. Howlett (VSB # 82237)
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, VA 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
Email:  drucker@sandsanderson.com
Email:  abiondi@sandsanderson.com
Email:  cseltzer@sandsanderson.com
Email:  falejandro@sandsanderson.com
Email:  ehowlett@sandsanderson.com
*Counsel for Defendants*