**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JOHN K. GOODROW,

      Plaintiff,

v.                                                    Civil Action No. 3:11cv20
                                                      (Consolidated)

FRIEDMAN & MACFADYEN, P.A.,
*et al.*,

      Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE DEFENDANTS'
CONSOLIDATED MOTION TO DISMISS THE AMENDED COMPLAINTS**

COME NOW the Plaintiffs, by counsel, and as for their Memorandum in Opposition to the Defendants' Consolidated Motion to Dismiss the Amended Complaints (Docket No. 133), they respectfully submit this memorandum of law.

## INTRODUCTION

The lead case was filed on January 10, 2011 alleging Defendants' violation of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C, § 1692, *et seq*. Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6), Docket No. 8, and the motion was denied in Judge Spencer's detailed substantive opinion.  (Docket No. 17, 18).  Now, after exhaustive motions practice before this Court, and nearly 330 paragraphs of detailed facts for each Plaintiff, we are back where we began.  Defendants want to escape this early Judge Spencer decision and are hopeful that this Court's very demanding pleading burdens – respectfully, which Plaintiffs' counsel argues much more demanding that either Rules 8 or 9 requires – will permit them to escape even the most basic discovery of their internal procedures and conduct. Plaintiffs are, as a matter of law, entitled to move forward and discover the additional internal evidence necessary to prove the already strong case that they have established to the Court will exist.

## ARGUMENT

### I.  THE PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO ESTABLISH A PLAUSIBLE CLAIM FOR BREACH OF FIDUCIARY DUTY

**A.  Neither *Carter v. Countrywide* nor *Horvath v. Bank of New York* stand for the proposition that Trustees must honor only duties expressly stated in a Deed of Trust.**

Plaintiffs' previous argument offered a series of Supreme Court of Virginia cases, all of which plainly stated that a Trustee under a Virginia real estate Deed of Trust was bound by fiduciary duties including the duty of impartiality. (Pls.' Opp. To Defs.' Mot. To Dismiss, Docket No. 97 at 23-38).[1] Defendants responded that the Trustee's duties – if any existed at all – were limited only to those explicitly written in the Deed of Trust.  That argument was then in part adopted by this Court [*Goodrow v. Friedman & MacFadyen, P.A.*, 3:11CV20, 2012 WL 6725617 (E.D. Va. Dec. 27,

---

[1] Plaintiffs adopt their previous brief and argument, but for the sake of avoiding repetition do not restate the same text and citations herein.

2012)(Lauck, J.) ("*Goodrow* II")], interpreting Judge Trenga's decision before it [*Horvath v. Bank of New York, N.A.*, 2010 WL 538039 (E.D. Va. Jan. 29, 2010) *aff'd*, 641 F.3d 617 (4th Cir. 2011) (Trenga, J)], with both decisions citing the Court's opinion in *Carter v. Countrywide Home Loans, Inc.*, 2008 WL 4167931 (E.D. Va. Sept. 3, 2008) (Dohnal, J.).   *Goodrow* II expressed skepticism as to these unstated or implied duties in a Deed of Trust.   Respectfully, the Court's decision did not offer any basis in law to justify its reservation given the established Virginia case law otherwise governing the question.   Instead, both *Goodrow* II and *Horvath* restated Judge Dohnal's sentence in *Carter*, stating: "Under Virginia law, however, deeds of trust are treated under the same principles as contracts, and the trustee only owes those duties that are listed in the deed of trust itself."   But the decision in *Carter* actually defeats an interpretation of this language that suggests that such duties must be express or detailed in the Deed of Trust.   Present Plaintiffs' counsel litigated *Carter*.   The issues were not the same, as is clear from the opinion.   In making the twice-cited statement above, *Carter* did so in full context as follows:

> Plaintiffs are correct that a deed of trust gives rise to certain fiduciary duties. *See Smith v. Credico Indus. Loan Co.,* 362 S.E.2d 735, 736 (Va.1987) Under Virginia law, however, deeds of trust are treated under the same principles as contracts, and the trustee only owes those duties that are listed in the deed of trust itself. *See Belvin's Ex'r v. Belvin,* 189 S.E. 315, 318 (Va.1937); *see also Fleet Finance v. Burke & Herbert Bank and Trust,* CHANCERY NO. 122305, 1992 WL 884461, at *3 (Va. Cir. Ct. Jan. 28, 1992). Plaintiffs' claim fails to set forth any fiduciary duties arising pursuant to the deed of trust. The Complaint does not allege that the deed of trust required White to provide accurate loan reinstatement and payoff amounts to Plaintiffs, to keep Plaintiffs fully informed as to the status of the foreclosure proceedings, or to communicate with Plaintiffs in a timely manner regarding the foreclosure proceedings.

*Carter*, 2008 WL 4167931.   Duties such as impartiality derive from the Deed of Trust.   Not all such duties need be express.   *Carter* does not suggest otherwise.

The three decisions cited in *Carter* either refute Defendants' narrow conception of deed of trust duties or are entirely inapposite to the issues at hand.   In fact, in the very first of the three Virginia state cases that form the basis for Judge Dohnal's cited statement, "Plaintiffs are correct that a deed of trust gives rise to certain fiduciary duties" *Id.*, *Smith v. Credico Indus. Loan Co.*, the Supreme Court of

Virginia restated what in 1987 it considered established law and offered "pertinent principles" that must also inform *this* Court and guide *this* case:

> **1. A trustee under a deed of trust is a fiduciary for both debtor and creditor and must act impartially between them; and**
> **2. A trustee must not place himself in a position where his personal interest conflicts with the interests of those for whom he acts as fiduciary[.]**

234 Va. 514, 516-17, 362 S.E.2d 735, 736-37 (1987)(emphasis added).  In *Smith*, the court actually invalidated the foreclosure sale.  *Belvin's Ex'r v. Belvin*, 167 Va. 355, 364, 189 S.E. 315, 319 (1937) is unhelpful to anyone.  Finally, the state Circuit Court decision from which the misused language likely derived, *Fleet Fin. v. Burke & Herbert Bank & Trust*, 27 Va. Cir. 98 (1992), obviously used the language "Virginia law does not impose fiduciary duties on trustees beyond those duties owed to the parties under the deed of trust" in an entirely different manner than that now suggested by Defendants, and offered in the Court's previous opinion.  In *Fleet Fin*., the state court reached that conclusion not because the losing plaintiff had sought to expand the duties within a deed of trust between the parties, but rather because the plaintiff in that case was not a party to the subject deed of trust.  The point was that if there was no Deed of Trust to which the plaintiff was a party, there would not be any duties the Trustee would owe that party.  *Id.*

In previous argument, the Court suggested that Plaintiffs might be asking it to reach a different legal conclusion than *Horvath*.  Plaintiffs do not ask the Court to do so.  As to the fiduciary duty arguments, *Horvath* was an opinion regarding procedure and pleading standards.  *See Horvath v. Bank of New York, N.A.*, 2010 WL 538039 (E.D. Va. Jan. 29, 2010) *aff'd*, 641 F.3d 617 (4th Cir. 2011).  When Judge Trenga concluded that in *Horvath*, foreclosure avoidance attorney Chris Brown had, "failed to allege facts that make plausible any claimed violation of fiduciary duty", the District Court was being kind.  The *Horvath* amended complaint literally included only a short one sentence factual allegation, "38. Defendant Equity is in breach of its fiduciary duty to Plaintiff to remain impartial as required by Virginia law."  (Exhibit "A", at ¶38).  This is one sentence more than Mr. Brown included

in his Rule 12(b)(6) opposition.  (Exhibit "B" at 9-11).[2]

Nor does Judge Moon's decision in *Sheppard v. BAC Home Loans Servicing, LP* assist Defendants' legal characterizations. 2012 WL 204288 (W.D. Va. Jan. 24, 2012).  As in *Horvath*, in *Sheppard* the plaintiff complained almost solely about the validity of the appointment of substitute trustee.  *Id.* ("In the case at hand, the deed of trust spells out the powers and duties of the trustee with respect to the sale of the property following the initiation of foreclosure. There is no duty (labeled fiduciary or otherwise) found in the deed of trust requiring the trustee to ensure either that it was properly appointed or that the entity invoking the sale is the secured party with authority to foreclose.")

**B. The Plaintiffs Plausibly Allege that Defendants Business Model and Pricing Scheme Placed Them in a Position of Conflict with the Interests of Homeowners for Whom They Acted as a Fiduciary and Pressured Them to Impartially Expedite Foreclosures.**

As discussed above, the high standard of impartiality on trustees was reiterated by the Virginia Supreme Court's decision in *Smith* less than twenty-five years ago. In that case, the court reiterated that its decisions in *Miller* and *Whitlow* were based upon "broad principles of public policy. Central among those principles is that a trustee must not be placed in a position of conflict." *Id.* at 517; *see also In Re Smith*, 99 Bankr. 724, 731 (Bankr. W.D. Va. 1989) (discussing the two principles established by the Virginia Supreme Court in *Smith*).

Defendants' entire business model is contrary to the principles established by the Virginia Supreme Court in *Miller*, *Whitlow*, and *Smith*. In its basic form, Defendants engaged in a systematic practice of law skirting and deception for financial gain and at the expense of borrowers for whom they acted as a fiduciary. To accomplish this goal, Defendants adopted a business model to streamline the foreclosure process without regard to borrowers' statutory and contractual rights, let alone Defendants' obligation to avoid such an obvious conflict. The two core aspects of Defendants' business strategy were: (1) to rapidly conduct foreclosures to maintain a positive "Attorney Performance Rating" in

---

[2] Mr. Brown did not appeal the fiduciary duty claim to the Fourth Circuit.  *Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 624 (4th Cir. 2011).

LPS's system, thereby ensuring that it would continue to receive foreclosure referrals; and (2) to keep the lowest cost structure possible. The Amended Complaints allege that with these objectives in mind, Defendants fabricated that notes were unavailable, created a shell entity falsely claiming to serve as a neutral trustee, lied to Circuit Courts through their Commissioners of Accounts, and forced sales of consumers' homes without ever communicating with the entity that had the legal right to do so.

**1. Plaintiffs Sufficiently Pleaded that Fannie Mae's Retained Attorney Network and LPS's Attorney Performance Rating Created Incentives That Prohibited        Defendants from Remaining Neutral.**

Plaintiffs sufficiently pleaded facts to state a claim that Defendants' pricing mechanism created an improper incentive to partially conduct foreclosures without regard to the laws of Virginia and the borrowers' loan modification status. In response to these allegations, Defendant's selectively interpret this Court's opinion in *Goodrow II* as barring any claim of impartiality. However, this contention altogether ignores the portion of the opinion in *Goodrow II* where the Court acknowledges Plaintiffs' assertion that Defendants' pricing mechanism created an improper incentive to foreclose in violation of their obligation to remain impartial. *Goodrow*, 2012 U.S. Dist. LEXIS 6725617 at *29 (stating "while Plaintiffs' briefing contends that Defendants' pricing mechanism created an improper incentive to foreclose rather than to modify, the Amended Complaints do not allege what Plaintiffs address in briefing."). This instruction is consistent with both *Whitlow* and *Smith*, where the Virginia Supreme Court based its decisions on "implicit proposition" that a trustee must refrain from placing himself in a position where his personal interest conflict with those from whom the trustee acts as a fiduciary.

Plaintiffs have now more than sufficiently alleged that Defendants' failed to remain impartial in their position as trustee because of the improper and significant financial incentive to foreclose created by LPS and Fannie Mae.[3] Lender Processing Services, Inc. ("LPS") is a company that assembles

---

[3] It is no secret that LPS created improper incentives for foreclosure attorneys, including foreclosure attorneys in the Commonwealth of Virginia. Less than three months ago, LPS and the Commonwealth of Virginia agreed to a Final Consent Order after the Attorney General filed a case against LPS in the

information to foreclose on consumers' properties. (*See* Buel Am. Compl. ¶ 60; Goodrow Second Am. Compl. ¶ 67; Banks Second Am. Compl. ¶ 66; Mbundure Am. Compl. ¶ 28; McBeth Am. Compl. ¶ 77; Chatter Second Am. Compl. ¶ 23). LPS provides customized technology platforms to mortgage servicers depending on the status of the consumers' loan. (Chatter Second Am. Compl. ¶ 24).[4] LPS's Desktop technology platform ("Desktop") is designed to aid mortgage servicers when loans are in default. (Chatter Second Am. Compl. ¶ 25). When a loan goes into a default, it is coded for foreclosure in the servicer's system, at which time Desktop automatically refers the loan for foreclosure to a law firm within LPS's network of firms ("Network Firms") (Second Am. Compl. Chatter ¶ 29). Because LPS is the exclusive means for foreclosure firms to access the millions of dollars in foreclosure related fees held by LPS's servicer-clients, LPS used its powerful position to set its own arbitrary timeline – contrary to the instructions of the beneficiary -- for how long the foreclosure process should take from referral to sale date. (Second Am. Compl. Chatter ¶ 38).

Defendants, like other Network Firms,[5] were required to comply with LPS's arbitrary deadlines, or else risk being removed from accessing the majority of the United States' top twenty

---

Circuit Court of the City of Richmond. In the Final Consent Judgment, LPS expressly agreed not to "incentivize or promote attorney speed or volume to the detriment of accuracy." Attached as Exhibit C is a copy of the Final Consent Order. In addition, LPS further agreed not to "pay volume-based or other incentives to employees or agents for the purpose of encouraging undue haste or lack of due diligence to the detriment of accuracy." *Id.* Similarly, In June 2010, FHFA's Office of Conservatorship Operations spent two days in Florida to investigate the allegations of abuse and to gain a better understanding of foreclosure processing. (*See, e.g.,* Goodrow ¶¶ 23). The resulting report found that servicers, attorneys, and other personnel were overloaded with the volume of foreclosures. The report also noted that law firms in Fannie Mae's RAN were not devoting the time necessary to their cases due to Fannie Mae's flat-fee structure and volume-based processing model. *Id.* Similar to LPS' system, this strict timeframe all but ensured that foreclosures were conducted in violation of the laws of the Commonwealth of Virginia. (*See, e.g.,* Goodrow ¶ 26).

[4] The LPS allegations cited in this portion of the brief regarding Defendants' pricing incentives are virtually identical in the Amended Complaints. (*See* Buel ¶ 61; Goodrow ¶ 68; Banks ¶ 67; Mbundure ¶ 29; McBeth ¶ 78; Chatter ¶ 23). Therefore, for the sake of repetition, Plaintiffs are only references the Chatter citations.

[5] Similarly, Fannie Mae also established a Retained Attorney Network ("RAN") and requires its retained foreclosure attorneys to execute an engagement letter, which documents the existence of an attorney-client relationship with Fannie Mae. (*See, e.g.,* Goodrow ¶¶ 13, 17). As alleged, Fannie Mae imposes strict timeframes similar to those of LPS on its RAN. (*See, e.g.,* Goodrow ¶¶ 32-34).

servicers. (Chatter Second Am. Compl. ¶ 39). LPS's software carefully tracks the speed in which the Network Firms meets LPS's imposed timelines in its system, which is often shorter than investor or lender imposed timelines. (Chatter Second Am. Compl. ¶ 46). Based on compliance with LPS's timelines, Network Firms are given an "Attorney Performance Rating" of green, yellow, or red. (Chatter Second Am. Compl. ¶ 46). Because time is the only component of the Attorney Performance Rating, Defendants instituted its law-violating policies to artificially inflate their Attorney Performance Rating in the LPS system and thereby continue to get more foreclosure referrals. (Chatter Second Am. Compl. ¶¶ 47, 56). LPS's monopoly over the foreclosure market and strict timeframes pressured Defendants to implement its law-violating policies. These policies include: (1) never seeking to determine whether or not a note was available (Chatter Second Am. Compl. ¶ 71); (2) never identifying or contacting the custodian, the beneficiary, or the servicer to determine whether a note was available (Chatter Second Am. Compl. ¶ 71); (3) identifying the loan servicer as the beneficiary in lieu of identifying and locating the actual holder of the mortgage loan (Chatter Second Am. Compl. ¶ 75); (4) forging substitution of trustees documents; (5) failing to identify whether the borrowers had been offered any loss mitigation alternatives, such as a HAMP modification, which could have caused the foreclosure times to be extended and resulted in their "Attorney Performance Rating" to change to "red." (Chatter Second Am. Compl. ¶ 126).

**2. Plaintiffs Sufficiently Pleaded that Fannie Mae and LPS's Pricing Scheme  Improperly Incentivized Defendants to Foreclose as Quickly as Possible Without   Regard     to      the Requirements of Law and the Status of Loss Mitigation Options.**

In addition to their objective of inflating their Attorney Performance Rating, the Amended Complaints sufficiently alleges that Defendants were in a position of conflict based on the pricing scheme under which Defendants were paid.[6] This is because Defendants were typically paid less than a

---

[6] The Amended Complaints also precisely detail the pricing incentives received by Defendants for loans owned by Fannie Mae. (*See* McBeth ¶¶ 26-41, 45-46; Goodrow ¶¶ 26-41, 45-46; Banks ¶¶ 27-42, 45-46;  Buel ¶¶ 27-42, 45-46). These allegations are not referenced whatsoever in Defendants' brief. Nevertheless, it is important to acknowledge that Defendants receive *at least* double the amount of money when a non-judicial foreclosure sale is completed, as well as additional compensation when

thousand dollars per foreclosure, from start to finish. (Chatter Second Am. Compl. ¶ 128). After subtracting the referral fee/kickback that went to LPS, this required Defendants to conduct foreclosures at a large enough quantity and with minimal attorney or staff time in order to remain profitable. (Chatter Second Am. Compl. ¶ 128). Moreover, the low fees paid per foreclosure are rather significant when considering that Defendants' only source of revenue was the fees they collected from foreclosures, unlike other debt collector law firms that collect various types of consumer debts. (Chatter Second Am. Compl. ¶ 129). Any delay in the foreclosure sale to ensure compliance with the law not only increased the possibility of reinstatement or a loan modification, but also increased the costs and expenses of the Defendants' sole source of revenue – the flat-fee they received to conduct foreclosures. (Chatter Second Am. Compl. ¶ 131).

In sum, Defendants sought to gain a competitive edge in the foreclosure market over other foreclosure trustees by conducting foreclosures as quickly as possible. In doing so, Defendants also adopted the lowest cost structure possible because its only source of revenue was the fees it received from LPS or Fannie Mae for the completed foreclosure. These pressures caused Defendants to implement a deceptive scheme that was not impartial to the homeowners.

Plaintiffs do not allege that these Trustee defendants were subject to any duty to conduct due diligence necessary to determine if a consumer was actually in default or subject to a loan modification

---

the foreclosed property is sold to a third-party other than Fannie Mae. (*See* McBeth ¶¶ 27-28; Goodrow ¶¶ 27-28; Banks ¶¶ 27-28; Buel ¶¶ 27-28). In particular, Defendants receive $925 in fees when a non-judicial foreclosure sale is completed, as opposed to $300 if the mortgage loan is reinstated after recordation of the substitute trustee's deed or $500 if the mortgage loan is reinstated after the notice of sale. (*See* McBeth ¶¶ 27-29; Goodrow ¶¶ 27-29; Banks ¶¶ 27-29;  Buel ¶¶ 27-29). The $625-$425 difference in fees is rather significant when considering that Defendants' *only* source of revenue is the fees it collects from foreclosures, unlike other debt collector law firms that collect various types of consumer debts in addition to foreclosures. Any delay in the foreclosure sale to ensure Defendants had the necessary documents (such as acceleration letters, notes, lost note affidavits) not only increased the possibility of reinstatement, but also increased the costs and expenses of Defendants' sole source of revenue – the flat-fee it received to conduct foreclosures. This additional compensation plus the decreased cost of complying with the law motivated Defendants' deceptive conduct, which can only be characterized as pecuniary – not as perfectly fair and impartial.

process.  However, these circumstances will present themselves at trial as explanations and evidence of caused harm from the improper and conflict-laced race to foreclosure.

**C. Plaintiffs State a Plausible Claim That Defendants Breached their Fiduciary Duty of Notice Pursuant to Paragraph 22 of the Deeds of Trust.**

In the instant cases, each deed of trust imposes virtually identical fiduciary duties on the Defendants. One such duty requires Defendants to provide notice of the sale in accordance with "applicable law." Specifically, Paragraph 22 of each deed of trust provides "[i]f Lender invokes the power of sale, Lender or **Trustee shall** give to Borrower… **notice of sale as required by Applicable Law**." (emphasis added). Applicable law is defined in each deed of trust as "all controlling applicable federal, state and local statutes, regulations, ordinances… as well as all applicable final, non-appealable judicial opinions." As pleaded, Defendants breached this duty to provide notice of the sale because they took intentional steps to create the false appearance of compliance with the notice requirements under Virginia law, including but not limited to Virginia Code § 55-59.1(B).

**1. Under Virginia Code § 55-59.1, the Beneficiary of the Deed of Trust Must Provide the Trustee with An Affidavit that the Note is Lost.**

Virginia has one of the fastest foreclosure clocks in the nation.[7]  This speed requires meaningful compliance with the limited protections afforded consumer debtors.  In Virginia, before a substitute or other trustee may foreclose on a deed of trust note, the trustee or secured party must provide certain notices and take certain preliminary steps, including those required by Code § 55-59.1(B) which is entitled "[n]otices required before sale by trustee to owners, lienors, etc.; if note lost." Va. Code Ann. § 55-59.1. This section establishes that written notice that must be provided to consumers prior to a non-judicial foreclosure sale in Virginia and constitutes Applicable Law under the Plaintiffs' deeds of trust, including when a note is purportedly unavailable. *Id*. In relevant part, the statute provides:

> If a note or other evidence of indebtedness secured by a deed of trust is lost or for any other reason cannot be produced **and the beneficiary submits to the trustee an affidavit to that effect**, the trustee may nonetheless proceed to sale, provided that the

---

[7] http://www.realtytrac.com/foreclosure-laws/foreclosure-laws-comparison.asp last visited June 3, 2012.

beneficiary has given written notice to the person required to pay the instrument that the instrument is unavailable and a request for sale will be made of the trustee upon the expiration of 14 days from the date of mailing of the notice.

*Id*. (emphasis added).

Section 55-59.1(B) provides clear instruction on the prerequisites that must be satisfied before a trustee may proceed to a foreclosure sale *if* a note is lost or cannot be produced. The first prerequisite – the triggering event allowing use of the § 55-59.1 process - is that the beneficiary first submit to the trustee an affidavit that the note is either lost or for any other reason cannot be produced. Under the plain language of § 55.1-59 (B), which is written in the conjunctive and mandates that if a mortgage note is unavailable <u>AND</u> the beneficiary submits to the trustee a "lost note affidavit," the trustee may proceed to sale provided that the homeowner is notified that the note is unavailable. Va. Code Ann. § 55-59.1(B). Thus, before a notice is provided pursuant to Code § 55-59.1(B), the beneficiary (or its agent) must submit an affidavit to the trustee that the note is lost or unavailable regardless of the reason.   Absent such events, a Trustee may not proceed to foreclose.

In their brief, Defendants contend that Plaintiffs failed to state a claim under Code § 55-59.1(B) because "[n]othing in Virginia Code section 55-59.1 requires that a lost note affidavit be provided to the homeowner." (Defs.' Mem. Supp. of their Consolidated Mtn. to Dismiss the Am. Compls. at 9)("Defs.' Mem.".) This is not what Plaintiffs allege in the Amended Complaints. Plaintiffs never once allege that Defendants violated Code § 55-59.1(B) because they failed to provide homeowners with a lost note affidavit. Rather, Plaintiffs allege that Defendants violated failed to comply with the legally prescribed notice process, incorporated expressly in each Deed of Trust (*See, e.g.,* Mbundure Am. Compl. ¶¶ 204-206), because the "triggering event" never occurred.   Defendants <u>never</u> received a lost note affidavit from <u>the beneficiary</u> of Plaintiffs' notes in accordance with the notice requirements in the statute.   Tellingly, Defendants do not address this allegation whatsoever in their entire fifty-page brief (and it would be improper to do so newly on Reply).   Moreover, the Defendants have yet to provide this Court or the Plaintiffs with a single affidavit confirming the unavailability of any of the

Plaintiffs' promissory notes even though Plaintiffs allege that Defendants always circumvent the ordinary foreclosure process with use of a § 55-59.1 letter.

The noteholder or its agent can only enforce a security interest upon a negotiable note.  *See* Va. Code Ann. § 8.3A-301 (2013). The only exception to this principle – that the right of enforcement of a note can be transferred only by delivery – is modified by the lost note concept in Code § 8.3A-301(iii). Under the lost note concept, a person not in possession of the note is still entitled to enforce the instrument if, *inter alia*, the person was in possession of the instrument when it was lost. *See* Va. Code § 8.3A-309 (2013).  Even then, there are multiple ways for Defendants to have lawfully conducted a foreclosure.

While physical delivery of a note seems uncomplicated, locating and obtaining the note presents significant difficulties in the robust secondary mortgage market where lenders (i.e., the actual entity who loaned money to the homeowner) typically sell the secured debt without transfer of the underlying promissory note. *See generally Bain v. Metro. Mort. Grp., Inc.,* 175 Wn.2d 83, 97 2012 (noting that "[c]ritics of the MERS system point out that after bundling many loans together, it is difficult, if not impossible, to identify the current holder of any particular loan, or to negotiate with that holder. While not before us, we note that this is the nub of this and similar litigation and has caused great concern about possible errors in foreclosures, misrepresentation, and fraud."); *U.S. Bank Nat'l Ass'n v. Ibanez*, 458 Mass. 637 (2011) (noting the difficulties in tracing ownership of a promissory note in the secondary mortgage market).

The Court is not here asked to determine if physical possession a note by Defendants or by the servicer was required in order to lawfully foreclose.  In fact, Defendants principals such as Fannie Mae and Freddie Mac offer "legally creative" alternatives to physical possession without resort to § 55-59.1(B).  For example, Fannie Mae has created a process to request possession of the Note to commence the foreclosure process:

> In most cases, a servicer will have a copy of the mortgage note that it can use to begin the foreclosure process. However, some jurisdictions require that the servicer produce

the original note before or shortly after initiating foreclosure proceedings. If Fannie Mae possesses the note through its designated document custodian, to obtain the note and any other custody documents that are needed, the servicer must submit a request to the designated document custodian's electronic release system.

Fannie Mae Single Family 2012 Servicing Guide, § 102, Initiation of Foreclosure Proceedings (March 14, 2012) (attached as Exhibit "D"). Banks Second Am. Compl. ¶¶ 38-40; Goodrow Second Am. Compl. ¶¶ 38-40; Buel Am. Compl. ¶¶ 38-40; McBeth Am. Compl. ¶¶ 38-40. Alternately, if physical possession of the Note is not required, Fannie Mae pre-delegates the transfer of constructive possession. *Servicing Guide*, § 202.07.02, Temporary Possession by the Servicer (attached as Exhibit "E"). ("In order to ensure that a servicer is able to perform the services and duties incident to the servicing of the mortgage loan, Fannie Mae temporarily gives the servicer possession of the mortgage note whenever the servicer, acting in its own name, represents the interests of Fannie Mae in foreclosure actions, bankruptcy cases, probate proceedings, or other legal proceedings.") Put another way, Fannie Mae still maintains physical possession of the note, but abstractly it would declare that legal or constructive possession would now be in the servicer's name.

Thus, a note was never really "unavailable", even administratively, let alone lost. And still, Defendants implemented a uniform law-violating solution -- mailing *every* consumer a standard Code § 55-59.1(B) notice.[8] As alleged, Defendants never requested the original notes from the noteholders, including Fannie Mae, who had a specific written procedure by which the servicer or foreclosure attorney could request and receive the note. (See, e.g., Goodrow ¶¶ 38, 41). This scheme was designed to achieve Defendants' primary business objectives: (1) maintaining a high Attorney Performance Rating; and (2) conducting foreclosures at the lowest cost possible. In essence, this deceptive scheme allowed Defendants to conduct unquestioned foreclosures within fourteen days pursuant to the Code § 55-59.1(B) notice and without any expenses other than the form letter it mailed to every consumer. In

---

[8] Attached to the Amended Complaints as Exhibit D is Defendants' standard § 55-59.1(B) notice addressed to five different homeowners between the time periods of October 2008 and August 2010. A cursory review of each notice reveals that the contents of Defendants' § 55-59.1 notice are virtually identical except for the identifying information of the homeowner. The only other change is the name of the loan servicer, whom Defendants falsely and uniformly claims is the beneficiary of the note.

implementing this scheme, however, Defendants deliberately violated the strict requirements in Code § 55-59.1(B) and thus the duty to comply with applicable notice requirements in the law" as demanded by Paragraph 22 of each deed of trust.

**2.  The Plain Language of the Statute Requires the Beneficiary to Submit an Affidavit to the Trustee.**

Plaintiffs agree with Defendants' legal conclusion that a trustee may begin certain aspects of the foreclosure process without either possession of the note or a lost note affidavit. (Defs.' Mem. at 9). For example, a trustee is permitted to send written notice of the time, date, and place of the sale pursuant to Code § 55-59.1(A) without actual possession of the note or a lost note affidavit. See Va. Code Ann. 55-59.1(A). However, in accordance with the provisions for enforcement of negotiable instruments in Code § 8.3A-301, the noteholder must deliver to the trustee the original note prior to the sale if the sale is noticed pursuant to Code § 55-59.1(A). Because of the aforementioned complications in obtaining physical possession of the note, Defendants implemented a system to exploit the "lost note" concept of Code §§ 8.3A-301(iii) and 55-59.1(B). The only problem with Defendants' lost note scheme is that the General Assembly enacted strict notice requirements in Code § 55-59.1(B) to defend against potential abuse of the lost note concept in the foreclosure process. This language crafted by the General Assembly ensures that a foreclosure is nonetheless conducted by the entity that possessed the legal authority to do so and that the note is in fact unavailable.

Defendants' reliance on this Court's opinion in *Goodrow II* is misplaced because it fails to distinguish between the purpose of the affidavit and the timing when it must be provided. In *Goodrow II*, the Court accepted Defendant's contention that "because the statute allows an affidavit to be sent to the trustee if a note cannot be secured 'for any reason,' a foreclosure may begin without a note of indebtedness for, among other reasons, administrative convenience." 2012 U.S. Dist. LEXIS 182188, at *26. While Plaintiffs still disagrees with this broad interpretation regarding the interpretation words "for any purpose," the plain language of Virginia Code § 55-59.1 nevertheless requires the beneficiary to submit to the trustee an **affidavit** to that the note is unavailable – regardless of the reason. Thus, it is

14

not just a question of whether the statute allows the affidavit to be sent to the trustee for "administrative convenience." But, more importantly, whether Defendants may notice or proceed to a sale pursuant to Code § 55-59.1(B) without a sworn statement from a representative of the beneficiary that the note is actually lost or cannot be produced. The answer to these questions are definitively no.

It is a "settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340 (1998). In this case, the express language in Code § 55-59.1(B) states that if a note is unavailable and "the beneficiary submits to the trustee an affidavit to that effect" then the trustee may nonetheless proceed to a sale, provided the beneficiary gives written notice to the person required to pay the instrument that the notice is unavailable. Thus, regardless of the reason *why* the note is unavailable, Code § 55-59.1(B) still requires the beneficiary to submit an affidavit to the trustee that the note *is* unavailable -- before written notice is provided to the homeowner that the note is lost or unavailable and that a request for sale will be made of the trustee upon the expiration of 14 days. Any other interpretation of this language in the statute would be superfluous. *See Cook v. Commonwealth*, 268 Va. 111, 114 (2004) (stating "[w]ords in a statute should be interpreted… to avoid rendering words superfluous.").

Defendants – motivated by purely financial gain -- took very intentional steps to create the false appearance of compliance with the notice requirements in Code § 55-59.1(B). Specifically, Defendants established a foreclosure scheme predicated on: (1) falsely identifying the loan servicer as the beneficiary/noteholder; and (2) sending blanket "lost note" letters to bypass the requirements for enforcement of negotiable instruments under Virginia law. This is because the actual method for enforcement of a note – identifying the beneficiary of the note and obtaining possession of the note prior to the sale – significantly increased the cost of conducting foreclosures and decreased the speed by which they could be conducted. Defendants' scheme eliminated expenses associated with obtaining physical possession of the note in the secondary mortgage market. *See* Dale A. Whitman, *How*

*Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It*, 37 Pepp. L. Rev. 737 (2010) (discussing the pattern and practice of using a lost note affidavit in foreclosure actions).

Yet, the two-prong scheme could only be effective (*i.e.*, profitable) if Defendants violated the notice requirements in Virginia Code § 55-59.1(B), which still require Defendants to identify the beneficiary and obtain the affidavit even if the note is unavailable. Thus, Defendants intentionally created the false impression of compliance with Code § 55-59.1(B) by identifying their point of contact in LPS's system, the loan servicer, as the beneficiary and then falsely representing the note was unavailable. In doing so, Defendants breach their fiduciary duties arising from the notice requirements in Code § 55-59.1(B), which is incorporated in every deed of trust to provide safeguards to consumers facing a non-judicial foreclosure.

### 3. Commissioner of Accounts' Offices in Northern Virginia Confirm the Existence   and Scale of Defendants' Lost Note Scheme.

After a foreclosure is conducting in Virginia, a foreclosure trustee must provide an account of the sale to the commissioner of accounts within six months after the deed of the sale. *See* Va. Code Ann. § 64.2-1309 (2013). When providing the account of the sale, the foreclosure trustee provides the commission of accounts with a statement of the transactions of the sale, including the notice of sale provided to homeowners. Plaintiffs, by counsel, were able to confirm that the Defendants almost never provide a lost note affidavit from the beneficiary to various Commissioners of Accounts in Northern Virginia after a foreclosure is completed, even though it mailed the standard Code § 55-59.1(B) notice to *every* consumer and almost always conducted foreclosures without possession of the original note. Specifically, the records from the Northern Virginia commissioners of accounts' offices reflect the following:

- On March 13, 2013, Darcey Arnold ("Ms. Arnold"), an auditor in the office of the Commissioner of Accounts for the City of Alexandria testified that she reviewed the relevant foreclosure records of Friedman & MacFadyen, P.A. during the years of 2007 through 2012. *See* Arnold Decl. ¶¶ 1-2, attached as Exhibit F. Ms. Arnold further testified that records reflected that Friedman & MacFadyen "conducted a total of 58 foreclosure

sales in the City of Alexandria. The records further reflect that a lost note affidavit was not filed by Friedman & MacFadyen a/k/a F&M Services subsequent to any of the aforementioned 58 foreclosure sales." *See* Arnold Decl. ¶¶ 3-4.

- Similarly, on March 13, 2013, Pamela P. Wanamaker, an auditor for the Commissioner of Accounts for Arlington County, testified that she "was able to identify 56 foreclosure sales that Johnie Muncy, as substitute trustee, administered in the County of Arlington during the period 2008 through 2012. The records reflect that Johnie Muncy, as substitute trustee, filed lost note affidavits for only five of the aforementioned 56 foreclosure sales." *See* Wanamaker Decl. ¶¶ 2-4, attached as Exhibit G.

- Similarly, Karey Wolfrey ("Ms. Wolfrey"), an assistant to Timothy Cope, one of the two Commissioners of Accounts for Prince William County, testified that "the computerized records of Mr. Cope's office only reflect that since 2009, Johnie R. Muncy conducted a total of 238 foreclosure sales. Of the 238 foreclosure accountings filed by Mr. Muncy, Mr. Cope's computerized records reflect a payment of $150.00 for a Lost Note Affidavit fee at the time of the original filing for only twelve accountings." *See* Wolfrey Decl. ¶¶ 1-4, attached as Exhibit H.

The implications of the commissioner of accounts' declarations are significant and consistent with the allegations in the Amended Complaints. The declarations confirm that Defendants almost never possessed a lost note affidavit from the beneficiary of the note at the time of a sale, let alone six months after when submitting the account of the sale to the commissioners. Instead, Defendants uniformly fabricated that the notes were unavailable through its standard Code § 55-59.1(B) letter in order to rapidly conduct the foreclosures and without any potential postponements created by the location of the note. As alleged, Defendants then made the efforts to obtain a copy of the note to present to the commissioners of accounts after the sale was conducted to create the appearance that Defendants complied with Virginia law. (Chatter Second Am. Compl. ¶ 182). This additional six-month timeframe allowed Defendants to maintain a positive Attorney Performance Rating in LPS's system and minimized Defendants lost revenues incurred in pursuing foreclosures on loans that were reinstated.

## II.     THE PLAINTIFFS HAVE PLEADED A PLAUSIBLE RICO CLAIM

Despite the Defendants' contention, the Plaintiffs have pleaded a prima facie RICO claim. As the court is aware, the predominant elements of a RICO claim consist of (1) conduct (2) of an

enterprise (3) through a pattern of racketeering activity. *Salinas v. United States*, 522 U.S. 52, 62 (1997). RICO's remedy for a private cause of action is found in 18 U.S.C. § 1964(c) which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." RICO's criminal prohibitions are contained in 18 U.S.C. § 1962, and subsection 1692(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Mail fraud, in turn, occurs whenever a person "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting to do so." *See* 18 U.S.C. § 1341. Any "mailing that is incident to an essential part of the scheme satisfies the mailing element." *Schmuck v. United States*, 489 U.S. 705, 712 (1989). Wire fraud, on the other hand, occurs whenever a person "having devised or intending to devise any scheme or artifice to defraud," uses the wire, radio, or television "for the purpose of executing such scheme or artifice." *See* 18 U.S.C. § 1343.

RICO liability is reserved for "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (internal quotation marks omitted)). Plaintiffs pleaded exactly such an occurrence with respect to the Defendants.

**A.      If Applicable at all, Rule 9(b) Only Applies to the RICO Elements of Fraud, and is "Relaxed" if Defendants are on Notice and the Missing Allegation Details Are Only Known Interannly By Defendants.**

Rule 9(b) further requires that fraud must be alleged with "particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). However, RICO claims often involve fraud and the Supreme Court has recognized the flexibility provided by Rule 11(b)(3). *See Rotella v. Wood*, 528 U.S. 549, 560 (2000)

(citing *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1050-1051 (7th Cir. 1998). In *Corley*, an action premised upon RICO, the Seventh Circuit held that "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties." *Corley*, 142 F.3d at 1051. Additionally, when a complaint's sufficiency is challenged under Rule 9(b), "it is the duty of the Court to balance the pleading requirement of notice pleading under Rule 8 against the requirement of particularity under Rule 9(b). *See In Re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation*, 467 F. Supp. 227, 250 (W.D. Tex. 1979)." *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F. Supp. 858, 866 (E.D. Va. 1980). This Court has observed that:

> Courts have not struck a balance between these rules by devising an easily applied test. Indeed, despite the many applications of Rule 9(b), no standard has evolved dictating precisely how much notice the Rule requires. No court has enunciated a test which casts light beyond the facts before it. This is not surprising. The nature of each individual case will necessarily determine the degree of specificity under which Rule 9(b) is appropriate . . . Therefore, if under the circumstances of the case it is apparent that even though plaintiffs' pleadings are vague, the defendants do in fact have notice of the matters of which plaintiffs complain, a strict application of Rule 9(b) can serve no purpose.

*Id.* at 266-67 (*citing In Re Commonwealth Oil/Tesoro Petroleum Corp.*, 467 F. Supp. at 250).

When balancing the requirements of Rules 8 and 9, the Fourth Circuit has held that there are many cases in which the requirements of Rule 9(b) can be relaxed. "For example, where the plaintiff's failure to describe the particulars of the alleged misrepresentation with greater specificity stem from the impossibility of access to certain information before discovery is conducted, 'some relaxation of Rule 9(b) is necessary....' *Pridgen v. Farmer*, 567 F. Supp. 1457, 1460 (E.D.N.C.1983). *Hirschler v. GMD Investments Ltd. P'ship*, CIV.A. 90-1289-N, 1990 WL 263438 (E.D. Va. Dec. 18, 1990). Additionally, "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003) (internal citations and quotations omitted).

Furthermore, several courts have held that when evidence of fraudulent activity is largely within a Defendant's knowledge or control, the requirements of Rule 9(b) should be relaxed. *See Ham v. Williams, et al.*, Civ. No. 4:03cv123 (E.D. Va. March 17, 2004) (Jackson, J.) (Exhibit "I"); *Shapiro v. UJB Fin. Corp.*, 964 F. 2d 272, 285 (3d Cir. 1992) (stating "courts have relaxed the particularity rule when factual information is peculiarly within the defendant's knowledge or control. All Plaintiff must do is "allege that the necessary information lies within defendants' control. (internal citations and quotations omitted)); *see also* 2A James W. Moore & Jo D. Lucas, *Moore's Federal Practice* ¶¶ [9.03[1] at 9-29 to 9- 29 (1991) (stating "where the facts are in the exclusive possession of the adversary, courts should permit the pleader to allege the facts on information and belief, provided a statement of the facts upon which the belief is founded is proffered"). This is because a strict application of Rule 9(b) "may permit sophisticated defrauders to successfully conceal the details of their fraud." *Shapiro*, 964 F.2d at 284. Therefore, a plaintiff is "required to plead the circumstances of the fraud, but is not required to present all of the evidence or facts supporting the allegations." *U.S. ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 224 F. Supp. 2d 1042, 1047 (W.D.N.C. 2002) *vacated,* 367 F.3d 245 (4th Cir. 2004) *rev'd and remanded on other grounds,* 545 U.S. 409, 125 S. Ct. 2444, 162 L. Ed. 2d 390 (2005) (citing *United States ex rel. Franklin v. Parke–Davis, Div. of Warner–Lambert Co.,* 147 F.Supp.2d 39, 46–47 (D.Mass.2001)).

### B.      Plaintiffs Have Standing to Bring a RICO Claim.

### 1.      Plaintiffs Are Not Required to Show Detrimental Reliance Under *Bridge v. Phoenix Bond & Indemnity Co.*

Defendants submit a litany of cases under the mistaken belief that the Plaintiffs must show detrimental reliance on the alleged fraud in order to bring a valid RICO claim.  However, the Defendants cite cases that all pre-date the Supreme Court's decision in *Bridge v. Phoenix Bond &*

*Indemnity Co.*, 553 U.S. 639 (2008). *Bridge* presented the Supreme Court with a nearly identical issue

that the Defendants have presented in their Motion to Dismiss. In *Bridge*, the Supreme Court addressed

"whether a plaintiff asserting a RICO claim predicated on mail fraud must plead and prove that it

relied on the defendant's alleged misrepresentations," and answered that a showing of reliance is not

required. *Bridge*, 553 U.S. at 641–42. In *Bridge*, the civil RICO claim was predicated on mail fraud in

which the respondents, competing bidders at public auctions for tax liens, alleged that petitioners

fraudulently obtained a disproportionate amount of tax liens by violating a bidding regulation and by

submitting false sworn affidavits that it had complied with this bidding regulation. The respondents

further "assert[ed] that the petitioners 'mailed or caused to be mailed hundreds of mailings in

furtherance of the scheme' when they sent property owners various notices required by Illinois law."

*Id.* at 644–45. In its decision, the Supreme Court held that "a plaintiff asserting a RICO claim

predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to

establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge*,

553 U.S. at 661.

*Bridge* is directly analogous to the case at hand. In fact, the Supreme Court provided a succinct

summary that is similar to the current case in several respects:

> Petitioners argue, however, that because the alleged pattern of racketeering activity consisted of acts of mail fraud, respondents must show that they relied on petitioners' fraudulent misrepresentations. …
> If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement. Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation.

*Bridge*, 553 U.S. at 647–48.

Similar to *Bridge*, the Plaintiffs here allege that the Defendants devised a scheme in which they

used fraudulent letters, Substitution of Trustee documents, Trustee's Deeds, and Foreclosure

Accountings to conduct or attempt to conduct a foreclosure sale of the Plaintiffs' and putative class

members' property. Chatter Second Am. Compl. ¶¶ 1–2, 67–125, 133, 170–204, 236–52, 273, 284–85; Banks Second Am. Compl. ¶¶ 1–2, 110–68, 177, 193–20, 263–79, 300–301, 310; Goodrow Second Am. Compl. ¶¶ 1–2, 107–65, 174, 190–259, 321–22, 332–33; Buel Am. Compl. ¶¶ 1–2, 103–62, 191–222, 285–86, 297–98; Mbundure Am. Compl. ¶¶ 1–2, 68–127, 137, 150–96, 246–47, 257–58; McBeth Am. Compl. ¶¶ 1–2, 120–79, 213–67, 329–30, 340–41. Plaintiffs allege that the Defendants use the mails in furtherance of this scheme, specifically by sending the fraudulent letters, Substitution of Trustee documents, Trustee's Deeds, and Foreclosure Accountings to the Plaintiffs, putative class members, the general district courts, and the Commissioners of Accounts.[9] Chatter Second Am. Compl. ¶¶ 67, 76, 89, 116, 172, 177, 184, 188, 242–45, 292, 293, 295; Banks Second Am. Compl. ¶¶ 110, 119, 132, 195, 200, 207, 211, 269, 271, 315–18; Goodrow Second Am. Compl. ¶¶ 107–08, 157, 164, 194, 200, 208, 249–51, 320, 339–41, 343; Buel Am. Compl. ¶¶ 104–05, 126, 154, 161, 194, 201, 209, 304–06, 208; Mbundure Am. Compl. ¶¶ 69–70, 91, 118, 119, 126, 153, 158, 168, 178, 245, 265–66, 268; McBeth Am. Compl. ¶¶ 121–22, 130, 143, 170–71, 178, 216, 225, 233, 253, 328, 348–50, 352. In contrast to *Bridge*, and despite the Defendants' baseless contention, the Plaintiffs here actually did rely on the misrepresentation when they received the fraudulent documents and have alleged as much. Chatter Second Am. Compl. ¶¶ 115, 252, 298; Banks Second Am. Compl. ¶¶ 158, 279; 321; Goodrow Second Am. Compl. ¶¶ 155, 346; Buel Am. Compl. ¶¶ 152, 264, 311; Mbundure Am. Compl. ¶¶ 117, 271; McBeth Am. Compl. ¶¶ 169, 355. The affidavits had the effect of intimidating and deceiving the Plaintiffs and the putative class members into believing that the Defendant had the right to conduct a foreclosure sale of their property. *Id.* Also, Plaintiffs and the putative class members relied on these documents when they paid money to the Defendants in order to stop a pending foreclosure sale of their property, when they were forced to pay fees to the Defendant, when they moved out of their homes, and/or when they paid money to the Defendants out of the foreclosure sale

---

[9] Plaintiffs have also alleged reliance on the part of these various third parties. Chatter Second Am. Compl. ¶ 298; Banks Second Am. Compl. ¶ 321; Goodrow Second Am. Compl. ¶ 346; Buel Am. Compl. ¶ 311; Mbundure Am. Compl. ¶ 271; McBeth Am. Compl. ¶ 355.

proceeds. *See, e.g.*, Chatter Second Am. Compl. ¶¶ 115, 237, 247; Banks Second Am. Compl. ¶¶ 158, 264, 273; Goodrow Second Am. Compl. ¶¶ 155, 244, 253; Buel Am. Compl. ¶¶ 152, 264; McBeth Am. Compl. ¶¶ 169, 356; Mbundure Am. Compl. ¶¶ 117, 272. Finally, Plaintiffs allege repeatedly throughout their Amended Complaints that the Defendants purposely used the fraudulent documents and made other misrepresentations for the purpose of rushing Plaintiffs through the foreclosure process without regard to the law. *See, e.g.*, Chatter Second Am. Compl. ¶¶ 2, 70, 75, 88; Banks Second Am. Compl. ¶¶ 2, 98, 99, 118, 131; Goodrow Second Am. Compl. ¶¶ 2, 97, 110, 115, 128; Buel Am. Compl. ¶¶ 2, 92, 107, 112, 125; McBeth Am. Compl. ¶¶ 2, 110, 124, 129, 142; Mbundure Am. Compl. ¶ 2, 59, 72, 77, 90.

## 2.      Plaintiffs Have Sufficiently Pleaded Proximate Cause

The Supreme Court has recognized that "[p]roximate cause . . . is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 655 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)). "Instead we 'use[d] "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts' with a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (quoting *Holmes*, 503 U.S. at 268) (alteration in original) (internal citation omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (1991) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). Plaintiffs here do not allege an indirect harm as a result of the Defendants' conduct. Plaintiffs sufficiently pleaded that the Defendants' scheme caused them direct injury. *See* Chatter Second Am. Compl. ¶¶ 252, 299–300; Banks Second Am. Compl. ¶¶ 279, 322–33; Goodrow Second Am. Compl. ¶¶ 259, 347–48; Buel Am. Compl. ¶¶ 264, 312–13; Mbundure Am. Compl. ¶¶ 196, 272–73; McBeth Am. Compl. ¶¶ 356–57. In fact, in this Court's Memorandum Opinion (Docket No. 106) regarding the Defendants' last motion to dismiss, this Court recognized that the Plaintiffs had alleged enough facts

that allowed it to presume that Plaintiffs satisfied the standing requirement to bring a RICO claim. Mem. Op. at 19–21, Docket No. 106.

Defendants' sole argument that Plaintiffs cannot establish proximate cause is that any default on Plaintiffs' mortgage loans were the proximate cause of their injuries, not the Defendants' violations of law.  However, the cases the Defendants cite in their motion to dismiss are distinguishable from the present case.

Defendants cite to *Kramer v. Brachan Aerospace Corp.*, 912 F.2d 151 (6th Cir. 1990) and *O'Malley v. O'Neill*, 887 F. 2d 1557 (11th Cir. 1989). However, these two cases are very different from the cases before this Court. These two cases each involved Plaintiffs who were penalized for reporting a RICO violation or for refusing to participate in a RICO violation and therefore were not harmed by the predicate acts forming the basis for the RICO violations. Both cases are contrary to the current cases in which Plaintiffs have alleged a foreclosure scheme involving the predicate acts of mail and wire fraud to perpetuate the process of conducting fraudulent foreclosures and in which the injury sustained by the Plaintiffs are a direct result of the Defendants' actions taken to further the scheme.

Additionally, the Defendants rely heavily on the Fourth Circuit's decision in *Brandenburg v. Seidel*, 859 F.2d 1179 (1988). In *Brandenburg*, the Fourth Circuit held that the RICO count must be dismissed because the Plaintiffs had not explained how the Defendants' actions had caused their damages; that negligent actions could not form the basis for a RICO claim because acts of negligence are not predicate acts under RICO; and that the Plaintiffs' complaint held no specific allegations that the named or class plaintiffs acted or relied on any representations made by the Defendants in that case. None of these situations is true in the cases currently before this Court. First, as described below, the Plaintiffs have alleged that their damages stem from the Defendants' actions, which under Rule 12(b)(6) is sufficient. Second, the Plaintiffs have not alleged that the Defendants' actions were negligent. In fact, the Plaintiffs allege that the Defendants acted purposefully throughout their Complaints. Chatter Second Am. Compl. ¶¶ 2, 70, 75, 88; Banks Second Am. Compl. ¶¶ 2, 98, 99,

118, 131; Goodrow Second Am. Compl. ¶¶ 2, 97, 110, 115, 128; Buel Am. Compl. ¶¶ 2, 92, 107, 112, 125; McBeth Am. Compl. ¶¶ 2, 110, 124, 129, 142; Mbundure Am. Compl. ¶¶ 2, 59, 72, 77, 90. Finally, although not required under *Bridge*, the Plaintiffs have alleged that they, as well as the putative class members, relied on the misrepresentations made by the Defendants. Chatter Second Am. Compl. ¶¶ 115, 237, 247, 252, 298; Banks Second Am. Compl. ¶¶ 158, 264, 273, 279, 321; Goodrow Second Am. Compl. ¶¶ 155, 244, 253, 346; Buel Am. Compl. ¶¶ 152, 264, 211; McBeth Am. Compl. ¶¶ 169, 355–56; Mbundure Am. Compl. ¶¶ 117, 271–72.

Moreover, despite the Defendants' repeated assertion that Plaintiffs cannot prove that the mailings were the proximate cause of their injury, the mailings are not the only predicate acts that Plaintiffs allege in their Complaints. Throughout their Complaints, the Plaintiffs allege a multitude of acts constituting mail and wire fraud, including but not limited to, (1) the electronic transmittal of fraudulent documents between the loan servicers, LPS, and the Defendants, *see* Chatter Second Am. Compl. ¶¶ 29, 167–69, 173, 178, 185, 282, 292, 293, 295; Banks Second Am. Compl. ¶¶ 93–95, 190–92, 196, 201, 208, 309, 316–18; Goodrow Second Am. Compl. ¶¶ 90–93, 195, 201, 331, 340–41, 343; Buel Am. Compl. ¶¶ 86–89, 113, 195, 202, 195, 305–08; Mbundure Am. Compl. ¶¶ 52–55, 147–48, 154, 159, 156, 265–68; McBeth Am. Compl. ¶¶ 105–07, 210–12, 217, 226, 339, 349–52; (2) the use of LPS's loan servicing software including the Desktop platform to perpetuate their entire foreclosure scheme, *see id.*; (3) the collection of payments from Plaintiffs and the putative class members pre- and post-foreclosure using the mails and the wires, *see* Chatter Second Am. Compl. ¶ 292; Banks Second Am. Compl. ¶ 316; Goodrow Second Am. Compl. ¶ 340; Buel Am. Compl. ¶ 305; Mbundure Am. Compl. ¶ 265; McBeth Am. Compl. ¶ 349; (4) the payment of an illegal "kickback" fee to LPS using the mail and wires, *see* Chatter Second Am. Compl. ¶ 291; Banks Second Am. Compl. ¶ 315; Goodrow Second Am. Compl. ¶ 339; Buel Am. Compl. ¶ 304; Mbundure Am. Compl. ¶ 264; McBeth Am. Compl. ¶ 348; (5) the mailing of the fraudulent documents to the Plaintiffs and putative class members and to the courts, *see* Chatter Second Am. Compl. ¶¶ 67, 76, 89, 116, 172, 177, 184, 188,

242–45, 292, 293, 295; Banks Second Am. Compl. ¶¶ 110, 119, 132, 195, 200, 207, 211, 269, 271,

315–18; Goodrow Second Am. Compl. ¶¶ 107–08, 157, 164, 194, 200, 208, 249–51, 320, 339–41,

343; Buel Am. Compl. ¶¶ 104–05, 126, 154, 161, 194, 201, 209, 304–06, 208; Mbundure Am. Compl.

¶¶ 69–70, 91, 118, 119, 126, 153, 158, 168, 178, 245, 265–66, 268; McBeth Am. Compl. ¶¶ 121–22,

130, 143, 170–71, 178, 216, 225, 233, 253, 328, 348–50, 352; and (6) the mailing of payments to the

various circuit courts for the costs of recording these fraudulent documents, *see* Chatter Second Am.

Compl. ¶ 292; Banks Second Am. Compl. ¶ 316; Goodrow Second Am. Compl. ¶ 340; Buel Am.

Compl. ¶ 305; Mbundure Am. Compl. ¶ 265; McBeth Am. Compl. ¶ 349.

As a result of the Defendants' actions, Plaintiffs suffered significant injury. Plaintiffs and the

putative class members were harmed when they were forced to pay money to the Defendants in order

to stop a pending fraudulent or illegally conducted foreclosure sale of their property, when they were

forced to pay fees to the Defendant, when they moved out of their homes, and/or when they paid

money to the Defendants out of the foreclosure sale proceeds. *See, e.g.*, Chatter Second Am. Compl. ¶¶

115, 237, 247; Banks Second Am. Compl. ¶¶ 158, 264, 273; Goodrow Second Am. Compl. ¶¶ 155,

244, 253; Buel Am. Compl. ¶¶ 152, 264; McBeth Am. Compl. ¶¶ 169, 356; Mbundure Am. Compl. ¶¶

117, 272.   Chatter, Banks and Goodrow lost their homes after the Defendants sold them at a

foreclosure auction. Chatter Second Am. Compl. ¶ 237; Banks Second Am. Compl. ¶ 264; Goodrow

Second Am. Compl. ¶ 244. Mr. and Mrs. Buel were forced to pay a significant amount of money,

including the Defendants' fees, in order to stop the foreclosure of their home. Buel Am. Compl. ¶¶

264. All Plaintiffs suffered emotional distress as a result of the Defendants' unlawful actions. *See, e.g.*,

Mbundure Am. Compl. ¶¶ 196; McBeth Am. Compl. ¶¶ 74–76. Plaintiff McBeth and Mbundure were

forced to hire an attorney to defend their home against foreclosure and incurred significant legal fees

and costs in connection with this representation.

Additionally, as a direct result of the Defendants' rush to conduct the foreclosures of the

Plaintiffs' properties, all of the Plaintiffs were deprived of a significant amount of time in which they

could have pursued several options in order to stay in their homes, including obtaining a loan modification. *See* Chatter Second Am. Compl. ¶¶ 19–22, 252; Banks Second Am. Compl. ¶¶ 63–65, 279; Goodrow Second Am. Compl. ¶¶ 63–65, 259; Buel Am. Compl. ¶¶ 57–59, Mbundure Am. Compl. ¶¶ 25–27; McBeth Am. Compl. ¶¶ 74–76. In fact, several Plaintiffs were in the process of applying for a loan modification when the Defendants conducted a foreclosure sale, or attempted a foreclosure sale, of their homes. Chatter Second Am. Compl. ¶¶ 160–62; Banks Second Am. Compl. ¶¶ 188; Goodrow Second Am. Compl. ¶¶ 185–87; Buel Am. Compl. ¶¶ 180–87; McBeth Am. Compl. ¶¶ 200–07. Had the Defendants followed lawful procedures while conducting the foreclosure sales of the Plaintiffs' homes, Plaintiffs might have been able to successfully complete the loan modification process, or some other alternative to foreclosure, and could have avoided the foreclosure sale of their homes.

The fact remains that Defendants' violations of law, as alleged by the Plaintiffs, were the direct cause of their injuries.  To the extent that Defendants seek to defeat such damage claims, their argument is more correctly left for the jury, and certainly not properly resolved through Rule 12(b)(6).

## C.  Plaintiffs Have Plausably Pleaded a RICO Enterprise.

Defendants cling to the assertion that, regardless of how they conduct foreclosures and which laws they violate in the process, the Plaintiffs and the putative class members deserved to lose their homes and, thus, Defendants never caused any injury. Defendants propel this argument to the forefront of their motion attempting to shirk responsibility for the fact that most of the documents they prepared were fraudulent or forged and that they engaged in this deceit for the sole purpose of cutting costs and forcing the Plaintiffs and putative class members out of their homes as soon as possible. They suggest without moral or legal support an angry "just desserts" or "unclean hands" type of argument.  In order to distract the court from their illegal activity, the Defendants argue that:

> Plaintiffs have not pleaded, and cannot plead in good faith that foreclosing on delinquent mortgages is unlawful or improper, much less corrupt. Nor can they plead in good faith that a person or entity who makes money in the process of foreclosing on

delinquent mortgages is behaving in an unlawful or corrupt manner.

Defs.' Mem. at 21. Plaintiffs' have made no such contention. Had Defendants followed Virginia and federal law in conducting the foreclosure of the Plaintiffs' and putative class members' homes, there would be no case. Instead, Plaintiffs contend that by forging the documents required to conduct foreclosures and by making fraudulent misrepresentations in letters and other documents that were sent through the mails and over the wires, the Defendants, working in conjunction with Fannie Mae, LPS, and the various loan servicers, have committed a RICO violation. Chatter Second Am. Compl. ¶¶ 268–301; Banks Second Am. Compl. ¶¶ 296–324; Goodrow Second Am. Compl. ¶¶ 317–49; Buel Am. Compl. ¶¶ 281–314; Mbundure Am. Compl. ¶¶ 242–74; McBeth Am. Compl. ¶¶ 325–58.

Despite being only at a Rule 12(b)(6) posture, Defendants repeatedly attempt to argue the merits of Plaintiffs' Complaints by asking the court to rule as a matter of law that Plaintiffs claims must fail. This is not a summary judgment posture, and Defendants are not entitled to a summary judgment ruling.  A Rule 12(b)(6) motion to dismiss does not resolve disputes concerning the facts alleged in the complaint, nor does it test the merits of the claims. *Foster v. Wintergreen Real Estate Co.*, 2008 WL 4829674, at *3 (W.D. Va. Nov. 6, 2008); *see also Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). A complaint will survive a Rule 12(b)(6) motion to dismiss as long as long as it sets out facts sufficient for the court to infer that each element of a cause of action is present. *See Jordan v. Alternate Resources Corp.*, 458 F.3d 332, 334-45 (4th Cir. 2006); *Wolman v. Tose*, 467 F.2d 29, 33 (4th Cir. 1972).

Defendants argue that Plaintiffs have failed to establish a RICO enterprise arguing:  1) the use of lost note affidavits was not illegal, 2) the wrongful conduct of the loan servicers that were the basis of federal review or lawsuits did not involve the Defendants, 3) the "kickback" or referral fee to LPS was not illegal—notably not denying that the referral fee was paid, 4) that the creation of the sham company was not illegal, and 5) Plaintiffs' Amended Complaints contain no allegations that the other members of the enterprise knew about the forged substitute trustee documents or other misconduct.

Defs.' Mem. at 21–25. Each of the Defendants' arguments fail, and, moreover, incorrectly portray the allegations contained within Plaintiffs' Amended Complaints. Plaintiffs will briefly address each of Defendants' arguments.

1.     **Plaintiffs Sufficiently Pleaded Defendants' Violation of Virginia Code § 55-59.1(B) and Misrepresentations About the Unavailability of Their Notes.**

Defendants misconstrue the Plaintiffs' allegations in their Complaints by stating that Plaintiffs' claim that the use of a "lost note affidavit" violates Virginia Code. *See* Defs.' Mem.  21–22. Plaintiffs have discussed the issue of the Defendants' use of a lost note affidavit at length above. *See* I.C.1. *supra*. Defendants' misrepresentations to the Plaintiffs that their Notes were unavailable (whether administratively or for any reason) and proceeding to sale in violation of the requirements in Virginia Code § 55-59.1 were unlawful and can be considered illegal activity of the enterprise. Regardless, Plaintiffs have pleaded sufficient facts to withstand a pleading challenge presented by a Rule 12(b)(6) motion.

2.     **Plaintiffs Plausibly Allege Defendants' and the Loan Servicers Had the Common Purpose of Illegal Activity.**

The Defendants claim that Plaintiffs' Complaints contain no allegations that the Defendants participated in the loan servicers' servicing misconduct or that the Defendants knew about the loan servicers' misconduct. This is another mischaracterization of Plaintiffs' Complaints.  Plaintiffs' Amended Complaints contain several allegations that the Defendants engaged in misconduct along with the loan servicers, not just with the knowledge of the servicers and other members of the enterprise, but also with their blessing. *See, e.g.*, Buel Am. Compl. ¶¶ 57, 58, 125, 298. The Plaintiffs further allege that the systematic and widespread conduct that the Defendants, loan servicers, and other members of the enterprise engaged in applied to each of them as well. *See, e.g.*, Buel Am. Compl. ¶ 171. Similarly, the Plaintiffs have alleged repeatedly that the Defendants were engaged in the enterprise along with the loan servicers, and thus aware of not only their own wrongdoing but that of the other members of the enterprise and vice versa. *See, e.g.*, Goodrow Am.

Compl. ¶¶ 49–63, 64; Buel Am. Compl. ¶¶ 44–47, 56–58, 298.   The fact is that Plaintiffs' Complaints are full of allegations that the members of the enterprise engaged in illegal and fraudulent activity for the common purpose of increasing their profits and speeding through the foreclosure process. *See* Chatter Second Am. Compl. ¶ 1, 2, 19–20, 22, 53, 55–56, 82, 88, 125, 233, 293; Banks Second Am. Compl. ¶¶ 1, 2, 43–45, 63–65, 96, 98, 118, 125, 131, 168, 317; Goodrow Second Am. Compl. ¶¶ 1, 2, 44–47, 63–64, 92–94, 128, 165, 259, 341; Buel Am. Compl. ¶¶ 1, 2, 44–47, 57–59, 88–90, 93, 125, 306; Mbundure Am. Compl. ¶¶ 1–2, 53–56, 59, 90, 266; McBeth Am. Compl. ¶¶ 1–2, 44–47, 57–59, 74–76, 102–08, 110, 136, 350. This is sufficient to withstand a Rule 12(b)(6) motion to dismiss.

### 3.      Plaintiffs Have Sufficiently Pleaded That the LPS Referral Fee is Illegal.

Again the Defendants attempt to improperly argue the merits of Plaintiffs' Complaints in their consolidated motion to dismiss. As previously explained, a Rule 12(b)(6) motion to dismiss does not resolve disputes concerning the facts alleged in the complaint, nor does it test the merits of the claims. *Foster*, 2008 WL 4829674, at *3; *see also Randall*, 30 F.3d at 522. A Rule 12(b)(6) motion simply tests the pleading sufficiency of a complaint. Plaintiffs' Amended Complaints adequately plead facts sufficient for the court to infer that the LPS referral fee was improper because it was paid to LPS upon referral, regardless of whether any work was actually completed by LPS. *See, e.g.*, Buel Am. Compl. ¶¶ 70–73, 298; Goodrow Am. Compl. ¶¶ 76–78. In fact, the North Carolina State Bar has found this LPS "referral fee" to violate rules of professional conduct governing attorneys. N.C. State Bar, 2012 Formal      Op.      10      (Jan.      25,      2013),      *available      at* http://www.ncbar.com/ethics/ethics.asp?page=7&from=10/2012. The North Carolina State Bar found that the participation in the attorney network may further violate state laws governing the unauthorized practice of law. *See id.* Additionally, the Nevada Attorney General filed a complaint against LPS after an extensive investigation into LPS's business practices for these "referral fees or illegal kickbacks" as violative of Nevada's state consumer protection statute. *Nevada v. Lender*

*Processing Servs., Inc., et al.*, No. A-11-653289-B (Clark Cnty. Dist. Ct. Dec. 15, 2011). Regardless, Plaintiffs' Complaints sufficiently plead enough facts for the Court to infer that this fee is improper.

**4.  Plaintiffs Sufficiently Alleged That the Other Members of the Enterprise Knew About the Improperly Prepared Substitute Trustee Documents.**

Defendants once again wrongly claim that Plaintiffs' Amended Complaints fail to assert that any other member of the enterprise was aware of or profited from the use of the forged and improper substitute trustee documents. Defs.' Mem. at 24–25.  This is simply not true. In fact, Plaintiffs' Complaints allege that the members of the enterprise not only knew of this conduct, but approved of it or participated in it itself for the sake of speeding up foreclosures. Chatter Second Am. Compl. ¶ 1, 2, 19–20, 22, 53, 55–56, 82, 88, 125, 233, 293; Banks Second Am. Compl. ¶¶ 1, 2, 43–45, 63–65, 96, 98, 118, 125, 131, 168, 317; Goodrow Second Am. Compl. ¶¶ 1, 2, 44–47, 63-64, 92–94, 128, 165, 259, 341; Buel Am. Compl. ¶¶ 1, 2, 44–47, 57–59, 88–90, 93, 125, 306; Mbundure Am. Compl. ¶¶ 1, 2, 53–56, 59, 90, 266; McBeth Am. Compl. ¶¶ 1, 2, 44–47, 57–59, 74–76, 102–08, 110, 136, 350. Defendants' argument is simply without merit.

**5.  Plaintiffs Have Adequately Alleged a RICO Enterprise.**

In pleading their RICO allegations, Plaintiffs have adequately established the enterprise requirement of RICO. An enterprise is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4). An association-in-fact enterprise requires a showing that the different entities shared a "common purpose which animated" the association-in-fact enterprise. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "A goal of making money establishes a common purpose under RICO where the enterprise members sought to profit from the alleged illegal activity." *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985). Under RICO, the Plaintiff must prove that the enterprise exists separate and apart from the pattern of racketeering activity. *See Tillett*, 763 F.2d at 631; *Turkette*, 452 U.S. at 583. While the RICO statute itself does not define the boundaries of an

enterprise, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes." *Boyle v. United States*, 556 U.S. 938, 944 (2009).

The Supreme Court has held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. However, this structure need not be formal; it is simple a continuing unit that functions with a common purpose. *Id.* at 948. For example, the association-in-fact need not have a hierarchal structure, members of the group need not have fixed roles, and the group need not have a name, regular meetings, dues, or established rules and regulations. *Id.*

In their Amended Complaints, Plaintiffs have pleaded a sufficient association-in-fact RICO enterprise consisting of the Defendants and their principals, Kenneth J. MacFadyen and Mark H. Friedman, LPS, Fannie Mae, and the mortgage loan servicers to survive Defendants' motion to dismiss. Chatter Second Am. Compl. ¶¶ 281-94; Banks Second Am. Compl. ¶¶ 308-20; Goodrow Second Am. Compl. ¶¶ 330-45; Buel Am. Compl. ¶¶ 294-307; Mbundure Am. Compl. ¶¶ 255-67; McBeth Am. Compl. ¶¶ 338-51.  They have also sufficiently pleaded the three *Boyle* requirements of the association-in-fact enterprise.

Plaintiffs have alleged that the purpose of the association-in-fact enterprise was to speeding up foreclosures to an unreasonable rate so as to increase their profit and bottom line, at the detriment of the Plaintiffs and putative class. *See* Chatter Second Am. Compl. ¶¶ 1, 2, 19-20, 22, 53, 55-56, 82, 88, 125, 233, 293; Banks Second Am. Compl. ¶¶ 1, 2, 43-45, 63-65, 96, 98, 118, 125, 131, 168, 317; Goodrow Second Am. Compl. ¶¶ 1, 2, 44-47, 63-64, 92-94, 128, 165, 259, 341; Buel Am. Compl. ¶¶ 1, 2, 44-47, 57-59, 88-90, 93, 125, 306; Mbundure Am. Compl. ¶¶ 1-2, 53-56, 59, 90, 266; McBeth Am. Compl. ¶¶ 1-2, 44-47, 57-59, 74-76, 102-08, 110, 136, 350. The Plaintiffs have also pleaded a

significant number of facts pertaining to each participant of the enterprise. *See* Chatter Second Am. Compl. ¶¶ 11–132; Banks Second Am. Compl. ¶¶ 11–176; Goodrow Second Am. Compl. ¶¶ 11–173; Buel Am. Compl. ¶¶ 11–170; Mbundure Am. Compl. ¶¶ 11–136; McBeth Am. Compl. ¶¶ 11–187.

Plaintiffs have also adequately alleged the relationship between the members of the association-in-fact enterprise. Although these relationships are described at length in the Amended Complaints, *see* Chatter Second Am. Compl. ¶¶ 281-94; Banks Second Am. Compl. ¶¶ 308-20; Goodrow Second Am. Compl. ¶¶ 330-45; Buel Am. Compl. ¶¶ 294-307; Mbundure Am. Compl. ¶¶ 255-67; McBeth Am. Compl. ¶¶ 338-51, a brief summary of the relationship between the members of the enterprise is as follows:

1.      LPS designs software programs to institute an expedited foreclosure timeline. This software also tracks how quickly an attorney foreclosure firm can conduct a foreclosure sale. LPS charges an "admin" fee for each referral completed using these programs. Chatter Second Am. Compl. ¶ 282; Banks Second Am. Compl. ¶ 309; Goodrow Second Am. Compl. ¶ 331; Buel Am. Compl. ¶ 295; Mbundure Am. Compl. ¶ 256; McBeth Am. Compl. ¶ 339.

2.      Loan servicers use LPS's software programs because it forces attorney foreclosure firms to complete foreclosures as quickly as possible.

3.      The Defendants use LPS's software programs because of the large amount of referrals that they are able to receive from the system.

4.      When a consumer defaults on his mortgage loan, the loan servicers refer the account to LPS, using software programs designed by LPS. *Id.*

5.      LPS then uses this software to refer the account to the Defendants. *Id.*

6.      Mark Friedman and Kenneth MacFadyen founded a law firm, Defendant Friedman, as well as a sham company, Defendant F&M, solely to conduct foreclosure sales. Chatter Second Am. Compl. ¶ 283 (Docket No. 119); Banks Second Am. Compl. ¶ 310; Goodrow Second Am. Compl. ¶ 332; Buel Am. Compl. ¶ 296; Mbundure Am. Compl. ¶ 257; McBeth Am. Compl. ¶ 340. Mark Friedman and Kenneth MacFadyen designed business to operate in a way that artificially inflated their "Attorney Performance Rating" in the LPS system by creating fraudulent foreclosure documents in order to drastically increase the speed with which Defendants were able to conduct foreclosures to the detriment of other law abiding trustees. *Id.* Defendant Friedman and/or Defendant F&M were Network Attorneys in LPS's system and regularly paid LPS's "admin fee". Chatter Second Am. Compl. ¶ 284; Banks Second Am. Compl. ¶ 310; Goodrow Second Am. Compl. ¶ 332; Buel Am. Compl. ¶ 297; Mbundure Am. Compl. ¶ 258; McBeth Am. Compl. ¶ 341.

7.      When a defaulted mortgage loan was referred to the Friedman entities for foreclosure, Defendants Friedman and/or Defendant F&M used Defendant Muncy, Kenneth MacFadyen,

Mark Friedman and other Friedman employees to create fraudulent documents to initiate the foreclosure process, including the substitution of trustee documents. *Id.*

8.      Using these fraudulent documents, Defendants would then conduct a foreclosure of the consumer's home. Chatter Second Am. Compl. ¶ 285; Banks Second Am. Compl. ¶ 310; Goodrow Second Am. Compl. ¶ 333; Buel Am. Compl. ¶ 298; McBeth Am. Compl. ¶ 342.

9.      LPS and the loan servicers knew of the Defendants' conduct and continued to refer foreclosure cases to them because of how quickly the Defendants were able to conduct foreclosure sales. *Id.* This in turn allowed the loan servicers to comply with their own arbitrary foreclosure timeline set by the investors or owners of Plaintiffs' loans. *Id.*

Finally, the Plaintiffs have established the longevity requirement of an association-in-fact enterprise by alleging that hundreds of acts took place, over at least a 3-year period, with hundreds of victims (including at least 200 in Fairfax County alone). Chatter Second Am. Compl. ¶ 272; Banks Second Am. Compl. ¶ 300; Goodrow Second Am. Compl. ¶ 321; Buel Am. Compl. ¶ 285; Mbundure Am. Compl. ¶ 246; McBeth Am. Compl. ¶ 329.

## D.      Plaintiffs Have Sufficiently Pleaded a Pattern of Racketeering Activity.

The Supreme Court has held that "[c]ontinuity is both a closed and an open-ended concept, referring *either* to a closed period of repeated conduct, *or* to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241. (emphasis added). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time". *Id.* The result that the Defendant apparently argues for—focusing only on the threat of future criminal acts as dispositive—would produce the illogical result that an  organized crime defendant could avoid liability altogether for the prior fraud committed through his enterprise by establishing that he is no longer a threat to continue his misdeeds in the future through the use of that enterprise.   Certainly, this is not what Congress intended.

To determine whether the closed-end continuity prong has been satisfied, the Court should look to the "number and variety of predicate acts, the length of time over which they were committed, the number of putative victims, the presence of separate schemes and the potential for multiple

distinct injuries". *Parcoil Corp. v. NOWSCO Well Serv. Ltd.,* 887 F.2d 502, 504 (4th Cir. 1989) (quoting *Brandenburg*, 859 F.2d at 1185). "No one factor is necessarily determinative"; rather the Court is to undertake "a carefully considered judgment taking into account all the facts and circumstances of the particular case." *Brandenburg,* 859 F.2d at 1185.  As to closed-ended continuity, the Supreme Court has held that "predicate acts extending over a few weeks or months" would not satisfy the requirement. However, in rejecting the argument that "multiple schemes" are required, the Court concluded that precise guidelines cannot be set to determine the existence of a pattern of racketeering activity.  *H.J. Inc.* at 243.   The Court reasoned that Congress "had a fairly flexible concept of pattern in mind". *Id.* at 239.   Regardless, the Plaintiffs concede that while in their survey of these cases, no court has found closed-ended continuity for a series of racketeering acts occurring for less than a year, numerous cases have found continuity to exist where the conduct occurred over more than one year, taking into account the other factors, including the number of acts committed and the number of victims affected.   For example, the Fourth Circuit has found that 58 acts committed over a three-year period, with 16 victims were sufficient to establish closed ended continuity. *Professionals Inc. v. Berry*, 959 F.2d 231 (4th Cir.  2011).  The Fourth Circuit also found in an earlier case that a single scheme comprised of "numerous" fraudulent letters directed at two victims over a five year period of time was sufficient to establish continuity.  *Morley v. Cohen,* 888 F.2d 1006, 1010 (4th Cir. 1989).  Defendants allege that Plaintiffs' have only pleaded six victims of the RICO scheme, and that, with respect to each Plaintiff, the scheme only lasted a couple of months. Defs.' Mem. at 27. This is simply inaccurate. Plaintiffs have alleged that hundreds of acts took place, over at least a 3-year period, with hundreds of victims (including at least 200 in Fairfax County alone). Chatter Second Am. Compl. ¶ 272; Banks Second Am. Compl. ¶ 300; Goodrow Second Am. Compl. ¶ 321; Buel Am. Compl. ¶ 285; Mbundure Am. Compl. ¶ 246; McBeth Am. Compl. ¶ 329. Without question, the Plaintiffs have sufficiently alleged a closed-ended pattern of continuous mail and wire fraud.

**E.      Defendants Attempt to Challenge Class Certification at an Improper Posture.**

Defendant improperly challenges Plaintiffs' Rule 23 class allegations—devoting only a half-page paragraph to their argument. Defendant's entire argument is based on the simple notion that because Plaintiffs' RICO claims fail, they therefore cannot be adequate representatives of a RICO class. However, because their RICO claims do not fail and adequately plead facts sufficient to infer that the elements of a RICO claim are satisfied as explained above, Defendants' argument is moot. Further, Plaintiffs incorporate by reference their previous argument made in opposition to Defendant's second Motion to Dismiss. *See Goodrow*, 2012 WL 6725617 at n. 2.

## III.    PLAINTIFFS HAVE PLEADED SUFFICIENT CLAIMS UNDER THE FDCPA.

Defendants assert a conglomeration of new and old challenges to Plaintiffs' FDCPA claims hoping this Court will conclude differently than Judge Spencer. It should not. Initially however, Plaintiffs ask the Court to recall Defendants' oral argument upon the previous motion to dismiss. Counsel exclaimed when asking for dismissal of the RICO and Fiduciary Duty claims that Plaintiffs of course were not without remedy – they had the FDCPA. And yet of course now, as before Judge Spencer, Defendants claim otherwise.

### A.    All Alleged Claims Occurred Within One Year Of Filing Of The Respective Complaint.

Plaintiffs do not seek to prosecute and do not allege a FDCPA claim based upon a violation that occurred more than one year before the filing of the respective action (e.g. for Chatter, within one year of the first *Chatter* Complaint, etc.). Each of the cases and Plaintiffs alleges a discrete violation that occurred within the respective one-year period.

#### 1.    Banks and Chatter

Banks alleges that Defendants made multiple false statements after the foreclosure sale in their role as debt collectors. Banks Second Am. Compl. ¶ 329, 331. Chatter Second Am. Compl. 306, 308. Defendants do not challenge these allegations on their merits, except for the assertion that the completion of a Trustee's sale may somehow "extinguish" the underlying debt and terminate FDCPA

governance.  Factually, this is untrue.  Plaintiffs allege that the Defendants' post-sale correspondence continued Defendants' efforts to collect on the mortgage debts.  In fact, in each instance, Defendants claimed a remaining mortgage deficiency in their post-sale reports and claimed the right to execute a Trustee's deed when no lawful right to do so then existed.

Legally, Defendants' argument is also untrue.  There is no such legal principle as asserted – the FDCPA still governs and is not "extinguished."  Plaintiffs' counsel trust their attorney opponents and thus have to believe that the cases cited to support Defendants' argument were provided from outside their defense team and were never actually read.  None of the cases say at all what Defendants claim and are grossly out of context.  In the *pro se* case, *Calkins v. Shapiro & Anderson, L.L.P.*, the accused "debt collector" was not governed by the FDCPA because that "debt collector" only represented the person who purchased the home at foreclosure who was seeking possession of their new purchase, did not represent the creditor and had no earlier involvement.  2005 WL 3434718 (D. Ariz. Dec. 13, 2005).  Similarly, in the *pro se Davidson v. JP Morgan Chase N.A.*, when the accused law firm first "came onto the scene, the subject property had already been sold, and there was no longer any debt to collect."  2011 WL 5882678 (N.D. Cal. Nov. 23, 2011).

## 2.    Goodrow and Buel

Defendants already lost their first attempt to argue a statute of limitations defense.  *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 468 (E.D. Va. 2011).  Now they complain that Goodrow and Buel may attempt to assert FDCPA claims based on Defendants' correspondence that pre-dated the January 10, 2010 limitations date.  They won't.  While Plaintiffs have pleaded nearly all of their history opposite or involving Defendants, all FDCPA violations alleged are based upon correspondence and conduct occurring within one year of the commencement of the respective action.

Each violation – each new letter – establishes a one-year limitations period that runs from the new date of the new letter.  *Purnell v. Arrow Fin. Services, LLC*, 303 F. App'x 297, 301 (6th Cir. 2008); *Alston v. Cavalry Portfolio Services, LLC*, 2013 WL 665036 (D. Md. Feb. 22, 2013)

("subsequent violations based on the same underlying debt constitute new violations for statute of limitations purposes under the FDCPA").

### 3.    Mbundure and McBeth

Plaintiffs agree that only Mbundure and McBeth allege timely claims for Defendants violation of §1692g.   Defendants for some reason waive off Mbundure because the copy of his initial communication letter attached to the Amended Complaint is "only a partial letter, which does not support his allegation." (Defs'. Mem. at 33).  But there is no requirement under Rule 8 or the FDCPA that a consumer must attach the actual correspondence to the complaint.

In both the *Mbundure* and *McBeth* Amended Complaints, the Plaintiffs allege that in Defendants' initial communications, they disclosed an entity that was not in fact the actual owner of the debt (the note) or the noteholder and thus the FDCPA "creditor".     Mbundure Am. Compl. ¶¶ 155, 156, 184 (Defendants disclosed "Dovenmuehle Mortgage" when the actual lender/noteholder/beneficiary was then asserted to be PNC Bank); McBeth Am. Compl.  ¶¶ 219, 223, 266, 267 (Defendants disclosed "Everhome" when Fannie Mae was the actual FDCPA creditor).  Of course a mortgage servicer can also in some circumstances be a FDCPA creditor, just like it may in others be a FDCPA debt collector or in others it may be neither.  Ignoring the allegations in the Amended Complaints, Defendants assert, "[S]ince identifying the servicer and/or noteholder as the creditor is not incorrect, Plaintiffs fail to state a claim under $ 1692(g)." (Def. Mem. at 33).   They also state the unremarkable fact that servicers "tend to be" creditors.  But even the case they cite does not stand for the proposition asserted.  Under the FDCPA, "[t]he term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692a(4).  The Amended Complaints allege that the respective debts were actually owed to and owned by entities other than those disclosed by Defendants.  For Mbundure, the debt would have been owed to PNC Bank or other even now undisclosed noteholder.  For McBeth, the

creditor (and noteholder) to whom the debt was owed was Fannie Mae.

Defendants do not develop their argument any further, and the Court should not look any further than the allegations in the Amended Complaints alleging that the Defendants' initial letters did not disclose the actual creditor.

**B.     All Plaintiffs Plausibly Allege that Defendants Violated § 1692(e) by Making "false, deceptive, or misleading representation or means in connection with the collection "of mortgage debts.**

Defendants' next set of arguments is another of their serial attempts to re-litigate or ignore the legal issues they lost in *Goodrow* I.   Just as Defendants therein argued that Mr. Goodrow lacked a viable § 1692e claim when they incorrectly identified the creditor, now they make the same argument as to Goodrow again, as well as to the new Plaintiffs.  Section 1692e provides that:

> A debt collector may not use any false, deceptive, or misleading representation . . . in connection with the collection of any debt [including]
> the false representation of the character, amount, or legal status of any debt; or the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692e.   Plaintiffs allege that Defendant violated these proscriptions in multiple ways including:

> a)      by misrepresenting an intent and entitlement to file a lawsuit against the consumer through Defendants' systematic use of "court case" style in the subject line of their letters, Chatter Second Am. Compl. ¶ 179; Banks Second Am. Compl. ¶ 202; Goodrow Second Am. Compl. ¶¶ 203, 220; Buel Am. Compl. ¶¶ 204, 209; Mbundure Am. Compl. ¶ 161; McBeth Am. Compl. ¶ 228;
>
> b)      by falsely representing that the Plaintiffs' notes were lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1, Chatter Second Am. Compl. ¶ 181; Banks Second Am. Compl. ¶ 204; Goodrow Second Am. Compl. ¶ 205; Buel Am. Compl. ¶ 207; Mbundure Am. Compl. ¶¶ 163-64; McBeth Am. Compl. ¶ 231;
>
> c)      by making false statements and misrepresenting that the identified servicers were the beneficiaries, noteholders and/or creditors to whom the mortgage debts were owed, Chatter Second Am. Compl. ¶¶ 175, 189; Banks Second Am. Compl. ¶ 198; Goodrow Second Am. Compl. ¶ 197; Buel Am. Compl. ¶¶ 197, 217; Mbundure Am. Compl. ¶¶ 156, 162; McBeth Am. Compl. ¶ 219;
>
> d)      by making a series of conflicting and/or false statements about the amounts of the debts that were due, Goodrow Second Am. Compl. ¶ 211-17; Buel Am. Compl. ¶¶ 212-221; Mbundure Am. Compl. ¶¶ 167-74; McBeth Am. Compl. ¶¶ 221-22, 240-41;
>
> e)      by making a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated their fees would be capped at $600.00, Goodrow Second Am. Compl. ¶¶ 223-24; Buel Am. Compl. ¶ 219-21;

McBeth Am. Compl. ¶¶ 243-46; and

    f)    by falsely stating that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized, or were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, thereby invalidly appointing themselves as substitute trustee (and/or where the signatures were forged altogether), Chatter Second Am. Compl. ¶¶ 190-202; Banks Second Am. Compl. ¶ 209-20; Goodrow Second Am. Compl. ¶¶ 227-42; Mbundure Am. Compl. ¶¶ 180-95; McBeth Am. Compl. ¶¶ 249-67.

Defendants' opposition attempts several legal arguments and Plaintiffs address those herein.   But most of these attacks contest the factual allegations of the Amended Complaints, ignoring the wide deference otherwise demanded under Rule 12(b)(6).

    **1.**    **The alleged falsehoods could be material to a 'least sophisticated' consumer**.

    Judge Spencer has in this case explained that the FDCPA demands a degree  of  clarity  and comprehensible representations sufficient for the "least sophisticated consumer." *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 472 (E.D. Va. 2011). Falsity and deception under § 1692e are tested by the "least sophisticated consumer" standard.  "The test is the capacity...to mislead; evidence of actual deception is unnecessary."  *United States v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir. 1996). The Second Circuit has explained the purpose and provenance of this standard:

    The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd. This standard is consistent with the norms that courts have traditionally applied in consumer-protection law.

*Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1983) (*quoting Federal Trade Commission v. Standard Education Society*, 302 U.S. 112, 116 (1937)).

    Defendant also argues that its falsehoods are not actionable because they were not material. They grossly inflate the demands of FCPA "materiality"[10], even if such a standard were to be created

---

[10] It remains an open question in this Circuit as to whether or not the Court should read into a § 1692e claim an implied 'materiality' threshold.  However, the falsehoods alleged in this case are beyond any of the fact patterns in which "materiality" has been a factor.  *See* e.g. *Penn v. Cumberland*, 883 F. Supp. 2d 581, 590-592 (E.D. Va. 2012) (Consumer had sued a debt collector for filing what he claimed

in this Circuit and District.   The question is not whether the misrepresentation or falsehood misleads a particular Plaintiff or consumer, but instead whether it has the capacity to mislead the "least sophisticated" consumer.   Judge Smith summarized the this standard and the substantial difference between the FDCPA and material fraud:

> A claim under § 1692e, however, differs substantially from a common law fraud claim. For example, a plaintiff asserting a claim under § 1692e need not prove actual reliance on a false representation. *United States v. Nat'l Fin. Servs., Inc.,* 98 F.3d 131, 139 (4th Cir.1996) (reasoning that "evidence of actual deception is unnecessary" to establish a claim under § 1692e(10)). In addition, a plaintiff need not establish actual damages to prevail under the FDCPA. *See* § 1692k(a)(2) (providing for statutory damages in addition to actual damages); *Morgan v. Credit Adjustment Bd., Inc.,* 999 F. Supp. 803, 808 (E.D.Va.1998) (awarding a plaintiff statutory damages and costs). Furthermore, a plaintiff does not have a burden to establish scienter under the FDCPA. *See* § 1692k(c) (explaining that to avoid liability under the Act, the *defendant* may show that a violation was not intentional).   In other words, establishing a violation of § 1692e is a substantially different matter than establishing common law fraud.

*Neild v. Wolpoff & Abramson, L.L.P.*, 453 F. Supp. 2d 918, 923-24 (E.D. Va. 2006) (Emphasis added).

And Judge Ellis more recently explained:

> The FDCPA provides a cause of action where a debt collector "use[s] any false, deceptive, or misleading representation or means in connection with the collection of any debt," and enumerates a nonexhaustive list of actionable conduct. 15 U.S.C. § 1692e. Importantly, the Fourth Circuit has held that "the test is the capacity of the statement to mislead; evidence of actual deception is unnecessary." *Nat'l Fin. Servs., Inc.,* 98 F.3d at 139; *see also Neild v. Wolpoff & Abramson, LLP,* 453 F.Supp.2d 918, 923 (E.D.Va.2006) ("[A] plaintiff asserting a claim under § 1692e need not prove actual reliance on a false representation.").

*Vitullo v. Mancini*, 684 F. Supp. 2d 747, 757-58 (E.D. Va. 2010).   The issues alleged in this case are beyond the boundaries of the material defense.   *See also Manlapaz v. Unifund CCR Partners*, 08 C 6524, 2009 WL 3015166 (N.D. Ill. Sept. 15, 2009) ("[S]tatements regarding ownership and legal recourse are material.").

Such a determination even if applicable is not properly made at this posture.   As the Supreme Court has explained in a comparable context, "The issue of materiality may be characterized as a

---

was a legally incorrect demurrer in response to a state court usury counterclaim and a jurisdiction plea in bar).

mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, (1976); *see also Johnson v. United States*, 520 U.S. 461, 465, (1997) ("materiality  be decided by the jury, not the court"); *Colony Ins. Co. v. Peterson*, 1:10CV581, 2012 WL 1867047 (M.D.N.C. May 22, 2012)("Finally, '[m]ateriality is generally a question of fact for the jury.' *Latta v. Rainey,* 202 N.C. App. 587, 599 (2010)").  Deception is largely a jury question.  *Melillo v. Shendell & Associates*, 2012 WL 253203 (S.D. Florida); *Voris v. Resurgent Capital Servs., L.P.*, 494 F. Supp. 2d 1156 (S.D. Cal. 2007); *Hosseinzadeh v. M.R.S. Assocs., Inc*., 387 F. Supp. 2d 1104 (C.D. Cal. 2005).

Finally, materiality (or lack thereof) is an affirmative defense and generally it is a defendant's burden to assert and prove a lack of materiality.  *See* e.g. *Hudspeth v. Capital Mgmt. Services, L.P.*, 2013 WL 674019 (D. Colo. Feb. 25, 2013)("Accordingly, the Court finds that defendant has failed to demonstrate that falsely stating that a debt will remain on a credit report indefinitely would be immaterial to the least sophisticated consumer.").

## 2. A "least Sophisticated" Consumer Could Believe that Defendant's use of a lawsuit case style related to an actual lawsuit brought or to be brought against the consumer.

Defendants argue that its use of the style "[Servicer] v. [Consumer]" as the subject for nearly all of its notices and correspondence is not actionable for two reasons.  First, Defendants claim that these correspondences are not collection letters.  In particular, they assert that the "Lost Note" letter allegedly sent pursuant to Va. Code § 55-59.1 is not a collection letter.   This question was addressed nearly two years ago by Judge Spencer in *Goodrow* I.  *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 470-71 (E.D. Va. 2011).  Plaintiffs do not repeat all of the same explanations, citations and arguments, but instead rely on Judge Spencer's decision and hereby incorporate by reference the arguments made in Plaintiffs' first opposition brief.

Defendants' second defense also ignores *Goodrow* I.  As in most of their challenges to the § 1692e claims, Defendants answer the Plaintiffs' allegations that the statement or conduct was

misleading by constructing what Defendants hope is a passable alternate explanation.  But the FDCPA

is not § 1983.  A defense does not prevail merely by suggesting a reasonable articulable alternate

explanation.  Instead, the question is not what Defendants can defend as a possible meaning, or even

what Defendants may have intended (though their present explanations are also incredible).  Instead, it

is the capacity to mislead or decisive a least sophisticated consumer.  Judge Spencer already offered

Defendants' such explanation in *Goodrow* I:

> Under this test, a statement is false or misleading if "it can be reasonably read to have
> two or more meanings, one of which is inaccurate." *Brown v. Card Serv. Ctr.,* 464 F.3d
> 450, 455 (3d Cir.2006) (citation omitted). The test requires a court to consider a
> statement's "capacity ... to mislead," such that "evidence of actual deception is
> unnecessary." *Nat'l Fin. Servs.,* 98 F.3d at 139.

*Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 472 (E.D. Va. 2011).  Thus the

question is not whether or not Defendants really intend for the Court to believe that a consumer could

interpret a case styled like a lawsuit with the consumer's name in the defendants' position as

suggesting the possibility that the debtor consumer may want to sue the first named party (the servicer

– the one in the "plaintiff" block of the case style).  Instead, it is whether or nota least sophisticated

consumer could interpret two different ways.  *Id.  Finch v. Silverstein*, 1996 WL 467251 (N.D. Ill.

Aug. 13, 1996)(The consumer stated a claim by alleging that the defendant's correspondence would

lead an unsophisticated consumer to believe that a lawsuit was imminent, by including a legal caption

and language implying that a lawsuit would be pursued, when suit was not imminent.); *Johnson v.*

*Ardec Credit Servs., Inc*., 1984 U.S. Dist. LEXIS 24889 (N.D. Ga. Mar. 21, 1984). (The collection

letter headed ''Total Equity d/b/aManchester Apartments v. Jessie Johnson'' conveys to a reasonable

consumer the false impression that judicial action is pending, violating § 1692e); *Yelvington v.*

*Buckner*, Clearinghouse No. 36,581 (N.D. Ga. 1984) (Threats of garnishment and suit against the

consumer's employer before the collector had filed suit violated § 1692e(5). A letter labeled ''FINAL

NOTICE'' with legal caption, red notary seal and indicating a copy to court clerk violated § 1692e(9)

and (13) by simulating legal process and creating a false impression of source or approval.); *Williams*

*v. Rash, Curtis & Assocs.*, 1978 U.S. Dist. LEXIS 20395 (N.D. Ga. Dec. 13, 1978) (Motion to dismiss was denied. Plaintiff alleged that a letter on a law office's letterhead with the caption ''Re: Medical Center of Columbus vs. Defendant Princella Williams'' simulated legal process.).

Defendants contrive an alternate explanation that the "vs." refers only to the possibility of a future case to be filed by the consumer.  But such an interpretation is patently false, refuted by the very "context" Defendants ask the Court to consider.  The Amended Complaints allege that the reinstatement letter shared such "lawsuit-themed" language, stating, "This responds to your recent request for the amount necessary to reinstate the above referenced loan and to resolve the pending action." (McBeth Am. Compl. ¶162).  Even Defendants' payoff statement letter contained the following statement: "Upon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action and obtain a dismissal of the action." (Am. Compl. §164.)

Finally, Defendants again distort the materiality argument asserting without explanation that, "There is nothing a consumer would do differently because of the "court case" style[.]" But such a claim is ridiculous.  It certainly is plausible that a least sophisticated consumer could be misled into believing that either a lawsuit had been filed or that one was imminent.  This could impact the consumer's willingness to pay the debt.  It could cause the consumer to go further underground now fearing more than just loss of a home.  Absolutely the falsehood is material.  To further highlight the incorrectness of their legal understanding of materiality, Defendants argue, "Indeed, nowhere do Plaintiffs allege that they contacted Defendants or a court for fear that a lawsuit had been filed." (Defs.' Mem. at  39).  This plaintiff-focused outlook (rejected expressly by Judges Smith and Ellis, as cited above) is exactly what materiality is not.  It is not a requirement of Plaintiffs' reliance.  It is instead measured against the hypothetical "least sophisticated consumer" and focuses on the capacity to mislead rather than actual measured deception of the named Plaintiffs.

**3.      Plaintiffs Plausibly Allege that statements in Defendants' supposed "Lost Note" letter were deceptive and misleading.**

Plaintiffs have alleged that each of the letter Defendants sent to Plaintiffs allegedly pursuant to Va Code § 55-59.1 contained material inaccuracies[11]. Defendants assertion that the respective notes were lost or unavailable were simply falsehoods.[12] The Court has already considered these issues and while concluding that the misleading use of a § 55-59.1 notice letter may not provide its own cause of action, it was properly clear to the Court that use of the notices on the basis alleged in the Complaint could be misunderstood by consumers; the process could be deception. *Goodrow v. Friedman & MacFadyen, P.A.*, 3:11CV20, 2012 WL 6725617 (E.D. Va. Dec. 27, 2012) ("If true, plaintiffs allege a practice that would diverge significantly from what a reasonable homeowner might believe was occurring during foreclosure.")

Plaintiffs have properly pleaded their FDCPA claim that the Defendants falsely represented that the Plaintiffs' notes were lost or unavailable and/or that the Defendants had satisfied the requirements of Va. Code § 55-59.1 by alleging that: 1) Defendants stated that the note was unavailable or lost, Goodrow Second Am. Compl. ¶¶ 205-06; Buel Am. Compl. ¶¶ 206-07; Mbundure Am. Compl. ¶¶ 163-64; McBeth Am. Compl. ¶¶ 230-31; 2) that this statement was not true, *Id*.; and 3) that this statement was therefore misleading or incorrect, Goodrow Second Am. Compl. ¶ 356; Mbundure Am. Compl. ¶ 281; McBeth Am. Compl. ¶ 365. Furthermore, in response to the Defendants' assertion that the statutory notice does not constitute debt collection activity, the letters themselves state that "THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." Chatter Second Am. Compl., Ex. C; Banks Second Am. Compl. Ex. D; Goodrow Second Am. Compl. Ex. D, Ex. I; Buel Am. Compl. Ex. D, Ex. I; Mbundure Am. Compl. Ex. C, Ex. H; McBeth Am. Compl. Ex. D, Ex. J. It is baffling that Defendants now assert that these

---

[11] In *Goodrow* I, Judge Spencer rejected Defendants' same argument that the § 55-59.1 letter was not an attempt to collect a debt. Plaintiffs have also addressed this issue above.

[12] Even if §55-59.1 were interpreted to permit its use even upon administrative inconvenience in requesting the notes, the letters are still misleading as they offer the "unavailable" as only one of multiple possibilities, including that the note is "lost." This was not the circumstance with the Plaintiffs' notes.

letters are mere "statutory notice" letters and not an attempt to collect a debt. Regardless, the Plaintiffs have sufficiently pleaded this claim.

The Amended Complaints expressly allege, with detailed support and explanation – that the Defendants' claim that the notes were lost or unavailable (however measured) was patently false.  As detailed above in support of Plaintiffs' § 1692g claim, all the Defendants needed to do was ask for the notes, or simpler still, just ask that they receive "constructive" possession.  Beyond this minimal burden, all Defendants needed to do was to wait until they received an actual affidavit that stated that the note was lost or unavailable.

Defendants' positions elsewhere in its brief defeat by contradiction their alternate claim that the lost note falsehoods were material.  The question is – could a falsehood cause any least sophisticated consumer to take alternate action.  Defendants elsewhere answer affirmatively in suggesting that by such (false) notices, "Defendants alert Plaintiffs to the possibility of foreclosure without the original note and invite Plaintiffs to petition the 'Circuit Court of the county or city where the property or some part thereof lies' if they believe some other party holds the claim." (Defs.' Mem. at 38).  Certainly there are a number of ways a least sophisticated consumer could decide to change conduct based upon receipt of the false letter.  But, the Court or jury could also take this question the other way.  By making the false statements, Defendants omitted the true ones.  For example, many consumers may have sought to contact a creditor or servicer or seek information about a note, had they note been informed it was lost.

Regardless, at this stage, a Rule 12(b)(6) posture, the Court must find that the Plaintiffs have plausibly alleged a claim based on the  allegations of material falsehoods in the Defendants "lost note" communications.

## 4.    The Amended Complaints plausibly allege that Defendants misrepresented the identity of the creditor and noteholder.

Plaintiffs have addressed this argument in part above. *See* Section III.A.   The Amended Complaints plainly allege that the entities Defendants represents to be the "creditors", noteholders" or

"beneficiaries" were not.  Nothing tricky.  Plaintiffs also sufficiently pleaded that the Defendants misrepresented that the Plaintiffs' servicers were the beneficiaries, noteholders and/or creditors to whom the mortgage debts were owed by: 1) stating that the Defendants identified the Plaintiffs' servicers as the beneficiary, noteholder or creditor of the loan, Chatter Second Am. Compl. ¶¶ 175, 189; Banks Second Am. Compl. ¶ 198; Goodrow Second Am. Compl. ¶ 197; Buel Am. Compl. ¶¶ 197, 217; Mbundure Am. Compl. ¶¶ 156, 162; McBeth Am. Compl. ¶ 219; 2) that these entities were not the beneficiary, noteholder or creditor of the loan, Chatter Second Am. Compl. ¶ 204; Banks Second Am. Compl. ¶ 212; Goodrow Second Am. Compl. ¶ 242; Buel Am. Compl. ¶ 218; Mbundure Am. Compl. ¶ 195; McBeth Am. Compl. ¶ 267; and 3) this constitutes a misrepresentation in violation of the FDCPA,  Chatter Second Am. Compl. ¶ 306; Banks Second Am. Compl. ¶ 329; Goodrow Second Am. Compl. ¶ 358; Buel Am. Compl. ¶ 321; Mbundure Am. Compl. ¶ 283; McBeth Am. Compl. ¶ 367.

Defendant does not deny the falsity of its statements.  Instead, it relies mostly on its now well-worn exaggerated materiality argument.  But the assertion that it would be immaterial for consumers to know that the "face of the creditor" (Def. Opp. At 43) is not itself the creditor ignores the tremendous difficulty consumers – even the named Plaintiffs – have had trying to circumvent the RICO enterprise servicers.  Loan modifications, lender errors and foreclosure alternatives are all nearly impossible to accomplish with the servicer who is not itself the creditor/noteholder.

**5.    The Amended Complaints allege that Defendants were not Validly Appointed to enforce the Deeds of Trust.**

Finally, the Plaintiffs have sufficiently pleaded that that the Defendants falsely stated that they had been properly appointed substitute trustee when in fact the substitution of trustees deeds were either signed by the servicer rather than the noteholder, were not properly notarized,  were signed by the Defendants as "attorney in fact" for a purported servicer or noteholder, or where one or more of the signatures were altogether forged by alleging that: 1) something about the Substitution of Trustees document was defective, Chatter Second Am. Compl. ¶¶ 190-203; Banks Second Am. Compl. ¶¶ 209-

20; Goodrow Second Am. Compl. ¶¶ 227-42; Mbundure Am. Compl. ¶¶ 180-95; McBeth Am. Compl. ¶¶ 249-67; 2) this defect rendered the document null and void, *Id.*; 3) the Defendants were therefore not validly appointed as Substitute Trustee *Id.*; and 4) therefore, any representation made that the Defendant was the Substitute Trustee was false, misleading, and deceptive Chatter Second Am. Compl. ¶ 308; Banks Second Am. Compl. ¶ 331; Goodrow Second Am. Compl. ¶ 363; Mbundure Am. Compl. ¶ 289; McBeth Am. Compl. ¶ 375.

Defendants' arguments miss the point. Of course a servicer may appoint the substitute trustee. It just needs possession of the note to become a note-holder. The materiality argument is also unhelpful. First, if applicable at all, "materiality" is a concept or threshold that is limited to a misrepresentation claim under §1692(e). See *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012). The Defendants' failure to obtain proper or lawful appointment is also remedied at § 1692f. Defendants also cite several cases that are inapposite. Unlike these decisions, Plaintiffs are not merely alleging that documents were robo-signed, with an employee rushing to spend as many as possible. They are alleging outright forgery, as well as id theft later down the road. Defendants ignore the near entirety of Plaintiff opposition.

**6.    The Amended Complaints plausibly allege that Defendants misrepresented and threatened to collect attorneys fees amounts on behalf of Defendants' clients in amounts that were not owed and inconsistent payoff amounts, nearly all of which were necessarily false.**

The Plaintiffs with mortgage loans owned by Fannie Mae also allege that the Defendants made a series of false statements about the amount of their fees despite knowing that they had a contractual agreement with Fannie Mae that indicated their fees would be capped at $600.00. Goodrow Second Am. Compl. ¶¶ 223-24; Buel Am. Compl. ¶ 219-21; McBeth Am. Compl. ¶¶ 243-46. These Plaintiffs have all pleaded that the Defendants charged more than $600 in foreclosure attorneys' fees. For example, Plaintiffs Buel have alleged that the Defendants sent them a letter dated October 27, 2010 that they owed $2,881.59 for "Current Foreclosure Attorney/Trustee Fees and Costs". Buel Am. Compl. ¶ 212. The Buels received another letter on October 29, 2010 that stated they owed $875.59 for

"Current Foreclosure Attorney/Trustee Fees and Costs". Buel Am. Compl. ¶ 213. Plaintiffs Banks, Goodrow, and Chatter have pleaded similar facts. Banks Second Am. Compl. ¶ 157; Goodrow Second Am. Compl. ¶¶ 223-24; McBeth Am. Compl. ¶¶ 243-46.

Defendants' opposition simply denies the allegations in the Amended Complaints. Plaintiffs allege that when Fannie Mae was the lender, Defendants were not permitted to charge more than $600, and less if the foreclosure is not complete. Defendants argue in responsethat the Plaintiffs' Deeds of Trust provide that "Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence." (Defs.' Mem. at 44). However, Defendants miss the point - they are not the "lender." Defendants' position in the case generally is remarkably inconsistent. But at the previous oral argument, the Defendants argued that they were not bound by provisions in the Deed of Trust or in the law that applied to lenders. This cuts both ways. Defendants negotiated a poor deal with Fannie Mae, capping their fees. But they cannot circumvent that by demanding money to be paid directly by the consumer. That is plain and simple – fraud. It is stealing. There is no privity or contract between Defendants and Plaintiffs. Defendants' hope for fees is solely derived from Plaintiffs' obligations to Fannie Mae.

Defendants also assert that they were entitled to charge additional fees beyond $600. "The $600 referred to by Plaintiffs is particular to a trustee conducting a foreclosure, but there is other work outside the scope of that $600." (Defs.' Mem. at 45) But this assertion is totally inappropriate for consideration at this Rule 12(b)(6) posture. Defendants cannot simply add facts not pled in the complaint and deny facts therein with their yet undisclosed evidence.

The Plaintiffs also properly pleaded that that the Defendants made a series of conflicting and/or false statements about the amounts of the debts that were due by alleging: 1) the Defendants made a representation concerning the amount of money owed on their loans, *See e.g.*, Goodrow Second Am. Compl. ¶¶ 211-17; Buel Am. Compl. ¶¶ 212-221; Mbundure Am. Compl. ¶¶ 167-74; McBeth Am.

Compl. ¶¶ 221-22, 240-41; 2) these amounts were incorrect and/or false, *Id.*; and 3) therefore, they were misleading and violated the FDCPA, *See e.g.*, Goodrow Second Am. Compl. ¶ 360; Buel Am. Compl. ¶ 323; Mbundure Am. Compl. ¶ 285; McBeth Am. Compl. ¶ 369.  In response, Defendants simply deny the plain allegations of the Amended Complaints and commence a number of possible explanations for the fluctuating balance calculations.  Maybe Defendants' explanations are "plausible", but at least as strongly so are Plaintiffs' allegations and claims.

Defendants' remaining arguments are also unhelpful.  There is not obligation to prove reliance in order for a specific consumer to recover under the FDCPA.  And a jury could easily find a payoff discrepancy of several thousand dollars material.

**7.    Plaintiffs allege a plausible violation of § 1692f by Defendants' threats to take action to foreclose that was not otherwise permitted by law.**

Defendants' argument applies to a generalized claim under § 1692f alleging conduct that was unfair or unconscionable.  However, the arguments offered by Defendant and discussed in its cited cases pertain only to that generalized claim.  In contrast, Plaintiffs' claims are all brought under §1692f(6),and are largely unchallenged.  The Court need look no further than this.

<div align="center">

**<u>CONCLUSION</u>**

</div>

For the reasons stated above, the Defendants' Motion to Dismiss should be denied.

<div style="margin-left: 50%;">

Respectfully submitted,
**PLAINTIFFS**


By_____/s/_____
                Of Counsel

</div>

Janelle E. Mason, VSB No. 82389
Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
janelle@clalegal.com

matt@clalegal.com

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel:     (757) 930-3660
Fax:     (757) 930-3662
lenbennett@clalegal.com
srotkis@clalegal.com

Dale W. Pittman, VSB No. 15673
*Counsel for the Plaintiff*
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel:     (804) 861-6000
Fax:     (804) 861-3368
dale@pittmanlawoffice.com

Kristi Cahoon Kelly, VSB No. 72791
*Counsel for the Plaintiff*
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Tel:     (703) 277-9774
Fax:     (703) 591-9285
kkelly@siplfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2013, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Douglas P. Rucker, Jr.
Andrew Biondi
Cullen D. Seltzer
SANDS ANDERSON PC
2300 Bank of America Center
1111 East Main Street (23219)
P. O. Box 1998
Richmond, V A 23218-1998
(804) 648-1636
(804) 783-7291 (facsimile)
drucker@sandsanderson.com
abiondi@sandsanderson.com
cseltzer@sandsanderson.com

*Counsel for the Defendants*

 

<div style="text-align:center">

_____ /s/ _____

</div>

Janelle E. Mason, VSB No. 82389
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
janelle@clalegal.com