Case 3:11-cv-00020-MHL   Document 144-1   Filed 04/25/13   Page 1 of 7 PageID# 2825

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

2013 WL 1729587
Only the Westlaw citation is currently available.
United States Court of Appeals,
Sixth Circuit.

Harold C. WALLACE, Plaintiff–Appellant,
v.
MIDWEST FINANCIAL & MORTGAGE SERVICES, INC.; Mortgageit, Inc.; David Schlueter; Bryan Bates; First Financial Home Lending, Inc., Defendants–Appellees,
Shane Soard, et al., Defendants.

No. 12–5208.   |   Argued: Jan. 17, 2013.   |   Decided and Filed: April 23, 2013.

**Synopsis**
**Background:** Mortgagor brought action against mortgagee and mortgage broker alleging Racketeer Influenced and Corrupt Organizations Act (RICO) violations and civil conspiracy. Mortgagee and broker moved for summary judgment. The United States District Court for the Eastern District of Kentucky, 2:07–cv–131, 728 F.Supp.2d 906, David L. Bunning, J., granted the motion.

**Holdings:** Mortgagor appealed. The Court of Appeals, Cole, Circuit Judge. held that:

[1] a fact issue existed as to whether home appraiser's allegedly inflated appraisal proximately caused mortgagor's injuries, and

[2] mortgagee did not manifestly make an illicit agreement with mortgage broker to generate large yield spread premiums.

Affirmed in part, reversed in part, and remanded.

Appeal from the United States District Court for the Eastern District of Kentucky at Covington. No. 2:07–cv–131—David L. Bunning, District Judge.

**Attorneys and Law Firms**

**ARGUED:** William H. Blessing, Cincinnati, Ohio, for Appellant. Michael T. Sutton, Sutton Rankin Law, PLC, Edgewood, Kentucky, for Midwest Financial Appellees. Matthew W. Breetz, Stites & Harbison, PLLC, Louisville, Kentucky, for MortgageIT Appellee. **ON BRIEF:** William H. Blessing, Cincinnati, Ohio, for Appellant. Michael T. Sutton, Sutton Rankin Law, PLC, Edgewood, Kentucky, for Midwest Financial Appellees. Matthew W. Breetz, Richard A. Vance, Stites & Harbison, PLLC, Louisville, Kentucky, for MortgageIT Appellee.
Before COLE and DONALD, Circuit Judges; RUSSELL, District Judge.[*]

**Opinion**

**OPINION**

COLE, Circuit Judge.

**\*1** This is a subprime mortgage case brought by the borrower, Harold Wallace, against the lender, MortgageIT, Inc. ("MortgageIT"), the mortgage broker, Midwest Financial & Mortgage Services, Inc. ("Midwest Financial"), the broker's two principals, David Schlueter and Bryan Bates, and several other now-dismissed parties. Wallace alleges that the defendants fraudulently inflated an appraisal of his home as part of a scheme to push him into a high-cost, adjustable-rate mortgage from which he now seeks relief. He made several claims below, only three of which are relevant here—two claims arising under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and one arising under Kentucky conspiracy law. The district court granted summary judgment in favor of the defendants on each of these claims. On appeal, Wallace argues that the district court erred in concluding he did not sufficiently demonstrate that the allegedly fraudulent appraisal proximately caused his financial injuries. We agree. Accordingly, we reverse the district court's grant summary of judgment in favor of the defendants based on a lack of proximate causation, affirm its grant of summary judgment in favor of MortgageIT on the state law claim on other grounds, and remand for further proceedings.

I.

Because this appeal arises from a motion for summary judgment, we accept as true Wallace's version of the facts. *Grawey v. Drury,* 567 F.3d 302, 310 (6th Cir.2009). The relevant ones reach back to October 2004, when

Case 3:11-cv-00020-MHL   Document 144-1   Filed 04/25/13   Page 2 of 7 PageID# 2826

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

Wallace purchased a newly built home in Florence, Kentucky. He financed the home with an adjustable-rate mortgage in the amount of $272,316—though not the one at issue here. Wallace later took out a second mortgage on the home in the amount of $164,500 to complete certain improvements and to pay down credit card debt. He made regular payments on both loans without incident.

In June 2006, Wallace hatched the ill-fated idea of building out his basement. The estimated cost of the project came in at $42,500, which Wallace intended to cover using the proceeds of a cash-out refinancing of both of his existing loans. By this point, Wallace had reduced the aggregate balance to slightly less than $380,000, meaning he was in the market for a refinance loan in the amount of approximately $422,500. Enter Shane Soard, a loan officer at Midwest Financial. Soard arranged to meet with Wallace to discuss his options for borrowing. Wallace claims Soard expressed familiarity with home values in the immediate neighborhood and "talked very positively about the increased value of [Wallace's] home." Wallace also claims Soard expressed confidence that he could secure a favorable refinance loan at a lower interest rate than Wallace paid on his existing loans. Their meeting left Wallace with the impression that he was on track to get a new fully amortizing mortgage with equal monthly payments.

After Wallace turned over some financial information and signed a few forms, Soard informed him that a home appraisal would be needed. For this, Midwest Financial turned to Accupraise, as it had for many of its other appraisals. Accupraise is a now-defunct company that performed real estate appraisals in parts of Ohio and Kentucky under the direction of a de-licensed appraiser named Andrew Brock, an erstwhile party to this litigation. A former employee of Accupraise explained that Midwest Financial would routinely "sen[d] a fax to Accupraise with certain information, including the ... requested appraisal value," and Brock would send back a tailor-made appraisal. Brock often did so without setting foot on the property he purported to appraise. Instead, he made a habit of forging the signature of a licensed appraiser to make his appraisals appear legitimate. In this instance, Accupraise and Brock provided Midwest Financial with a Uniform Appraisal Report valuing Wallace's home at $500,000. Soard called Wallace with the news that his home had been appraised at nearly twice the amount he had paid just two years prior. Based on the value of the appraisal, Soard told Wallace he was eligible for a $500,000 loan. Wallace declined and reiterated his desire only to borrow enough to build out his basement. The next day Soard responded by offering Wallace a $425,000 loan. They agreed on the terms of the loan during the course of the same telephone conversation—though Wallace maintains that Soard continued to misrepresent the nature of the payment schedule—and set a time to close.

**\*2** Midwest Financial then submitted Wallace's completed loan application to MortgageIT for approval. MortgageIT reviewed the application to determine the level of risk involved in lending to Wallace. The appraisal factored significantly into this process: it substantiated the value of the asset used to secure the loan and produced a favorable loan-to-value ratio of eighty-five percent. The appearance of remarkable appreciation notwithstanding, the appraisal raised no red flags among the underwriters at MortgageIT. Wallace's loan application was ultimately approved. Closing went ahead as scheduled, at which point Wallace signed several documents disclosing the final terms of his cash-out refinance loan.

Unbeknownst to Wallace, those terms were consistent with a type of financial product called an option adjustable-rate mortgage ("option ARM"). The hallmark of an option ARM is its flexibility. In general, it gives the "borrower[ ] the option of skipping the principal payment and some of the interest payment for an introductory period of several years. The unpaid balance[ ] [is then] added to the body of the loan." David Streitfeld, *Big Banks Easing Terms on Loans Deemed as Risks,* N.Y. Times, July 3, 2011, at A1. An option ARM thus allows for the possibility of negative amortization. Once the introductory period ends or the maximum limit on negative amortization is reached, the amortization schedule resets and the borrower is left with potentially unaffordable minimum payments that reflect the capitalization of unpaid interest, as well as a principal balance that potentially exceeds the value of the real estate used as security. Here, Wallace was offered a teaser rate of two percent that quickly multiplied into something much higher under the terms of his loan. For securing a high long-term interest rate, Midwest Financial received a yield spread premium from MortgageIT in excess of $14,000. *See generally Lee v. Countrywide Home Loans, Inc.,* 692 F.3d 442, 445–46 (6th Cir.2012) (explaining that a yield spread premium is the amount paid to a broker for securing a loan with a higher interest rate).

The refinance loan has since created insurmountable financial problems for Wallace in the form of fees, interest costs, and other expenses related to his inability to meet its terms. Wallace has also learned that the true value of his home at the time of the appraisal was approximately $375,000—or $125,000 less than he was led to believe during the course of negotiations with Midwest Financial. With no equity left in his home,

Case 3:11-cv-00020-MHL   Document 144-1   Filed 04/25/13   Page 3 of 7 PageID# 2827

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

Wallace could not sell it for enough to repay the loan. Wallace's financial problems recently forced him to declare bankruptcy and ultimately surrender the home.

In May 2007, Wallace filed this suit alleging that he was the victim of a fraudulent scheme between the defendants "to generate higher dollar loans to borrowers and thereby capture more fees." The nub of this scheme was the appraisal. Wallace says that Midwest Financial acted in concert with Accupraise to manufacture misleadingly optimistic real estate valuations that induced him and borrowers like him to enter into larger loans with higher interest rates than they could reasonably afford. In return, Midwest Financial received a better yield spread premium—or "kickback" in Wallace's words—from MortgageIT, who bundled his loan with others as part of a mortgage-backed security and sold it off to investors, turning a profit while avoiding most of the risk of default.

**\*3** Wallace brought federal law claims under RICO, the Truth in Lending Act ("TILA"), and the Real Estate Settlement Procedures Act ("RESPA"), in addition to state law claims for breach of contract, fraud, breach of fiduciary duty, and conspiracy. The parties conducted extensive discovery, after which Midwest Financial and MortgageIT both moved for summary judgment. The district court granted their motions as to Wallace's civil RICO claim, civil RICO conspiracy claim, TILA claim, and state law civil conspiracy claim. The court denied their motions as to the rest. The court also ordered the parties to enter mediation, which eventually produced a settlement agreement. Under the agreement, Wallace prevailed on his RESPA claim while all of his other claims that survived summary judgment were dismissed with prejudice, including the claims against Soard, Brock, and Accupraise.

On appeal, Wallace challenges only the district court's grant of summary judgment in favor of the defendants on the three remaining claims: (1) his civil RICO claim under 18 U.S.C. § 1962(c) alleging Midwest Financial as the enterprise, Schlueter and Bates as individual defendants, and violations of the federal mail and wire fraud statutes while procuring and paying for inflated appraisals as predicate acts; (2) his civil RICO conspiracy claim under 18 U.S.C. § 1962(d) alleging that Midwest Financial, Schlueter, Bates, and MortgageIT conspired to violate § 1962(c) by engaging in mail and wire fraud while procuring and paying for inflated appraisals; and (3) his civil conspiracy claim under Kentucky law alleging essentially the same wrongful conduct. We address each claim in turn.

## II.

Wallace first appeals from the district court's grant of summary judgment for the defendants on his two civil RICO claims. We review this decision de novo. *Colvin v. Caruso,* 605 F.3d 282, 288 (6th Cir.2010). In so doing, we construe the evidence in the light most favorable to Wallace and draw all reasonable inferences in his favor. *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 294 (6th Cir .2012). Summary judgment is warranted only when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). As such, our primary inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Calumet Farm, Inc.,* 398 F.3d 555, 558–59 (6th Cir.2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of" one of the statute's four criminal provisions. 18 U.S.C. § 1964(c). Two provisions are relevant here. The first is § 1962(c), which generally makes it illegal for an enterprise to engage in "racketeering activity," as defined by predicate acts including mail and wire fraud. The second is § 1962(d), which makes it illegal "for any person to conspire to violate any" of the other criminal provisions. The Supreme Court has held in no uncertain terms that under each provision a plaintiff must show that the predicate acts alleged "not only [were] a 'but for' cause of his injury, but [were] the *proximate cause* as well." *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (emphasis added). This requirement is the primary issue on appeal. Specifically, Wallace challenges the district court's finding that his injuries were "unrelated to the inflated appraisal," the procurement of which constitutes the predicate act of mail or wire fraud, but flowed instead from "the high interest rate and unfavorable terms of his adjustable rate mortgage...." The district court made no finding as to the remaining elements of his claims. Thus, the question before us is whether Wallace has sufficiently demonstrated that the allegedly fraudulent appraisal proximately caused his injuries. We answer in the affirmative and remand to the district court for further consideration.

A.

Case 3:11-cv-00020-MHL   Document 144-1   Filed 04/25/13   Page 4 of 7 PageID# 2828

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

**\*4** [1] [2] It is well-settled that proximate cause is an essential ingredient of any civil RICO claim. The language of the statute limits the scope of liability to those injuries suffered "by reason of" an alleged violation of one of the criminal provisions. *See* 18 U.S.C. § 1964(c). In *Holmes,* the Supreme Court explained that this language requires plaintiffs to plead and prove proximate causation. 503 U.S. at 265–68. The Court employed the term " 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* at 268. Accordingly, the Court read RICO as incorporating the many traditional proximate-cause considerations found at common law. *Id.; see Perry v. Am. Tobacco Co., Inc.,* 324 F.3d 845, 848 (6th Cir.2003). One such consideration is directness—whether there exists "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes,* 503 U.S. at 268; *see also Hemi Grp., LLC v. City of New York,* 559 U.S. 1, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010) (noting that any "link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient" (quoting *Holmes,* 503 U.S. at 271, 274)). Another such consideration is foreseeability—whether the plaintiff's injury was a foreseeable consequence of the conduct alleged. *See Perry,* 324 F.3d at 850–51; *see also Desiano v. Warner–Lambert Co. .,* 326 F.3d 339, 346, 348 (2d Cir.2003). We have in some cases also considered whether the causal connection between the injury and the conduct is logical and not speculative. *See Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 614–15 (6th Cir.2004). At bottom, these considerations are all consistent with the foundational notion that proximate cause is a "flexible concept" and must be assessed on a case-by-case basis. *See Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

[3] [4] [5] Despite its flexibility, the proximate-cause requirement tends to invite confusion in cases involving mail and wire fraud as the predicate acts. Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. *See* 18 U.S.C. § 1341. Strict application of traditional proximate-cause considerations might be seen as mandating first-person reliance on the mailing itself. However, the Supreme Court recently held that a plaintiff need not show that she relied on any allegedly fraudulent misrepresentations to state a claim. *See Bridge,* 553 U.S. at 653–59. For RICO purposes, reliance and proximate cause remain distinct—if frequently overlapping— concepts. While reliance is "often used to prove ... the element of causation," that does not mean it is the only way to do so, nor does that "transform reliance itself into an element of the cause of action." *Id.* at 659 (quoting *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 478, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (Thomas, J., concurring in part and dissenting in part)). A plaintiff need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme. *See id.* at 649–50. Thus, the appropriate inquiry in this case is not whether Wallace actually relied on the allegedly inflated appraisal, but whether the fraudulent scheme furthered by that appraisal proximately caused his financial injuries.

**\*5** We turn now to Wallace's causal theory. He contends that Midwest Financial and Accupraise committed fraud by producing and sending through the mail a false appraisal of his home that inflated its value by more than $100,000 as part of a larger scheme to secure high-interest loans. This appraisal gave rise to the illusion of substantial equity against which Wallace intended to borrow to fund his build-out project. Based on that illusion, Soard was able to convince Wallace to enter into a large option ARM, the unfavorable terms of which were never made clear to Wallace. The accruing interest outpaced Wallace's ability to pay and negative amortization occurred. Wallace was never able to catch up, and with no real equity in his home, he could not sell it for enough to repay the loan. He was thus injured in the amount of the fees, interest costs, and other expenses tied to the option ARM.

Wallace's theory is sufficient to raise a question of fact regarding causation under the directness standard. *See Holmes,* 503 U.S. at 268. Once we accept that Wallace was an intended target of the defendants' alleged scheme to induce borrowers to agree to loans with high interest rates and other unfavorable terms—as we must at this stage in the litigation—the link between the scheme and the type of injury Wallace suffered is plain to see. Wallace's confidence in his ability to afford a larger mortgage and confusion regarding the underlying terms might well have "led directly" to his decision to enter into the option ARM at issue. *See Anza,* 547 U.S. at 461. This remains true even if the relevant RICO violation is drawn more narrowly than the scheme as a whole. Looking closely at the evidence in the record, it is clear enough that the inflated appraisal itself played a significant role in the negotiations between Soard and Wallace. Indeed, one of Wallace's first priorities was "seeing if [he] had enough equity in [his] home" to finance the build-out project. Midwest Financial subsequently asked for and received an appraisal from Accupraise overstating the value of Wallace's home, thereby giving rise to the illusion of equity. A good-faith appraisal would have revealed at best that Wallace had no equity in his home and at worst that he was already upside-down on his

Case 3:11-cv-00020-MHL   Document 144-1   Filed 04/25/13   Page 5 of 7 PageID# 2829

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

existing mortgages. Without any corresponding evidence showing that Wallace intended to pursue the build-out project at all costs, it is certainly possible that the illusion of equity made the difference here. In other words, we are able to trace a straight line between the alleged fraud and the asserted injury. *See Hemi,* 130 S.Ct. at 990.

[6] Wallace's theory looks even better under the other proximate-cause standards. First, his injuries were foreseeable. *See Perry,* 324 F.3d at 848; *see also Anza,* 547 U.S. at 469–70 (Thomas, J., concurring in part and dissenting in part). The defendants' alleged scheme to cultivate the illusion of equity by way of an inflated appraisal created more than a bare possibility that Wallace would enter into a large loan. As Wallace tells it, the scheme was calibrated to practically guarantee such a result. Why else intentionally overstate the value of his home and run the risk of an undersecured mortgagee? Wallace's eventual injuries in the form of escalating interest payments and an unmanageable principal balance were hardly unforeseeable or uncertain consequences of such a scheme. That much is true regardless of the directness of those injuries. *Cf. Anza,* 547 U.S. at 469–70 & n. 6 (Thomas, J., concurring in part and dissenting in part) (citing Prosser & Keeton on the Law of Torts § 42, at 273, 293–97 (5th ed.1984)).

*6 [7] Second, Wallace's theory is neither illogical nor speculative. *See Trollinger,* 370 F.3d at 614–15. He was led to believe that he had substantial equity in his home; leveraging this knowledge, Soard pushed him into a large option ARM; since then, negative amortization has prevented him from paying down the principal. This theory is not contingent on intervening causes: Wallace and Soard did not engage in detailed or protracted negotiations regarding the terms of the mortgage after Soard called with news of the appraisal and a corresponding offer. The record shows no more than two days passed from the time of the call to an oral agreement. As such, the connection between the scheme to create an illusion of equity and the ultimate decision to obtain the option ARM is strong enough to raise a genuine issue of material fact regarding causation.

In arriving at the opposite conclusion, the district court noted that the inflated appraisal only "influenced the size of Wallace's loan" and amounted to no more than a " 'but for' cause of his obtaining a high-cost mortgage." The court identified "the high interest rate and unfavorable terms" of Wallace's loan as the true sources of his injuries. But this betrays an unnecessarily rigid understanding of the case. The high interest rate and unfavorable terms are more properly viewed as components of the alleged injuries rather than the proximate cause of such. After all, it is the overwhelming amortization payments and capitalization of significant unpaid interest from which Wallace seeks relief.

In addition, an appraisal is a more fundamental part of the lending calculus than the district court lets on. Wallace himself averred that he only intended to proceed with his build-out project if he "had enough equity in [his] home" to finance it. Given that most homeowners borrow by leveraging their equity, it is not difficult to see how a scheme geared toward creating the illusion of it encourages borrowers to act in the first place. While the illusion alone did not compel Wallace to borrow as he did here, it certainly increased the likelihood that he would. Put another way, the inflated appraisal appears to be "a substantial factor in the sequence of responsible causation" according to Wallace's version of the facts. *See Cox v. Admin. U.S. Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir.1994) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23–24 (2d Cir.1990)). That is sufficient at this stage in the litigation. *See Dye,* 702 F.3d at 294.

The district court also noted that "a falsely inflated appraisal harms only the lender" in refinancing transactions because the lender is the one left "with an asset that is worth less than the amount loaned to the borrower" in the event of a default. But this observation misses the mark as well. For one thing, a borrower has much to lose from entering into a too-big loan, especially when that loan is an option ARM. A larger initial balance creates a larger gap between the minimum payment and the interest charged over that same period, which in turn leads to skyrocketing payments when the unpaid interest is tacked onto the balance and the payment schedule resets—as happened here. While Wallace managed to make regular payments on an earlier option ARM with a smaller principal, he was unable to pay enough to avoid negative amortization on the larger one. This created an apparent self-feeding spiral that eventually tipped Wallace into bankruptcy.

*7 For another thing, the subprime mortgage crisis taught us that lenders like MortgageIT acted as cavalierly as they did because the quick securitization and sale of mortgages to investors diffused the risk of default. If MortgageIT had truly been concerned about "ensur[ing] that any loan transaction entered into [was] adequately collateralized" to minimize its risk, one would think an appraisal showing nearly one-hundred percent appreciation in two years would raise red flags. Apparently it did not. The point is that the context in which this loan transaction occurred—refinancing rather than a new home purchase—does not alter the causal analysis.

Case 3:11-cv-00020-MHL Document 144-1 Filed 04/25/13 Page 6 of 7 PageID# 2830

Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)

[8] In the end, we must bear in mind that a "proximate cause is not ... the same thing as a sole cause." *Cox,* 17 F.3d at 1399. Though the decision to obtain a mortgage is no doubt complicated, the appraisal of the home used to secure it is a fundamental part of the calculus. That holds true in this case. As such, it is no surprise that the application of traditional proximate-cause considerations supports a minimal finding that Wallace has raised a genuine issue of material fact regarding causation. The connection between the scheme to manufacture inflated appraisals and Wallace's financial injuries is not so indirect, unforeseeable, or illogical that the defendants must prevail as a matter of law. *See In re Calumet,* 398 F.3d at 558–59. The district court erred in concluding otherwise.

**B.**

Finding as it did on the element of causation, the district court declined to consider whether Wallace had raised a sufficient question of fact as to the remaining elements of his two civil RICO claims. Under § 1962(c), those elements are the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985) (footnote omitted); *see Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393, 404 (6th Cir.2012). Section 1962(d) adds as an additional element "the existence of an illicit agreement to violate" one of RICO's criminal provisions, including § 1962(c). *Heinrich,* 668 F.3d at 411 (quoting *United States v. Sinito,* 723 F.2d 1250, 1260 (6th Cir.1983)). Rather than decide for ourselves whether Wallace has proved what he needs to prove to survive the defendants' motions for summary judgment, we leave it to the district court to decide in the first instance.

**III.**

Wallace also appeals from the district court's grant of summary judgment in favor of the defendants on his state law civil conspiracy claim. We review this decision de novo as well. *Colvin,* 605 F.3d at 288.

[9] [10] Under Kentucky law, a plaintiff must prove "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson,* 95 S.W.3d 875, 897 (Ky.Ct.App.2002) (citing *Montgomery v. Milam,* 910 S.W.2d 237, 239 (Ky.1995)). The "gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy"—meaning a plaintiff must also prove that the act or acts caused her injuries. *Id.* In this sense, it is substantively similar to RICO § 1962(d).

**\*8** Accordingly, Wallace's state law claim parrots his civil RICO conspiracy claim. He alleges that Midwest Financial, Schlueter, Bates, Soard, Accupraise, Brock, and MortgageIT conspired to manufacture fraudulent appraisals designed to dupe consumers into obtaining unaffordable option ARMs for which MortgageIT paid generous yield spread premiums. As the district court recognized, this alleged conspiracy seems to consist of two distinct subparts that bind the defendants together—though Wallace does not directly say so in his complaint. The first subpart involves the alleged agreement between Midwest Financial, Schlueter, Bates, Soard, and Brock to manufacture the fraudulent appraisals. The second subpart involves the alleged agreement between Midwest Financial, Schlueter, Bates, and MortgageIT providing for "unlawful kickbacks" in the form of yield spread premiums. We address each in turn.

Regarding the first subpart, the district court held that Wallace's claim failed because he could not show that the fraudulent appraisal—the relevant unlawful act—caused his injuries. The court relied on its prior determination to the same effect. For the reasons set forth above, we disagree. Viewing the facts in the light most favorable to Wallace, we find that he has raised a sufficient question of fact as to causation. However, it is yet to be determined whether he has also raised a sufficient question of fact as to the remaining elements of his claim under Kentucky conspiracy law. *See id.* at 896 ("[T]he burden is on the party alleging that a conspiracy exists to establish each and every element of the claim in order to prevail."). We once again allow the district court to make this determination in the first instance.

[11] Regarding the second subpart, the district court held that Wallace "presented no evidence which establishes that Defendants [Midwest Financial and MortgageIT] entered into an agreement to commit an unlawful act." With this we agree. The court did not rely on its faulty proximate-cause analysis to reach this conclusion. Instead, the court correctly noted that "yield spread premiums are not illegal per se under" federal law, and found nothing in the record that suggested MortgageIT conspired to provide a specifically illegal yield spread premium in this case. More generally, MortgageIT had no obvious relationship or communications with Midwest

Case 3:11-cv-00020-MHL Document 144-1 Filed 04/25/13 Page 7 of 7 PageID# 2831

**Wallace v. Midwest Financial & Mortg. Services, Inc., --- F.3d ---- (2013)**

Financial outside of the formal application process and payment of such premiums—certainly nothing on the order of an illicit agreement. At most, it might be said that MortgageIT knew of the appraisal-based scheme given its review of the application materials and then agreed to the overarching objective by paying yield spread premiums. *Cf. Heinrich,* 668 F.3d at 411 (applying such a standard to a civil RICO conspiracy claim). But this theory is simply too attenuated to raise a sufficient question of fact. Because the record offers essentially no support for Wallace's contention that MortgageIT manifested an agreement to commit an unlawful act, we affirm the district court's decision in this respect.

### IV.

***9** For these reasons, we reverse the district court's grant summary of judgment in favor of the defendants based on a lack of proximate causation, affirm its grant of summary judgment in favor of MortgageIT on the state law claim on other grounds, and remand for further proceedings.

\*     The Honorable Thomas B. Russell, Senior United States District Judge for the Western District of Kentucky, sitting by designation.

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.