

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

JOHN K. GOODROW,

        Plaintiff,

v.

FRIEDMAN & MACFADYEN, P.A., *et al.*,

        Defendants.

Civil Action No. 3:11cv20
Consolidated Action

## MEMORANDUM OPINION

By Order entered July 9, 2013, this Court granted in part and denied in part the

Consolidated Motion to Dismiss the Amended Complaints[1] ("Motion to Dismiss") filed by

Defendants Friedman & MacFadyen, P.A. ("Friedman & MacFadyen"), F&M Services, L.C.

("F&M"), and Johnie R. Muncy (collectively, "Defendants"). (ECF No. 157.) The Court

granted in part and denied in part the Motion to Dismiss Count One. The Court granted the

Motion to Dismiss the breach of any duty of notice or to advertise and dismissed those claims

with prejudice. The Court denied the Motion to Dismiss the breach of any duty of impartiality

claim. The Court granted the Motion to Dismiss and dismissed with prejudice Count Two,

---

[1] The six amended complaints at issue are: (1) the Goodrow Second Amended Class
Complaint (ECF No. 117); (2) the McBeth First Amended Class Complaint (ECF No. 116);
(3) the Mbundure First Amended Class Complaint (ECF No. 118); (4) the Buel First Amended
Class Complaint (ECF No. 114); (5) the Banks Second Amended Class Complaint (ECF
No. 115); and, (6) the Chatter Second Amended Class Complaint (ECF No. 119). For ease of
reference, the Court refers to the six pending amended complaints as "Amended Complaints."
    Defendants sought dismissal of the amended complaints filed in these six cases
consolidated for pretrial purposes. Plaintiffs John K. Goodrow, Michele McBeth, Adam
Mbundure, Laurel and Milton Buel, Letonya Banks, and Allen Chatter (collectively, "Plaintiffs")
responded and Defendants replied. The Court heard oral argument. The Court exercises
jurisdiction pursuant to 28 U.S.C. §§ 636(c), 1331, and 1367.

Plaintiffs' RICO claim. The Court denied in part and granted in part the Motion to Dismiss the FDCPA claim in Count Three. This Memorandum Opinion sets forth the Court's rationale.

The Amended Complaints raised three counts: (1) Count One: Trustee's Breach of Fiduciary Duties; (2) Count Two: Violation of 18 U.S.C. § 1962(c) (civil RICO[2]); and, (3) Count Three: Violations of the FDCPA.[3] Plaintiffs presented each count as a putative class claim. Defendants' Motion to Dismiss challenged the three counts.[4]

## STANDARD OF REVIEW

### Rule 12(b)(6):  Failure to State a Claim

The Court employs the familiar standard applicable when reviewing a motion to dismiss. "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This

---

[2] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

[3] Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p.

[4] Defendants challenge Plaintiffs' ability to adequately represent the FDCPA and RICO classes. (Br. Supp. Defs.' Mot. Dismiss ("Br. Supp.") 28-29, ECF No. 133.) Because the Court dismisses the RICO claim with prejudice, the Court need not address the sufficiency of the RICO class allegations. In their motions, all parties have briefed whether certain RICO, fiduciary duty, and FDCPA "claims" should remain within each Count.

Because some "claims" remain, this Court addresses the "claims" raised by the parties in briefing, without deciding class issues at this juncture. The Court notes, however, that the length of briefing, and of this opinion, seems driven by the difficulty in finding succinct commonalities in the factual underpinnings of these six Plaintiffs' cases. While consolidated discovery will commence, the Court will require persuasion to address this record on a consolidated basis again.

principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," stating a claim that is "plausible on its face," rather than merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citation omitted).

## The Court Will Consider Some Extrinsic Documents

The Court already explained when it may appropriately consider at the motion to dismiss stage matters outside the pleadings. *Goodrow v. Friedman & MacFadyen, P.A.* ("*Goodrow II*"), No. 3:11cv20, 2012 WL 6725617, at *2 (E.D. Va. Dec. 27, 2012). The Court will consider the documents attached to Defendants' Brief in Support of their Motion to Dismiss ("Brief in Support") because the documents are central to Plaintiffs' claims, sufficiently referred to in the Amended Complaints, and neither party contests their authenticity. *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396-97 (4th Cir. 2006) (citations omitted). The Court will not consider the declarations of Darcey Arnold, Pamela Wanamaker, or Karey Wolfrey attached as exhibits to Plaintiffs' Memorandum In Opposition to the Defendants' Motion to Dismiss ("Opposition") because these declarations raise matters outside the pleadings and are not central to Plaintiffs' claims.[5] *See id.*

---

[5] Plaintiffs also attached excerpts from the Fannie Mae Servicing Guide to their Opposition. Although the six Amended Complaints refer to the Fannie Mae Servicing Guide, and although Defendants do not challenge the authenticity of the excerpts, the Court questions whether the excerpts qualify as central to Plaintiffs' claims "[g]iven that courts consistently find that borrowers lack standing to enforce contracts between loan servicers and lenders." *Goodrow II*, 2012 WL 6725617, at *5 n.8.

3

## FACTUAL BACKGROUND[6]

### The Parties and Defendants' Foreclosure Operation

These actions stem from Defendants' allegedly unlawful foreclosure on the property secured by the Plaintiffs' Deeds of Trust through the use of allegedly fraudulent documents. *Goodrow II*, 2012 WL 6725617, at *2-3. The parties remain unchanged. *Id.*

Defendants ran a foreclosure operation where the functioning of the various interrelated entities masked from homeowners the true manner in which the foreclosures commenced. When conducting foreclosures, Defendants used a "lost note letter" to speed foreclosure in lieu of obtaining proper documentation or the original note. Defendants structured their business "to artificially inflate their 'Attorney Performance Rating' in the LPS system and thereby continue to get more foreclosure referrals." Defendants created a Substitution of Trustee document that allowed Defendants to conduct the sale improperly because the document misidentified loan servicers as noteholders and the signators signed in the Trustee's name, but not their own.

Defendants mailed the same set of letters and foreclosure notices to every consumer on whom they attempted to conduct a foreclosure sale.[7] According to Plaintiffs, the letters misrepresented the following: that Defendants intended to file a lawsuit and that legal action

---

[6] For the purpose of the pending Motion to Dismiss, the Court takes the following facts from the six Amended Complaints (ECF Nos. 114-119), assumes the well-pleaded factual allegations are true, and views them in the light most favorable to Plaintiffs. *Matkari*, 7 F.3d at 1134. The six Amended Complaints range in length from three hundred (300) numbered paragraphs to three hundred eighty-eight (388) numbered paragraphs. Recognizing the volume of allegations and incorporating the summary in *Goodrow II*, the facts follow.

[7] The six letters and one statement at issue, sent in a swift timeframe, are as follows: (1) the Initial Correspondence; (2) the Lost/Unavailable Note Letter (the "L/UN Letter"); (3) the Notice of Trustee's Sale Letter (the "NOTS Letter"); (4) an Alternatives to Foreclosure Letter (the "ATF Letter"); (5) a Reinstatement Letter; (6) a Payoff Letter; and, (7) the faulty substitution of trustee documents, including the false Foreclosure Accounting Statement (the "FAS").

was pending; the unavailability of Notes; who held the Note; the amount of debt and applicable

fees; and whether the Substitute Trustee was properly appointed and had the right to foreclose.

After sending the confusing and misleading letters and foreclosure sale notices, Defendants

advertised the foreclosure sales in local newspapers.

After the sale, Defendants created a Trustee's Deed by which the Substitute Trustee

conveyed the property to the purchaser.  Defendants then mailed these faulty documents to

consumers and the Commissioners of Accounts in the Circuit Courts of Virginia.  The

Commissioners of Accounts used the deceptive documents to approve the substitute trustee's

account of the sale.

## Other Entities Associated with Defendants' Foreclosure Operation

Defendants accomplished these allegedly unlawful foreclosure sales with the aid and

knowledge of the Federal National Mortgage Association ("Fannie Mae"),[8] Lender Processing

Services, Inc. ("LPS"),[9] and Plaintiffs' Loan Servicers.  Fannie Mae's compensation system

included paying Defendants more to foreclose than to modify, paying Defendants additional fees

related to the foreclosure, imposing fees on Loan Servicers when unreasonable delay occurred,

and retaining at least two firms in order to ensure competition.  According to Plaintiffs, these

compensation mechanisms created an improper incentive for Defendants to conduct foreclosures

that violated Virginia law because, among other things, they encouraged speedy foreclosures

---

[8] Fannie Mae "is a housing government-sponsored enterprise (GSE)" that purchases residential mortgage loans from originator sellers and either holds the loans in its own portfolio or packages them into mortgage backed securities sold to global investors. (Goodrow Second Am. Compl. ¶¶ 11-12.) "Fannie Mae contracts with loan servicers to collect mortgage payments and handle other customary loan servicing functions, including foreclosures." (*Id.* ¶ 13.)

[9] LPS "assembles the information used to foreclose on consumers' properties" and provides software to mortgage loans servicers, including LPS Desktop, designed to help service defaulted mortgage loans. (*Id.* ¶¶ 66-68 (footnote omitted).)

rather than modifications, and improperly motivated Defendants, despite their trustee status, to foreclose rather than pursue different outcomes homeowners or investors might desire.

LPS maintained a green, yellow, or red law firm rating system, evaluating law firms solely on speed of foreclosure and ceasing referrals to law firms with a prolonged "red" rating. LPS also charged Defendants a referral fee for each foreclosure LPS referred to Defendants, which Plaintiffs claim qualified as an improper payment, or fee-splitting. Defendants passed the undisclosed fee to purchasers to be paid at the foreclosure sale.

Lastly, the Loan Servicers ostensibly engaged in abuses as part of the foreclosure process, including intentionally misleading borrowers because the systems described above made deceptive practices more profitable. As stated by the Plaintiffs, the Loan Servicers "enlisted the aid of third parties, such as LPS and the Defendants," to deceive or mislead consumers, including the Plaintiffs, regarding the manner in which foreclosures commenced. (Goodrow Second Am. Compl. ¶ 64.)

**Defendants' Conduct Towards Plaintiffs**

Plaintiffs all executed promissory notes ("Notes") payable to Lenders and secured by Deeds of Trust. The Deeds of Trust and Notes obligated Plaintiffs to repay their Lenders and granted the Lenders the power to appoint a substitute trustee and the right to invoke the power of sale upon default. Subsequent to origination, Fannie Mae purchased the Loans of Goodrow, McBeth, the Buels, and Banks, but provided no documentation of the sale to Plaintiffs. After the sale of the Loans to Fannie Mae, or other transfer,[10] Loan Servicers began servicing the Loans.

---

[10] The Mbundure Deed of Trust was "assigned from Riggs Bank, N.A. to Mortgage Electronic Registration System, Inc. ('MERS') as nominee for PNC Bank, N.A. ('PNC Bank')." (Mbundure First Am. Compl. ¶ 141.)

Plaintiffs regularly made payments to their Loan Servicers until they began to experience financial difficulties. Goodrow, McBeth, the Buels, Chatter, and Banks sought modifications, while Mbundure pursued a short sale to avoid foreclosure. After Plaintiffs unsuccessfully acted to modify their Loans or avoid foreclosure, Defendants began sending their form letters to Plaintiffs in an attempt to collect a debt.

The Defendants' first letter, the Initial Correspondence, identified Plaintiffs' Loan Servicer as the "current noteholder and/or servicer" of the Loans.[11] The Initial Correspondence informed the Plaintiffs that their "loan[s] [had] been referred to this office for legal action based upon a default under the terms of your Mortgage/Deed of Trust and Note" and included the "total indebtness due from the date of default."[12] (*See, e.g.*, Goodrow Second Am. Compl. Ex. H.)

Defendants' second letter, the Lost/Unavailable Note Letter, dated here on the same day or the day after the Initial Correspondence,[13] and the third letter, the Notice of Trustee's Sale

---

[11] Mbundure's Initial Correspondence identified "Dovenmuehle Mortgage" as "the 'holder/servicer.'" (Mbundure First Am. Compl. ¶ 156.)

[12] Plaintiffs aggressively seek to avoid pleading specific facts about default, but several documents in the record suggest that the Plaintiffs defaulted. As stated below, default becomes fatal to Plaintiffs' RICO count, but not yet to the FDCPA claims. The system of multiple deceptive letters before the Court withstands FDCPA review on a motion to dismiss.

[13] The Court does not have all relevant letters at this early stage of pleading. Chatter and Banks failed to attach copies of all of the letters sent to them by Defendants, but both allege the same pattern of conduct from Defendants as the other Plaintiffs. They allege "the initial letter Defendant Friedman sent to [them] was the same or substantially the same as the form letters" sent to other Plaintiffs. (Chatter Second Am. Compl. ¶ 172, Ex. B; Banks Second Am. Compl. ¶ 195, Ex. C.) Mbundure failed to attach the first page of his Initial Correspondence to his Amended Complaint, but likewise alleges he received an Initial Correspondence substantially similar, if not identical, to the Initial Correspondence received by the other Plaintiffs.

Letter,[14] both on law firm letterhead, contained subject lines which improperly suggested that a lawsuit was pending or about to be filed. Defendants never intended to file and never filed a lawsuit against Plaintiffs in this non-judicial foreclosure state.

In the L/UN Letter and NOTS Letter, Friedman & MacFadyen signed correspondence to Plaintiffs as the "appointed" Trustee and Substitute Trustee, respectively, although the substitute trustee documents did not appoint Friedman & MacFadyen as substitute trustee.[15] The NOTS Letter also included the Substitution of Trustee document, often dated one day and notarized a different date, naming the Loan Servicer as the Noteholder and stating that the Loan Servicer appointed F&M and Muncy as Substitute Trustees.[16] Ultimately, Defendants' system included three documents about Substitute Trustee issues, and listed three different Substitute Trustees in the documents.

The NOTS Letter stated that "[Plaintiffs'] Note[s] [were] in default for non-payment" and that "the default[s] [were] not cured as previously demanded by the holder of the note." McBeth,

---

[14] The NOTS Letter included notice of the scheduled foreclosure sale and the Substitution of Trustee document. (*See, e.g.*, Goodrow Second Am. Compl. Ex. L; McBeth First Am. Compl. Ex. M.)

[15] The L/UN Letter indicated the "undersigned," identified as "FRIEDMAN & MacFADYEN, P.A." and "Johnie R. Muncy," "[had] been appointed as trustee." (*See, e.g.*, Goodrow Second Am. Compl. Ex I; McBeth First Am. Compl. Ex. J.) The NOTS Letter identified "Friedman & MacFadyen, P.A." as "Substitute Trustee," appointed for the purpose of foreclosing. (*See, e.g.*, Goodrow Second Am. Compl. Ex L; McBeth First Am. Compl. Ex. M.)

[16] For example, McBeth's Substitution of Trustee document, dated July 27, 2010 and notarized August 5, 2010, named EverHome as the Noteholder and stated EverHome appointed F&M and Muncy as Substitute Trustees. (McBeth First Am. Compl. Ex. M.)

Mbundure, Chatter, and Banks received the NOTS Letters within or less than one month after receiving the Initial Correspondence.[17]

Friedman & MacFadyen also sent the ATF Letter, Reinstatement Letter, and Payoff Letter that included language in each that improperly suggested the existence of pending legal action against Plaintiffs.[18] The Payoff and Reinstatement Letters instructed Plaintiffs how to obtain "withdrawal" or "dismissal" of "the action," while the ATF Letter utilized the lawsuit styled subject line.

Goodrow, Mbundure, Chatter, and Banks lost their homes in a foreclosure sale. McBeth does not state if, or when, the foreclosure sale of her home took place, but her NOTS Letter scheduled the sale for August 27, 2010. The Buels allege that, as a result of Defendants' conduct, they paid $111,800.30 to prevent the foreclosure sale of their home.

Goodrow, Chatter, and Banks allege that Defendants filed a false Foreclosure Accounting Statement with the Commissioners of Accounts. The FAS listed the $600 trustee's commission, which Plaintiffs allege included the undisclosed fee paid to LPS for referring Plaintiffs' Loans to Defendants for foreclosure. The Commissioners of Accounts relied on the improper documents and approved the trustee's accounting of the sales. After approval, the Commissioner's Approval of Sale was recorded in the circuit court.

---

[17] As an illustration, McBeth's Initial Correspondence contains a July 28, 2010 date and her NOTS Letter contains an August 10, 2010 date. (McBeth First Am. Compl. Exs. I, M.)

[18] Friedman & MacFadyen sent Goodrow, McBeth, and the Buels the ATF Letter. Defendants also mailed McBeth a Reinstatement Letter that advised her how much to pay to bring her loan current. Defendants mailed Mbundure a Reinstatement Letter and a Payoff Letter. Defendants mailed the Buels a Payoff Letter that provided a $113,806.30 payoff quote and then mailed the Buels a second Payoff Letter inexplicably providing a $111,800.30 payoff quote. Defendants sent Goodrow a Reinstatement Letter and Payoff Letter that both contain a November 24, 2008 date.

## PROCEDURAL HISTORY

Prior to the parties' consent to magistrate judge jurisdiction and the consolidation of these six cases, the district court denied a motion to dismiss Goodrow's amended complaint, finding he "stated viable [FDCPA] claims." *Goodrow v. Friedman & MacFadyen, P.A.* ("*Goodrow I*"), 788 F. Supp. 2d 464, 466 (E.D. Va. 2011). In that single-Plaintiff case, Goodrow based his FDCPA claims on misrepresentations contained in his January 11 NOTS Letter and February 3 Trustee's Deed. *Id.* at 466-67.

In *Goodrow II*, this Court granted Defendants' Motion to Dismiss the Amended Complaint and granted Plaintiffs leave to amend.[19] (ECF Nos. 106-107.) Plaintiffs filed these six Amended Complaints, the parties filed consolidated briefing, and the Court heard oral argument. (ECF Nos. 114-119, 132-33, 141-42.) Subsequently, the Court granted both parties leave to file supplemental authority. (ECF Nos. 146, 149, 155.)

## ANALYSIS

**I.    Count III Arguably States FDCPA Violations Because Defendants' Debt Collecting Communications, Viewed Collectively, Could Plausibly Mislead the Least Sophisticated Consumer and Affect His or Her Ability to Make Intelligent Decisions With Respect to the Debt**

In Count III, the Plaintiffs propose a single Class alleging violations of the FDCPA. The FDCPA count encompasses six form letters (and one Accounting Statement) involving six loans. Each Plaintiff received more than one letter, but no Plaintiff received all forms of communication undergirding the proposed class. Plaintiffs allege the existence of numerous

---

[19] In this Memorandum Opinion, the Court addresses procedural history supplemental to that described in *Goodrow II*, 2012 WL 6725617, at *5.

potential subclasses and contend that each class or subclass aligns with an actionable misrepresentation.[20]

At this stage of pleading, the Court will deny Defendants' Motion to Dismiss. Although Plaintiffs conflate a series of events into one count, this Court will not strike the entire count because the repetitive and cumulative aspects of the plausibly misleading representations distinguish this case from cases evaluated by other courts. While the Court expresses concern about whether numerous potential subclasses can coexist with a future finding of typicality or commonality, at this stage, the Court will allow Count III to go forward. For the reasons stated below, the Court finds that Plaintiffs plausibly allege that a least sophisticated consumer might be misled by the collective effect of receiving, in a tight time frame, even a subset of these potentially materially misleading letters.

### A.   Substantive FDCPA Statute of Limitations Analysis

#### 1.   Standard for Statute of Limitations

The Court first addresses Defendants' statute of limitations arguments. Both parties acknowledge that some letters fall outside the FDCPA's one-year statute of limitations,[21] but neither party has addressed the impact of the United States Court of Appeals for the Fourth Circuit's recent decision finding that the "discovery rule" applies to FDCPA limitations periods.

---

[20] The six Plaintiffs do not identify the same subclasses. Goodrow, Mbundure, and the Buels identify five, McBeth names seven, and Chatter and Banks specify two. Because each potentially actionable misrepresentation corresponds to a subclass, the Court organizes its discussion according to the substance of the misrepresentation and identifies five potential misrepresentations: that Defendants intended to file a lawsuit and that legal action was pending; the unavailability of the Note; who held the Note; the amount of debt and applicable fees; and, Defendants' appointment as Substitute Trustee.

[21] "An action to enforce any liability created by [the FDCPA] may be brought in any appropriate United States district court without regard to the amount in controversy . . . within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d).

*See Lembach v. Bierman*, Nos. 12-1723, 12-1746, 2013 WL 2501752, at *3 (4th Cir. June 12, 2013) (per curiam). *Lembach* confirmed that the limitations period does not begin to run until a plaintiff knows or has reason to know of the injury creating the basis of a lawsuit. *See id.* (holding that a claim based on falsely notarized Trustee document does not accrue until a diligent party discovers the fraud which, in *Lembach*, occurred when the document was docketed in a court record and the Lembachs saw the fraudulent signatures).

Without prejudice to raising limitations issues, if any,[22] implicated by *Lembach*, the Court will grant Defendants' Motion to Dismiss Plaintiffs' time-barred FDCPA claims grounded in: (1) the Initial Correspondence and Lost/Unavailable Note Letter sent to Goodrow, Chatter, Banks, and the Buels; (2) the Notice of Trustee's Sale Letter sent to Chatter and Banks; and, (3) the Reinstatement Letter and Payoff Letter sent to Goodrow and the ATF Letter sent to Goodrow and the Buels.[23]

Each Plaintiff received the same, or a similar combination of, form correspondence. The Court addresses which letters might be subject to limitations below.

---

[22] In *Lembach*, as discussed more fully below, the defendant law firm filed, in Maryland state court, the same "robo-signed" Order to Docket in a series of foreclosures with a Trustee signature notarized as if witnessed personally, when it was not. *Lembach*, 2013 WL 2501752, at *1. The homeowners did not directly receive the order and "had no way of discovering the alleged violation until they actually saw the fraudulent signatures on the docketing material." *Id.* at *3. Here, in these non-judicial foreclosures, Plaintiffs received most documents personally and did not have to discover them by reviewing a court filing.

[23] Defendants tender no statute of limitations challenges to the FDCPA claims advanced by Mbundure or McBeth.

### 2.    The Challenged Letters

First, the Initial Correspondence and Lost/Unavailable Note Letter [24] sent to Goodrow, the Buels, Chatter, and Banks fall outside the applicable limitations period. As a result, when evaluating the sufficiency of Plaintiffs' allegations at the motion to dismiss stage, the Court will not consider FDCPA claims stemming from these two letters sent to these four Plaintiffs. Although these letters will not individually support a FDCPA violation for these four Plaintiffs, Goodrow, the Buels, Chatter, and Banks each allege they received the Initial Correspondence and the Lost/Unavailable Note Letter as part of Defendants' collective effort to foreclose as quickly and inexpensively as possible. The Court will allow Plaintiffs' allegations regarding the cumulative effect of the letters to proceed as an FDCPA claim beyond the motion to dismiss stage. The time-barred letters will remain in the record, and the parties can argue their evidentiary value at a later date.

Second, the Notice of Trustee's Sale Letters sent to Chatter and Banks fall outside the applicable statute of limitations period. [25] For the same reasons stated above, the Court will not

---

[24] The Court addresses these two letters together because Plaintiffs allege that Defendants sent the Initial Correspondence on the same, or nearly the same, day as the Lost/Unavailable Note Letter to each of these four Plaintiffs. Where Plaintiffs attach these two letters here, they are dated on the same day or one day apart. (*See, e.g.,* Goodrow Second Am. Compl. Exs. H, I; Buel First Am. Compl. Exs. H, I.)

[25] Defendants argue that the statute of limitations applicable to FDCPA claims completely bars all claims alleged by Chatter and Banks. Defendants contend that the Trustee's Foreclosure Accounting Statements cannot support an FDCPA violation because they post-date the extinguishment of any debt. This argument has persuasive value. However, as explained later, in *Goodrow I*, 788 F. Supp. 2d at 471-72, the Court refused to dismiss a claim based on a NOTS Letter and the Trustee's Deed, sent post-sale. The law of the case thus contemplates a post-sale cause of action, at least on a motion to dismiss. Second, Defendants rely on one case that is factually distinguishable because the district court in that case barred a cause of action against a company that *began* communicating *post* foreclosure. *Calkins v. Shapiro & Anderson, L.L.P.,* No. 05-0815-PHX-ROS, 2005 WL 3434718, at *5 (D. Az. Dec. 13, 2005). More

13

allow Chatter and Banks to rest their FDCPA claims on the Notice of Trustee's Sale Letter. However, Chatter and Banks both allege they received the NOTS Letter as part of Defendants' collective effort to foreclose as quickly and inexpensively as possible. While these time-barred NOTS Letters cannot give rise to a claim, the Court will allow the letters to be used for whatever evidentiary value the parties establish.

Finally, Goodrow's Reinstatement, Payoff, and ATF Letters and the Buels's ATF Letter also fall outside the limitations period. The court will allow consideration of these letters as described above.

**B.     Substantive FDCPA Analysis**

**1.     Standard to Plead a FDCPA Violation**

The Court now turns to Defendants' substantive challenges to Plaintiffs' FDCPA claims. "'The FDCPA protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage.'" *Lembach*, 2013 WL 2501752, at *2 (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996)). To prevail on an FDCPA claim, a plaintiff must allege that: (1) he or she was the object of collection activity arising from a consumer debt as defined by the FDCPA; (2) the defendant is a debt collector as defined by the FDCPA;[26] and (3) the defendant engaged in an act or omission prohibited by the FDCPA, such as using a false, deceptive, or misleading representation or means in connection with the collection of any debt. *See Moore v.*

---

importantly, presuming at least one communication falls within the limitations period, this Court will not dismiss a claim that rests on the collective effect of all letters received by a Plaintiff.

[26] In this case, no dispute exists as to whether the collection activity involved a consumer debt, or that Defendants qualify as "debt collector[s] as defined by the FDCPA." *See Goodrow I*, 788 F. Supp. 2d at 470 (discussing Defendants' status as debt collectors at the motion to dismiss stage in the pre-consolidated action before the district court).

*Commonwealth Trs., LLC*, No. 3:09CV731, 2010 WL 4272984, at *2 (E.D. Va. Oct. 25, 2010)

(citing *Blagogee v. Equity Trustees, LLC*, No. 1:10-CV-13 (GBL-IDD), 2010 WL 2933963, at *5

(E.D. Va. July 26, 2010)); *see also* 15 U.S.C. § 1692e.

The Fourth Circuit recently confirmed that, as to the third element of an FDCPA claim, in

order to plead a false representation, the party must show that the misrepresentations are

material.[27] *Lembach*, 2013 WL 2501752, at *4. In so doing, the Fourth Circuit confirmed its

adoption of "the 'least sophisticated consumer' standard to determine if a § 1692e violation has

occurred." *Id.* (citing *Nat'l Fin. Servs., Inc.*, 98 F.3d at 135-36). Under this standard, "courts

typically ask whether [a false statement] would mislead or deceive the least sophisticated

consumer with respect to the alleged debt," by affecting a consumer's ability to make intelligent

decisions as to the debt. *Penn v. Cumberland*, 883 F. Supp. 2d 581, 589 (E.D. Va. 2012).

### 2.   The Parties' Positions

In Count III, Plaintiffs allege a series of violations under 15 U.S.C. §§ 1692e, 1692f, and

1692g.[28] Plaintiffs contend that Defendants sent debt collecting correspondence that falsely

represented information, including whether a lawsuit existed, whether the Note was lost, who

held the Note, the exact amount of debt or fees, and who acted as substitute trustee.

---

[27] *See also Penn v. Cumberland*, 883 F. Supp. 2d 581 (E.D. Va. 2012) (finding that materiality must be shown for Section 1692e violations, but doing so in an inapposite analysis of allegations advanced via Virginia state court demurrer).

[28] Plaintiffs allege Defendants' form letters and statements violated 15 U.S.C. §§ 1692e, 1692f, and 1692g. Section 1692e states in part: "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." The statute contains a nonexhaustive list of examples of violative conduct.
Section 1692f provides: "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." Like Section 1692e, Section 1692f lists nonexhaustive examples of violative conduct.
Section 1692g reads in pertinent part: "Within five days after the initial communication with a consumer . . . a debt collector shall . . . send the consumer a written notice containing-- . . . **(2)** the name of the creditor to whom the debt is owed . . . ."

Defendants counter that Plaintiffs fail to allege that Defendants engaged in an act or omission prohibited by the FDCPA.  Defendants contend Plaintiffs' FDCPA allegations fail because Defendants' communications:  (1) do not qualify as attempts to collect a debt; (2) do not contain false, deceptive, or misleading representations; and, (3) do not contain material misrepresentations.

The Court first addresses whether Defendants' form communications qualify as attempts to collect a debt, and will analyze the materiality of any misrepresentations later.  Because the examination of whether a communication qualifies as an attempt to collect a debt turns on the nature of the communication itself, the Court examines the challenged letters in detail.

### 3.    Attempt to Collect a Debt Under the FDCPA

Of the six letters and the additional Accounting Statement before the Court, Defendants acknowledge that three constitute attempts to collect a debt.  Defendants concede that the Initial Correspondence, Reinstatement Letter, and Payoff Letter qualify as attempts to collect a debt.[29]  However, Defendants challenge whether the three other form communications constitute an

---

[29] Defendants do not challenge the Initial Correspondence sent to McBeth and Mbundure (sent within the statute of limitations) as an attempt to collect a debt.  Instead, Defendants challenge this letter on materiality grounds.  They contend that identifying the loan servicer as the "current noteholder and/or servicer" does not run afoul of 15 U.S.C. § 1692g(a)(2)'s requirement that the debt collector send written notice containing the name of the creditor to whom the debt is owed.

Likewise, Defendants do not challenge whether the Reinstatement and Payoff Letters qualify as an attempt to collect a debt.  Instead, Defendants challenge whether representations regarding the debt amount and fees are inconsistent and, if so, whether those representations are material.

Defendants fail to dispute whether the ATF Letter qualifies as an attempt to collect a debt.  The ATF Letter, sent on law firm letterhead, makes use of the lawsuit style subject line, informs the recipient it "is an attempt to collect a debt," and directs him or her to contact Friedman & MacFadyen to discuss a potential repayment plan to avoid foreclosure.  (See, e.g., McBeth First Am. Compl. Ex. K.)  McBeth's ATF Letter contains the same date as her Initial Correspondence and L/UN Letter.  At this stage of pleading, and absent any challenge by Defendants, the Court will not find that the ATF Letter does not qualify as an attempt to collect a debt.

attempt to collect a debt. Defendants challenge Plaintiffs' claims as to: (1) the Lost/Unavailable Note Letter; (2) the Notice of Trustee's Sale Letter; and, (3) communications to the Commissioners of Accounts, including the Trustee's Foreclosure Accounting Statement and Trustee's Deed. As explained below, the Court finds that the Plaintiffs allege facts that plausibly suggest that all three of these remaining documents constitute an attempt to collect a debt.

      (a)    **At This Stage of Pleading, Plaintiffs Allege Facts that Plausibly Suggest the Lost/Unavailable Note Letter Qualifies as an Attempt to Collect a Debt**

The record before the Court shows that Defendants mailed to Plaintiffs the Lost/Unavailable Note Letter at nearly the same time as the Initial Correspondence. Here, the letters are dated the same day or one day apart. (*See, e.g.*, McBeth First Am. Compl, Exs. J, I (same day).) The fact that the L/UN Letter accompanied the Initial Correspondence that *is* a debt collection document might, by itself, decide the "attempt to collect a debt" issue favorably for Plaintiffs. This is true because, among other things, the Initial Correspondence generally includes a calculation of amount owed, states that it is from a debt collector, and provides avenues to dispute or inquire about the debt.

Regardless, the Court finds that, reading the record as it must on a motion to dismiss, Plaintiffs allege facts that plausibly suggest the Lost/Unavailable Note Letter at bar qualifies as an attempt to collect a debt. While other courts have made different findings, they appear to have done so regarding similar, but different, letters. *See Blick v. Wells Fargo Bank, N.A.*, No. 3:11cv00081, 2012 WL 1030137, at *1 (W.D. Va. Mar. 27, 2012); *Blagogee*, 2010 WL 2933963, at *1. The Lost/Unavailable Note Letter here differs in at least two ways, outlined below, from the FDCPA letters evaluated by other courts.

(i)      **The L/UN Letter States it Attempts to Collect a Debt**

First, Defendants' Lost/Unavailable Note Letter contains this conspicuous warning:

"THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED

WILL BE USED FOR THAT PURPOSE." (*See, e.g.*, McBeth First Am. Compl. Ex. J.) The

Lost/Unavailable Note Letter's warning evinces stronger language and a firmer tone than the

notice language at issue in the letters before the *Blagogee*[30] and the *Blick*[31] courts.

The *Blagogee* letter contained the less forceful language that the "communication is from

a debt collector" or "may be an attempt to collect a debt," *see Blagogee*, 2010 WL 2933963, at

*6, rather than the unambiguous "THIS IS AN ATTEMPT TO COLLECT A DEBT" warning

evinced in the Lost/Unavailable Note Letter at bar. The *Blick* letter used even more reluctant

wording that the communication "may be deemed a communication from a debt collector." *See*

---

[30] In *Blagogee*, 2010 WL 2933963, at *1, a Substitute Trustee, who had acted for the non-party mortgage servicer which held the note and deed of trust, moved to dismiss an FDCPA claim brought by *pro se* plaintiffs. Looking only at that acceleration notice that included the appointment of substitute trustee document, the court granted a motion to dismiss. *Blagogee*, 2010 WL 2933963, at *6.
     The *Blagogee* court found that the letter at issue did not qualify as an attempt to collect a debt because it did not contain "an express demand for payment, notice of the person to whom their debt should be paid, or a statement indicating that Equity was attempting to collect a debt." *Id.* The *Blagogee* court found that the acceleration notice, entitled "RE: NOTICE OF DEFAULT, ACCELERATION & FORECLOSURE SALE," merely "appris[ed] [Plaintiffs] of default, acceleration and foreclosure." *Id.* at *2. "Although [the letter] contained a header stating, 'This Communication is from a Debt Collector,' neither the form nor substance made a demand for payment, provided an address where a curative payment should be sent, or stated how the Blagogees might halt the foreclosure process." *Id.*

[31] In *Blick*, 2012 WL 1030137, at *8, the district court granted the defendant law firm's motion to dismiss FDCPA claims in a foreclosure action on the ground that the *pro se* complaint did not "sufficiently allege that [the law firm's] letter was even an attempt to collect a debt." The law firm, instructed to commence the foreclosure, "neither made an express demand for payment nor provided Plaintiffs with any information regarding who was claiming current ownership of the debt or how the debt could be satisfied." *Id.* The letter at issue "alerted the Plaintiffs that, among other things, BGWW intended to ask Defendant Equity Trustees, LLC ('Equity Trustees') to sell the property at a foreclosure sale, and the promissory note was unavailable at the time BGWW mailed the notice." *Id.* at *1.

18

*Blick*, 2012 WL 1030137, at *8 n.8.[32]  *Cf. Townsend v. Fed. Nat'l Mortg. Ass'n*, -- F. Supp. 2d --,

2013 WL 549263, at *6-8 (W.D. Va. Feb. 12, 2013) (substitute trustee's letter stating that it had

been instructed to initiate foreclosure and including the identity of the creditor, the amount owed,

a debt dispute procedure, and conspicuous warning language that the communication "is an

attempt to collect a debt," qualified as an attempt to collect a debt).[33]

(ii)     **The L/UN Letter Contains a Lawsuit-Style Caption**

Second, the Lost/Unavailable Note Letter contains a subject heading which plausibly

suggests that a lawsuit is pending or that Defendants intend to file a lawsuit.  For example, on

law firm letterhead, McBeth's L/UN Letter states it pertains to the following:  "Re:  EverHome

Mortgage Company v. Michele L. McBeth."  (*See, e.g.*, McBeth First Am. Compl. Ex. J.)

---

[32] The *Blick* opinion does not contain this explicit reference, but the opinion refers to the relevant letter and this Court's examination of that record reveals this language. *See Blick*, 2012 WL 1030137, at *8 n.8 (citing to pertinent letter as "Compl. Ex. B.").

[33] The Court also notes that the L/UN Letter expressly informs the recipient that "[t]he undersigned *has been appointed . . .* as trustee *. . . for the purpose of foreclosing* on the Deed of Trust/Mortgage." (*See* McBeth First Am. Compl. Ex. J (emphasis added).) In *Townsend*, the district court concluded that the plaintiffs "sufficiently alleged that [the substitute trustee law firm] was acting as a debt collector attempting to collect a debt under the FDCPA" and noted that the letter at issue informed the recipient that the law firm "had been instructed to initiate foreclosure proceedings." *Townsend*, -- F. Supp. 2d --, 2013 WL 549263, at *6, *8.
   In contrast to Defendants' L/UN Letter and the language used in the *Townsend* letter, other courts evaluated conditional language regarding the possibility of a foreclosure sale. The *Blagogee* letter informed the recipient that the substitute trustee had scheduled the foreclosure sale. *See Blagogee*, 2010 WL 2933963, at *2. The *Blagogee* letter also stated that the Substitute Trustee would offer the property for sale "[u]pon written request" of the holder of the note. While the *Blagogee* opinion does not contain this explicit reference, the opinion referred to the relevant letter and this Court's examination of that record reveals this language. *See Blagogee*, 2010 WL 2933963, at *2 (citing to pertinent letter as "Def's Mem. Ex. D."). In *Blick*, the notice "merely informed Plaintiffs that a foreclosure would proceed in 14 days" and that BGWW "intended" to ask the substitute trustee to sell the property at a foreclosure sale. *Blick*, 2012 WL 1030137, at *1, *8 & n.8. The Lost/Unavailable Note Letter here employed direct and explicit language about foreclosing, rather than the more conditional language regarding a potential foreclosure expressed in the *Blagogee* and *Blick* letters.

Plaintiffs allege all L/UN letters contain this misrepresentation.  Neither the *Blagogee* nor the *Blick* courts reviewed letters containing such a "Re:" line.

In summary, based upon the two differentiating characteristics and the record showing that the L/UN Letter often accompanied, or closely followed, the Initial Correspondence, this Court finds the Lost/Unavailable Note Letter sufficiently distinguishable from letters before other courts.  The Court finds Plaintiffs to have plausibly alleged, for purposes of this Motion to Dismiss, that the L/UN Letter qualifies as an attempt to collect a debt.

> **(b)   At this Stage of Pleading, Plaintiffs Allege Facts that Plausibly Suggest the Notice of Trustee's Sale Letter Qualifies as an Attempt to Collect a Debt**

Regarding the Notice of Trustee's Sale Letter, the district court already concluded in *Goodrow I* that the Trustee's Sale Letter, at this stage of pleading, survives a challenge as to whether it qualifies as "a communication in connection with the collection of a debt." *Goodrow I*, 788 F. Supp. 2d at 470-71.  The district court explained:

> The January 11 Notice warned Goodrow that his home would be sold unless the entire balance of his promissory note was paid before the sale date, and urged him to contact Friedman & MacFadyen if he desired to satisfy his debt and avoid the foreclosure sale.  The Notice also included an FDCPA disclaimer stating that the Notice represented an attempt to collect a debt.  The January 11 Notice did not contain an express demand for payment, but the presence of an express demand for payment is 'just one of several factors' the Court uses in order to determine whether a communication was made in connection with the collection of a debt.  At this stage of litigation, the Court is unwilling to conclude that the January 11 Notice was not a communication in connection with the collection of a debt.

*Id.* at 471 (citation omitted).

The Notice of Trustee's Sale Letter at bar mirrors the letter previously before the District Judge in *Goodrow I*.  *Goodrow I* remains the law of the case, meaning that, "[a]t this stage of

20

litigation, the Court is unwilling to conclude that the [Notice of Trustee's Sale Letter] was not a communication in connection with the collection of a debt." *Id.*

     (c)     **At this Stage of Pleading, Plaintiffs Allege Facts that Plausibly Suggest the Trustee's Foreclosure Accounting Statement and Trustee's Deed Can Provide a Cause of Action under Section 1692e**

Goodrow, Chatter, and Banks allege that Defendants forwarded correspondence to the Commissioners of Accounts that "misrepresented that the [loan] servicer was the beneficiary, noteholder, investor, and/or creditor to whom the debt was owed" and "filed a Trustee's Deed that contained this same misrepresentation." (*See, e.g.*, Banks Second Am. Compl. ¶ 329; Chatter Second Am. Compl. ¶ 306; *see generally* Goodrow Second Am Compl. ¶¶ 251-59.) While the Court may ultimately find that a foreclosure sale could eliminate a claim under the FDCPA because it "extinguishes the debt and disables the property," (Br. Supp. 31), the Court will not so find at this procedural juncture, especially given the law of the case, and considering the collective impact of all letters received.

In *Goodrow I*, the district court concluded that the Trustee's Deed, filed after the sale of the property, could provide the basis for a claim under 15 U.S.C. § 1692e. *Goodrow I*, 788 F. Supp. 2d at 472 ("Nothing in *Wilson* or any other binding precedent of which the Court is aware dictates the conclusion that a deed can never provide a basis for an FDCPA claim."). Because *Goodrow I* leaves open the possibility for a claim based on documents filed after the foreclosure, and given Plaintiffs' theory regarding the collective impact of all correspondence sent, this Court will deny Defendants' Motion to Dismiss claims brought by Chatter, Banks, and Goodrow

stemming from correspondence sent to the Commissioner of Accounts or from the filing of the Trustee's Deed.[34]

### 4.    Alleged Misrepresentations, Their Materiality, and the Standard of Review

Having concluded that the six letters and the additional Accounting Statement survive a dismissal challenge as to whether they qualify as attempts to collect a debt, the Court turns to the materiality of any misrepresentations contained in the pertinent communications.

### (a)    Standard of Review

The Court must apply the *Lembach* standard when evaluating whether any misrepresentations could plausibly mislead the least sophisticated consumer by affecting his or her ability to make intelligent decisions with respect to the debt. In *Lembach,* the Fourth Circuit affirmed a Federal Rule of Civil Procedure 12(b)(6) dismissal of a 15 U.S.C. § 1692e claim, among others, finding that the robo-signed documents filed with a Maryland court in order to initiate foreclosure proceedings did not contain material misrepresentations. *Lembach,* 2013 WL 2501752, at *4. Specifically, the Fourth Circuit found that, although the signatures were false, the documents were "otherwise correct," meaning that the misrepresentations had "no connection to the debt," in part, because "the Lembachs were unquestionably in default, and the documents correctly stated the debt." *Id.* The *Lembach* court concluded that Plaintiffs failed "to allege how they, or any consumer, would be misled by a signature by someone other than the trustee that is affixed to a document that was substantively correct." *Id.*

---

[34] Perhaps recognizing that all the correspondence sent to Chatter and Banks falls outside the one-year limitations period, both Chatter and Banks only allege FDCPA violations as a result of Defendants' false statements made after the foreclosure sale. Goodrow similarly alleges a FDCPA violation on the basis of misrepresentations made after the foreclosure sale to the Commissioner of Accounts and in the Trustee's Deed.

(b)    **The Five Separate Misrepresentations Alleged by Plaintiffs**

Plaintiffs' Amended Complaints all allege that Defendants' communications contained

misrepresentations that violate two categorical FDPCA prohibitions: (1) using a "false,

deceptive, or misleading representation or means in connection with the collection of any debt,"

in violation of 15 U.S.C. § 1692e; and, (2) using "unfair or unconscionable means to collect or

attempt to collect any debt," in violation of 15 U.S.C. § 1692f.  The Amended Complaints recite

the statutory language for 15 U.S.C. § 1692e(2), (5), (10) and 15 U.S.C. § 1692f(1), (6), but no

single factual paragraph references a specific subsection. [35]  McBeth and Mbundure also claim

violations of 15 U.S.C. § 1692g, alleging Defendants failed to identify the creditor in the Initial

Correspondence.[36]

Despite the fact that the correspondence here suggests that Plaintiffs are in default, the

Court will deny the Motion to Dismiss at this stage.  First, the Buels paid off their loan, requiring

an entirely different analysis.  Second, this Court has a series of documents to consider, and the

collective impact of multiple inconsistent communications on a least sophisticated consumer

would differ from the falsely signed, but substantively correct, Order to Docket at issue in

---

[35] Plaintiffs allege each misrepresentation violates both 15 U.S.C. §§ 1692e and 1692f. Generally, when a plaintiff fails to allege conduct separate from the conduct forming the basis of the § 1692e claim, and the § 1692e claim fails, the § 1692f claim also fails.  *See Penn*, 883 F. Supp. 2d at 594.  Here, the Court ultimately concludes that Plaintiffs' non-time barred § 1692e claims survive.  The Court will hold in abeyance any ruling on Plaintiffs' § 1692f claims pending any final determination as to the § 1692e claims.

[36] Section 1692g(a)(2) expressly requires a debt collector to disclose "the name of the creditor to whom the debt is owed," suggesting that the Court need not address materiality under this section because a failure to identify the noteholder would plainly violate the dictates of that section.  The *Lembach* analysis involves only § 1692e and §1692f claims, not §1692g claims.

The Court notes that, pre-*Lembach,* the Fourth Circuit concluded in *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012) that a failure to disclose that a communication is from a debt collector, in violation of 15 U.S.C. § 1692e(11), required no materiality assessment because the statute expressly prohibited the failure to disclose.

*Lembach.* Third, the Plaintiffs here firmly allege that the documents at bar are connected to the debt and not "otherwise correct," including as to whether the documents suggested the existence of, or intent to file a lawsuit, who owned the debt, the stated amount of debt, and who acted as the substitute trustee.

As such, the Court finds Plaintiffs plausibly allege material violations of the FDCPA. When grouped by substance, Plaintiffs allege five separate misrepresentations. As detailed below, of the alleged five misrepresentations, only one fails to allege something that plausibly is false.

### (i)   Misrepresenting Intent and Entitlement to File Lawsuit

Plaintiffs place five letters before the Court that, at this stage in pleading, would survive Defendants' Motion to Dismiss because the collective effect of their content plausibly supports an allegation that Defendants threatened to bring legal action when they had no intent to bring such action in this non-judicial foreclosure state. For example, on law firm letterhead, McBeth's L/UN and ATF Letters state they pertain to the following: "Re: EverHome Mortgage Company v. Michele L. McBeth." (*See, e.g.*, McBeth First Am. Compl. Exs. J-K.) Also on law firm letterhead, her NOTS Letter states it is: "Re: EverHome Mortgage Company v. Michele L. McBeth and Jeffrey Felipe McBeth." (*See, e.g.*, *id.* Ex. M.) The form L/UN Letter, ATF Letter, and NOTS Letter make use of a subject line suggesting the existence of a lawsuit and plausibly signaling a legal action against Plaintiffs when nothing in the record supports an inference that Defendants intended to engage in anything but a non-judicial foreclosure.

The Reinstatement and Payoff Letters, also on law firm letterhead, but without the law suit styled subject line, inform Plaintiffs that "[a]fter reinstatement, you will be required to sign appropriate documents and take other requested action to assist in obtaining a *withdrawal of the*

24

*action*" and that "[u]pon receipt of the necessary funds Friedman & MacFadyen, P.A. will take appropriate action to obtain a *dismissal of the action*."[37] (*See, e.g.*, McBeth First Am. Compl. Ex. L; Buel First Am. Compl. Exs. K-L) (emphasis supplied).) Plaintiffs allege that Defendants sent the form letters implying unintended legal action within a swift time frame. While every Plaintiff did not receive each letter, Plaintiffs allege that each Plaintiff received more than one letter containing these misrepresentations within a short period of time.[38]

When viewing the allegations favorably to Plaintiffs, the repeated suggestions in Defendants' form letters that a lawsuit exists, or admonition that Plaintiffs will need to take certain steps to resolve the pending "action," are plausibly deceptive. In this non-judicial foreclosure state, it is not plausible that a law firm intended to file a civil action. The suggestion of a lawsuit against a borrower facing foreclosure could plausibly mislead the least sophisticated consumer, affecting his or her ability to make intelligent decisions with respect to the debt. Indeed, the repeated implication that a lawsuit exists, within a short time period, potentially heightens the import of each statement.

---

[37] An "action" plausibly suggests a legal suit, rather than a foreclosure, which in Virginia would be non-judicial and without need for formal legal process. Defendants referred to the "foreclosure sale," as opposed to the "action" in the ATF Letter, plausibly suggesting the deliberate use of "action" in the Repayment and Payoff Letters. (*Compare* McBeth First Am. Compl. Exs. K, L.)

[38] McBeth's four letters are dated in a two week time frame, between July 28, 2010 and August 10, 2010. (*See id.* Exs. J-M.)

### (ii)   Misrepresenting the Note was Lost or Unavailable

Virginia law requires notice as to a lost or unavailable note.  Plaintiffs contend

Defendants deceptively stated Plaintiffs' notes were "lost" in their form Lost/Unavailable Note

Letter.[39]

Section 55-59.1(B) of the Code of Virginia ("Section 55-59.1(B)") reads, in pertinent

part:

> If a note or other evidence of indebtedness secured by a deed of trust *is lost or for any reason cannot be produced* and the beneficiary submits to the trustee an affidavit to that effect ["the Lost Note Affidavit"], the trustee may nonetheless proceed to sale, provided *the beneficiary has given written notice* to the person required to pay the instrument that the instrument is unavailable *and a request for sale will be made of the trustee upon expiration of 14 days* from the date of mailing of the notice ["Written Notice of Sale in Fourteen Days"].

Va. Code Ann. § 55-59.1(B) (West 2013) (emphasis supplied).

This statute is extremely broad.  The statute requires only that an affidavit be sought if a

note cannot be produced "for any reason."  The breadth of this statute precludes a finding that the

second misrepresentation raised by Plaintiffs could survive an FDCPA challenge, even on a

motion to dismiss.  The Lost/Unavailable Note Letter informs the Plaintiffs that Defendants

"[did] not have the original note in [their] possession at this time.  We do have evidence of the

indebtedness referenced above." (*See, e.g.*, McBeth First Am. Compl. Ex. J.)

As alleged, at the time Defendants mailed the L/UN Letters to Plaintiffs, Defendants did

not possess Plaintiffs' actual notes.  Because Defendants' L/UN Letter does not claim that

Defendants will never locate the original note, their representation regarding the present

---

[39] Plaintiffs allege Defendants used the L/UN Letter "rather than locating the entity that was the actual noteholder of the loan or requesting the original note from the servicer prior to commencing the foreclosure process" to "streamline the foreclosure process." (*See, e.g.*, McBeth First Am. Compl. ¶ 124.)  Plaintiffs claim that Defendants "did not even seek to determine whether or not the note was available.  They never contacted the custodian, the servicer, or Fannie Mae to make such inquiry." (*See, e.g.*, *id.* ¶ 125.)

unavailability of the note is not plausibly false, and cannot support an FDCPA claim. Virginia law does not require more, despite Plaintiffs' allegations that an undue incentive for speedy foreclosure animates the failure to look for the note. The Court will address that argument in greater detail in Part II.B.

(iii)     **Misrepresenting that the Loan Servicer was the Beneficiary, Noteholder, Investor, and/or Creditor**

Three communications give confusing or conflicting information identifying the Noteholder, thereby plausibly creating a material misrepresentation as to the legal status of a debt, or the material use of a deceptive means to attempt to collect a debt. The Initial Correspondence identifies Plaintiffs' Loan Servicer as the "current noteholder and/or servicer." (*See, e.g., id.* Ex. I.) In contrast, the Lost/Unavailable Note Letter, sent nearly at the same time, identifies the Loan Servicer as the "holder/servicer." (*See, e.g., id.* Ex. J.) Finally, the Substitution of Trustee document, included with the NOTS Letter, identifies the Loan Servicer as the "Noteholder." (*See, e.g., id.* Ex. M.) In each instance, Plaintiffs plausibly allege that Fannie Mae or another entity actually holds the note.

Although Defendants' use of "and/or" to describe the Loan Servicers in the Initial Correspondence renders this representation plausibly true, and thus not actionable under the FDCPA, the other two descriptions of Plaintiffs' Loan Servicers in the L/UN Letter and Substitution of Trustee document are plausibly false because the Loan Servicer can be a separate entity from the Noteholder.[40] Defendants use of the slash mark to equate Plaintiffs' Loan Servicer and Noteholder in the L/UN Letter and description of the Loan Servicer as the

---

[40] Plaintiffs allege here that in all six instances, the noteholder and servicer were, indeed, different entities. For example, Goodrow, McBeth, Banks, and the Buels allege Fannie Mae held their Note while First Horizon Home Loans and MetLife, EverHome and Wells Fargo, Litton Loan, and Chase, respectively, serviced the loans. Mbundure and Chatter also allege separate entities held and serviced their loans.

27

Noteholder in the Substitution of Trustee document at least plausibly suggest these entities are indistinguishable when they might, in fact, be distinct from each other. The use of the slash mark and the confusing description could plausibly make the true identity of the Noteholder unclear and could mislead the least sophisticated consumer and affect his or her ability to make intelligent decisions with respect to debt. These three forms of communication identify different Noteholders, and the actual noteholder never appears in the correspondence. No document identifies a single Noteholder or Servicer. Thus, this separate misrepresentation as to the Noteholder constitutes a plausibly material misrepresentation before the Court.

### (iv)  Misrepresenting the Amount of Debt Due and Amount of Fees Defendants Were Entitled to Collect

Four Plaintiffs allege that they received at least two letters giving inconsistent representations of the amount due.[41] All four plaintiffs challenge some aspects of fees, and the Buels, among the four, challenge the payoff figures they received. Goodrow, McBeth, Mbundure, and the Buels challenge the inconsistent representations regarding the fees associated with debt amounts due. McBeth and the Buels also allege Defendants misrepresented the amount of fees they were entitled to collect in light of their contract with Fannie Mae capping fees to $600.

First, Goodrow alleges the fees listed in his November 24, 2008 Payoff Letter and November 24, 2008 Reinstatement Letter differ.[42] The differences, although small, could

---

[41] None of the plaintiffs allege that the inconsistencies stem from the same set of letters.

[42] Goodrow's Payoff Letter lists a property inspection fee of $15, an appraisal fee of $95, and $45 in other fees. (Goodrow Second Am. Compl. Ex. J.) By contrast, his Reinstatement Letter, dated the same day as the Payoff Letter, lists an inspection fee of $60, no appraisal fee, and no other fees. (*Id.* Ex. K.)

28

plausibly mislead a least sophisticated consumer because Goodrow received conflicting and confusing information about the amount of money he owed in two letters dated the same day.

Second, McBeth alleges the fees included in her debts owed in her July 28, 2010 Initial Correspondence differ from the amounts listed in her August 3, 2010 Reinstatement Letter.[43] While not substantial, the differences in amounts owed could plausibly mislead the least sophisticated consumer because, within a week, McBeth received conflicting and confusing information about the amount of money she owed without any explanation for the differences.

Third, Mbundure claims the fees and costs identified in his August 2, 2010 Initial Correspondence differ from those included in his August 18, 2010 Reinstatement Letter, and from his September 22, 2010 Payoff Letter.[44] Mbundure received conflicting information from Defendants, in a short time span, regarding the amount and type of fees owed. The existence of a certain amount of fees in one letter, and a different amount of fees in a following letter, could plausibly mislead a least sophisticated consumer because, when viewed together, no letter presents a clear picture of what Mbundure owed and why.

---

[43] The July 28, 2010 Initial Correspondence identifies "$158,561.98" as the "total indebtedness due from the date of default." (McBeth First Am. Compl.Ex. I.) Defendants list $4,452.34 in accrued interest, $600 in legal fees, $150 in foreclosure expenses to date, $61 in total fees, and $309.98 in accrued late charges. (*Id.*) The August 3, 2010 Reinstatement Letter claims $1,449.80 in "current foreclosure attorney/trustee fees," $360.34 in late charges, $15 in inspection fees and no other fees. (*Id.* Ex. L.)

[44] Mbundure's Initial Correspondence calculates $3,707.36 in accrued interest, $141.88 in accrued late charges, a $600 legal fee, $150 in foreclosure expenses, and $74 in total fees. (Mbundure First Am. Compl. Ex. G.) His August 18, 2010 Reinstatement Letter itemizes $2,006 in foreclosure attorney/trustee fees and costs, $283.76 in late charges, $27 in other fees, and no inspection or appraisal fees. (*Id.* Ex. I.) Finally, the September 22, 2010 Payoff Letter identifies $1,255.62 in foreclosure attorney/trustee fees, a $100 appraisal fee, a $27 property inspection fee, and no other fees. (*Id.* Ex. J.)

Finally, the Buels challenge as deceptive the different payoff amounts listed in their

October 27, 2010 and October 29, 2010 Payoff Letters,[45] and inconsistencies in their interest

calculation date.[46] Given that the October 29, 2010 Payoff Letter lists a lower payoff amount

than the October 27, 2010 Payoff Letter, when presumably a higher amount would apply because

of accrued interest and further delay in making payments, Defendants concede this

representation is "inconsisten[t]". (Br. Supp. 48.) The Buels allege a series of differences that

could plausibly mislead the least sophisticated consumer because the letters present confusing

and conflicting information as to the amount owed and could plausibly confuse a consumer and

render him or her unable to make reasonable and intelligent decisions with respect to his or her

debt.

Indeed, each of these four Plaintiffs place before the Court plausibly conflicting and

confusing information that the amount owed was incorrect, or misrepresented. While some

misrepresentations appear minor, the cumulative effect of receiving conflicting information in a

condensed time frame could plausibly mislead the least sophisticated consumer. A confused

understanding of the correct amount of debt and fees owed could affect a consumer's ability to

make intelligent decisions with respect to the debt, including whether to pursue options to avoid

foreclosure, or to accede to foreclosure.

---

[45] The October 27, 2010 Payoff Letter informs the Buels they owe $113,806.30, while the October 29, 2010 Payoff Letter calculates the total outstanding sum as $111,800.30. (Buel First Am. Compl. Exs. K-L.) The first Payoff Letter claims $2,881.59 in current foreclosure attorney/trustee fees and costs, while the second Payoff Letter claims $875.59 in current foreclosure attorney/trustee fees and costs. (*Id.*)

[46] The Buels' Initial Correspondence began calculating interest February 1, 2009, while both October Payoff Letters began calculating interest January 1, 2009. (*Id.* Exs. H, K-L.)

(v)    **Misrepresenting Defendants' Appointment as
Substitute Trustee and Their Right to Foreclose**

Regarding Defendants' correspondence as to who served as Substitute Trustee,

Plaintiffs' challenge the fact that Defendants named three different Substitute Trustees in three

separate documents *to each Plaintiff* within a swift period of time. The letters identify different

substitute trustees and no letter identifies a single substitute trustee.[47] Thus, this separate

misrepresentation as to the substitute trustee constitutes a plausibly material misrepresentation

before the Court.

The identification of three different Substitute Trustees in three different documents sent

to each Plaintiff within a short time period could plausibly mislead a least sophisticated

consumer. First, unlike the substantively correct, but robo-signed, document in *Lembach*, the

documents here conflict with each other, and therefore, cannot be "otherwise correct" in

identifying the Substitute Trustee. *Lembach*, 2013 WL 2501752, at *4. Second, a least

sophisticated consumer's inability to discern the identity of the Substitute Trustee could affect

his or her ability to make intelligent decisions with respect to the debt because the Substitute

Trustee exercises certain duties and obligations pursuant to a deed of trust, including offering the

property at a foreclosure sale. Virginia operates a non-judicial foreclosure system. Therefore,

borrowers cannot rely on the protections of a formal court process when they have questions

concerning the validity of the foreclosure proceedings. Instead, they must either engage their

---

[47] The L/UN Letter informed Plaintiffs that the "undersigned," identified as
"FRIEDMAN & MacFADYEN, P.A." and "Johnie R. Muncy" "[had] been appointed" as trustee
to foreclose. (*See, e.g.*, McBeth First. Am. Compl. Ex. J, dated July 28, 2010.) However, the
NOTS Letter identified only "Friedman & MacFadyen, P.A." as the Substitute Trustee. (*See,
e.g., id.* Ex. M, dated August 10, 2010.) The Substitution of Trustee document identified "Johnie
R. Muncy and F & M Services, L.C." as Substitute Trustees. (*See e.g., id.* Ex. M, dated July 27,
2010, notarized August 5, 2010, and included with the August 10, 2010 Notice of Sale Letter.)

31

own attorneys or must directly interact with the Substitute Trustee. Confusing and conflicting

identifications of who that entity is could plausibly mislead a least sophisticated consumer.[48]

### (c) Conclusion as to the Four Separate Material Misrepresentations

Despite the fact that correspondence in the record states that Plaintiffs are in default,[49] the

Court has found that, viewing allegations favorably, Plaintiffs plausibly allege four separate

misrepresentations that could rise to a level of materiality. These four misrepresentations appear

in a series of documents for this Court to consider. The collective impact of receiving even a

subset of these documents on a least sophisticated consumer differs from the impact of a single

robo-signed document filed in each homeowner's case in *Lembach*. Here, the Plaintiffs firmly

allege that the documents at bar are connected to the debt, and are not "otherwise correct" as to

whether a lawsuit exists, as to who owned the debt, as to the amount of debt, and as to who acted

as the substitute trustee.

### (d) Conclusion as to the Collective Effect of the Material Misrepresentations

The Court has already identified misrepresentations and their potential to mislead the

least sophisticated consumer. Considering the material misrepresentations plausibly at issue in

---

[48] In addition to naming different substitute trustees in different communications to
Plaintiffs, Plaintiffs also challenge the method of appointment, including the different
Substitution of Trustee document dates and notary information. (*See* McBeth First Am. Compl.
Ex. M (first page of Substitution of Trustee document dated July 27, 2010 but second page
contains August 5, 2010 notarization date); Goodrow Second Am. Compl. Ex. L (first page of
Substitution of Trustee document dated October 8, 2008 while second page contains October 21,
2008 notarization date).) Although the *Lembach* court concluded that a Substitute Trustee's
failure to personally execute documents required to be filed to initiate foreclosures did not
constitute a material misrepresentation, when considering the other plausibly confusing features
of Defendants' appointment as Substitute Trustee, the confusing notary dates and document
dates could be an additional factor in misleading the least sophisticated consumer regarding the
Substitute Trustee's appointment.

[49] Given the payoff of their loan, any analysis would differ substantially as to the Buels.

each form letter sent to the six named Plaintiffs, the Court, at the motion to dismiss stage, will not forestall Plaintiffs' theory regarding the collective effect of Defendants' practice of sending the misleading communications to Plaintiffs. Indeed, the cumulative nature of multiple form letters sent to each Plaintiff so swiftly, all with an alleged goal of enabling Defendants to conduct foreclosure sales as quickly and inexpensively as possible, suggests that Defendants fail to demonstrate entitlement to judgment as a matter of law.

The Court recognizes that Virginia law allows swift, non-judicial foreclosures. Nothing in this analysis seeks to override existing Virginia requirements. That said, perhaps especially because Virginia allows such swift foreclosures, the materiality element is satisfied at this stage. The collective impression of Defendants' letters plausibly leaves Plaintiffs with a confused understanding of how the foreclosure action is proceeding against him or her, and what, if any, options exist to an outcome other than foreclosure. At this early pleading stage, the Court will not limit the materiality analysis of Plaintiffs' FDCPA claims to any single communication. The Court may analyze "collective" materiality differently as this case progresses, but the Court will not eliminate Plaintiffs' claims on a motion to dismiss.

Therefore, the Court will deny in part Defendants' Motion to Dismiss claims raised in Count III.

## II.    The Court Will Deny in Part and Grant in Part Defendants' Motion to Dismiss Count One Alleging that Defendants' Breached their Fiduciary Duties

The Court will deny in part and grant in part Defendants' Motion to Dismiss Count One. The Court will deny the motion with respect to the duty of impartiality. Plaintiffs' Amended Complaints describing Fannie Mae's compensation mechanisms and LPS's law firm rating system, coupled with potentially inconsistent case law, preclude dismissal as a matter of law

regarding whether a duty of impartiality exists, and whether the Defendants may have breached it.

The Court grants the Motion to Dismiss with respect to claims grounded in Defendants' duty of notice pursuant to Section 55-59.1(B). Plaintiffs fail to plausibly allege a claim for the breach of the duty of notice. The plain language of Section 55-59.1(B) fails to impose requirements that a "beneficiary," here the noteholder or lender, must first submit the Lost Note Affidavit before giving Written Notice of Sale in Fourteen Days. Therefore, the Court will dismiss the claimed breach of the duty of notice.

Finally, the Court grants the Motion to Dismiss with respect to Defendants' duty to advertise.[50] Plaintiffs lack standing to challenge the alleged defective substitute trustee appointment and any resulting improper advertising. Plaintiffs also fail to plausibly allege that Defendants advertised the foreclosure sales when they had no present right to do so because the NOTS Letters Plaintiffs placed before this Court include no improper advertising dates.

### A.     Amended Allegations and Discordant Precedent Do Not Support Dismissal of the Duty of Impartiality Claim as a Matter of Law

In the absence of controlling authority finding as a matter of law that a trustee owes no duty of impartiality to a borrower, and given Plaintiffs' allegations regarding compensation incentives and LPS's firm rating system, this Court is unwilling to find at the motion to dismiss stage that, as a matter of law, the duty of impartiality claim should be dismissed.

### 1.     The Discordant Precedent

"A deed of trust gives rise to certain fiduciary duties." *Goodrow II*, 2012 WL 6725617, at *6 (citing *Carter v. Countrywide Home Loans, Inc.*, No. 3:07CV651, 2008 WL 4167931, at *11 (E.D. Va. Sept. 3, 2008).) Because "'deeds of trust are treated under the same principles as

---

[50] Paragraph 22 of the Deeds of Trust requires that the trustee "give public notice of sale by advertising, in accordance with Applicable Law." (Br. Supp. Ex. 4 ¶ 22.)

contracts, . . . the trustee only owes those duties that are listed in the deed of trust itself.'" *Id.* (quoting *Carter*, 2008 WL 4167931, at *11). Importantly, "[a] trustee under a deed of trust has no due diligence duty and only owes duties listed in the deed of trust." *Id.* (citing *Horvath v. Bank of New York, N.A.*, No. 1:09-cv-01129 (AJT/TCB), 2010 WL 538039, at *1 (E.D. Va. Jan. 29, 2010) (dismissing breach of trustee's fiduciary duty claim and finding that plaintiff did not allege any such duties existed in the deed of trust or facts establishing impartiality)).

No court has found the existence of the fiduciary duty Plaintiffs ask this Court to recognize. *Sheppard v. BAC Home Loans Servicing, LP*, No. 3:11-cv-0062, 2012 WL 204288, at *7 (W.D. Va. Jan. 24, 2012) ("Plaintiff has cited no additional authority for his assertion that there is a common law fiduciary duty owed to borrowers by trustees"; "There is no duty (labeled fiduciary or otherwise) found in the deed of trust requiring the trustee to ensure either that it was properly appointed or that the entity invoking the sale is the secured party with authority to foreclose.").

However, the Fourth Circuit and the Supreme Court of Virginia have at least noted that a trustee must act with perfect fairness or impartiality. *See Cerceo v. Shmidheiser*, 1997 WL 314428, at *4 (4th Cir. June 10, 1997) (citing *Whitlow v. Mountain Trust Bank*, 207 S.E.2d 837, 840 (Va. 1974) ("[A] trustee under a deed of trust is a *fiduciary* for both the debtor and the creditor, and in this dual capacity, the trustee must act impartially respecting these two competing interests.") (emphasis supplied)); *Powell v. Adams*, 18 S.E.2d 261, 263 (Va. 1942)

("It is incumbent upon [the trustee] to act toward [both debtor and creditor] with perfect fairness and impartiality."), *cited in Sheppard*, 2012 WL 204288, at *7.[51]

While this Court questions whether such statements will ultimately support the existence of a common law duty of impartiality, the discordant precedent counsels caution toward dismissal at this early procedural juncture.

### 2. The Amended Allegations Regarding Compensation and Incentives to Foreclose Swiftly

Amended factual allegations regarding Fannie Mae's compensation mechanisms and LPS's law firm rating system suggest Defendants labored under a structure and organization that encouraged foreclosures at the expense of alternatives borrowers might seek or prefer.[52]

#### (a) Fannie Mae's Compensation Mechanisms

Plaintiffs allege compensation mechanisms imposed by Fannie Mae that plausibly created an incentive for the trustee to foreclose quickly rather than to modify the loan. First, Plaintiffs contend that the low flat fee paid by Fannie Mae to Defendants required an emphasis on quantity of cases in order to turn a profit.[53] Second, Plaintiffs contend that law firms received additional

---

[51] Relying on black letter contract law, other courts have found that a deed of trust incorporates an implied covenant of good faith and fair dealing. *See Bourdelais v. JP Morgan Chase Bank, N.A.*, No. 3:10CV670, 2012 WL 5404084, at *5-6 (E.D. Va. Nov. 5, 2012) (denying motion to dismiss because bank's alleged inducement to default to secure a modification sufficiently stated a claim for the breach of duty of good faith and fair dealing when house was subsequently foreclosed upon); *Acuna v. Chase Home Finance, LLC*, No. 3:10-CV-905, 2011 WL 1883089, at *6 (E.D. Va. May 17, 2011) (same).

[52] Under Plaintiffs' theory, the misleading communications sent by Defendants could provide circumstantial evidence that Defendants acted at odds with a trustee's obligation to act with perfect fairness towards the creditor and debtor.

[53] Fannie Mae paid its third party foreclosure attorneys just $600.00 to $1000.00 to complete a foreclosure from start to finish. Plaintiffs also allege that Fannie Mae's retention of two law firms to ensure competition somehow created improper incentives. This Court cannot hold Fannie Mae at fault for employing an otherwise acceptable capitalist model.

36

money at the end of foreclosure, including third party transfer and notary fees, resulting in higher payments to foreclose than to reinstate.[54] Third, Plaintiffs contend that Fannie Mae paid no fees "if a substitution of trustee's deed [was] not recorded," (McBeth First Am. Compl. ¶ 185) meaning that a firm received nothing if the foreclosure did not start. Fourth, Fannie Mae required speed by imposing a fee on loan servicers for "any delay in completing the foreclosure process" where "the servicer [was] unable to provide a reasonable explanation for the delay." (*Id.* ¶ 34.)

### (b)    LPS's Law Firm Rating System

Plaintiffs also allege LPS's law firm rating system plausibly created an incentive for the trustee to foreclose quickly rather than pursue alternatives to foreclosure, which might be required under a system of impartiality or perfect fairness. First, Plaintiffs contend that Defendants improperly shifted Defendants' referral payment to LPS to purchasers at the foreclosure sale without disclosing what this payment actually encompassed.[55] Second, using speed as the only factor, LPS rated the foreclosing law firms "green," "yellow," or "red" based

---

[54] Specifically, Plaintiffs allege that Fannie Mae "provide[d] certain add-on compensations when foreclosures [were] completed, such as an additional $200.00 if the property [was] sold to a third party other than Fannie Mae at the foreclosure sale and title [was] transferred and a $150.00 notary fee for completed foreclosures," and "only [paid] $350.00 for a deed in lieu of foreclosure, $300.00 if the loan [was] reinstated after notice of default, and $500.00 if the loan [was] reinstated after notice of sale," (Goodrow Second Am. Compl. ¶¶ 28-29).

[55] Plaintiffs allege the "admin fee" LPS charged foreclosing law firms "amount[ed] to a referral fee" or an improper payment or "[a]t the very least . . . violate[d] state laws or professional rules governing fee-splitting and impermissible referral fees" because LPS assessed the fee irrespective of the foreclosure taking place or the completion of any administrative work. (McBeth First Am. Compl. ¶¶ 87, 89.) The "fees [were] then passed on to the consumer, to be paid at the foreclosure sale, without any indication or disclosure that LPS [was] paid this referral fee." (*Id.* ¶ 89.)

on their compliance with LPS's timelines.[56]  Prolonged "red" ratings could result in the cessation of referrals and the loss of future foreclosure business.  (*Id.* ¶ 100.)  Because LPS evaluated Defendants based solely on speed and tied future referrals, and future revenue, to compliance with its swift deadlines, Plaintiffs plausibly allege that Defendants conducted foreclosures as part of a process that was plausibly detrimental to borrowers.

### (c)    Defendants' Six Misleading Letters

Lastly, Plaintiffs contend that the six misleading letters utilized by Defendants demonstrate that these compensation and rating systems actually swayed Defendants to work only in the interests of the Noteholder or Servicer as to foreclosure, rather than considering any interests held by the borrower.

Even measuring the discordant case law against a Virginia foreclosure system that allows swift, non-judicial action,[57] the Court cannot find that Defendants have established entitlement to dismissal at this early stage of pleading.  The Court will permit Plaintiffs' claim regarding the duty of impartiality to survive motion to dismiss scrutiny because, if the duty does exist, the compensation mechanisms, rating system, and misleading letters might plausibly implicate that duty.

---

[56] LPS tracked the speed in which the foreclosing law firms met LPS's timelines, which were often shorter than the investor's or lender's timelines.  (McBeth First Am. Compl. ¶ 100.) LPS issued "an 'Attorney Performance Rating'" "[b]ased on whether the firms complied with LPS timelines."  (*Id.*)  The Attorney Performance Rating failed to "take into account the quality with which the foreclosures [were] conducted."  (*Id.* ¶ 101.)

[57] As a non-judicial foreclosure state, Virginia law contemplates foreclosures within a certain period of time.  *See* Va. Code Ann. § 55-59.1(B) (West 2013) (permitting foreclosure sale fourteen days after written notice to the borrower that a note is lost or cannot be produced).

B.    **Plaintiffs Fail To Allege a Breach of the Duty of Notice**

The Court grants the Motion to Dismiss with respect to claims grounded in Defendants'

duty of notice[58] pursuant to Section 55-59.1(B) because the broad and plain language of Section

55-59.1(B) does not support Plaintiffs' preferred interpretation that a "beneficiary," here the

noteholder or lender, must first submit the Lost Note Affidavit before giving Written Notice of

Sale in Fourteen Days. The Court will dismiss the claimed breach of the duty of notice.

Plaintiffs continue to assert that Section 55-59.1(B) prevents a trustee from proceeding to sell the

property until after both the beneficiary submitted the Lost Note Affidavit and the beneficiary

provided Written Notice of Sale in Fourteen Days;[59] see *Vazzana v. CitiMortgage, Inc.*,

No. 7:12CV00497, 2013 WL 2423092, at *3-4 (W.D. Va. June 4, 2013) (granting motion to

dismiss when the Noteholder instituted foreclosure proceedings without sending plaintiff a lost

note letter complying with Section 55-59.1(B); holding that "[t]he statute 'contains no

requirement that the lost note affidavit that must be given to the trustee also be given to

Plaintiff'" (quoting *Van v. BAC Home Loan Servicing LP*, 4:10cv73, 2010 WL 9077597, at *3

---

[58] Paragraph 22 of the Deeds of Trust requires the "Lender or Trustee," when the Lender invokes the power of sale, to "give to Borrower, the owner of the Property, and all other persons, notice of sale as required by applicable law." (*See* McBeth First. Am. Compl. ¶ 272.)

[59] The Court already has found that the core of Plaintiffs' argument cannot stand. While counterintuitive to the notion that one would only send a notice if a note "genuinely" could not be found, the Virginia statute allows notice of a "lost" note to be sent if a note cannot be found "for any reason."
    The Court notes that, while it addresses other claims raised as to any Duty of Notice, § 55-59.1(C) provides that "[f]ailure to comply with the requirements of notice contained in this section [55-59.1] shall not affect the validity of the sale." Va. Code Ann. § 55-59.1(C) (West 2013). The Court cannot see how Defendants could breach any fiduciary duty of notice when the statute provides that any failure to comply has no effect on the validity of the sale.
    That said, the Court recognizes that Plaintiffs contend that Defendants breached their fiduciary duty of notice when they identified the Loan Servicers (and not the Noteholders) as the "beneficiaries" of the Note in the Lost/Unavailable Note Letter. Defendants allegedly did this in order to "expedite the foreclosure with the lowest cost structure." (McBeth First Am. Compl. ¶ 283.)

(E.D. Va. Sept. 23, 2010))); *Buzbee v. U.S. Bank, N.A.*, CL2010-11329, 2012 WL 7960035, at *4 (Va. Cir. Ct. May 2, 2012) ("[T]here is no statutory requirement concerning the timing of the Affidavit of Lost Note."). Because Plaintiffs fail, again, to state a claim based on a violation of this statute, this Court will dismiss this claim with prejudice.

Section 55-59.1(B), the "Applicable Law" invoked by Paragraph 22 of the Deeds of Trust, allows the equivalent of a L/UN Letter to be sent "If a note or other evidence of indebtedness secured by a deed of trust is lost or *for any reason cannot be produced* . . ." and it allows sale if *"the beneficiary has given written notice* to the person required to pay the instrument that the instrument is unavailable *and a request for sale will be made of the trustee upon expiration of 14 days.*" Va. Code Ann. § 55-59.1(B) (West 2013) (emphases added).

Because the plain language of the statute does not require that a beneficiary, usually the noteholder or lender, first submit the Lost Note Affidavit before giving notice of the sale, the Court will dismiss the claimed breach of the duty of notice. Plaintiffs continue to assert that Section 55-59.1(B) prevents a trustee from proceeding to sell the property until after both the beneficiary submitted the Lost Note Affidavit and the beneficiary provided Written Notice of Sale in Fourteen Days. Plaintiffs argue that Section 55-59.1(B)'s "triggering event" "is that the beneficiary first submit to the trustee [the Lost Note Affidavit]." (Pls.' Opp'n 11.) "Thus, before [Written Notice of Sale in Fourteen Days] is provided pursuant to Section 55-59.1(B), the beneficiary (or its agent) must submit [the Lost Note Affidavit]. Absent such events, a Trustee may not proceed to foreclose." (*Id.*) Plaintiffs contend that because the "triggering event" never occurred, i.e. because the beneficiary never submitted the Lost Note Affidavit, Defendants could not proceed to sale. (*Id.*)

Nothing in Section 55-59.1(B) discusses or references a "triggering event" and the plain language does not implicate a specific and rigid temporal sequence. Both the requirement of the Lost Note Affidavit and the requirement of the Written Notice of Sale in Fourteen Days must be satisfied by the time of the sale in order for the trustee to offer the property for sale on the premise that the note is lost or unavailable for any reason. However, the statute does not address the timing of either requirement in relation to the other nor in relation to the possibility that the trustee may send Written Notice of Sale in Fourteen Days while later obtaining the note. Therefore, the Court grants the Motion to Dismiss the duty of notice claim.

C.     **Plaintiffs Do Not Allege a Breach of the Duty to Advertise**

The Court grants the Motion to Dismiss with respect to Defendants' duty to advertise. Plaintiffs lack standing to challenge the alleged defective substitute trustee appointment and any potentially improper advertising. Further, Plaintiffs' own letters do not plausibly suggest that Defendants advertised the foreclosure sales "when they had no present right to do so" based on the advertising dates listed in the NOTS Letters. (McBeth First Am. Compl. ¶¶ 286-87, 290.)

Plaintiffs lack standing to challenge the defective or improper substitute trustee appointment. *See Bennett v. Bank of Am., N.A.*, No. 3:12CV34-HEH, 2012 WL 1354546, at *7 (E.D. Va. Apr. 18, 2012) ("Plaintiff does not have standing to challenge the validity of the [substitute trustee's] appointment."). Because Plaintiffs lack standing to contest the substitute trustee's appointment in the first instance, Plaintiffs cannot challenge how the allegedly improperly appointed substitute trustee exercised his or her obligations under the Deed of Trust, including the duty to advertise the foreclosure sale.

Secondly, Plaintiffs' own letters do not support the claim that Defendants advertised the sales when they had no present right to do so. The pertinent letters suggest that no advertising

41

took place until after the Substitution of Trustee occurred.  The NOTS Letters contained the Written Notice of Sale in Fourteen Days, including the scheduled sale date, and the advertisement dates.  Given that the advertisement dates post-date the substitute trustee appointments, the listed advertisement dates do not plausibly suggest that Defendants advertised the sale when they had no present right to do so.  (*See* Goodrow Second Am. Compl. Ex. L; McBeth First Am. Compl. Ex. M.)  Plaintiffs' Deeds of Trust all required the trustee to "give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located." (*See, e.g.,* Br. Supp. Ex. 1 ¶ 22.)  Defendants executed the Goodrow, Mbundure, Chatter, and Banks Substitution of Trustee document and then advertised the foreclosure sale of the properties.[60]  Plaintiffs' mere conclusory allegations to the contrary do not survive motion to dismiss scrutiny. *See Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 555-56, 570.

Therefore, the Court will deny the Motion to Dismiss with respect to the potential duty of impartiality, but will grant the Motion to Dismiss with respect to the duties of notice and to advertise.

---

[60] Because the Buels paid money to reinstate their mortgage loan, no sale occurred. Defendants advertised McBeth's foreclosure sale once a week for three successive weeks, on August 2, 2010, August 9, 2010, and August 16, 2010, despite the terms of her Deed of Trust only requiring the trustee to advertise the sale once a week for two successive weeks. (*See* McBeth First Am. Compl. Ex. M; Br. Supp. Ex. 6 ¶ 22.)  The McBeth Substitution of Trustee document, appointing Muncy and F&M as the Substitute Trustees, contains a July 27, 2010 date on the first page and an August 5, 2010 notary date on the second page. (*See id.* Ex M.)  While the August 2, 2010 foreclosure sale advertisement ran prior to the notary date on the Substitution of Trustee document, but still after the date on the first page, Defendants also advertised the sale once a week for two successive weeks after the notary date, satisfying the requirements of the McBeth Deed of Trust and making it implausible that Defendants advertised McBeth's foreclosure sale when they had no present right to do so.

**III.    The Court Dismisses the Civil RICO Count Since Plaintiffs Lack Standing to Assert a RICO Cause of Action Because They Do Not Sufficiently Allege Defendants' Conduct Proximately Caused Their Injuries Given the Evidence of Default on the Record**

The Court will grant the Motion to Dismiss Plaintiffs' RICO claim because Plaintiffs lack standing to assert a civil RICO claim. Plaintiffs' claim cannot survive Defendants' challenge that the record plausibly shows Plaintiffs' default served as a proximate cause to the harm they suffered. The documents forming the basis of the RICO claim, Defendants' misleading form letters, indicate Plaintiffs were in default.[61] Therefore, given RICO's heightened pleading standards, the Court will dismiss Count II with prejudice and will deny leave to amend because the Court already granted leave to amend once.[62]

**A.    Standard to Plead a Civil RICO Claim**

RICO provides a private right of action for treble damages to persons injured in their business or property as a result of a violation of RICO's criminal prohibitions contained in 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 987 (2010). "The showing required to succeed on a RICO charge in the Fourth

---

[61] *Goodrow II* noted "the plausibility that Plaintiffs ultimately lost their homes due to nonpayment." *Goodrow II*, 2012 WL 6725617, at *10 & n.12. Plaintiffs continue to deny that the Amended Complaints contain any allegations that Plaintiffs defaulted on their mortgage obligations. All Plaintiffs claim they experienced financial hardship and sought to prevent foreclosure. Plaintiffs do not allege that they otherwise complied with the terms of their Deeds of Trust or that they were not in default. The Court expressed concern with the artful pleading in the prior opinion and now declines to permit such pleading to save the deficient causation theory.

[62] In contrast, the Court has found, at the motion to dismiss stage, that despite a plausible default in some instances, some of Plaintiffs' FDCPA claims can survive. RICO and the FDCPA have different pleading standards and different statutory goals. The Court is unwilling to find that the FDCPA, which "protects consumers from abusive and deceptive practices by debt collectors," *Lembach*, 2013 WL 2501752, at *2 (quoting *Nat'l Fin. Servs., Inc.*, 98 F.3d at 135), excludes from protection those who face foreclosure because they owe a debt. The Court so finds because the status of the documents at bar plausibly contain material misrepresentations "in connection with the debt" and the Plaintiffs allege the documents themselves are not "otherwise correct." *Id.* at *4.

Circuit is both demanding and well-established," *Baker v. Sturdy Built Mfg., Inc.*,

No. 3:07CV212-HEH, 2007 WL 3124881, at *3 (E.D. Va. Oct. 23, 2007), because "Congress

contemplated that only a party engaging in widespread fraud would be subject to [RICO's]

serious consequences."[63] *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989).

"To state a claim under [18 U.S.C.] § 1962(c), [a plaintiff] must allege '(1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity.  Plaintiff[s] must additionally

show that (5) [they were] injured in [their] business or property (6) by reason of the RICO

violation.'" *Levinson v. Mass. Mut. Life Ins. Co.*, No. 4:06cv086, 2006 WL 3337419, at *6 (E.D.

Va. Nov. 9, 2006) (quoting *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003))

(second through fourth alterations in original).

**B.   Standing Requirements[64]**

The Fourth Circuit has found that the "by reason of" language in 18 U.S.C. § 1964(c)

"creates certain 'standing' requirements before one can attempt to state a claim under 18 U.S.C.

---

[63] The civil RICO claim is "extraordinary" and a plaintiff faces difficulty making the requisite showing because "Congress passed RICO because of concern over long-term criminal conduct." *Baker*, 2007 WL 3124881, at *3 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Where the alleged wrongdoing is "best labeled as consumer complaints rather than succinct legal claims of indictable mail and wire fraud," the claim fails. *Id.* at *3-4 (motion to dismiss civil RICO claim granted where plaintiffs' complaint "boil[ed] down to a series of contract disputes between a construction company and its disgruntled customers"). "'[C]ourts are cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'" *Id.* at *4 (quoting *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000)). Because "RICO was never intended to be applied to commonplace commercial controversies," the Court is unwilling to invoke RICO's serious consequences where the record plausibly discloses Plaintiffs' default and thus renders them unable to allege Defendants' predicate acts proximately caused their injuries. *Id.*

[64] In *Goodrow II*, which granted Defendants' prior motion to dismiss but also granted leave to amend, the Court presumed Plaintiffs satisfied RICO's standing requirements and addressed the substantive elements of a RICO claim. *See Goodrow II*, 2012 WL 6725617, at *10-12.

§ 1962." *Choimbol v. Fairfield Resorts, Inc.*, 428 F. Supp. 2d 437, 444 (E.D. Va. 2006) (citing

*Brandenburg v. Seidel*, 859 F.2d 1179, 1188 n.10 (4th Cir. 1988)).[65] "(1) [T]he plaintiff must

have detrimentally relied on the predicate acts of racketeering activity; (2) the predicate acts

must be the proximate cause of the injury to the plaintiff; and (3) the plaintiff must suffer actual

injury." *Id.* (citing *Brandenburg*, 859 F.2d at 1188 n.10). Here, the Plaintiffs cannot survive a

proximate cause analysis. For that reason, the RICO claim will be dismissed.[66]

### C.    Even at the Motion to Dismiss Stage, Plaintiffs' Causal Theory Is Too Attenuated and the Conduct Directly Causing Plaintiffs' Harm Is Plausibly Distinct From the Conduct Giving Rise to Defendants' Fraud

The Court cannot find that Plaintiffs satisfy RICO's standing requirements. The

documents Plaintiffs cite as giving rise to the RICO cause of action also state that they are in

default and thus make them unable to survive Defendants' challenge that the record indicates

their default served as the proximate cause to the harm they suffered. Without satisfying this

standing requirement, Plaintiffs cannot "attempt to state a claim under 18 U.S.C. § 1962,"

*Choimbol*, 428 F. Supp. 2d at 444, and become "vulnerable to a motion to dismiss" as a result of

failing to plausibly allege "an adequate causal nexus between that injury and the predicate acts of

racketeering activity." *Brandenburg*, 859 F.2d at 1187 (citations omitted).

---

[65] "The Supreme Court has explained these injury and causation requirements as aspects of standing, rather than elements of the civil RICO plaintiff's prima facie case." *Brandenburg*, 859 F.2d at 1187. "Under § 1962(c), a 'plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-97 (1985)). "In any event, it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, or an adequate causal nexus between that injury and the predicate acts of racketeering activity alleged." *Id.* (citations omitted).

[66] Because the Court concludes that Plaintiffs' allegations do not survive RICO causation analysis, the Court does not address the other facets of RICO standing or the substantive elements of a civil RICO claim.

## 1.   Causation Requirement

A plaintiff must allege "that [he or she was] proximately harmed by the RICO violation." *Foster v. Wintergreen Real Estate Co.*, No. 3:08cv00031, 2008 WL 4829674, at *4 (W.D. Va. Nov. 6, 2008) (citing 18 U.S.C. § 1964(c)). With respect to mail fraud and wire fraud, "a plaintiff must *plausibly* allege both that he detrimentally relied in some way on the fraudulent mailing or wire . . . and that the mailing or wire was a proximate cause of the alleged injury to his business or property." *Id.* (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233 (4th Cir. 2004)) (footnote omitted).

"Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations" and "requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirect[t]' is insufficient." *Hemi Group, LLC*, 130 S. Ct. at 989 (alteration in original) (citation omitted). The RICO action cannot lie where "the causal connection was considered too tenuous, and the plaintiff's theory ignored the more immediate causes of their injuries" and "[w]here the injuries were more appropriately attributable to intervening causes that were not predicate acts under RICO." *Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994) (citing *Brandenburg*, 859 F.2d at 1190).

## 2.   Plaintiffs' Causal Theory is Too Tenuous in Light of Default

Plaintiffs ask this Court to accept a causal theory that is likely "too remote," and "indirec[t]" in light of their own default. *Hemi Group, LLC*, 130 S. Ct. at 989 (alteration in original) (internal quotation marks omitted). Given the heightened pleading standard and extraordinary nature of the RICO claim, the Plaintiffs cannot survive a challenge that the "conduct directly responsible" for Plaintiffs' harm flows proximately from their default and not

the Defendants' alleged fraud, i.e. the preparation and use of allegedly fraudulent documents. Even taking into account the collective nature of the correspondence and its plausible potential to materially mislead the least sophisticated consumer when conducting an FDCPA analysis, in the RICO context, "the conduct directly causing the harm [here is] distinct from the conduct giving rise to the fraud." *Id.* at 990. Because Plaintiffs' own default and failure to abide by the terms of their Deeds of Trust plausibly resulted in Plaintiffs' harm, the Court cannot conclude that Plaintiffs satisfy RICO's standing requirements. No direct relationship exists between Defendants' conduct and Plaintiffs' harm. *See id.* at 991 ("[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").

Therefore, the Court grants the Motion to Dismiss with respect to the RICO claim and dismisses Count Two with prejudice.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court granted in part and denied in part Defendants' Motion to Dismiss the Amended Complaints by the Order entered July 9, 2013. The Court granted in part and denied part the Motion to Dismiss Count One. The Court granted the Motion to Dismiss the breach of any duty of notice or to advertise and dismissed those claims with prejudice. The Court denied the Motion to Dismiss the breach of any duty of impartiality claim. The Court granted the Motion to Dismiss and dismissed with prejudice Count Two, Plaintiffs' RICO claim. The Court denied in part and granted in part the Motion to Dismiss the FDCPA claim in Count Three. The Court held in abeyance any final ruling regarding the statute of limitations and ruling on the FDCPA class allegations.

It is so ORDERED.

                                       /s/
                                  M. Hannah Lauck
                            United States Magistrate Judge

Richmond, Virginia
Date: JUN 2 6 2013